# EXHIBIT 1

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                                          Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                    Chapter 11

      Debtor.

_____/

MICHAEL GOLDBERG, as Chapter 11
Trustee of the estate of Debtor, The Center for
Special Needs Trust Administration, Inc.

      Plaintiff,
                                                                Adv. Pro. No. 8:25-ap-00048-RCT

v.

BIG STORM REAL ESTATE LLC, BRIAR
CAPITAL REAL ESTATE FUND, LLC,
MJMRBM LLC and PEDRO FALCON,

      Defendants.

_____/

## AFFIDAVIT OF LEAH GOLDBERG IN SUPPORT OF BRIAR
## CAPITAL REAL ESTATE FUND, LLC'S MOTION FOR SUMMARY JUDGMENT

**STATE OF COLORADO**
**COUNTY OF DENVER**

      BEFORE ME, the undersigned authority, on this day personally appeared Leah Goldberg, known to me to be the person whose name is subscribed below, and who being duly sworn stated the following:

      My name is Leah Goldberg. I am over 18 years of age and am of sound mind. I have never been convicted of a felony and am fully competent to make this Affidavit. I have personal knowledge of the facts stated herein, and if called to testify I could and would testify to the following:

1

1.      I am the Chief Financial Officer of Briar Capital, L.P., a Texas limited partnership, which is the parent company of Briar Capital Real Estate Fund, LLC (collectively, "Briar Capital") and have served in that role since January 15, 2021. Prior to becoming CFO, I was a Senior Vice President – Underwriting, from June 17, 2019 through January 14, 2021.

2.      I am executing this affidavit in support of the Motion for Summary Judgment in the above-captioned adversary proceeding (the "Adversary Proceeding").

3.      Where indicated, I have personal knowledge of the facts set forth in this affidavit. I have also reviewed the business records of Briar Capital with respect to the loan made from Briar Capital and Big Storm Real Estate LLC ("BSRE") and Big Storm Pinellas LLC ("BSP") on or about September 18, 2020, as subsequently amended (the "Big Storm Loan," as more specifically described below), and various business records associated with the Big Storm Loan.  All of the business records described in this Affidavit were made at or near the time referenced herein — or from information transmitted by — someone with knowledge of their contents thereof. It is the practice and regularly conducted business activity of Briar Capital to make and keep such business records.

4.      I have personal knowledge of the facts and circumstances with respect to the origination of the Big Storm Loan, as I had primary responsibility for the closing of the Big Storm Loan on or about September 18, 2020, and the First Amendment (as described below). I have personal knowledge of and am familiar with the Second Amendment (as described below) and the servicing of the Big Storm Loan as further detailed in this affidavit.

5.      On September 18, 2020, Briar Capital made a loan to BSRE and BSP in the original principal amount of $2,500,000.00. On June 23, 2023, the amount of the Big Storm Loan was increased to $3,250,000.00 (the "Future Advance"). The Big Storm Loan is secured by the collateral as described in the loan documents described below (the "Big Storm Loan Documents"), including the real and personal property located at 12707 49th Street North, Clearwater, Florida 33762 (the "Pinellas Park Property").  The "Big Storm Loan Documents" include, without limitation, the following:

   a.  Term Note, dated as of September 18, 2020 executed by BSRE and BSP in favor of Briar Capital in the original principal amount of $2,500,000.00 (the "Original Note"), a true and correct copy of which is attached hereto as **Exhibit A**;

   b.  Loan Agreement dated as of September 18, 2020 by and among Briar Capital, BSRE and BSP (the "Loan Agreement"), a true and correct copy of which attached hereto as **Exhibit B**;

   c.  Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of September 18, 2020, executed by BSRE in favor of Briar Capital and recorded in the Official Records of Pinellas County, Florida (the "Official Records") on September 21, 2020, as Instrument # 2020280245 (the "Mortgage"), a true and correct copy of which is attached hereto as **Exhibit C**;

4917-7948-2956

d.  Security Agreement dated as of September 18, 2020 by and among Briar Capital, BSRE and BSP (the "Borrower Security Agreement"), a true and correct copy of which attached hereto as **Exhibit D**;

e.  Guaranty Agreement dated as of September 18, 2020 by BIG STORM BREWERY LLC, a Florida limited liability company ("Big Storm Brewery"), BIG STORM PASCO LLC, a Florida limited liability company ("Big Storm Pasco"), BIG STORM CAPE CORAL LLC, a Florida limited liability company ("Big Storm Cape Coral"), BIG STORM CIDER AND MEAD LLC, a Florida limited liability company ("Big Storm Cider and Mead"), BIG STORM COCKTAILS LLC, a Florida limited liability company ("Big Storm Cocktails"), and BIG STORM COFFEE COMPANY LLC, a Florida limited liability company ("Big Storm Coffee", together with Big Storm Brewery, Big Storm Pasco, Big Storm Cape Coral, Big Storm Cider and Mead, and Big Storm Cocktails, individually and collectively, the "Entity Guarantors") in favor Briar Capital (the "Entity Guaranty"), a true and correct copy of which is attached hereto as **Exhibit E**;

f.  Guaranty Agreement dated as of September 18, 2020 by LEO JOSEPH GOVONI (the "Govini") in favor of Briar Capital (the "Individual Guaranty"), a true and correct copy of which is attached hereto as **Exhibit F**;

g.  Security Agreement dated as of September 18, 2020 by and among Briar Capital and the Entity Guarantors (the "Entity Guarantor Security Agreement"), a true and correct copy of which is attached hereto as **Exhibit G**;

h.  Deposit Account Control Agreement dated as of September 18, 2020 by and among Briar Capital, BSRE and American Momentum Bank ("AMB") (the "DACA"), a true and correct copy of which is attached hereto as **Exhibit H**;

i.  Authorization Agreement for Direct ACH Payments (ACH Debits) dates as of September 18, 2020 by BSRE and BSP in favor of Briar Capital (the "ACH Agreement"), a true and correct copy of which is attached hereto as **Exhibit I**;

j.  Subordination, Non-Disturbance and Attornment Agreement dated as of September 18, 2020 by and among Briar Capital, BSRE and BSP (the "SNDA"), a true and correct copy of which is attached hereto as **Exhibit J**;

k.  UCC-1 Financing Statements and UCC-3 Financing Statement Amendments for BSRE, BSP and the Entity Guarantors (the "UCCs"), true and correct copies of which are attached hereto as **Exhibit K**;

l.  The First Amendment to Loan Agreement dated as of March 22, 2023 by and among Briar Capital, BSRE, BSP, Entity Guarantors and Govoni   (the "First Amendment"), a true and correct copy of which is attached hereto as **Exhibit L**;

m. Amended and Restated Term Note dated as of June 22, 2023 executed by

3

BSRE and BSP in favor of Briar Capital in the original principal amount of $3,250,000.00 (the "Amended Note"), a true and correct copy of which is attached hereto as **Exhibit M**; the Amended Note evidenced the Future Advance in the amount of $838,672.55;

n.  Second Amendment to Loan Agreement dated as of June 22, 2023 by and among Briar Capital, BSRE, BSP, Entity Guarantors and Govoni  (the "Second Amendment"), a true and correct copy of which is attached hereto as **Exhibit N**; and

o.  Notice of Future Advance and Receipt and First Amendment to Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of June 22, 2023, executed by BSRE in favor of Briar Capital and recorded in the Official Records on June 23, 2023, as Instrument # 2023164982 (the "Notice of Future Advance Mortgage"), a true and correct copy of which is attached hereto as **Exhibit O**.

6.     In connection with the origination of the Big Storm Loan, BSRE executed and delivered to Briar Capital and Officer's Certificate dated as of September 18, 2020 (the "BSRE Officer's Certificate"), a true and correct copy of which is attached hereto as **Exhibit P**.  The BSRE Officer's Certificate includes BSRE's Operating Agreement, establishes that Govoni was an officer of BSRE, that Govoni was duly authorized to execute any and all of the Big Storm Loan Documents, and included the unanimous written consent of the governing body BSRE to consummate the Big Storm Loan. Substantially similar officer's certificate were executed by BSP and the Guarantors confirming their authority to execute the Big Storm Loan Documents.

7.     Further, in the Loan Agreement, BSRE and BSP represented that each were "in compliance with any Law to which such Loan Party or any of is respective Properties are subject" and that "[n]o Borrower nor any Entity Guarantor will violate any Laws in any material respect. (Loan Agreement, §§ 3.08, 5.11). These representations were reaffirmed in the First Amendment (§ 5) and Second Amendment (§ 6).

8.     The Big Storm Loan was not made to finance the purchase of the Pinellas Park Property as alleged in the Trustee's Complaint. Rather, BSRE had owned the Pinellas Park Property since February 4, 2015 as to "BSRE Parcel 1" (as described in a special warranty deed from M.R. French to BSRE dated February 4, 2015, and recorded in the Official Records on February 10, 2015, as Instrument # 2015038146, in Book 18673, Page 477), and since September 14, 2016 as to "BSRE Parcel 2" (as described in a special warranty deed from Forty Ninth Street Real Estate to BSRE dated September 14, 2016, and recorded in the Official Records on September 16, 2016, as Instrument # 2016285343, in Book 19344, Page 605). Copies of the forgoing special warranty deeds are attached hereto as **Exhibit Q**.

9.     The terms of the Big Storm Loan and Big Storm Loan Documents, including all amendments thereto, were negotiated at arms' length, in good faith, and in a commercially reasonable manner.

4

10.     As part of Briar Capital's due diligence with respect to the Big Storm Loan, I personally visited the Pinellas Park Property on September 1, 2020 and met with representatives of BSRE and BSP, including Govoni. None of the due diligence conducted by Briar Capital prior to making the Big Storm Loan or the Future Advance indicated any fraudulent activity on the part of BSRE, BSP or Govoni.

11.     To the best of my knowledge, and consistent with Briar Capital's due diligence and the representations in the Big Storm Loan Documents, neither I nor anyone at Briar Capital had knowledge of any alleged fraudulent activity of Govoni in connection with the Debtor, BSP BSRE, BSP or an affiliated entity at the time the Big Storm Loan was originated, as of the date of the First Amendment, the Second Amendment, or at any other relevant time. Briar Capital first learned of Govoni's alleged fraudulent activity through the bankruptcy case and the allegations in the Complaint.

12.     A true and correct copy of the Closing Statement dated September 18, 2020 for the origination of Big Storm Loan is attached hereto as **Exhibit R** (the "Original Closing Statement"). The Original Closing Statement contains typical costs, expenses and disbursements for the origination of a commercial real estate loan.

13.     A true and correct copy of the Closing Statement dated June 22, 2023 for the modification and future advance as to the Big Storm Loan is attached hereto as **Exhibit S** (the "Future Avance Closing Statement"). The Future Closing Statement contains typical costs, expenses and disbursements for a modification and future advance of a commercial real estate Loan.

14.     The Big Storm Loan Documents require monthly payments of principal, interest, and if requested by Briar Capital, insurance and tax escrows. (Loan Agreement, §§ 2.03, 2.11). The monthly payment varies based on an adjustable interest rate equal to the *lower* of (i) the *greater* of (A) Term SOFR *plus* 9.34% per annum, and (B) the applicable Prime Rate *plus* 6.00% per annum, and (ii) the Maximum Rate. (Loan Agreement, § 2.03(a)). The index rate was modified in First Amendment from applicable LIBOR Rate *plus* 9.25% per annum to Term SOFR *plus* 9.34% per annum.

15.     Briar Capital maintains business records relating to the monthly payments made to Briar Capital pursuant to the Big Storm Loan Documents (the "Payment History"). A copy of the Payment History between BSRE and Briar Capital through November 1, 2024 is attached here to as **Exhibit T**. To reiterate, records of payments contained in the Payment History were made at or near the time the payments were made. It is the practice and regularly conducted business activity of Briar Capital to record and keep such payment records.

16.     Briar Capital took the security interests provided to it in the Big Storm Loan Documents for value and in good faith to secure the obligations under the Big Storm Loan Documents. Such value is evidenced by the contents of the Big Storm Loan Documents and the Closing Statements confirming that funds were advanced to BSRE and BSP. Briar Capital also took all payments made pursuant to the Big Storm Loan Documents for value and in good faith because they were in partial satisfaction of the debt evidenced by the Big Storm Loan Documents, and were consistent with the payments required by the Big Storm Loan Documents.

5

17.     To the best of my knowledge, and as indicated by the representations in the Big Storm Loan Documents, neither I nor anyone employed by Briar Capital had any knowledge that any payments made to Briar Capital pursuant to the Big Storm Loan Document were allegedly derived from fraudulently obtained funds. To the contrary, Briar Capital believed that payments were derived from revenue generated by the Pinellas Park Property.

18.     Briar Capital has not received a non-returned payment in connection with the Big Storm Loan since September 3, 2024. A payment tendered on October 4, 2024 was returned for insufficient funds. As of the date of this Affidavit, Briar Capital is owed approximately $4,000,000. Interest, fees, costs and expenses (including attorneys' fees and costs) continue to accrue.

*Leah Goldberg*

Leah Goldberg
Chief Executive Officer
Briar Capital Real Estate Fund, LLC

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned notary, on this the 12th day of June 2025, by Leah Goldberg, who is personally known to me ____, or produced Colorado Drivers as identification.

License # 152800274                    *[signature]* Notary Public

```
ALYSSA INGALLS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20224027406
MY COMISSION EXPIRES 07/13/2026
```

6

4917-7948-2956

# EXHIBIT A

# TERM NOTE

$2,500,000.00                          Houston, Texas                          As of September 18, 2020

FOR VALUE RECEIVED, BIG STORM REAL ESTATE LLC, a Florida limited liability company ("***Big Storm Real Estate***"), BIG STORM PINELLAS LLC, a Florida limited liability company ("***Big Storm Pinellas***"), and each other Person from time to time party hereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "***Borrowers***," and each individually, a "***Borrower***"), hereby promise to pay to the order of BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company ("***Lender***") on or before the Term Loan Maturity Date, the principal amount of $2,500,000.00, or so much thereof as may be disbursed and outstanding under this note, together with interest, as described in this note.

This note has been executed and delivered under, and is subject to the terms of, that certain Loan Agreement dated as of the date hereof (as amended, restated, supplemented, or otherwise modified from time to time, the "***Loan Agreement***"), between Borrower and the other parties from time to time parties thereto as "Borrowers", and Lender, and is the *Term Note* referred to in the Loan Agreement. Unless defined in this note, or the context requires otherwise, capitalized terms used in this note have the meanings given to such terms in the Loan Agreement. Reference is made to the Loan Agreement for provisions affecting this note regarding applicable interest rates, principal and interest payment dates, final maturity, voluntary and mandatory prepayments, acceleration of maturity, exercise of rights, payment of attorneys' fees, court costs and other costs of collection, certain waivers by Borrower and others now or hereafter obligated for payment of any sums due under this note, and security for the payment of this note. This note is a Loan Document and, therefore, is subject to the applicable provisions of ***Article VIII*** of the Loan Agreement, all of which applicable provisions are incorporated into this note by reference as if set forth in this note verbatim.

Specific reference is made to ***Section 8.06*** of the Loan Agreement for usury savings provisions.

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE DETERMINED SOLELY FROM WRITTEN AGREEMENTS, DOCUMENTS, AND INSTRUMENTS, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO SUCH WRITINGS. THIS NOTE, THE LOAN AGREEMENT, AND THE OTHER WRITTEN LOAN DOCUMENTS EXECUTED BY BORROWERS AND LENDER (OR BY ANY BORROWER FOR THE BENEFIT OF LENDER) REPRESENT THE FINAL AGREEMENT BETWEEN BORROWERS AND LENDER WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

THIS NOTE MUST BE CONSTRUED — AND ITS PERFORMANCE ENFORCED — UNDER TEXAS LAW.

***[Signature is on the following page.]***

10734051v2

EXECUTED as of the date first written above.

**BORROWERS:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By: _____
       Leo Joseph Govoni
       Manager


BIG STORM PINELLAS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

By: _____
       Leo Joseph Govoni
       Manager

Signature Page to Term Note

# EXHIBIT B

**LOAN AGREEMENT**

**between**

**BIG STORM REAL ESTATE LLC**
**and**
**BIG STORM PINELLAS LLC,**
*as Borrowers*

**and**

**BRIAR CAPITAL REAL ESTATE FUND, LLC,**
*as Lender*

**Dated September 18, 2020**

**Table of Contents**

**Page**

**ARTICLE I
GENERAL TERMS**

Section 1.01    Other Definitions..................................................................................... 1
Section 1.02    Accounting Principles ............................................................................. 1
Section 1.03    References to Documents......................................................................... 1
Section 1.04    Time ......................................................................................................... 1

**ARTICLE II
LOAN COMMITMENT AND TERMS**

Section 2.01    The Term Loan......................................................................................... 1
Section 2.02    Advance Procedure ................................................................................. 2
Section 2.03    Interest Rates and Payments................................................................... 2
Section 2.04    Late Charge ............................................................................................. 3
Section 2.05    Computation ............................................................................................ 3
Section 2.06    Voluntary Prepayments........................................................................... 3
Section 2.07    Mandatory Prepayments.......................................................................... 4
Section 2.08    General Payment Terms; Application of Payments. ................................ 4
Section 2.09    Fees ......................................................................................................... 5
Section 2.10    Waivers .................................................................................................... 6
Section 2.11    Escrow Fund............................................................................................ 6
Section 2.12    Certain Waivers Relating to Fair Market Value and Deficiencies ........... 6

**ARTICLE III
REPRESENTATIONS AND WARRANTIES**

Section 3.01    Existence, Power, and Authorization ...................................................... 8
Section 3.02    No Conflict, Lien, or Consent ................................................................ 8
Section 3.03    Financial Condition................................................................................. 8
Section 3.04    Liabilities, Litigation, and Default ......................................................... 8
Section 3.05    Taxes ....................................................................................................... 8
Section 3.06    Titles, Collateral, Permits....................................................................... 9
Section 3.07    Use of Proceeds....................................................................................... 9
Section 3.08    Compliance with the Law ....................................................................... 9
Section 3.09    Subsidiaries; Equity Interests................................................................. 9
Section 3.10    Status of Mortgaged Property ................................................................ 9
Section 3.11    Foreign Person ...................................................................................... 10
Section 3.12    Leases..................................................................................................... 10
Section 3.13    Benefit of Term Loan Proceeds ............................................................ 11

**ARTICLE IV
AFFIRMATIVE COVENANTS**

Section 4.01    Financial Statements and Reports ......................................................... 11
Section 4.02    Compliance with Laws; Payment of Taxes and Other Claims................ 13
Section 4.03    Maintenance; Improvements to Mortgaged Property............................. 14
Section 4.04    Performance of Obligations ................................................................... 14

i

Section 4.05    Reimbursement of Expenses ................................................................ 14
Section 4.06    Insurance ............................................................................................ 15
Section 4.07    Right of Inspection; Appraisals ........................................................... 17
Section 4.08    Leases; SNDAs .................................................................................. 18
Section 4.09    Further Assurances .............................................................................. 19
Section 4.10    Segregated Account ............................................................................ 19

## ARTICLE V
## NEGATIVE COVENANTS

Section 5.01    Debts, Guaranties and Other Obligations............................................... 19
Section 5.02    Liens.................................................................................................. 20
Section 5.03    Investments, Loans and Advances ........................................................ 20
Section 5.04    Restricted Payments ............................................................................ 20
Section 5.05    Disposition of Properties ..................................................................... 21
Section 5.06    Nature of Business, Ownership, Management ....................................... 21
Section 5.07    Mergers, Consolidations, Acquisition, Etc............................................ 21
Section 5.08    Changes in Accounting Method or Fiscal Year ..................................... 21
Section 5.09    Transactions With Affiliates ................................................................ 21
Section 5.10    Use of Proceeds.................................................................................. 21
Section 5.11    Compliance with Laws ........................................................................ 21
Section 5.12    Management Fees................................................................................. 21
Section 5.13    Minimum Tangible Net Worth.............................................................. 22

## ARTICLE VI
## EVENTS OF DEFAULT

Section 6.01    Events................................................................................................ 22
Section 6.02    Remedies............................................................................................ 24
Section 6.03    Right of Set-off .................................................................................. 24

## ARTICLE VII
## CONDITIONS

Section 7.01    Conditions to Term Loan ..................................................................... 24
Section 7.02    Conditions to All Advances ................................................................. 26

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01    Notices .............................................................................................. 26
Section 8.02    Amendments, Waivers, Cumulative Rights ........................................... 26
Section 8.03    Invalidity ........................................................................................... 27
Section 8.04    Successors and Assigns; Survival ......................................................... 27
Section 8.05    Participations ..................................................................................... 27
Section 8.06    Maximum Rate.................................................................................... 27
Section 8.07    Multiple Originals ............................................................................... 28
Section 8.08    Governing Law and Jurisdiction ........................................................... 28
Section 8.09    No Third-Party Beneficiaries ............................................................... 29
Section 8.10    Release of Liability ............................................................................. 29
Section 8.11    INDEMNIFICATION.......................................................................... 29
Section 8.12    **Waiver of Trial by Jury** ................................................................. 30

Section 8.13    Joint and Several Liability; Cross-Guaranty; Borrower Representative. ................. 30
Section 8.14    Loan Agreement Controls. ..................................................................................... 31
Section 8.15    Collateral Protection Insurance. ............................................................................ 31
Section 8.16    **Final Agreement**. .............................................................................................. 32

## SCHEDULES, APPENDICES, AND EXHIBITS

Schedule 1        Land
Schedule 3.09     Company Information; Equity Interests
Appendix 1        Other Defined Terms

Exhibit A         Form of Term Note

**LOAN AGREEMENT**

THIS LOAN AGREEMENT (this "***Agreement***") is made and entered into as of September 18, 2020, by and between BIG STORM REAL ESTATE LLC, a Florida limited liability company ("***Big Storm Real Estate***"), BIG STORM PINELLAS LLC, a Florida limited liability company ("***Big Storm Pinellas***"), and each other Person from time to time party hereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "***Borrowers***," and each individually, a "***Borrower***"), as borrowers, and BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company (together with its successors and assigns, "***Lender***"), as lender.

**RECITALS**

A.      Borrowers have requested that Lender extend credit to Borrowers in the form of a term loan facility.

B.      Lender is willing to extend the requested credit on the terms and conditions of this Agreement.

Accordingly, for and in consideration of the premises, mutual covenants and agreements set out in this Agreement, Borrowers and Lender agree as follows:

**ARTICLE I**
**GENERAL TERMS**

Section 1.01      <u>Other Definitions</u>.  Capitalized terms used but not defined in this Agreement shall have the respective meanings given such terms in the UCC.  All references to "Borrower" herein shall mean any or all of the Persons identified in the Preamble above as a "Borrower."  Other defined terms used in this Agreement are set out on ***Appendix 1***.

Section 1.02      <u>Accounting Principles</u>.  Accounting principles are applied under this Agreement in accordance with GAAP on a "consistent basis" when the accounting principles applied in a current period are comparable in all material respects to those accounting principles applied in a preceding period.

Section 1.03      <u>References to Documents</u>.  Unless otherwise expressly provided in this Agreement, (a) references to corporate formation or governance documents, contractual agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements, substitutions, and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document, and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.04      <u>Time</u>.  Unless otherwise indicated, all time references (e.g., 11:00 a.m.) are to Central time (daylight or standard, as applicable).

**ARTICLE II**
**LOAN COMMITMENT AND TERMS**

Section 2.01      <u>The Term Loan</u>.  Subject to the terms and conditions of this Agreement, Lender agrees to make a term loan to Borrowers in an amount equal to the Maximum Loan Amount in a single

Loan on the Closing Date which, when paid or prepaid, may not be reborrowed (the "***Term Loan***"). Lender's Commitment to lend under the Term Loan shall expire on the Closing Date.

Section 2.02    Advance Procedure.

(a)    Lender shall make the Advance under the Term Loan available to Borrowers by funding such Advance into an escrow account maintained with the applicable title company that is handling the closing of the Term Loan, or by funding the amount thereof directly into the Segregated Account (after deducting the payment of all closing fees and expenses and the amounts necessary to fund the Escrow Fund).

(b)    Lender may, but shall not be obligated to, (i) make one or more Advances (each such Advance, a "***Protective Advance***") for any reason at any time in its sole discretion, without Borrowers' compliance with any of the conditions of this Agreement and without the consent of any Borrower, and regardless of whether any Default or Event of Default has occurred and is continuing or whether such Advance would constitute an Overadvance, (ii) disburse the proceeds of any Protective Advance directly to third Persons in order to protect or preserve Lender's interest in the Collateral or to perform any obligation of any Loan Party under this Agreement or any other Loan Document, or otherwise to enhance the likelihood of repayment of the Obligation, and/or (iii) apply the proceeds of any Protective Advance to the Obligation then due and payable in such order as Lender may elect in its sole discretion.  All Protective Advances shall be treated as Advances under this Agreement for all purposes, shall constitute part of the Obligation, shall be payable upon demand, and unless otherwise agreed by Lender, shall accrue interest at the Default Rate until repaid.

(c)    No Protective Advance made by Lender is intended to, and no Protective Advance shall, operate as a waiver of any rights or remedies of Lender, and does not (and will not) constitute or operate as (i) a waiver of (or a consent to) any such Default or Event of Default, or any other default, event of default, or other violation of, or noncompliance with, any covenant, term, condition, or other provision of this Agreement or any of the other Loan Documents, (ii) an agreement to waive any existing or future Default or Event of Default, or to forebear from exercising any rights or remedies or otherwise refrain from taking any action with respect to any existing or future Default or Event of Default, (iii) a waiver by Lender of any of its rights and remedies, whether under this Agreement, the other Loan Documents, at Law, in equity, or otherwise, or (iv) a waiver of Lender's right to insist upon strict compliance with each term, covenant, condition and provision of this Agreement and the other Loan Documents.

Section 2.03    Interest Rates and Payments.  The Term Principal Amount shall accrue interest at the following rates and principal and interest shall be due and payable, subject to ***Section 6.02***, as follows:

(a)    The Term Principal Amount shall accrue interest at an annual rate equal to the *lower* of (i) the *greater* of (A) the applicable LIBOR Rate *plus* 9.25% per annum, and (B) the applicable Prime Rate *plus* 6.00% per annum, and (ii) the Maximum Rate.

(b)    The LIBOR Rate and the Prime Rate shall be adjusted on the first day of each month.  For each month, the LIBOR Rate and the Prime Rate shall be determined using the LIBOR Rate or the Prime Rate, as applicable, in effect on the immediately preceding Interest Determination Date, and such rate or rates shall continue in effect until the first day of the next month.

(c)     Upon the occurrence of a Default or an Event of Default (regardless of whether the Obligation has been accelerated), principal, past due interest, fees, and expenses (in each case, to the extent permitted by Law) in respect of the Obligation shall accrue interest at an annual rate equal to the Maximum Rate (the "*Default Rate*").  Interest calculations are subject to certain recapture provisions set out herein.

(d)     Payments of principal and accrued and unpaid interest on the Term Loan in the amount of $23,303.28 are due and payable monthly on the first day of each month, beginning November 1, 2020 and continuing through the Term Loan Maturity Date.  The remaining Term Principal Amount, together with all accrued and unpaid interest, and any other portion of the Obligation that remains outstanding, is due and payable in full on the Term Loan Maturity Date. Lender shall have the right, in its sole discretion, to re-amortize any payments hereunder to account for or otherwise reflect any interest rate fluctuations.

(e)     Each Borrower hereby irrevocably authorizes and instructs Lender to make payments of any amounts payable under or in connection with this Agreement or any other Loan Document by debiting any Borrower's deposit accounts, by an automated clearing house (ACH) process, or by Lender making an Advance (which amount shall be, in Lender's sole discretion, added to the Term Principal Amount).  Each Borrower shall enter into an ACH Agreement. Borrowers shall not allow the balance of any deposit account subject to such ACH Agreement to exceed the maximum amount of deposit insurance therefor available through the FDIC.  No Borrower will change or modify the terms of any ACH Agreement without the prior written consent of Lender.  If Lender determines that the bank that is party to any ACH Agreement or at which any funds of any Borrower are deposited is unacceptable for any reason, such Borrower shall, upon written notice from Lender, transfer Borrower's cash balances and deposit account relationship to a bank acceptable to Lender.

Section 2.04     <u>Late Charge</u>.  If any payment required under this Agreement, any Note, or any other Loan Document is not paid within ten (10) days after such payment is due, then Borrowers shall pay a late charge to Lender equal to ten percent (10.0%) of the amount of such payment to compensate Lender for administrative expenses and other costs associated with delinquent payments.  Such late charge shall be immediately due and payable and shall be in addition to, and not in lieu of, all other rights and remedies available to Lender.  The ten (10) day period referenced in this *Section 2.04* shall not be construed in any way as extending the due date of any payment.

Section 2.05     <u>Computation</u>.  Interest on the Obligation will be calculated on the basis of actual number of days elapsed (including the first day but excluding the last day), but computed as if each calendar year consisted of 360 days (unless computation would result in an interest rate in excess of the Maximum Rate, in which event the computation is made on the basis of a year of 365 or 366 days, as the case may be).  All interest rate determinations and calculations by Lender, as applicable, are conclusive and binding, absent manifest error.

Section 2.06     <u>Voluntary Prepayments</u>.

(a)     Notwithstanding anything in this Agreement or in any other Loan Document to the contrary, Borrowers shall not be entitled to voluntarily prepay, refinance, or otherwise repay or defease any portion of the Term Principal Amount prior to the scheduled due date or maturity thereof except as expressly provided in this *Section 2.06*.

(b)     Borrowers shall have the right to prepay the Term Principal Amount only if the following conditions are satisfied:  (i) Borrower Representative provides written notice to Lender

3

of Borrowers' intention to fully repay the Obligation not less than ten (10) days prior to the date of such prepayment; (iii) such prepayment is in full payment of the outstanding Obligation; (iv) such prepayment occurs on a scheduled payment date; and (v) Borrowers shall pay to Lender the amount of the Early Termination Fee.

Section 2.07    Mandatory Prepayments.

(a)    If the Term Principal Amount at any time exceeds the Maximum Loan Amount (as such amount may be adjusted from time to time in accordance with the terms of this Agreement), then Borrowers shall immediately repay the Term Principal Amount, in at least the amount of that excess, together with all accrued and unpaid interest on the Term Principal Amount so repaid.

(b)    If the value of the Mortgaged Property decreases (as evidenced by the most recent appraisal thereof), then Lender shall give notice to Borrower Representative and within thirty (30) days of such notice, Borrowers shall (a) provide additional Collateral to Lender, which Collateral shall have a value acceptable to Lender (as determined by Lender in its sole discretion) and shall be otherwise acceptable to Lender in all respects, (b) prepay the Term Principal Amount by an amount requested by Lender, or (c) take such other action as Lender may request in its reasonable credit judgment.

(c)    Borrower shall pay the following amounts to Lender on the date such amounts are received by, or for the account of, any Borrower, in each case in the form received and with any necessary endorsements or assignments:

(i)    100% of all Net Proceeds from insurance in respect of any casualty event affecting any Collateral;

(ii)    100% of all Net Proceeds from an Eminent Domain Event affecting any Collateral; and

(iii)    100% of the Net Proceeds from the Disposition of any Collateral.

Notwithstanding the foregoing, provided that no Default or Event of Default has occurred and is continuing, Lender may, in its sole discretion, release all or any portion of any Net Proceeds described in *clause (i)* above to Borrowers, and Borrowers shall use such Net Proceeds payable in respect of any (A) casualty event to repair or restore the applicable Collateral, and (B) business interruption or loss of business income to continue regular and customary business operations.

Section 2.08    General Payment Terms; Application of Payments.

(a)    Except as otherwise expressly provided in this Agreement (i) all payments by Borrowers under this Agreement shall be made to Lender in Dollars and in immediately available funds not later than 1:00 p.m. on the date specified herein, and (ii) all payments received by Lender after 1:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  All payments to be made by Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.

(b)     If any payment or prepayment to be made by Borrowers shall come due on a day other than a Business Day, payment shall be made on the next Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)     All payments shall be applied in the following order:  (i) to all fees, expenses, late charges, collection costs, and other charges, costs and expenses for which Lender has not been paid or reimbursed under the Loan Documents; (ii) to accrued and unpaid interest on the Term Principal Amount; (iii) to the remaining Term Principal Amount in the order Lender elects; and (iv) to the remaining Obligation in the order and manner Lender elects, with any remaining balance payable to Borrowers or any other applicable Person entitled thereto under applicable Law.

(d)     All prepayments shall be applied as specified in **Section 2.08(c)**, *provided that*, if an Event of Default has occurred and is continuing, all payments or prepayments shall be applied to the Obligation in the order and manner Lender elects in its sole discretion.  All proceeds of Collateral from the exercise of any rights shall be applied among principal, interest, fees, expenses, late charges, collection costs, and other charges, costs and expenses, which have not been paid or reimbursed under the Loan Documents, at the sole discretion of Lender.

Section 2.09    Fees.

(a)     Early Termination Fee. If (i) payment of the Term Principal Amount is accelerated by Lender upon the occurrence of an Event of Default, or (ii) the Term Principal Amount (or any portion thereof) is prepaid, refinanced, or otherwise paid prior to the scheduled due date therefor or maturity thereof, then in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of Lender's lost profits as a result thereof, Borrowers shall pay Lender upon the effective date of such prepayment a fee (the "**Early Termination Fee**") which shall be calculated as follows: (A) four percent (4%) of the Maximum Loan Amount if the prepayment occurs on or before September 18, 2021; (B) three percent (3%) of the Maximum Loan Amount if the prepayment occurs after September 18, 2021, but on or before September 18, 2022; or (C) two (2%) of the Maximum Loan Amount if the prepayment occurs after September 18, 2022.  The Early Termination Fee shall be presumed to be the amount of damages sustained by Lender as the result of an early termination, and Borrowers acknowledge that it is reasonable under the circumstances currently existing.  The fee provided for in this **Section 2.09(a)** shall be deemed included in the Obligation.

(b)     Closing Fee.  Borrowers shall pay to Lender a closing fee in the amount of $25,000.00, which fee shall be fully non-refundable and duly earned and payable on the Closing Date.

(c)     Fees Generally. To the extent permitted by Law, the fees described in this **Section 2.09** (i) do not constitute compensation for the use, detention, or forbearance of money, (ii) are in addition to, and not in lieu of, interest and expenses otherwise described in this Agreement or in any other Loan Document, (iii) are payable without offset, counterclaim or deduction, and in funds that will be available for immediate use by 1:00 p.m. on the date due, (iv) are fully earned and are non-refundable, (v) accrue interest, if not paid when due, at the Default Rate, and (vi) are calculated on the basis of actual number of days elapsed (including the first day but excluding the last day), but computed as if each calendar year consisted of 360 days (unless computation would result in an interest rate in excess of the Maximum Rate, in which

event the computation is made on the basis of a year of 365 or 366 days, as the case may be).  The fees described in this ***Section 2.09*** are in all events subject to the provisions of ***Section 8.06***.

Section 2.10     Waivers.  Borrowers and each surety, Guarantor, endorser, and other party ever liable for payment of any sums of money payable pursuant to this Agreement jointly and severally waive notice, presentment, demand for payment, protest, notice of protest and non-payment or dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, diligence in collecting, grace, and all other formalities of any kind, and consent to all extensions without notice for any period or periods of time and partial payments, before or after maturity, and any impairment of any collateral securing this Agreement, all without prejudice to Lender.

Section 2.11     Escrow Fund.  Borrowers shall pay to Lender at closing an amount equal to (a) three (3) months in respect of insurance premiums, and (b) ten (10) months of the estimated ad valorem taxes to be paid in connection with the ownership of the Mortgaged Property for 2020.  Thereafter, Borrowers shall pay an amount equal to (i) one-twelfth (1/12) (or such other amount as may be required by Lender) of the amount which would be sufficient to pay the Property Taxes and the Other Charges which are payable, or estimated by Lender to be payable, during the following period of twelve (12) months, plus (ii) if requested by Lender, one-twelfth (1/12) (or such other amount as may be required by Lender) of the amount which would be sufficient to pay the insurance premiums (which amounts may be estimated by Lender) for the renewal of the insurance policies for the Mortgaged Property or otherwise required under the Loan Documents.  The Escrow Fund, together with the payments of interest and principal required under this Agreement, shall be added together and shall be paid as an aggregate sum by Borrowers to Lender.  Each Borrower hereby pledges to Lender any and all monies now or hereafter deposited in the Escrow Fund as additional security for the Obligations.  Lender will apply the Escrow Fund to payments of Property Taxes, insurance premiums, and Other Charges to the extent Lender elects to do so in its sole discretion.  If the Escrow Fund is not sufficient to pay any such Property Taxes, insurance premiums, or Other Charges, Borrowers shall promptly pay to Lender, upon demand, an amount that Lender shall estimate as sufficient to make up the deficiency.  Upon the occurrence of an Event of Default, Lender may apply any sums then on deposit in the Escrow Fund to the payment of the following items in any order in Lender's sole discretion:

(A)     Property Taxes;

(B)     insurance premiums;

(C)     Other Charges; and

(D)     the Obligation.

Until expended or applied as above provided, any amounts in the Escrow Fund shall constitute additional security for the Obligation.  The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender.  No earnings or interest on the Escrow Fund shall be payable to Borrowers.

Section 2.12     Certain Waivers Relating to Fair Market Value and Deficiencies.

(a)     If the Mortgaged Property is sold at a foreclosure sale pursuant to the terms of the Mortgage and the sales price results in a deficiency, Borrowers knowingly, intelligently, and voluntarily waives Borrowers' rights to request a judicial finding of the fair market value of the real property as of the date of the foreclosure sale as a defense or set-off against any deficiency.  Without limiting the foregoing, notwithstanding the provisions of §§ 51.003, 51.004 and 51.005

6

of the Texas Property Code (as amended from time to time) or any other applicable Law, and to the extent permitted by Law, Borrowers agree that Lender shall be entitled to seek a deficiency judgment from Borrowers and any other Loan Party equal to the difference between the Obligation and the amount for which the Mortgaged Property was sold pursuant to a judicial or non-judicial foreclosure sale.  Borrowers expressly recognize that this *Section 2.12* constitutes a waiver of the above-cited provisions of the Texas Property Code and any other applicable Law which would otherwise permit Borrowers independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of any Mortgaged Property as of the date of foreclosure and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value.  Borrowers further recognize and agree that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by any Borrower or any other Loan Party against whom recovery of a deficiency is sought.  The foregoing to the contrary notwithstanding, nothing herein shall prevent Lender from pursuing its remedies directly against any Loan Party prior to any foreclosure.  Alternatively, in the event the waiver provided for herein is determined by a court of competent jurisdiction to be unenforceable, then notwithstanding the provisions of §§ 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time) or any other applicable Law, and to the extent permitted by Law, Borrowers agree that Lender shall be entitled to seek a deficiency judgment from Borrowers and each other Loan Party equal to the difference between the Obligation and the fair market value of the Mortgaged Property.  The provisions of *Section 2.12(b)* shall be the basis for the finder of fact's determination of the fair market value of the Mortgaged Property as of the date of the foreclosure sale in proceedings governed by §§ 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time) or any other Applicable Law.

(b)     This *Section 2.12(b)* shall apply in the event an arbitrator or court of competent jurisdiction determines that the waiver by Borrowers set out in *Section 2.12(a)* is unenforceable.  Borrowers stipulate and agree that for purposes of determining the fair market value of any Mortgaged Property (or any portion thereof), as such term is used in Section 51.003 of the Texas Property Code (as amended from time to time) or any other applicable Law, which is sold at a non-judicial foreclosure sale pursuant to the terms of any Deed of Trust or Mortgage (and in accordance with Section 51.002 of the Texas Property Code) or other applicable Law, the following factors shall be used to determine such Mortgaged Property's fair market value, for such purposes:  (a) the Mortgaged Property shall be valued "AS IS" without any value being anticipated for any improvements or refurbishing to be conducted, or constructed, after the date of the foreclosure sale; (b) the intention of the purchaser to re-sell the Mortgaged Property promptly, without any extensive holding period; (c) any re-sale shall be for cash only, without financing by the seller; (d) all reasonable costs of closing a re-sale shall be deducted from the estimate of fair market value, such as attorneys' fees, title policy premiums, surveyor fees and expenses, the then prevailing broker's or salesman commission, and unpaid ad valorem tax amounts; and (e) the application of a discount to the value to be applied to any future sales price to arrive at its then current fair market value.  Borrowers further stipulate that any value given to any Mortgaged Property in connection with the closing of the Term Loan or at any other time or times, shall not be used and shall not be considered for guidance in determining the fair market value of such Mortgaged Property on the date of any such foreclosure sale.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

On the Effective Date, and until the Obligation is indefeasibly paid in full and the Commitment has been irrevocably terminated, Borrowers and the other Loan Parties make the following representations and warranties and each request for an Advance constitutes a renewal of these representations and warranties as of the date of the request:

Section 3.01    Existence, Power, and Authorization.  Each Borrower and each Entity Guarantor is (a) duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it is organized and in which it transacts business, (b) duly authorized to execute, deliver and perform this Agreement and the other Loan Documents, to which each is a party, and (c) has taken all actions to authorize the due execution, delivery and performance of this Agreement and the other Loan Documents to which such Borrower is a party.

Section 3.02    No Conflict, Lien, or Consent.  The execution of this Agreement and the other Loan Documents to which each Borrower and each Entity Guarantor is a party does not violate any provisions of the Organizational Documents of any such Borrower or Entity Guarantor or any material agreement to which any Borrower or any Entity Guarantor is a party, will not result in the creation or imposition of any lien upon any Properties of any Borrower or any Entity Guarantor, and does not require the consent or approval of any other Person, including, without limitation, any Governmental Authority.

Section 3.03    Financial Condition.

(a)    No Material Adverse Event has occurred which has not been disclosed to Lender in writing.

(b)    None of the financial statements, reports, rent rolls, projections, forecasts, or other information (collectively, the "***Closing Financial Statements***") furnished by any of the Loan Parties to Lender reflecting the Loan Parties' condition as of the most recently ended fiscal quarter ending at least 45 days before the Effective Date, or to be furnished by any of the Loan Parties to Lender with respect to the Loan Parties contain, as of their respective dates, any untrue statement of material fact or omit to state any material fact necessary to make the information therein not misleading.

(c)    Each Borrower and each other Loan Party, on an individual basis, is Solvent and will continue to be Solvent after the execution and performance by each Borrower of this Agreement and the funding of the Term Loan.

Section 3.04    Liabilities, Litigation, and Default.  Except as described in the Closing Financial Statements, or as otherwise disclosed to Lender in writing, no Borrower nor any other Loan Party (a) has any material liabilities, direct or contingent, (b) has any litigation or other action of any nature pending or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party, or (c) is in default under any indenture, mortgage, deed of trust, agreement or other instrument to which such Loan Party is a party or by which such Loan Party is bound (including this Agreement and the other Loan Documents).

Section 3.05    Taxes.  Each Loan Party has filed all tax returns and reports it is required to file and has paid all Property Taxes and other taxes (including, but not limited to, income taxes, franchise taxes, and property and other ad valorem taxes) which have become due and payable.

Section 3.06    Titles, Collateral, Permits.    Each Borrower and each Entity Guarantor has (a) indefeasible title to its real property, (b) a vested leasehold interest in all of its leased property, and (c) good and marketable title to its personal property, all as reflected on the Current Financials and, in each case such title is free and clear of all liens except for Permitted Liens.  All Collateral required under the Loan Documents is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except for Permitted Liens.  Each Borrower and each Entity Guarantor possesses all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade name rights, patent rights, copyrights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

Section 3.07    Use of Proceeds.    The proceeds of the Term Loan will be used by Borrowers (a) to further develop and make improvements to the Mortgaged Property in accordance with **Section 4.03(c)**, (b) to finance the construction of improvements having an aggregate cost of up to $450,000 at other locations or owned by Big Storm Real Estate, (c) for working capital, and (d) for other lawful purposes expressly permitted under **Section 3.13**.  None of such proceeds will be used for, and no Borrower is engaged in, the business of extending credit for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 221).

Section 3.08    Compliance with the Law.    Each Loan Party (a) is in compliance with any Law to which such Loan Party or any of its respective Properties are subject, including, but not limited to, RICO and the Anti-Terrorism Laws, and (b) is in compliance in all material respects with the applicable provisions of ERISA, and no "reportable event," as such term is defined in Section 4043 of ERISA, has occurred with respect to any ERISA Plan of such Loan Party.  None of the execution, delivery, and performance of this Agreement nor any of the other Loan Documents, nor the use of proceeds of the Advances, will violate the Trading with the Enemy Act, as amended, or any of the foreign asset control regulations of OFAC or any enabling legislation or executive order relating thereto.  No Loan Party (nor any Person owning an Equity Interest in any Loan Party) (i) is in violation of any of the country or list-based economic and trade sanctions administered and enforced by OFAC, (ii) is a Prohibited Person, (iii) engages in any transactions or dealings with any Prohibited Person, (iv) has any assets located in or with any Prohibited Person, or (v) derives revenues from investments in, or transactions with, any Prohibited Person.  Each Loan Party is in compliance, in all material respects, with the Patriot Act.

Section 3.09    Subsidiaries; Equity Interests.    Borrowers have no Subsidiaries.  For each Borrower, **Schedule 3.09** sets out such Borrower's name, the address of its chief executive office, U.S. taxpayer identification number, entity type and jurisdiction of organization, the amount of issued and outstanding Equity Interests of such Borrower, and the names of the owners of its Equity Interests.  Except as set forth on **Schedule 3.09**, there are no outstanding subscriptions, warrants, options, calls, commitments, convertible securities or other agreements to which a Borrower is a party or by which it is bound, calling for the issuance of any Equity Interests or securities convertible or exchangeable into Equity Interests of such Borrower.

Section 3.10    Status of Mortgaged Property.

(a)    Borrowers have obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Mortgaged Property and the conduct of their respective businesses and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and are not subject to revocation, suspension, forfeiture or modification.

(b)     The Mortgaged Property and the present and contemplated use and occupancy thereof is in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other applicable Laws.

(c)     The Mortgaged Property is served by all utilities required for the current or contemplated use thereof.  All utility services for the Mortgaged Property are provided by public utilities.

(d)     All public roads and streets necessary for service of and access to the Mortgaged Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public.

(e)     The Mortgaged Property is free from damage caused by fire or other casualty.

(f)     All costs and expenses of any and all labor, materials, supplies and equipment used in the construction, development, or repair of any portion of the Mortgaged Property have been paid in full.

(g)     Borrowers have paid in full for, and are the owners of, all furnishings and fixtures used in connection with the operation of the Mortgaged Property (other than moveable equipment), free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created hereby.

(i)     No portion of the Mortgaged Property is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Regulations.

(j)     All of the Improvements lie within the boundaries of the Land and do not encroach on any adjoining property.

(k)     The Mortgaged Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting Mortgaged Property, and no other such land or improvements are assessed and taxed together with the Mortgaged Property or any portion thereof.

Section 3.11     Foreign Person.  No Borrower is a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations.

Section 3.12     Leases.  Except for the Big Storm Pinellas Lease, there are no Leases in place as of the Closing Date.  Without limiting the provisions of **Section 4.08**, with respect to the Big Storm Pinellas Lease and any other Lease that any Borrower enters into after the Closing Date, Borrowers represent and warrant that (a) the applicable Borrower is the sole landlord or lessor under each of the Leases now in existence; (b) the Leases are valid and enforceable and are in full force and effect; (c) no party under the Leases is in default (except that the agreement of Big Storm Real Estate to abate rental payments under the Big Storm Pinellas Lease, consistent with past practices, shall not constitute a breach of this *clause (c)*); (d) all rentals due and payable under the Leases have been paid or otherwise satisfied in full (except that the agreement of Big Storm Real Estate to abate rental payments under the Big Storm Pinellas Lease, consistent with past practices, shall not constitute a breach of this *clause (d)*); (e) the terms of all alterations, modifications and amendments to the Leases are reflected in the tenant estoppel certificate (if any) delivered to and approved by Lender; (f) none of the rents reserved in the Leases have been assigned or otherwise pledged or hypothecated other than to Lender; (g) none of the rents have been

collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (h) the premises demised under the Leases have been completed and the lessees or tenants have accepted the same and have taken possession of the same on a rent paying basis; (i) there exist no offsets or defenses to the payment of any portion of the rents and no Borrower has any monetary obligation to any lessee or tenant; (j) no Borrower has received notice from any lessee or tenant challenging the validity or enforceability of any Lease; (k) there are no agreements with any lessee or tenant other than as expressly set forth in the Leases (as amended) and disclosed to Lender in writing; (l) the Leases are valid and enforceable against the lessees and tenants that are parties thereto; (m) the Leases contain no option to purchase, right of first refusal to purchase, right of first refusal to relet, or any other similar provisions; (n) no person or entity has any possessory interest in, or right to occupy, the Mortgaged Property except under and pursuant to the Leases; (o) there are no security deposits relating to any of the Leases; and (p) no brokerage commissions or finders' fees are due and payable regarding any of the Leases.

Section 3.13    Benefit of Term Loan Proceeds.  Borrowers and the Entity Guarantors are under common ownership and Control and operate as a common enterprise, and each of them expects to benefit, directly and indirectly, from the proceeds of the Term Loan.  Without limiting the foregoing, Big Storm Pinellas occupies and operates its business on the Mortgaged Property and acknowledges and agrees that, subject to the requirements of *Sections 3.13* and *4.03(c)*, proceeds of the Term Loan will be used (a) to directly benefit the Mortgaged Property, (b) to pay taxes, insurance, and other costs associated therewith, (c) to the extent approved by Lender (which approval shall not be unreasonably withheld), to finance the construction of tenant improvements at other locations operated by Big Storm Pinellas, and (d) to finance the construction of further improvements to the Mortgaged Property to the extent permitted under this Agreement, and in each such case such usage of the Term Loan proceeds will benefit Big Storm Pinellas directly and indirectly.

**ARTICLE IV**
**AFFIRMATIVE COVENANTS**

Borrowers and the other Loan Parties will at all times comply with the covenants contained in this *Article IV*, from the date hereof until the Obligation is indefeasibly paid in full and the Commitment has been irrevocably terminated.

Section 4.01    Financial Statements and Reports.  The Loan Parties will promptly furnish to Lender:

(a)    Annual Financial Statements.

(i)    As soon as available, and in any event not later than 90 days after the end of each fiscal year of Big Storm Real Estate, financial statements (including statements of income, statements of retained earnings and cash flows and a balance sheet) showing the consolidated and consolidating financial condition and results of operations of Big Storm Real Estate as of, and for the year ended on that last day, setting out, in each case, in comparative form, the figures for the previous fiscal year, which shall be in Acceptable Form and certified by a Responsible Officer of Big Storm Real Estate as being prepared in accordance with GAAP and presenting fairly, in all material respects, the consolidated financial condition and results of operations of Big Storm Real Estate.

(ii)    As soon as available, and in any event not later than 120 days after the end of each fiscal year of the Big Storm Brewery, financial statements (including statements of income, statements of retained earnings and cash flows and a balance sheet)

reviewed by a firm of independent certified public accountants acceptable to Lender, showing the consolidated and consolidating financial condition and results of operations of Big Storm Brewery and its Subsidiaries (including, but not limited to, Big Storm Pinellas) as of, and for the year ended on that last day, setting out, in each case, in comparative form, the figures for the previous fiscal year, which shall be in Acceptable Form and accompanied by a report from such firm of independent certified public accountants confirming that the financial statements were prepared in accordance with GAAP and present fairly, in all material respects, the consolidated financial condition and results of operations of Big Storm Brewery and its Subsidiaries.

(iii)    As soon as available, and in any event not later than 90 days after the end of each year, for each Individual Guarantor, a financial statement (in the form previously reviewed by Lender) through December 31 of the immediately preceding year, which shall be in Acceptable Form and signed by such Individual Guarantor and shall include, in detail, a balance sheet and a list of such Individual Guarantor's contingent liabilities for the then-current calendar year.

(b)    Quarterly Deliverables.

(i)    As soon as available, and in any event not later than 30 days after the end of each March, June, September, and December, financial statements (including statements of income, statements of retained earnings and cash flows and a balance sheet) showing the consolidated and consolidating financial condition and results of operations of Big Storm Real Estate as of, and for the year ended on that last day, setting out, in each case, in comparative form, the figures for the previous fiscal year, which shall be in Acceptable Form and certified by a Responsible Officer of Big Storm Real Estate as being prepared in accordance with GAAP and presenting fairly, in all material respects, the consolidated financial condition and results of operations of Big Storm Real Estate.

(ii)    As soon as available, and in any event not later than 30 days after the end of each March, June, September, and December, to the extent applicable, a copy of each Borrower's and each Entity Guarantor's IRS Form 941 with proof of payment of applicable payroll taxes.

(c)    Monthly Deliverables.  Promptly after preparation, and not later than 20 days after the end of each month, Borrowers shall deliver the following to Lender, all of which shall be in Acceptable Form:  (i) unaudited financial statements (including statements of income, statements of retained earnings and cash flows and a balance sheet) showing the consolidated and consolidating financial condition and results of operations of Big Storm Brewery and its Subsidiaries for the prior month and for the period from the beginning of the current fiscal year to the last day of that month, which shall be in Acceptable Form and certified by a Responsible Officer of Big Storm Brewery; (ii) an aging of all accounts payable and accounts receivable of Big Storm Brewery and its Subsidiaries, showing each such account which is 30, 60, 90 and over 90 days from the applicable due date; and (iii) a monthly inventory report.

(d)    Annual Budget, Operating Plan, and Tax Returns.  As soon as available, and in any event (i) within 90 days after the beginning of each fiscal year of Big Storm Brewery and its Subsidiaries, a copy of that year's budget, including pro forma monthly income statements and balance sheets, and (ii) within 10 days after each applicable filing date, the federal tax returns for (A) Boston Holding and its Subsidiaries, (B) Seaboard Craft Beer, (C) Individual Guarantor, and (D) to the extent not included in immediately preceding *clauses (A)* through *(C)*, each other Loan Party (and, if requested by Lender, copies of any extensions of the filing date therefor), all of

12

which shall be certified by a Responsible Officer of such Person, as applicable, and shall be in Acceptable Form.

(e)     Property Tax Receipts.  As soon as available, and in any event not later than (i) 30 days prior to the scheduled due date thereof (or, if earlier, promptly following the payment thereof), each Borrower shall deliver copies of statements for Property Taxes assessed against the Mortgaged Property, and (ii) 10 days after the scheduled due date thereof (or, if earlier, promptly following the payment thereof), each Borrower shall deliver payment receipts or other evidence satisfactory to Lender evidencing that all applicable Property Taxes have been fully paid.

(f)     Borrower Estoppel Certificate.  Promptly following any request therefor by Lender, and in any event within 7 days after such request, each Borrower, shall furnish a duly acknowledged written statement in Acceptable Form setting forth the unpaid amount of the Obligation (including the Term Principal Amount, all accrued and interest thereon, and any fees and other amounts payable with respect thereto), and stating either that no offsets or defenses exist against the obligation to pay such unpaid amount of the Obligation, or if such offsets or defenses are alleged to exist, the nature and extent thereof, and containing such other information and statements as Lender shall reasonably request.

(g)     Notice.  Written notice, promptly after any Loan Party receives notice of, or otherwise becomes aware of, (i) the institution of any litigation involving any Loan Party for which the monetary amount at issue is greater than $100,000, (ii) the institution of any litigation involving injunctive relief, (iii) any liability or alleged liability under any Environmental Law arising out of, or directly affecting, the properties or operations of such Borrower, (iv) any substantial dispute with any Governmental Authority, (v) the incurrence of any material contingent Debt, (vi) a default in respect of any Debt (including any contingent Debt) or any Investment Property, (vii) a Default or Event Default, specifying the nature thereof and what action each Borrower has taken, is taking, or proposes to take, (viii) any actual or alleged breach or default by any Borrower or any lessee or tenant under, and any notice of termination or cancellation of, any Lease, (ix) the assertion by any Person of any Lien on any Collateral that is not a Permitted Lien, and (x) the occurrence of any Material Adverse Event.

(h)     Other Requested Information.  Promptly upon reasonable request by Lender, such other information, agreements, and materials not otherwise required to be furnished under the Loan Documents respecting the business affairs, assets and liabilities of the Loan Parties.

Section 4.02    Compliance with Laws; Payment of Taxes and Other Claims.  Each Borrower will, and will cause each other Loan Party to, (a) observe and comply in all material respects with all Laws (including Environmental Laws) applicable to it or its Property (including the Collateral), and (b) pay and discharge promptly, and in any event at least thirty (30) days before the date on which the failure to so pay could result in a lien upon any Property of any Loan Party, all Property Taxes and other taxes, assessments, governmental charges, levies, fees, rent, charges, and Other Charges of every kind and nature now or hereafter assessed or imposed upon any Loan Party or any of its Property (including upon the income of any Property), as well as all claims of any kind (including claims for labor, materials, supplies and rent) which, if unpaid, could become a lien upon any or all of the Property of any Loan Party.  The certificate, advice or bill of the appropriate Governmental Authority or official (or other applicable Person designated by Law to receive payment of any such amounts) indicating or evidencing the non-payment of any such amount shall be conclusive evidence (as between Lender and Borrowers) that such amount is due and unpaid, and Lender may rely thereon.

Section 4.03    <u>Maintenance; Improvements to Mortgaged Property</u>.

(a)    Each Borrower will, and will cause each other Loan party to, maintain (i) its partnership, company or corporate existence, as applicable, and its rights and franchises; and (ii) proper and accurate books and records, all in accordance with GAAP, consistently applied.

(b)    Borrower will, and will cause each other Loan party to, keep the Mortgaged Property in first class order, repair, operating condition and appearance, causing all necessary repairs, renewals, replacements, additions and improvements to be promptly made, and will not allow any of the Mortgaged Property to be misused, abused or wasted or to deteriorate. Notwithstanding the foregoing, Borrowers shall not, without the prior written consent of Lender, (i) remove from the Mortgaged Property any fixtures or personal property covered by any Mortgage or Deed of Trust, except such as is replaced by Borrowers by a replacement asset of equal suitability and value, or (ii) make any structural alteration to the Mortgaged Property or any other alteration thereto which materially impairs the value thereof.  If any act or occurrence of any kind or nature (including any Eminent Domain Event or any casualty for which insurance was not obtained or obtainable) shall result in damage to or any loss or destruction of any Mortgaged Property, Borrowers shall give prompt written notice thereof to Lender and Borrowers shall promptly, at Borrowers' sole cost and expense and regardless of whether insurance or condemnation proceeds (if any) shall be available or sufficient for the purpose, commence and continue diligently to completion to restore, repair, replace and rebuild the Mortgaged Property as nearly as possible to its value, condition and character immediately prior to such Eminent Domain Event or damage, loss or destruction, as applicable.

(c)    Borrowers shall have the right from time to time to make changes and alterations in or to the Mortgaged Property, at Borrowers' expense, *provided that*, (i) no structural change or alteration or other change which would impair the value of any of the Mortgaged Property may be made without Lender's prior written consent, (ii) subject to *subclause (iii)* below, no structural change or alteration involving an estimated cost of more than $50,000.00, shall be undertaken without the prior written consent of Lender, and (iii) to the extent that Borrowers desire to use proceeds of the Term Loan to further develop and make improvements to the Mortgage Property, Borrowers shall submit a written request therefor to Lender along with such plans and other materials as Lender may reasonably request, and Lender will not unreasonably withhold its consent to such request.

(d)    Subject to the requirements of ***Section 4.03(c)***, Big Storm Real Estate shall use not less than $1,250,000 of the proceeds of the Term Loan to further develop and make improvements to the Mortgaged Property.

Section 4.04    <u>Performance of Obligations</u>.  Each Borrower will do and perform every act and discharge all of the obligations provided to be performed and discharged by such Borrower under the Loan Documents.

Section 4.05    <u>Reimbursement of Expenses</u>.  Each Borrower shall promptly pay upon demand (a) all reasonable costs, fees and expenses paid or incurred by Lender in connection with the negotiation, preparation, delivery and execution of any Loan Document, and any related or subsequent amendment, waiver, or consent or any negotiation, workout or restructure (including in each case, the reasonable fees and expenses of Lender's counsel), and (b) all due diligence, closing, and post-closing costs.

Section 4.06    Insurance.  Borrowers shall, and shall cause each other applicable Loan Party to, at Borrowers' expense, at all times maintain in full force and effect the following:

(a)    Insurance against loss or damage to the Mortgaged Property by fire, windstorm, tornado and hail and against loss and damage by such other, further and additional risks as may be now or hereafter embraced by an "all-risk" form of insurance policy.  The amount of such insurance shall not be less than one hundred percent (100%) of the full replacement (insurable) cost of the Improvements, furniture, furnishings, fixtures, equipment and other items (whether personalty or fixtures) included in the Mortgaged Property and owned by a Borrower from time to time, without reduction for depreciation.  The determination of the replacement cost amount shall be adjusted annually to comply with the requirements of the insurer issuing such coverage or, at Lender's election, by reference to such indices, appraisals or information as Lender determines in its reasonable discretion.  Full replacement cost, as used herein, means, with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor, and means, with respect to such furniture, furnishings, fixtures, equipment and other items, the cost of replacing the same, in each case, with inflation guard coverage to reflect the effect of inflation, or annual valuation.  Each policy or policies shall contain a replacement cost endorsement and either an agreed amount endorsement (to avoid the operation of any co-insurance provisions) or a waiver of any co-insurance provisions, all subject to Lender's approval.

(b)    Comprehensive Commercial General Liability Insurance for personal injury, bodily injury, death and property damage liability in amounts not less than $1,000,000 per occurrence, $2,000,000 aggregate and with total excess and umbrella coverage totaling $4,000,000 (or such lesser amount as Lender may approve in its discretion).  During any construction on the Mortgaged Property, each contractor having a contract for construction in an amount equal to or greater than $100,000 shall also provide the insurance required in this *clause (b)*, except that the minimum required coverages shall be $1,000,000 per occurrence and $2,000,000 in the aggregate (both inclusive of umbrella coverage).  Lender hereby retains the right to periodically review the amount of said liability insurance being maintained by Borrowers and to require an increase in the amount of said liability insurance should Lender deem any increase to be commercially reasonable under then existing circumstances.

(c)    General boiler and machinery insurance coverage is required if steam boilers or other pressure-fired vessels are in operation at the Mortgaged Property.  Minimum liability amount per accident must equal the greater of (i) the replacement (insurable) value of the Improvements housing such boiler or pressure-fired machinery or (ii) $2,000,000.

(d)    If the Mortgaged Property or any part thereof is identified by any Governmental Authority (or any department, agency or division thereof) as being situated in an area now or subsequently designated as having special flood hazards, flood insurance in an amount equal to the *lesser of* (i) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement basis (or the unpaid balance of the indebtedness secured hereby if replacement cost coverage is not available for the type of building insured); and (ii) the maximum insurance available under the appropriate National Flood Insurance Administration program.  Lender shall have the right to obtain a flood certification to location of each Mortgaged Property as to any proximate flood plain, and Borrowers shall reimburse Lender for such expense. Notwithstanding anything to the contrary, Borrowers shall bear the sole responsibility for maintaining continuous flood insurance.

(e)     During the period of any construction on the Mortgaged Property or renovation or alteration of the Improvements, a so-called "Builder's All-Risk Completed Value" or "Course of Construction" insurance policy in non-reporting form for any Improvements under construction, renovation or alteration in an amount approved by Lender and Worker's Compensation Insurance covering all persons engaged in such construction, renovation or alteration.

(f)     Loss of business income insurance in an amount not less than $500,000.

(g)     Such other insurance on the Mortgaged Property or on any replacement or substitutions thereof or additions thereto as may from time to time be required by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, law and ordinance, sinkhole, mine subsidence, earthquake, and environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

(h)     All such insurance shall (i) be with insurers authorized to do business in the state within which each Mortgaged Property is located and who have and maintain a rating of at least "AA" (or its equivalent) from Standard & Poor's, a Division of The McGraw-Hill Companies, Inc. or any other nationally recognized statistical agency selected by Lender; (ii) contain the complete address of the Mortgaged Property (or a complete legal description); (iii) be for terms of at least one year; (iv) contain deductibles which do not exceed $10,000 or, with respect to the policy described in *clause (d)* above $3,000; and (v) be subject to the approval of Lender as to insurance companies, amounts, content, forms of policies, method by which premiums are paid and expiration dates.  Without limiting the generality of the foregoing, the comprehensive all-risk insurance and business income insurance policies required pursuant to this **Section 4.06** shall be required to cover perils of terrorism and acts of terrorism.

(i)     Borrowers shall deliver to Lender evidence that said insurance policies have been paid current and certified copies of such insurance policies and original certificates of insurance signed by an authorized agent of the applicable insurance companies evidencing such insurance satisfactory to Lender.  Borrowers shall renew all such insurance and deliver to Lender certificates evidencing such renewals at least 15 days before any such insurance shall expire. Without limiting the required endorsements to the insurance policies, Borrowers further agree that all such policies shall include a standard, non-contributory, mortgagee clause naming:

> Briar Capital Real Estate Fund, LLC
> its successors and assigns
> 1500 CityWest Blvd., Suite 560
> Houston, Texas  77042

(i) as an additional insured under all liability insurance policies; (ii) as the first mortgagee on all property insurance policies; and (iii) as the loss payee on all loss of rents or loss of business income insurance policies.  Borrowers further agree that all such insurance policies: (1) shall provide for at least 30 days' prior written notice to Lender prior to any cancellation or termination thereof and prior to any modification thereof which affects the interest of Lender; (2) shall contain an endorsement or agreement by the insurer that any loss shall be payable to Lender in accordance with the terms of such policy notwithstanding any act or negligence of any Loan Party which might otherwise result in forfeiture of such insurance; (3) shall waive all rights of subrogation against Lender; and (4) in the event that any Land or any Improvements constitute a legal non-conforming use under applicable building, zoning or land use laws or ordinances, shall

include an ordinance or law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to Replacement Cost With Agreed Value Endorsement), Coverage B: "Demolition Cost", and Coverage C: "Increased Cost of Construction" coverages.  Lender agrees that such insurance policies may be in the form of a blanket policy, *provided that*, in the event that any such coverage is provided in the form of a blanket policy, each Borrower hereby acknowledges and agrees that failure to pay any portion of the premium therefor which is not allocable to the Mortgaged Property or by any other action not relating to the Mortgaged Property which would otherwise permit the issuer thereof to cancel the coverage thereof, would require the Mortgaged Property to be insured by a separate, single-property policy.  The blanket policy must properly identify and fully protect the Mortgaged Property as if a separate policy were issued for one hundred percent (100%) of replacement cost at the time of loss and otherwise meet all of Lender's applicable insurance requirements set forth in this ***Section 4.06***.  The delivery to Lender of the insurance policies or the certificates of insurance as provided above shall constitute an assignment of all proceeds payable under such insurance policies relating to the Mortgaged Property by each Borrower to Lender as further security for the indebtedness secured hereby.  In the event of foreclosure of any Deed of Trust or Mortgage, or other transfer of title to any Mortgaged Property in extinguishment in whole or in part of any Obligation secured by any Loan Document, all right, title and interest of each Borrower in and to all proceeds payable under such policies then in force concerning the Mortgaged Property shall thereupon vest in the purchaser at such foreclosure, or in Lender (or any other applicable transferee) in the event of such other transfer of title.  Approval of any insurance by Lender shall not be a representation of the solvency of any insurer or the sufficiency of any amount of insurance.  In the event any Borrower fails to provide, maintain, keep in force or deliver and furnish to Lender the policies of insurance required under this Agreement or evidence of their renewal as required herein, Lender may, but shall not be obligated to, procure such insurance and Borrowers shall pay all amounts advanced by Lender therefor (and, for the avoidance of doubt, shall be entitled, in its sole discretion, to disburse or otherwise utilize any funds on deposit in the Escrow Fund to pay such amounts), together with interest thereon at the Maximum Rate from and after the date advanced by Lender until actually repaid by Borrowers, promptly upon demand by Lender.  Any amount so advanced by Lender, together with interest thereon, shall constitute a portion of the Obligation and shall be secured by each Deed of Trust and Mortgage and by all of the other Loan Instruments securing all or any part of the Obligation.  Lender shall not be responsible for nor incur any liability for the insolvency of the insurer or other failure of the insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of any Borrower to furnish such insurance.  Borrowers shall not obtain insurance for the Mortgaged Property in addition to that required by Lender without the prior written consent of Lender, which consent will not be unreasonably withheld, *provided that* (i) Lender is named on such insurance; (ii) Lender receives complete copies of all policies evidencing such insurance; and (iii) such insurance and the related insurer comply with all of the applicable requirements set forth herein.

Section 4.07    <u>Right of Inspection; Appraisals</u>.

(a)    Borrower will permit, and will cause each other Loan Party to permit, any officer, employee, agent, or representative of Lender, to visit and inspect any Mortgaged Property or any of the other Properties of Borrowers, to examine Borrowers' books and records, to take copies and extracts therefrom, and to discuss the affairs, finances and accounts of Borrowers with Borrowers' current and former officers, employees, accountants and auditors, all at such times and as often as Lender may desire and without prior notice to any Borrower or any other Person.  Borrowers shall reimburse Lender for its out-of-pocket expenses incurred in connection with any

17

of the foregoing, *provided that*, so long as no Event of Default has occurred and is continuing, the first such visit and inspection in each fiscal year shall be at Lender's cost and expense.

(b)    Lender may obtain appraisals of the Mortgaged Property (or any portion thereof) at any time from time to time at Borrowers' sole cost and expense.

Section 4.08    Leases; SNDAs.

(a)    Borrowers have furnished to Lender true and correct executed copies of all Leases of any portion of the Mortgaged Property (and any amendments and supplements thereto, and any extensions, restatements, and other modifications thereof). Except for any such Leases delivered to Lender, there are no Leases of any portion of the Mortgaged Property.

(b)    Except with respect to the Big Storm Pinellas Lease, Borrowers shall not lease any portion of the Mortgaged Property. Without limiting the foregoing, if Borrowers desire to enter into any Lease of all or any portion of the Mortgaged Property, Borrowers shall notify Lender at least ten (10) Business Days prior to entering into any Lease and, upon Lender's request, shall deliver a copy or draft of such Lease to Lender. All new Leases of the Mortgaged Property and renewals of any Leases (other than extensions or renewals which, under the terms of any Lease, may be effected by unilateral notice or agreement by the lessee or tenant) shall be subject to the prior written approval of Lender.

(c)    Borrowers shall (i) observe and perform or cause to be observed and performed all of the obligations imposed upon the landlord lessor under each Lease if the failure to perform or observe the same would materially and adversely affect the value of the Mortgaged Property taken as a whole, and shall not do or permit to be done anything to impair the value of any Lease; (ii) promptly send copies to Lender of all notices of default under any Lease which any Borrower sends or receives; (iii) enforce in a commercially reasonable manner all of the terms, covenants and conditions contained in each Lease upon the part of the lessee or tenant thereunder to be observed or performed; (iv) not collect any of the rentals or other payments due under any Lease more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (v) not execute any other assignment of the landlord's or lessor's interest in any Lease or rents or other amounts payable from time to time thereunder; (vi) not (A) materially alter, modify or change the terms of any Lease without the prior written consent of Lender, or (B) cancel or terminate any Lease or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of any Mortgaged Property or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees or tenants thereunder; (vii) not alter, modify or change the terms of any guaranty of the obligations of the lessee or tenant under any Lease, or cancel or terminate such guaranty without the prior written consent of Lender; (viii) not consent to any assignment of or subletting under any Lease not in accordance with their terms, without the prior written consent of Lender; and (ix) notify Lender of any lease payments (including, but not limited to, any rental payments) that are more than 30 days in arrears.

(d)    Upon Lender's request, Borrowers shall cause each of lessee or tenant of any Mortgaged Property to enter into an SNDA, pursuant to which such lessees and tenants will, among other things, agree to subordinate the Leases to Lender's Lien on the Mortgaged Property and covenant and agree with Lender to make all payments of rent and other amounts payable by them under the Leases to Lender to the extent provided in such SNDA.

18

(e)        Nothing in this **Section 4.08** or in any other provision in this Agreement or any other Loan Document shall be deemed to permit or authorize any Borrower to enter into, or a consent by Lender with respect to, any Lease with respect to all or any portion of any Mortgaged Property.

Section 4.09    Further Assurances.    Each Borrower will cure promptly any defects in the execution and delivery of the Loan Documents, the description of any Collateral, or the perfection of any security interest or Lien in favor of Lender.  Each Borrower, at such Borrower's expense, will promptly execute and deliver to Lender upon its request all such other and further documents, agreements and instruments in order to (a) effectuate the purpose and intent of the Loan Documents, (b) further evidence and more fully describe any Collateral, (c) correct any errors or omissions in the Loan Documents, (d) more fully state the security obligations set out herein or in any of the Loan Documents, or (e) perfect, protect or preserve any Liens created pursuant to any of the Loan Documents.  Each Borrower further agrees to make any recordings, to file any notices, or obtain any consents, in each case as may be requested by Lender or as may be necessary or appropriate in connection with any of the foregoing.

Section 4.10    Segregated Account.    Big Storm Real Estate shall at all times hold the proceeds of the Term Loan in the Segregated Account, and shall not transfer or disburse any such proceeds from the Segregated Account except for purposes expressly permitted under this Agreement.  The Segregated Account shall at all times be subject to a deposit account control agreement in favor of Lender and in Proper Form, and shall not be subject to any Lien other than Liens in favor of Lender.

**ARTICLE V**
**NEGATIVE COVENANTS**

Borrowers and the other Loan Parties will at all times comply with the covenants contained in this **Article V**, from the date hereof until the Obligation is indefeasibly paid in full and the Commitment has been irrevocably terminated.

Section 5.01    Debts, Guaranties and Other Obligations.    Neither any Borrower nor any Entity Guarantor will incur, create, assume or in any manner become or be liable in respect of any Debt, other than (a) the Obligation, (b) trade payables arising in the ordinary course of business, (c) Subordinated Debt owed by Big Storm Pinellas to Boston Finance pursuant to the Boston Finance Credit Agreement in an aggregate principal amount not to at any time exceed $20,000,000, *provided that*, such Debt is at all times subject to a Subordination Agreement, (d) Subordinated Debt owed by Big Storm Real Estate to Boston Finance in an aggregate principal amount not to at any time exceed $10,000,000, pursuant to that certain Revolving Line of Credit Promissory Note dated as of January 1, 2015, executed by Big Storm Real Estate and made payable to Boston Finance in the original principal amount of $10,000,000, *provided that*, such Debt is at all times subject to a Subordination Agreement, (e) Debt owed by Big Storm Real Estate to MJMRBM, LLC in an aggregate principal amount of up to $499,000, *provided that*, such Debt is not secured by a Lien on any Collateral and is secured solely by Liens permitted under **Section 5.02(d)**, (f) Debt owed by Big Storm Real Estate to Pedro Falcon, an individual, in an aggregate principal amount of up to $765,000, *provided that*, such Debt is not secured by a Lien on any Collateral and is secured solely by Liens permitted under **Section 5.02(e)**, (g) Debt of Big Storm Brewery consisting of Economic Injury Disaster Loans from the U.S. Small Business Administration incurred in accordance with applicable Laws and in an aggregate principal amount of up to $150,000, (h) unsecured Subordinated Debt of one or more of the Entity Guarantors owed to Broadleaf Property Management LLC in an aggregate principal amount of up to $46,000, *provided that*, such Debt is at all times subject to a Subordination Agreement, (i) unsecured Subordinated Debt of one or more of the Entity Guarantors owed to BFG Investment Holdings, LLC in an aggregate principal amount of up to $300,000, *provided that*, such Debt is at all times subject to a Subordination Agreement, (j) Subordinated Debt consisting of

intercompany loans made using proceeds of Subordinated Debt permitted under *clause (c)* above, *provided that*, such intercompany Subordinated Debt is at all times subject to a Subordination Agreement, (k) Debt of Big Storm Pinellas and the Entity Guarantors consisting of purchase money indebtedness and capital lease obligations, and other Debt secured solely by equipment of Big Storm Pinellas not constituting Collateral, in an aggregate principal amount under this *clause (k)* not to at any time exceed $100,000, and (l) any other Debt approved by Lender in writing from time to time in its sole discretion.

Section 5.02    Liens.  Neither any Borrower nor any Entity Guarantor will create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except for the following (collectively, "***Permitted Liens***"):

(a)    Liens securing the payment of the Obligation or any other Debt to Lender;

(b)    Liens for taxes which (i) are not delinquent, or (ii) for which (A) no Lien has been filed of record with respect to such taxes, (B) no Collateral or any portion thereof or interest therein would be in any danger of sale, forfeiture or loss by reason of the contest for such taxes, and (C) such Loan Party has set aside on its books adequate reserves against such taxes;

(c)    encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not secure any Debt and do not, individually or in the aggregate, materially affect the value of the assets encumbered thereby or materially impair the ability of a Loan Party to use such assets in its business, and none of which is violated in any material aspect by any existing or proposed Improvements or land use;

(d)    Liens on the real estate owned by Big Storm Real Estate and located at 12924 49th St N, Clearwater, Florida 33762, which secure Debt permitted under ***Section 5.01(e)***;

(e)    Liens on the real estate owned by Big Storm Real Estate and located at 610 Charlotte St, Punta Gorda, Florida 33950, which secure Debt permitted under ***Section 5.01(f)***;

(f)    Liens on assets of Big Storm Brewery which secure Debt permitted under ***Section 5.01(g)*** above; and

(g)    Liens which secure Debt permitted under ***Section 5.01(k)***, *provided that*, such Liens only encumber the assets financed by such Debt and do not encumber any Mortgaged Property or any other Collateral.

Section 5.03    Investments, Loans and Advances.  No Borrower nor any Entity Guarantor will make or permit to remain outstanding any loans or advances to, or investments in, any Person, except for the following:  (a) Debt permitted under ***Section 5.01(j)***; (b) investments by Big Storm Brewery in its Subsidiaries that are Loan Parties; (c) investments by Loan Parties (other than Borrowers) in other Loan Parties; and (d) investments by a Borrower in another Borrower.

Section 5.04    Restricted Payments.  No Borrower nor any Entity Guarantor may make any Restricted Payment, *other than* (a) Tax Distributions, *provided that*, no Default or Event of Default exists at the time of, or would exist immediately after giving effect to, any such Tax Distribution, (b) Distributions declared or made by a Borrower wholly in the form of its Equity Interests, (c) Restricted Payments in respect of Subordinated Debt to the extent such payments are permitted under the applicable Subordination Agreement, *provided that*, at the time of and immediately after giving effect to any such payment described in *clause (c),* (i) no Default or Event of Default exists and (ii) such payment is permitted under the applicable Subordination Agreement.

Section 5.05    Disposition of Properties.

(a)    No Borrower nor any Entity Guarantor will sell, transfer, lease, or otherwise dispose of all of its Properties, except for the sale of inventory in the ordinary course of business and the sale of equipment that is worn-out, obsolete, or no longer used or useful in the business of any such Person.

(b)    No Borrower will at any time lease or otherwise allow any Person to occupy or use all or any portion of any Mortgaged Property to any Person without Lender's prior written consent, except that (i) Big Storm Pinellas may occupy the Mortgaged Property pursuant to the Big Storm Pinellas Lease, and (ii) Affiliates of Borrowers may occupy the Mortgaged Property so long as each such Person has executed and delivered to Lender a subordination of occupancy rights or other applicable agreement in Proper Form.

Section 5.06    Nature of Business, Ownership, Management.    Borrowers and the Entity Guarantors will not permit (a) any change to be made in the direct or indirect ownership of the Equity Interests of any Borrower or any Entity Guarantor that would result in a Change of Control, (b) any change in the nature and/or character of its business or the business of any Entity Guarantor as carried on at the Closing Date, or (c) any Key Management Person to cease his or her involvement in the day-to-day management or operation of any Borrower or any Entity Guarantor.

Section 5.07    Mergers, Consolidations, Acquisition, Etc.    No Borrower nor any Entity Guarantor will (a) amend its Organizational Documents, (b) change its name or structure, (c) consolidate with or merge into or acquire any Person, or permit any other Person to consolidate with or merge into or acquire any Borrower, (d) acquire any Equity Interests in any Person, (e) create or acquire any Subsidiary after the Closing Date, or (f) acquire all or a substantial portion of the assets of any Person, in each case without Lender's prior written consent.

Section 5.08    Changes in Accounting Method or Fiscal Year.    No Borrower nor any Entity Guarantor will make any change in its accounting method as in effect on the date of this Agreement or change its fiscal year ending date.

Section 5.09    Transactions With Affiliates.    No Borrower nor any Entity Guarantor will, directly or indirectly, enter into any transaction (including, but not limited to, the sale or exchange of property or the rendering of any service) with any Affiliate, other than (a) in the ordinary course of its business and upon substantially the same or better terms as it could obtain in an arm's length transaction with a Person who is not an Affiliate, and (b) transactions permitted under **Sections 5.01** through **5.04**.

Section 5.10    Use of Proceeds.    Borrowers will not use the proceeds of this Agreement for purposes other than those set out in **Section 3.07**.

Section 5.11    Compliance with Laws.    No Borrower nor any Entity Guarantor will violate any Laws in any material respect.

Section 5.12    Management Fees.    Borrowers shall not pay, or become obligated to pay, any management fees with respect to any of the Mortgaged Property except pursuant to a written management agreement submitted to and approved by Lender in its sole discretion in writing, which agreement shall provide that (a) all fees thereunder are fully subordinated to the complete and prior indefeasible payment in full of the Obligation Term Loan, and (b) that such agreement is terminable by Lender upon 30 days' notice after any Event of Default occurs.

Section 5.13    <u>Minimum Tangible Net Worth</u>.  The Tangible Net Worth of Big Storm Brewery and its Subsidiaries shall not at any time be less than $3,000,000.  The financial covenant set forth in this ***Section 5.13*** shall be calculated and tested monthly as of the last day of each month, beginning September 30, 2020.

**ARTICLE VI**
**EVENTS OF DEFAULT**

Section 6.01    <u>Events</u>.  The occurrence of any of the following events shall constitute an "***Event of Default***":

(a)    <u>Payments</u>.  Any Borrower shall fail to pay (i) any principal of or interest on the Obligation when due, (ii) any other amount due under this Agreement or any Loan Document when due, (iii) any Property Taxes when due, or (iv) any Other Charges when due and any applicable grace period for the payment of such Other Charges shall have expired; or

(b)    <u>Representations and Warranties</u>.  Any representation or warranty made or deemed made by any Loan Party (or any officer or representative thereof) in this Agreement, any other Loan Document, or in any amendment of this Agreement or any other Loan Document, or in any certificate, report, notice, or financial statement furnished at any time in connection with this Agreement, any other Loan Document, or in any amendment of this Agreement or any other Loan Document, shall prove to have been incorrect when made or deemed to have been made; or

(c)    <u>Affirmative Covenants</u>.  Any failure by any Loan Party to observe or perform any of the covenants or agreements contained in ***Article IV*** of this Agreement; or

(d)    <u>Negative Covenants</u>.  Any failure by any Loan Party to observe or perform of any of the covenants or agreements contained in ***Article V*** of this Agreement; or

(e)    <u>Other Loan Document Obligations</u>.  Any failure in the due observance or performance by any Loan Party of any of the covenants or agreements contained in any Loan Document other than this Agreement; or

(f)    <u>Involuntary Bankruptcy Proceedings</u>.  A receiver, conservator, custodian, liquidator, creditors' committee, board of inspectors, or trustee is appointed for any Loan Party, or of any of their Properties, or is created, engaged, retained, procured, authorized, or appointed in the U.S. or under any Law of any foreign country by the order or decree of any court or agency or supervisory authority having jurisdiction; or any Loan Party becomes a debtor under any Debtor Relief Law, or is the subject of an order for relief, or becomes bankrupt or insolvent; or any of the Loan Party's Property is sequestered, seized, or attached in the U.S. or under any law of any foreign country by court order or decree; or a complaint, petition, or similar pleading is commenced against any Loan Party or any Property thereof under any Debtor Relief Law, whether such law is now in existence or hereafter in effect; or

(g)    <u>Voluntary Petitions, Assignments, Etc.</u>  Any Loan Party (i) voluntarily commences any proceeding or files any petition seeking liquidation, reorganization, or other relief under any Debtor Relief Law now or hereafter in effect, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any proceeding or petition described in ***Section 6.01(f)***, (iii) applies for or consents to an appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for such Person or for any of its assets, (iv) files an answer admitting a material allegation of a petition filed against it in any such proceeding,

22

(v) makes a general assignment for the benefit of creditors, or (vi) takes any corporate or other organizational action for the purpose of effecting any of the foregoing; or

(h)　　<u>Insolvency</u>.  Any Loan Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(i)　　<u>Discontinuance of Business</u>.  Any Borrower or any Entity Guarantor discontinues its usual business; or

(j)　　<u>Default Under Other Agreements</u>.

(i)　　Any Loan Party fails to make any payment due on any Debt (including, but not limited to, any Subordinated Debt), or defaults or breaches its obligations, or otherwise fails to comply with any such obligations, in respect of any Debt (including, but not limited to, any Subordinated Debt);

(ii)　　Without limiting *subclause (i)* above, any default or event of default (however defined) occurs under the Boston Finance Credit Agreement or any other agreement, document, or instrument governing or evidencing any Subordinated Debt; or

(iii)　　Any Loan Party breaches or fails to comply with any of the terms of any Subordination Agreement.

(k)　　<u>Undischarged Judgments; Forfeiture</u>.  One or more judgments for the payment of money, in an aggregate amount for all such judgments in excess of $100,000, are rendered by any court or other Governmental Authority against any Loan Party and such Loan Party does not immediately discharge the same or provide for its immediate discharge in accordance with its terms, or procure a stay of execution thereof within 10 days from the date of entry thereof, or any action is instituted to levy upon or cause any forfeiture of any assets of any Loan Party; or

(l)　　<u>Fraudulent Transfers</u>.  Any Loan Party shall have concealed, removed, or permitted to be concealed or removed, any part of its Property, with intent to hinder, delay or defraud its creditors or any of them; or

(m)　　<u>Overadvance</u>.  An Overadvance occurs or exists and Borrower fails to (i) repay the Term Principal Amount in at least the amount of the excess, together with accrued and unpaid interest on the principal amount so repaid, or (ii) provide Lender with additional collateral of a type and in an amount acceptable to Lender in its sole discretion; or

(n)　　<u>Change of Control</u>.  A Change of Control occurs; or

(o)　　<u>Eminent Domain Events</u>.  An Eminent Domain Event occurs and affects any Mortgaged Property or any part thereof which Lender deems to be a material or significant part; or

(p)　　<u>Leases</u>.  Any Borrower defaults under, or otherwise breaches or fails to timely comply with its obligations under, any Lease and any applicable grace or cure period provided for in such Lease shall have expired (except that the agreement of Big Storm Real Estate to abate rental payments under the Big Storm Pinellas Lease, consistent with past practices, shall not constitute an Event of Default under this *clause (p)*); or

(q)     Validity and Enforceability of Loan Documents.  Any Lien granted under any Loan Document ceases to be a first priority Lien on any applicable Loan Party's assets (except with respect to Liens on assets of Big Storm Brewery which are permitted under **Section 5.02(f)**), or any Loan Document at any time after its execution and delivery (i) ceases to be in effect in any material respect or is declared by a Governmental Authority to be null and void, or (ii) its validity or enforceability is contested by a Loan Party or a Loan Party denies that it has any further liability or obligations under any Loan Document; or

(r)     Material Adverse Event.  A Material Adverse Event occurs.

Section 6.02     Remedies.  Upon the occurrence of any Event of Default, Lender may take any or all of the following actions:  (a) declare the entire Obligation then outstanding (including, but not limited to, the Term Principal Amount and all accrued and unpaid interest thereon) to be immediately due and payable (*provided that*, the occurrence of any event described in **Sections 6.01(f)**, **(g)** or **(h)** shall automatically accelerate the maturity of the Obligation, without the necessity of any action by Lender) without presentment, demand, protest, notice of protest or dishonor, notice of default, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or other notice of any kind, all of which are hereby expressly waived by the each Borrower and each Guarantor; (b) foreclose or otherwise enforce all Liens or security interests securing payment of the Obligation, or any part thereof, (c) demand payment from the Guarantors (or any of them); and (d) take any and all other actions available to Lender under this Agreement or the other Loan Documents at Law, in equity or otherwise; and in each such case, all obligations, if any, of Lender hereunder shall immediately cease and terminate.  The failure of Lender to exercise any of the foregoing options shall not constitute a waiver of the right to exercise the same upon the occurrence of a subsequent Event of Default.

Section 6.03     Right of Set-off.  Lender is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrowers), to set-off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Debt at any time owing by Lender to or for the credit or the account of any Loan Party against any and all of the Obligation, irrespective of whether or not Lender shall have made any demand under this Agreement and although such obligations may be unmatured.

## ARTICLE VII
## CONDITIONS

Section 7.01     Conditions to Term Loan.  This Agreement shall become effective once all parties have executed and delivered this Agreement.  The obligation of Lender to make the Term Loan is subject to Borrowers' satisfaction of the following conditions:

(a)     Executed Loan Documents.  Duly executed copies of this Agreement, the Term Note, the Deeds of Trust and Mortgages over the Mortgaged Properties, a Guaranty executed by each Guarantor, each applicable Subordination Agreement, to the extent requested by Lender, an SNDA executed by each of the tenants of the Mortgaged Property, Borrower, and Lender; and all of the other Loan Documents requested by Lender to be delivered on or before the Closing Date, each in Acceptable Form;

(b)     Corporate Documents.  For each Borrower and each Entity Guarantor:

(i)     Officer's Certificates.  A certificate of a Responsible Officer of such Person, certifying as to the items described in **Sections 7.01(b)(ii)-(v)**;

(ii)    <u>Organizational Documents</u>.  The Organizational Documents of such Person;

(iii)    <u>Resolutions</u>.  Copies of resolutions of the Board of Directors of such Person approving the transactions contemplated by this Agreement and the other Loan Documents to which it is a party, and authorizing certain officers of such Person to negotiate, execute, and deliver the Loan Documents to which it is a party;

(iv)    <u>Incumbency</u>.  An incumbency certificate of such Person certified by a secretary or assistant secretary (or other authorized officer) of such Person to be true and correct as of the Closing Date;

(v)    <u>Good Standing</u>.  Copies of certificates of good standing, existence, or their equivalent with respect to such Person, certified as of a recent date by the appropriate Governmental Authority of its jurisdiction of organization and, to the extent requested by Lender, any other jurisdiction in which such Person transacts business; and

(vi)    <u>Tax Identification Number</u>.  The tax identification number (if any) of such Person;

(c)    <u>Reserved</u>.

(d)    <u>Leases</u>.  Fully-executed copies of the Leases and all amendments to, and extensions and modifications of, the Leases;

(e)    <u>Insurance</u>.  Evidence that the Loan Parties maintain all insurance policies required by this Agreement, together with mortgagee endorsements and other appropriate endorsements in favor of Lender with respect to all insurance policies covering any Collateral;

(f)    <u>Appraisals</u>.  Appraisals of each of the Mortgaged Properties in Acceptable Form.

(g)    <u>Environmental Reports</u>.  Environmental assessments of each of the Mortgaged Properties in Acceptable Form;

(h)    <u>Surveys</u>.  A survey of each of the Mortgaged Properties in Acceptable Form;

(i)    <u>Title Commitments</u>.  Binding title commitments or pro forma policies, each in Acceptable Form, insuring Lender's Liens on the Mortgaged Properties;

(j)    <u>UCC Search</u>.  A UCC search acceptable to Lender;

(k)    <u>Payoff Letters and Lien Releases</u>.  A customary payoff letter and lien release in Acceptable Form, executed by each Person (a) that has a Lien on any Mortgaged Property as security for any Debt, or (b) that is owed any Debt by any Loan Party that is not permitted under this Agreement;

(l)    <u>Fees and Expenses</u>.  Payment by Borrowers of all fees, expenses, and other amounts payable to Lender;

(m)    <u>Material Adverse Event</u>.  Evidence satisfactory to Lender that, since December 31, 2018, no Material Adverse Event has occurred;

(n)    <u>Due Diligence</u>.  Lender shall have completed its due diligence and results of such due diligence shall be satisfactory to Lender in its sole discretion;

(o)    <u>IRS Forms</u>.  Lender shall have received and approved a duly completed IRS Form 8821 for each Borrower; and

(p)    <u>Other</u>.  Such other documents, instruments, agreements or information as may be reasonably requested by Lender.

Section 7.02    <u>Conditions to All Advances</u>.    At the time of any Advance (other than Overadvances and Protective Advances, which shall be made solely in Lender's discretion), and after giving effect to such Advance, each of the following conditions shall be satisfied to the satisfaction of Lender:  (a) no Default or Event of Default may exist; (b) no Material Adverse Event shall have occurred; (c) each representation and warranty of any Loan Party made or referred to in each Loan Document or in any certificate delivered to Lender pursuant is true and correct in all material respects (except for any such representation or warranty that is qualified by Material Adverse Effect or materiality, which shall be true and correct in all respects); (d) the Closing Financial Statements, the Current Financials, and all other financial information required by Lender shall have been furnished and shall be, as of the date of the requested Advance, true and correct in all material respects; and (e) all legal matters concerning Borrowers and the Guarantors shall be acceptable to Lender and its legal counsel.  Borrowers' request for the Advance under the Term Loan shall constitute a representation and warranty by Borrowers that the conditions set forth in this ***Article VII*** have been satisfied.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01    <u>Notices</u>.    All notices and communications under or in connection with this Agreement shall be in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid, sent by facsimile, or personally delivered to an officer of the receiving party. All such notices communications shall be mailed, faxed, or delivered (a) if to any Borrower or Borrower Representative, 12707 49th Street North, Clearwater, Florida 33762, Attention:  Jonathan Golden, fax: (727) 497-1666, or to such other address or fax number, or to such individual's or department's attention as Borrower Representative may have furnished Lender in writing, and (b) if to Lender, Briar Capital Real Estate Fund, LLC, 1500 CityWest Boulevard, Suite 560, Houston, Texas 77042, Attention:  Frank Goldberg, fax: (713) 532-3430, or to such other address or fax  number, or to such individual's or department's attention as it may have furnished to Borrower Representative in writing.  Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, certified mail, postage prepaid, return receipt requested, (ii) if faxed, when transmitted, provided that a fax received after 5 p.m. on any day will be deemed received on the immediately following Business Day, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.  Any instrument in writing received by Lender in connection with this Agreement, which purports to be dispatched or signed by or on behalf of any Borrower, shall conclusively be deemed to have been signed by such party, and Lender may rely thereon and shall have no obligation, duty or responsibility to determine the validity or genuineness thereof or authority of the Person or Persons executing or dispatching the same.

Section 8.02    <u>Amendments, Waivers, Cumulative Rights</u>.  This Agreement and the other Loan Documents may be amended, modified, supplemented or be the subject of a waiver only by a writing executed by Lender and Borrowers.  No course of dealing on the part of Lender or its officers, employees, consultants or agent's, nor any failure or delay by Lender with respect to exercising any right, power or privilege of Lender under this Agreement or any other Loan Document shall operate as a waiver thereof.

The rights and remedies of Lender under this Agreement and each other Loan Document shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

Section 8.03    Invalidity.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby, and (b) the parties shall engage in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 8.04    Successors and Assigns; Survival.  This Agreement is binding upon, and inures to the benefit of the parties to this Agreement and their respective successors and permitted assigns.  Unless otherwise provided in the Loan Documents, all covenants, agreements, indemnities, representations and warranties made in any of the Loan Documents survive and continue in effect as long as the Commitment is in effect or the Obligation is outstanding.  No Loan Party nor any Person acting on behalf of any of them may assign any of their rights or obligations hereunder or any other Loan Document without the prior written consent of Lender.  Lender may assign any of its rights or obligations under this Agreement and the other Loan Documents at any time and from time to time, without notice to or the consent of any Loan Party or any other Person.

Section 8.05    Participations.  Lender may, at any time and from time to time, and without notice to or the consent of any Loan Party or any other Person, sell to one or more Persons (each a "**Participant**") participating interests in the Obligation.  Lender may furnish any information concerning the Loan Parties in its possession or under its control from time to time to assignees and Participants (including prospective assignees and Participants).

Section 8.06    Maximum Rate.  It is the intent of Lender and Borrowers to conform to and contract in strict compliance with applicable usury law from time to time in effect.  All agreements between Lender and Borrowers are hereby limited by the provisions of this ***Section 8.06*** which shall override and control all such agreements, whether now existing or hereafter arising and whether written or oral.  In no way, nor in any event or contingency (including but not limited to prepayment or acceleration of the maturity date of the Obligation), shall the interest taken, reserved, contracted for, charged, or received under this Agreement or otherwise, exceed the maximum non-usurious amount permissible under applicable Law.  If, from any possible construction of any of the Loan Documents or any other document, interest would otherwise be payable in excess of the maximum non-usurious amount, any such construction shall be subject to the provisions of this paragraph and interest owing pursuant to such documents shall be automatically reduced to the maximum non-usurious amount permitted under applicable Law, without the necessity of execution of any amendment or new document.  If Lender shall ever receive anything of value which is characterized as interest on the Obligation under applicable Law and which would, apart from this provision, be in excess of the maximum lawful amount, an amount equal to the amount which would have been excessive interest shall, without penalty, be applied to the reduction of the Term Principal Amount and not to the payment of interest, or refunded to Borrowers or the other payor thereof if and to the extent such amount which would have been excessive exceeds the Term Principal Amount.  The right to demand payment of the Obligation does not include the right to receive any interest which has not otherwise accrued on the date of such demand, and Lender does not intend to charge or receive any unearned interest in the event of such demand.  All interest paid or agreed to be paid to Lender with respect to the Obligation shall, to the extent permitted by applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term (including any renewal or

extension) of the Term Loan so that the amount of interest on account of the Obligation does not exceed the maximum non-usurious amount permitted by applicable Law.

Section 8.07    Multiple Originals.  Each Loan Document may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts must be construed together to constitute one and the same instrument.  Loan Documents may be transmitted and signed by facsimile, portable document format (PDF), and other electronic means and shall have the same effect as manually-signed originals and shall be binding on the Loan Parties and Lender.

Section 8.08    Governing Law and Jurisdiction.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET OUT THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

(b)    Jurisdiction.    Each Borrower and each other Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, any Lender or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of Texas sitting in Harris County, and of the United States District Court of the Southern District of Texas, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(c)    Waiver of Venue.    Each Borrower and each other Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in *Section 8.08(b)*.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Service of Process.    Each Borrower and each other Loan Party irrevocably consents to service of process in the manner provided for notices in *Section 8.01*.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable Law.

(e)    Litigation Priority.    Each Borrower and each other Loan Party irrevocably waives, to the fullest extent permitted by applicable Law, any claim that any action or proceeding

28

commenced by Lender relating in any way to this Agreement should be dismissed or stayed by reason, or pending the resolution, of any action or proceeding commenced by any Borrower or any other Loan Party relating in any way to this Agreement whether or not commenced earlier. To the fullest extent permitted by applicable Law, each Loan Party shall take all measures necessary for any such action or proceeding commenced Lender to proceed to judgment prior to the entry of judgment in any such action or proceeding commenced by any Loan Party.

Section 8.09    No Third-Party Beneficiaries.    This Agreement is for the sole and exclusive benefit of Borrowers and Lender, and there shall be no third-party beneficiaries under this Agreement. This Agreement does not create, and is not intended to create, any rights in favor of or enforceable by any other Person.  This Agreement may be amended or modified without notice to, or the consent of or approval of any other Person.

Section 8.10    Release of Liability.    To the maximum extent permitted by Law from time to time in effect, each Borrower and each other Loan Party hereby knowingly, voluntarily and intentionally (and after it has consulted with its own attorney) irrevocably and unconditionally agrees that no claim may be made by Borrowers or any other Loan Party against Lender or any of Lender's respective Affiliates, participants, partners, shareholders, members, directors, managers, officers, employees, attorneys, accountants, successors and assigns (collectively, the "***Indemnitees***" and each individually, an "***Indemnitee***"), for any special, indirect, consequential or punitive damages in respect of any breach or wrongful conduct (whether the claim is based on contract, tort or statute) arising out of, or related to, the transactions contemplated by this Agreement, any of the other Loan Documents, or any other related documents, or any act, omission, or event occurring in connection herewith or therewith.  In furtherance of the foregoing, each Loan Party hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor, and each Loan Party shall indemnify and hold harmless each Indemnitee of and from any such claims. Without prejudice to the survival of any other obligations of the Loan Parties under this Agreement or any other Loan Documents to which any Loan Party is a party, the obligations of the Loan Parties under this ***Section 8.10*** shall survive the termination of this Agreement and the other Loan Documents and the payment of the Obligation.

Section 8.11    <u>INDEMNIFICATION</u>.    WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT ARE CONSUMMATED, EACH LOAN PARTY SHALL INDEMNIFY AND HOLD HARMLESS EACH INDEMNITEE FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, DEMANDS, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES AND DISBURSEMENTS (INCLUDING FEES AND EXPENSES OF COUNSEL) OF ANY KIND OR NATURE WHATSOEVER WHICH MAY AT ANY TIME BE IMPOSED ON, INCURRED BY OR ASSERTED AGAINST ANY SUCH INDEMNITEE IN ANY WAY RELATING TO OR ARISING OUT OF OR IN CONNECTION WITH (A) THE EXECUTION, DELIVERY, ENFORCEMENT, PERFORMANCE OR ADMINISTRATION OF ANY LOAN DOCUMENT OR ANY OTHER AGREEMENT, LETTER OR INSTRUMENT DELIVERED IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED THEREBY OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED THEREBY, (B) ANY COMMITMENT, ADVANCE OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM, OR (C) **ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF ANY HAZARDOUS MATERIAL ON OR FROM ANY PROPERTY CURRENTLY OR FORMERLY OWNED OR OPERATED BY ANY LOAN PARTY, OR ANY LIABILITY IN RESPECT OF ANY ENVIRONMENTAL LAW RELATED IN ANY WAY TO ANY LOAN PARTY, OR** (D) ANY ACTUAL OR PROSPECTIVE LITIGATION, CLAIM, OR INVESTIGATION RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY (INCLUDING ANY INVESTIGATION OF, PREPARATION FOR, OR DEFENSE OF ANY

PENDING OR THREATENED CLAIM, INVESTIGATION, LITIGATION OR PROCEEDING) AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO (ALL THE FOREGOING, COLLECTIVELY, THE "*INDEMNIFIED LIABILITIES*"), **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE NEGLIGENCE OF THE INDEMNITEE**; *PROVIDED THAT*, SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, DEMANDS, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES OR DISBURSEMENTS ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NON-APPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.  ALL AMOUNTS DUE UNDER THIS *SECTION 8.11* SHALL BE PAYABLE WITHIN 10 (TEN) BUSINESS DAYS AFTER WRITTEN DEMAND.  THE AGREEMENTS IN THIS *SECTION 8.11* SHALL SURVIVE THE TERMINATION OF THE COMMITMENT, THE REPAYMENT, SATISFACTION OR DISCHARGE OF THE OBLIGATION, AND THE TERMINATION OF THE LOAN DOCUMENTS.

Section 8.12  **Waiver of Trial by Jury.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 8.13  Joint and Several Liability; Cross-Guaranty; Borrower Representative.

(a)  Notwithstanding anything herein to the contrary, except (in the case of any Guarantor) as otherwise set forth in the Guaranty executed by any Guarantor, each Person executing this Agreement identified as a "Borrower" or a "Guarantor" hereunder shall be jointly and severally liable to Lender and its successors and assigns for the full and prompt payment and performance of all of the Obligation; *provided that*, the maximum amount of each Borrower's and each Guarantor's joint and several liability hereunder is limited, to the extent, if any, required so that its liability is not subject to avoidance under any Debtor Relief Law.  Each Borrower and each Guarantor shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligation.

(b)  Each Borrower and each Guarantor hereby agrees that, except (in the case of any Guarantor) as otherwise set forth in the Guaranty executed by such Guarantor, all of them are jointly and severally liable for, and hereby absolutely and unconditionally guarantee to Lender and its successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of the Obligation.  Each Borrower agrees that its guaranty obligations hereunder are continuing guaranties of payment and performance and not of collection, that its obligations under this Agreement and the other Loan Documents shall not be discharged until the Obligation has been indefeasibly paid and performed in full, and that its obligations under this *Section 8.13* shall be absolute and unconditional, irrespective of, and

unaffected by, (i) the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other Loan Document or any Loan Document, document or instrument to which any Loan Party is or may become a party, (ii) the absence of any action to enforce this Agreement (including this ***Section 8.13***) or any other Loan Document or the waiver or consent by Lender with respect to any of the provisions thereof, (iii) the existence, value or condition of, or failure to perfect its lien against, any security for the Obligation or any action, or the absence of any action, by Lender in respect thereof (including the release of any such security), (iv) the insolvency of any Borrower, and Guarantor, or any other obligor, or (v) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

(c)     Each Borrower hereby designates Big Storm Real Estate as its representative and agent on its behalf for the purposes of giving instructions with respect to the disbursement of the proceeds of the Advances, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents, and taking all other actions on behalf of any Borrower or all of Borrowers under the Loan Documents. Big Storm Real Estate hereby accepts such appointment. Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or Borrowers hereunder to Borrower Representative on behalf of such Borrower or Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

(d)     Each Borrower expressly (i) waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution, and any other claim which such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligation hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property which is Collateral for the Obligation), arising from the existence or performance of this Agreement, and (ii) fully subordinates all other Debt owed to such Borrower by any other Borrower or Guarantor to the complete payment and performance of the Obligation, in each case until the Commitments have been irrevocably terminated and the Obligation has been indefeasibly paid in full.

(e)     Without limiting the foregoing, each Borrower waives any rights and defenses that such Borrower may have (i) arising from any impairment of such Borrower's rights of subrogation, reimbursement, indemnification, contribution, and any other rights and defenses that are or may become available to such Borrower under applicable Law, (ii) by reason of any election of remedies by the creditor, and (iii) because the principal's note or other obligation is secured by real property or an estate for years.

Section 8.14     <u>Loan Agreement Controls</u>.  In the event of a conflict or inconsistency between the terms and provisions of this Agreement and the terms and provisions of any of the other Loan Documents, the terms and provisions of this Agreement shall govern and control.

Section 8.15     <u>Collateral Protection Insurance</u>.  TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE:  (a) EACH BORROWER IS REQUIRED TO (i) KEEP THE PROPERTIES INSURED AGAINST DAMAGE IN THE AMOUNT LENDER SPECIFIES; (ii) PURCHASE THE INSURANCE FROM AN INSURER OR AN ELIGIBLE SURPLUS LINES INSURER; AND (iii) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY

IN THE EVENT OF A LOSS; (b) BORROWERS MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (c) IF BORROWERS FAIL TO MEET ANY REQUIREMENT LISTED IN CLAUSE (a) OR (b), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWERS AT BORROWERS' EXPENSE.

Section 8.16    **Final Agreement**.    **THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

[*Signatures are on the following page.*]

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed as of the date first above written.

**BORROWERS:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By: _____
      Leo Joseph Govoni
      Manager

BIG STORM PINELLAS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

By: _____
      Leo Joseph Govoni
      Manager

**LENDER:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

By:     Briar Capital, L.P.,
        its sole member

By:     Briar Capital General, LLC,
        its general partner

By:_____
        Frank S. Goldberg
        Chief Executive Officer

Each of the undersigned hereby acknowledges and agrees to the terms and conditions of this Agreement, and agrees to be bound thereby, in all respects.

**GUARANTORS:**

_____
Leo Joseph Govoni, individually


**BIG STORM BREWERY LLC,**
a Florida limited liability company

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By:_____
              Leo Joseph Govoni
              Manager


**BIG STORM PASCO LLC,**
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
        as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By:_____
              Leo Joseph Govoni
              Manager


Signature Page to Loan Agreement

BIG STORM CAPE CORAL LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
              Leo Joseph Govoni
              Manager

BIG STORM COFFEE COMPANY LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
              Leo Joseph Govoni
              Manager

BIG STORM CIDER AND MEAD LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
              Leo Joseph Govoni
              Manager

BIG STORM COCKTAILS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

By:    _____
       Leo Joseph Govoni
       Manager

**SCHEDULE 1**

**Land**

The property located at or about 12707 49th Street North, Clearwater, Florida 33762, having a Pinellas County Property Appraiser's Parcel Number of 09-30-16-70992-100-1207, described more particularly as follows:

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

The North 160.0 feet of the South 405.0 feet of Lot 12, in the N.E. 1/4 of Section 9, Township 30 South, Range 16 East, as shown by the Plat of PINELLAS GROVES, INC., as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, LESS that portion lying within 50.0 feet of the centerline of 49th Street North as it is now constructed.

AND

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

That part of Lots 12 and 13 in the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas Groves, as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, more particularly described as follows:

The South 260.0 feet of the West 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the West 50.0 feet thereof for 49th Street North Right of Way and less the South 30.0 feet thereof for 126th Avenue North Right of Way.

Together with the West 165.00 feet of the East 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the North 995.81 feet thereof and less the South 30.00 feet thereof for 126th Avenue North Right of Way, and reserving the East 40.00 feet of said West 165.00 feet for street purposes.

Less that portion conveyed to Pinellas County in O.R. Book 7593, Page 1527, Public Records of Pinellas County Florida.

**SCHEDULE 3.09**

**Company Information; Equity Interests**

A.      **Company Information**

| Company Name | Address of Chief Executive Office | Organizational ID No. | Entity Type | Jurisdiction of Formation | U.S. Taxpayer Identification Number |
|---|---|---|---|---|---|
| Big Storm Real Estate LLC | 12707 49th Street N. Suite 500 Clearwater, Florida 33762 | L15000011199 | Limited Liability Company | Florida | 47-2955495 |
| Big Storm Pinellas LLC | 12707 49th Street N. Suite 500 Clearwater, Florida 33762 | L14000180884 | Limited Liability Company | Florida | 47-3226518 |

B.      **Equity Interests**

| Borrower | Owners | Percent Owned |
|---|---|---|
| Big Storm Real Estate LLC | Boston Holding Real Estate LLC | 100% |
| Big Storm Pinellas LLC | Big Storm Brewery LLC | 100% |

**APPENDIX 1**
**OTHER DEFINED TERMS**

As used in this Agreement and the Loan Documents, the following terms shall have the following meanings, unless the context otherwise requires:

*Acceptable Form* means in form and substance acceptable to Lender.

*ACH Agreement* means an agreement in Acceptable Form among Borrower, Lender, and a Depository Bank allowing Lender to automatically debit an amount sufficient to make any payments from time to time required under this Agreement.

*Advance* means any (a) advance of funds by Lender in respect of the Term Loan, or (b) any other amount (including any Protective Advance) disbursed by Lender under the Loan Documents for any reason.

*Affiliate* means, as to any Person, any other Person that directly or indirectly Controls, or is Controlled by, or is under common Control with, that Person. For purposes of this definition, (a) the term "*Affiliate*" when used in respect of any Borrower includes each shareholder, member, partner, officer, director, or manager of such Borrower, and (b) each of the following are "*Affiliates*" of the others:  (i) each Guarantor; (ii) each Borrower; (iii) any shareholder, member, partner, officer, director, or manager of any Borrower; (iv) any corporation, partnership or limited liability company whose primary shareholders, partners or members are the spouse, children or other family member of any Individual Guarantor (or any other natural person who directly or indirectly controls Borrower); and (v) any trust whose primary beneficiaries are the spouse, children or other family member of any Individual Guarantor (or any other natural person who directly or indirectly controls Borrower).

*Agreement* means this Loan Agreement and all schedules and exhibits to this Loan Agreement.

*Anti-Terrorism Laws* means any and all present and future judicial decisions, Laws, rulings, permits, certificates, and orders of any Governmental Authority relating to terrorism or money laundering, including, without limiting the generality of the foregoing, the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*Patriot Act*"); the Trading with the Enemy Act (50 U.S.C.A. App. I et. seq.) (the "*Trading with the Enemy Act*"); the International Emergency Economic Powers Act (50 U.S.C.A. § 1701-06); Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"); each list from time to time maintained by OFAC with respect to Sanctioned Entities and Sanctioned Persons.

*Bankruptcy Code* means the Bankruptcy Code in Title 11 of the United States Code, as amended, modified, succeeded or replaced from time to time.

*Big Storm Brewery* means Big Storm Brewery LLC, a Florida limited liability company.

*Big Storm Cape Coral* means Big Storm Cape Coral LLC, a Florida limited liability company.

*Big Storm Cider and Mead* means Big Storm Cider and Mead LLC, a Florida limited liability company.

*Big Storm Cocktails* means Big Storm Cocktails LLC, a Florida limited liability company.

***Big Storm Coffee*** means Big Storm Coffee Company LLC, a Florida limited liability company.

***Big Storm Pasco*** means Big Storm Pasco LLC, a Florida limited liability company.

***Big Storm Pinellas Lease*** means that certain Lease Agreement dated as of February 4, 2015, between Big Storm Real Estate, as landlord, and Big Storm Pinellas, as tenant, pursuant to which Big Storm Pinellas leases the Mortgaged Property from Big Storm Real Estate, as such Lease Agreement may be amended, extended, renewed, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof.

***Board of Directors*** means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person, (b) in the case of any limited liability company, the board of managers, sole member, managing member, or other governing body of such Person, (c) in the case of any partnership, the Board of Directors of the general partner of such Person, and (d) in any other case, the functional equivalent of the foregoing.

***Borrower*** means each of, and ***Borrowers*** means all of, Big Storm Real Estate, Big Storm Pinellas, and each other Person from time to time party hereto as a "Borrower" (including any trustee or other fiduciary hereafter appointed as the legal representative for any or all such Persons or with respect to the property of the estate of any or all such Persons, whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case, and the successor upon conclusion of the Chapter 11 Case of each such Person).

***Borrower Representative*** means Big Storm Real Estate.

***Boston Finance Credit Agreement*** means that certain Revolving Line of Credit Agreement dated effective as of December 1, 2014, among Big Storm Pinellas, as the debtor thereunder, and Boston Finance, as the lender thereunder, as amended, restated, supplemented, replaced, refinanced, or otherwise modified from time to time in accordance with the terms thereof and hereof.

***Boston Finance*** means Boston Finance Group, LLC, a Florida limited liability company.

***Boston Holding*** means Boston Holding Company, LLC, a Florida limited liability company.

***Business Day*** means a weekday, Monday through Friday, except a legal holiday or a day on which Lender's offices are otherwise closed and, if such day relates to any determination of the LIBOR Rate, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank Eurodollar market.  Unless otherwise provided, the term "days" when used herein shall mean calendar days.

***CERCLA*** shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986), and as now or hereafter amended.

***Change of Control*** means that (a) Leo Joseph Govoni fails to own and control, directly or indirectly, 95% or more, of the Equity Interests of Big Storm Real Estate, (b) Leo Joseph Govoni and Leo John Govoni fail to collectively own and control, directly or indirectly, 90% or more of the Equity Interests of Big Storm Pinellas and each Entity Guarantor having the right to vote for the election of members of such Person's Board of Directors, or (c) a majority of the members of the Board of Directors of any Borrower or any Entity Guarantor were not nominated or approved by Leo Joseph Govoni and Leo John Govoni.

***Closing Date*** means the date all conditions precedent to Lender's obligation to make the initial Advances described in ***Section 7.01*** have been satisfied or waived in writing by Lender.

***Closing Financial Statements*** is defined in ***Section 3.03***.

***Collateral*** means all Property of Borrowers and the Entity Guarantors.

***Commitment*** means Lender's obligation and commitment to make the Term Loan in an amount not to exceed the Maximum Loan Amount.

***Control*** means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controls," "Controlling," and "Controlled" shall have meanings correlative thereto.

***Current Financials*** means, when determined, the consolidated financial statements most recently delivered to Lender under ***Section 4.01***.

***Debt*** means (without duplication), for any Person, all obligations required by GAAP to be classified upon such Person's balance sheet as liabilities.

***Debtor Relief Laws*** means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, fraudulent transfer, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

***Default*** means the occurrence of any event or the existence of any circumstance that would, with the giving of notice or lapse of time, or both, become an Event of Default.

***Depository Bank*** means a commercial bank whose deposits are insured by the FDIC and is otherwise acceptable to Lender.

***Deed of Trust*** means each deed of trust and assignment of leases and rents in Acceptable Form and executed by a Borrower, as grantor, in favor of the trustee named therein, for the benefit of Lender, to secure the Obligation.

***Disposition*** means the sale, assignment, transfer, license, lease (as lessor), exchange, or other disposition of any asset by any Person (including any sale and leaseback transaction), or the granting of any option or other right to do any of the foregoing.

***Distribution*** means (a) any dividend, distribution, or other payment (whether in cash, securities, or other property) in respect of the Equity Interests of a Person, (b) any redemption, purchase, retirement or other acquisition by a Person of any of its Equity Interests, including under any put option or call option, or (c) the establishment of any fund for any such distribution, dividend, payment, redemption, purchase, retirement, or acquisition, including any sinking fund or similar arrangement.

***Dollars*** and ***$*** mean lawful money of the United States of America.

***Effective Date*** means the date of this Agreement.

*Eminent Domain Event* means any Governmental Authority, or any Person acting under, for, or on behalf of, a Governmental Authority, institutes proceedings to condemn, seize or appropriate all or part of any Mortgaged Property or other Collateral.

*Entity Guarantor* means (a) Big Storm Brewery, (b) Big Storm Pasco, (c) Big Storm Cape Coral, (d) Big Storm Cider and Mead, (e) Big Storm Cocktails, (f) Big Storm Coffee, and (g) any other Person (other than a natural person) that executes a Guaranty in favor of Lender.

*Environmental Indemnity* means each of, and *Environmental Indemnities* means all of, (a) that certain Environmental Indemnity Agreement dated as of the Closing Date, among Borrowers, as indemnitors, and Lender, and (b) each other Environmental Indemnity Agreement executed by any other Person for the benefit of Lender, in each case, as amended, restated, or supplemented from time to time.

*Environmental Law* shall mean, collectively, CERCLA the Hazardous Materials Transportation Act (49 U.S. C. Section 1802 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. Section 300f et seq.), the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), the Clean Air Act (42 U.S.C. Section 7401 et seq.), and all other federal, state or local statutes, ordinances, codes, rules, regulations, judgments, orders and decrees regulating, relating to the pollution or protection of the environment, the release of any materials into the environment, or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material as now or at any time hereafter in effect, each as now or hereafter amended, and all permits, licenses, authorizations, concessions, grants, franchises, agreements or other governmental restrictions or requirements relating to the protection of the environment or to any Hazardous Substance.

*Equity Interests* means, as to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

*ERISA* means the Employee Retirement Income Security Act of 1974.

*ERISA Plan* means any plan subject to Title IV of ERISA and maintained by a Borrower or any affiliate thereof, or any such plan to which a Borrower is required to contribute on behalf of its employees.

*Escrow Fund* shall mean the amounts of money necessary to fund the Property Taxes and insurance premiums, in each case as set forth in *Section 2.11* hereof.

*Event of Default* is defined in *Section 6.01*.

*Exchange Act* means the Securities Exchange Act of 1934, as in effect from time to time.

*FDIC* means the Federal Deposit Insurance Corporation or any successor thereto.

*Flood Insurance Regulations* means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, et seq.), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto, and in each case, any regulations promulgated thereunder.

*GAAP* means generally accepted accounting principles in the U.S. set out in the opinions and pronouncements of the of the Accounting Principles Board of the American Institute of Certified Public Accountants and the Financial Accounting Standards Board as in effect from time to time.

*Governmental Authority* means any nation, state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

*Guarantor* means each of, and "*Guarantors*" means all of, (a) each Entity Guarantor, and (b) each Individual Guarantor.

*Guaranty* means a guaranty agreement in Acceptable Form.

*Hazardous Substance* shall mean: (a) any "hazardous substance" as such term is presently defined in CERCLA; (b) any additional substances or materials which are hereafter incorporated in or added to the definition of "hazardous substance" for the purposes of CERCLA; (c) any element, substance, compound or mixture, including disease-causing agents, now or hereafter designated as, or containing components designated as, hazardous, dangerous, toxic, harmful, and/or subject to regulation by any Environmental Law, including asbestos in any form and any substance containing asbestos, mold, urea formaldehyde foam insulation, transformers or other equipment which contains dielectric fluid or polychlorinated biphenyls, flammable explosives, lead, radioactive materials, chemicals known to cause cancer or reproductive toxicity, pollutants, effluents, contaminants, emissions or related materials and any waste, substance or material now or hereafter regulated by any Environmental Law; (d) any radioactive material, including any source, special nuclear or by-product material as defined at 42 U.S.C. Section 2014, as now or hereafter amended; (e) any lead-based paint; and (f) mold, fungus, micro bacterial contamination or pathogenic organisms.

*Improvements* means, collectively, all buildings, structures, fixtures, and other improvements constructed or situated on, or attached or otherwise affixed to, all or any portion of the Land, in each case whether now existing or hereafter created or constructed.

*Individual Guarantor* means each of, and "*Individual Guarantors*" means all of (a) Leo Joseph Govoni, an individual, and (b) any other natural person that executes a Guaranty in favor of Lender.

*Interest Determination Date* means the day that is two (2) Business Days prior to the last day of each month.

*Key Management Person* means Leo Joseph Govoni and Leo John Govoni.

*Land* means the parcels of real property and all related rights and interests owned by Borrowers and described on *Schedule 1*.

***Laws*** means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority (whether or not such orders, requests, licenses, authorizations, permits or agreements have the force of law).  The term "***Law***" shall have a correlative meaning.

***Lease*** or ***Leases*** shall mean the Big Storm Pinellas Lease any of the other leases now in existence between any Borrower and any other party as lessee or tenant, and all agreements for use and occupancy of all or any part of the Mortgaged Property, now existing or hereafter entered into, including (a) the entire landlord's or lessor's interest in all present and future leases (including subleases), licenses and concessions (including rights in respect of lessees or tenants holding over and tenancies following attornment) covering all or any portion of the Mortgaged Property, (b) all agreements for the use or occupancy of any portion of the Mortgaged Property, (c) any and all guaranties of the performance of any lessee, tenant, or other party under any lease, license or concession, (d) all cash or securities deposited with such Borrower to secure performance of any lessee's or tenant's obligations under such lease, and (e) any and all extensions, modifications, renewals or supplements to any such lease, license or concession (including any guaranty or other item included in this definition of "Leases").

***Lender*** is defined in the preamble to this Agreement.

***LIBOR Rate*** means, when determined, the variable rate of interest per annum equal to the one month London interbank offered rate as published in the "Money Rates" section of *The Wall Street Journal* on the applicable Interest Determination Date (or, if such source is not available, such alternate source as determined or selected by the Lender), as adjusted from time to time in Lender's sole discretion for reserve requirements, deposit insurance assessment rates, and other regulatory costs; *provided that*, if at any time the LIBOR Rate is less than 0.25%, the LIBOR Rate shall be deemed to be 0.25% for purposes of this Agreement.  If such rate shall cease to be published or is published infrequently or sporadically, then the LIBOR Rate shall be determined by reference to another rate or lending rate index selected by Lender in its sole and absolute discretion.

***Lien*** means any lien (including statutory liens), mortgage, security interest, financing statement, collateral assignment, pledge, negative pledge assignment, charge, encumbrance, hypothecation, deposit arrangement, purchase option, right of first refusal, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever, or encumbrance of any kind, and any other right of or arrangement with any creditor (whether based on common law, constitutional provision, statute or contract) to have its claim satisfied out of any Property or assets, or their proceeds, before the claims of the general creditors of the owner of such Property or assets.

***Loan Documents*** means this Agreement, the Term Note, all Guaranties, all Deeds of Trust and Mortgages, all Environmental Indemnities, all SNDAs, all Subordination Agreements, all security agreements, pledge agreements, and other documents and instruments from time to time executed to create or perfect a lien on any Collateral, all other documents, instruments, certificates and requests from time to time executed with any of the foregoing, and all annexes, appendices, exhibits and schedules to any of the foregoing, in each case as amended, restated, supplemented, or otherwise modified from time to time.

***Loan Party*** means each of, and ***Loan Parties*** means all of, Borrowers and Guarantors.

***Material Adverse Event*** means any circumstance or event that, individually or collectively with other circumstances or events, could reasonably be expected to result in the impairment of any Loan Party's ability to perform any material obligations, or enforce any rights under, any Loan Document, a material adverse effect upon the enforceability of any Loan Document, or a material and adverse change in, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise), or prospects of any Loan Party as represented in the Closing Financial Statements.

***Maximum Loan Amount*** means $2,500,000 as such amount may be adjusted from time to time by Lender in its sole discretion based on any appraisal of the Mortgaged Property (or any portion thereof) obtained by Lender pursuant to this Agreement.

***Maximum Rate*** means the maximum rate of non-usurious interest permitted from day-to-day by applicable Law, including Chapter 303 of the Texas Finance Code (the "***Finance Code***") (and as the same may be incorporated by reference in other Texas statutes).  To the extent that Chapter 303 of the Finance Code is relevant to Lender for the purposes of determining the Maximum Rate, Lender may elect to determine such applicable legal rate pursuant to the "weekly ceiling," from time to time in effect, as referred to and defined in Chapter 303 of the Finance Code; subject, however, to the limitations on such applicable ceiling referred to and defined in the Finance Code, and further subject to any right Lender may have subsequently, under applicable Law, to change the method of determining the Maximum Rate.

***Mortgage*** means each mortgage and assignment of leases and rents in Acceptable Form and executed by a Borrower, as mortgagor, for the benefit of Lender, to secure the Obligation.

***Mortgaged Property*** means each of, and ***Mortgaged Properties*** means all of, the Land, Improvements, and other assets constituting "Mortgaged Property" under, and as defined in, each Deed of Trust and Mortgage.

***Net Proceeds*** means (a) with respect to any Disposition of any asset by any Person, the aggregate amount of cash and non-cash proceeds from such Disposition received by, or paid to or for the account of, such Person, net of customary and reasonable out-of-pocket costs, fees, and expenses, (b) with respect to any amount payable under any insurance policy, all cash proceeds received by, or paid to or for the account of, any Loan Party or Lender from an insurer under any insurance policy maintained by any such Loan Party, and (c) with respect to any Eminent Domain Event, all cash proceeds received by, or paid to or for the account of, any Loan Party from any Governmental Authority net of attorney's fees and other customary and reasonable out of pocket costs, fees, and expenses.  Non-cash proceeds include any cash proceeds received by way of deferred payment of principal pursuant to a note, installment receivable, purchase price adjustment receivable, or otherwise, but only as and when received.

***Obligation*** means all present and future Debt, liabilities and other obligations, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, and all renewals, increases and extensions thereof, or any part thereof, now or in the future owed to Lender by any Loan Party under any Loan Document, *together with* all interest accruing thereon, reasonable fees, costs and expenses payable under the Loan Documents or in connection with the enforcement of rights under the Loan Documents, including (a) fees and expenses payable or reimbursable under ***Section 4.05***, and (b) interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

***OFAC*** means the Office of Foreign Assets Control of the U.S. Department of the Treasury, and any successor office, agency, or department.

*Organizational Documents* means, for any Person, (a) the articles of incorporation or certificate of formation and bylaws of such Person if such Person is a corporation, (b) the articles of organization or certificate of formation and regulations or limited liability company agreement (or other similar governing document) of such Person if such Person is a limited liability company, (c) the certificate of limited partnership or certificate of formation and the limited partnership agreement of such Person if such Person is a limited partnership, or (d) the documents under which such Person was created and is governed if such person is not a corporation, limited liability company or limited partnership.

*Other Charges* shall mean all ground rents, maintenance charges, governmental impositions, appraisal fees, fees in respect of environmental assessments, and other similar charges in respect of or otherwise affecting any Mortgaged Property or other Collateral, and any other fees, charges, or expenses incurred by Lender in connection with this Agreement or otherwise assessed against or in connection with the Mortgaged Property.

*Overadvance* means any Advance (or any portion thereof) that, when made, would cause the Term Principal Amount to exceed the Maximum Loan Amount.

*Permitted Debt* means the Debt permitted under *Section 5.01*.

*Permitted Liens* is defined in *Section 5.02*.

*Person* means any individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, Governmental Authority or other entity or organization of whatever nature.

*Prime Rate* means the rate of interest per annum quoted in the "Money Rates" section of *The Wall Street Journal* (or, if such source is not available, such alternate source as determined or selected by the Lender) on the applicable Interest Determination Date and designated as the "Prime Rate" for the U.S. If such prime rate, as so quoted, is split between two or more different interest rates, then the Prime Rate shall be the highest of such interest rates; *provided that*, if at any time the Prime Rate is less than 3.25%, the Prime Rate shall be deemed to be 3.25% for purposes of this Agreement. If such prime rate shall cease to be published or is published infrequently or sporadically, then the Prime Rate shall be (a) the rate of interest per annum designated from time to time by Lender as its base or prime rate, which may not necessarily be the lowest interest rate charged by Lender and is set by Lender in its sole discretion, or (b) if Lender does not designate or announce a base or prime rate, or does so infrequently or sporadically, then the Prime Rate shall be determined by reference to another base rate, prime rate or similar lending rate index selected by Lender in its sole and absolute discretion.

*Prohibited Person* means any Person that (a) is a Sanctioned Entity or a Sanctioned Person, (b) is specifically named or listed in, or otherwise prohibited from engaging in transactions with Lender due to, any Anti-Terrorism Laws, (c) is owned or controlled by, or acting for or on behalf of, any Person specifically named or listed in, or otherwise prohibited from engaging in transactions with Lender due to, any Anti-Terrorism Laws, (d) Lender is prohibited from dealing with, or engaging in any transaction with, pursuant to any Anti-Terrorism Laws, or (e) is affiliated with any Person described in *clauses (a)-(d)* of this definition.

*Property* means any interest in any kind of asset, whether real, personal or mixed, or tangible or intangible. The term "*Properties*" shall have a correlative meaning.

*Property Taxes* shall mean ad valorem taxes, assessments, water rates, and sewer rents, now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof.

*Protective Advance* is defined in *Section 2.02(b)*.

*Related Parties* means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

*Responsible Officer* means, for any Person, its chief executive officer, president, any vice president, or treasurer.

*Restricted Payment* means (a) any Distribution, (b) any amount paid by any Borrower or any of its Subsidiaries in repayment, redemption, retirement, repurchase, direct or indirect, of any Subordinated Debt, (c) any payment by any Borrower or any of its Subsidiaries of any management fees, consulting fees or other similar fees to any of its Affiliates, whether pursuant to a management agreement or otherwise, or (d) any voluntary or mandatory repayment, prepayment, defeasance, or other payment in respect of any Subordinated Debt.

*RICO* means the Racketeer Influence and Corrupt Organization Act of 1970, as amended.

*Sanctioned Entity* means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in a country, in each case, that is subject to a country sanctions program administered and enforced by OFAC.

*Sanctioned Person* means a Person named on the Specially Designated Nationals and Blocked Persons List maintained by OFAC or in Section 1 of the Anti-Terrorism Order, as amended.

*Seaboard Craft Beer* means Seaboard Craft Beer Holdings LLC, a Florida limited liability company.

*Segregated Account* means a deposit account established by Big Storm Real Estate and maintained at American Momentum Bank, which shall be subject to a deposit account control agreement in favor of Lender and in Proper Form, and into which the proceeds of the Term Loan (after deducting all closing fees and expenses and the amounts necessary to fund the Escrow Fund) will be deposited and held until used for purposes permitted under this Agreement.

*SNDA* means a Subordination, Non-Disturbance and Attornment Agreement in Acceptable Form, among one or more lessees or tenants of any Mortgaged Property, the applicable Loan Party, and Lender.

*Solvent* means, with respect to any Person as of a particular date, that on such date (a) such Person is able to pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (b) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature in their ordinary course, (c) such Person is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Person's assets would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which such Person is engaged or is to engage and (d) the book value of the assets of such Person as set out on such Person's balance sheet is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person.  In computing the amount of contingent liabilities at any time, it is intended that such liabilities will be computed as the amount which, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

**Subordinated Debt** means Debt which is contractually subordinated in right of payment, collection, enforcement and lien rights to the prior payment in full of the Obligation on terms satisfactory to Lender.

**Subordination Agreement** means a subordination agreement in Proper Form.

**Subsidiary** of a Person means another Person of which a majority of the voting Equity Interests are at the time beneficially owned or Controlled by, or the management of which is otherwise Controlled, in each case directly or indirectly through one or more intermediaries, or both, by such Person.

**Tangible Net Worth** means, when determined for Big Storm Brewery and its Subsidiaries on a consolidated basis and without duplication, (a) the aggregate amount at which all assets of Big Storm Brewery and its Subsidiaries would be shown on a balance sheet at such date, *minus* (b) Total Liabilities of Big Storm Brewery and its Subsidiaries, after deducting (i) patents, copyrights, trademarks, trade names, franchises, goodwill, experimental expenses and other similar intangibles net of accumulated amortization; (ii) unamortized debt discount and expense; (iii) assets located, and notes and accounts receivable due from obligors domiciled, outside the U.S.; (iv) obligations due to Big Storm Brewery and its Subsidiaries from their respective Affiliates to the extent such obligations exceed the liabilities of Big Storm Brewery and its Subsidiaries to such Affiliates as of such date, calculated in accordance with GAAP and shown on the Closing Financial Statements or the Current Financials, (v) capitalized research and development costs, and (vi) such other assets as are properly classified as "intangible assets," *plus* (c) Subordinated Debt of Big Storm Brewery and its Subsidiaries.

**Tax Distribution** means, for any period or portion thereof in which Borrowers are pass-through entities (including a disregarded entity or partnership) for U.S. federal income tax purposes, cash Distributions made by Borrowers to the respective holders of their Equity Interests on or prior to each estimated payment date in an aggregate amount not greater than the amount estimated to be necessary for such members to pay their estimated state and U.S. federal income tax liabilities (calculated at the highest marginal rate applicable to any such holder of Equity Interests) in respect of income earned by Borrowers during the applicable period, taking into account (a) any taxable losses of Borrowers allocated to such members in prior periods but not previously utilized as an offset against income or gains, (b) the deductibility of U.S. state taxes, and (c) the character of any income, gains, deductions, losses or credits.

**Term Loan** is defined **Section 2.01**.

**Term Loan Maturity Date** means the *earlier* of (a) September 18, 2023, (b) the acceleration of the Obligation in accordance with **Section 6.02**.

**Term Note** means a promissory note substantially in the form of **Exhibit A**, executed by Borrowers and made payable to the order of Lender.

**Term Principal Amount** means, when determined, the aggregate outstanding principal amount of the Term Loan.

**U.S.** means United States of America.

**UCC** means (a) the Uniform Commercial Code in effect in Texas from time to time, or (b) if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of Lender's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Texas, the Uniform Commercial Code as in effect in such other

jurisdiction for purposes of the provisions of this Agreement relating to such perfection or effect of perfection or non-perfection.

**EXHIBIT A**

**FORM OF TERM NOTE**

$2,500,000.00                    Houston, Texas                    As of _____, 2020

FOR VALUE RECEIVED, BIG STORM REAL ESTATE LLC, a Florida limited liability company ("***Big Storm Real Estate***"), BIG STORM PINELLAS LLC, a Florida limited liability company ("***Big Storm Pinellas***"), and each other Person from time to time party hereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "***Borrowers***," and each individually, a "***Borrower***"), hereby promise to pay to the order of BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company ("***Lender***") on or before the Term Loan Maturity Date, the principal amount of $2,500,000.00, or so much thereof as may be disbursed and outstanding under this note, together with interest, as described in this note.

This note has been executed and delivered under, and is subject to the terms of, that certain Loan Agreement dated as of the date hereof (as amended, restated, supplemented, or otherwise modified from time to time, the "***Loan Agreement***"), between Borrower and the other parties from time to time parties thereto as "Borrowers", and Lender, and is the *Term Note* referred to in the Loan Agreement. Unless defined in this note, or the context requires otherwise, capitalized terms used in this note have the meanings given to such terms in the Loan Agreement. Reference is made to the Loan Agreement for provisions affecting this note regarding applicable interest rates, principal and interest payment dates, final maturity, voluntary and mandatory prepayments, acceleration of maturity, exercise of rights, payment of attorneys' fees, court costs and other costs of collection, certain waivers by Borrower and others now or hereafter obligated for payment of any sums due under this note, and security for the payment of this note. This note is a Loan Document and, therefore, is subject to the applicable provisions of ***Article VIII*** of the Loan Agreement, all of which applicable provisions are incorporated into this note by reference as if set forth in this note verbatim.

Specific reference is made to ***Section 8.06*** of the Loan Agreement for usury savings provisions.

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE DETERMINED SOLELY FROM WRITTEN AGREEMENTS, DOCUMENTS, AND INSTRUMENTS, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO SUCH WRITINGS. THIS NOTE, THE LOAN AGREEMENT, AND THE OTHER WRITTEN LOAN DOCUMENTS EXECUTED BY BORROWERS AND LENDER (OR BY ANY BORROWER FOR THE BENEFIT OF LENDER) REPRESENT THE FINAL AGREEMENT BETWEEN BORROWERS AND LENDER WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

THIS NOTE MUST BE CONSTRUED — AND ITS PERFORMANCE ENFORCED — UNDER TEXAS LAW.

***[Signature is on the following page.]***

EXECUTED as of the date first written above.

**BORROWERS:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By: _____

Name: _____

Title: _____


BIG STORM PINELLAS LLC,
a Florida limited liability company

By: _____

Name: _____

Title: _____

# EXHIBIT C

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Attn: Jason T. Lloyd

THIS DOCUMENT PREPARED BY:

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Attn: Jason T. Lloyd

_____

Space above this line for Recorder's Use

## MORTGAGE, ASSIGNMENT OF RENTS,
## SECURITY AGREEMENT AND FIXTURE FILING

This Mortgage, dated as of September 18, 2020 (this "*Mortgage*"), is given by BIG STORM REAL ESTATE LLC, a Florida limited liability company ("*Big Storm Real Estate*"), as mortgagor ("*Mortgagor*"), whose address is 12707 49th Street North, Clearwater, FL 33762, to Briar Capital Real Estate Fund, LLC, a Texas limited liability company, as mortgagee (together with its successors and assigns, "*Mortgagee*"), whose address is 1500 CityWest Boulevard, Suite 560, Houston, Texas 77042. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Loan Agreement (as defined below).

1.   GRANT.

1.1.   The Property. For the purpose of securing payment and performance of the Secured Obligations defined in **Section 2** below, Mortgagor hereby irrevocably and unconditionally grants, conveys, transfers and assigns to Mortgagee, upon the statutory mortgage condition for breach of which this Mortgage is subject to foreclosure as provided by Law, with mortgage covenants and right of entry and possession, all estate, right, title and interest which Mortgagor now has or may later acquire in the following property (all or any part of such property, or any interest in all or any part of it, together with the Personalty (as hereinafter defined) being hereinafter collectively referred to as the "*Property*"):

(a)   The real property located in the County of Pinellas, State of Florida, as described in Exhibit A hereto (the "*Land*");

(b)   All buildings, structures, improvements, fixtures and appurtenances now or hereafter placed on the Land, and all apparatus and equipment now or hereafter attached in any manner to the Land or any building on the Land, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment (collectively, the "*Improvements*");

(c)   All easements and rights of way appurtenant to the Land; all crops growing or to be grown on the Land (including all such crops following severance from the Land); all standing timber upon the Land (including all such timber following severance from the Land); all

10696107v2

development rights or credits and air rights; all water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and shares of stock pertaining to such water or water rights, ownership of which affect the Land; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Land;

(d)    All existing and future leases, subleases, subtenancies, licenses, occupancy agreements and concessions relating to the use and enjoyment of all or any part of the Land or the Improvements, and any and all guaranties and other agreements relating to or made in connection with any of the foregoing;

(e)    All proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any of the Land, Improvements, or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies, whether or not such policies are required by Mortgagee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or the other property described above or any part of them; and

(f)    All proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above.

1.2.    Fixture Filing.  This Mortgage constitutes a financing statement filed as a fixture filing under the Florida Uniform Commercial Code, as amended or recodified from time to time, covering any Property which now is or later may become a fixture attached to the Land or any building located thereon.

2.    THE SECURED OBLIGATIONS.

2.1.    Purpose of Securing.  Mortgagor makes the grant, conveyance, transfer and assignment set forth in *Section 1*, makes the irrevocable and absolute assignment set forth in *Section 3*, and grants the security interest set forth in *Section 4*, all for the purpose of securing the Obligation (as defined in the Loan Agreement), including, but not limited to, the following obligations (collectively, the "*Secured Obligations*"), in any order of priority that Mortgagee may choose:

(a)    Payment of all obligations of Mortgagor (in such capacity, the "*Obligor*") to Mortgagee arising under the following instrument(s) or agreement(s) (in each case, as amended, restated, extended, renewed, replaced, or otherwise modified from time to time, collectively, the "*Debt Instrument*"):

(i)    A certain Term Note dated as of September 18, 2020 (as amended, restated, extended, renewed, replaced, supplemented, or otherwise modified from time to time), payable by Obligor and Big Storm Pinellas LLC, a Florida limited liability company ("*Big Storm Pinellas*"), as makers in the stated principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) to the order of Mortgagee, the terms of which are incorporated herein by reference.

(ii)    A certain Loan Agreement dated as of September 18, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "*Loan Agreement*"), between Obligor, Big Storm Pinellas, and Mortgagee, which provides for a Term Loan in a principal amount not exceeding Two Million Five Hundred Thousand

and 00/100 Dollars ($2,500,000.00), and certain Protective Advances and Overadvances, the terms of which are incorporated herein by reference.

(iii)    A certain Guaranty Agreement dated as of September 18, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "*Entity Guaranty*"), given by Big Storm Brewery LLC, a Florida limited liability company ("*Big Storm Brewery*"), Big Storm Pasco LLC, a Florida limited liability company ("*Big Storm Pasco*"), Big Storm Cape Coral LLC, a Florida limited liability company ("*Big Storm Cape Coral*"), Big Storm Cider and Mead LLC, a Florida limited liability company ("*Big Storm Cider and Mead*"), Big Storm Cocktails LLC, a Florida limited liability company ("*Big Storm Cocktails*"), Big Storm Coffee Company LLC, a Florida limited liability company ("*Big Storm Coffee*", together with Big Storm Brewery, Big Storm Pasco, Big Storm Cape Coral, Big Storm Cider and Mead, and Big Storm Cocktails, the "*Entity Guarantors*") for the benefit of Mortgagee, to guarantee the complete payment and performance of all of Obligor's Obligations under the Loan Agreement and related loan documents.

(iv)    A certain Guaranty Agreement dated as of September 18, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "*Individual Guaranty*", together with the Entity Guaranty, collectively, the "*Guaranty*"), given by Leo Joseph Govoni (in such capacity, "*Individual Guarantor*", together with the Entity Guarantors, collectively, the "*Guarantor*") for the benefit of Mortgagee, to guarantee the complete payment and performance of all of Obligor's Obligations under the Loan Agreement and related loan documents.

(v)    A certain Environmental Indemnity Agreement dated September 18, 2020 (as amended, restated, extended, renewed, replaced, or otherwise modified from time to time), by Mortgagor in favor of Mortgagee.

This Mortgage also secures payment of all obligations of Obligor under the Debt Instrument which arise after the Debt Instrument is extended, renewed, modified or amended pursuant to any written agreement between Obligor and Mortgagee, and all obligations of Obligor under any successor agreement or instrument which restates and supersedes the Debt Instrument in its entirety;

(b)    Payment and performance of all obligations of Mortgagor under this Mortgage; and

(c)    Payment and performance of all future advances (including, but not limited to, any Protective Advances and Overadvances) and other obligations under the Debt Instrument.

This Mortgage does not secure any obligation which expressly states that it is unsecured, whether contained in the foregoing Debt Instrument or in any other document, agreement or instrument. Unless specifically described in *Section 2.1(a)* above, "Secured Obligations" shall not include any debts, obligations or liabilities which are or may hereafter be "consumer credit" subject to the disclosure requirements of the Federal Truth in Lending law or any regulation promulgated thereunder.

2.2.    Terms of Secured Obligations. All Persons who may have or acquire an interest in all or any part of the Property will be considered to have notice of, and will be bound by, the terms of the Debt Instrument described in *Section 2.1(a)* and each other agreement or instrument made or entered into in connection with each of the Secured Obligations. These terms include any provisions in the Debt

-3-

Instrument which permit borrowing, repayment and reborrowing, or which provide that the interest rate on one or more of the Secured Obligations may vary from time to time.

2.3.    Future Advances. This Mortgage is given to secure not only the Secured Obligations existing as of the date hereof, but also such future advances (including any Protective Advances), whether such advances are obligatory or are to be made at the option of Mortgagee, or otherwise, as are made within twenty (20) years from the date hereof, to the same extent as if such future advances were made on the date of the execution of this Mortgage, although there may be no advance made at the time of the execution of this Mortgage and although there may be no Secured Obligations outstanding at the time any advance is made.  The total amount of Secured Obligations that may be so secured may decrease or increase from time to time, but the total unpaid balance so secured at any one time shall not exceed a maximum principal amount of Five Million Dollars ($5,000,000.00), *plus*: (a) interest thereon, (b) any disbursements made for the payment of taxes, levies, or insurance on the Mortgaged Property, or other monies expended to protect the security of this Mortgage, and (c) any advances (including any Protective Advances) or disbursements made under the Loan Agreement or any other loan agreement or construction loan agreement referred to in this Mortgage to enable completion of any contemplated improvements, with interest on such advances or disbursements.  Nothing contained in this Section or in this Mortgage shall in anyway be construed to obligate Mortgagee to make any future advances, except as set forth in the Loan Agreement.

2.4.    No Limitation of Future Advance Rights. Mortgagor covenants and agrees with Mortgagee that:

(a)    Mortgagor waives and agrees not to assert any right to limit future advances under this Mortgage, and any such attempted limitation shall be null, void and of no force and effect. Any correspondence by Mortgagor regarding the future advances must be sent to Mortgagee at the address set forth above.

(b)    An Event of Default under this Mortgage shall automatically exist (i) if Mortgagor executes any instrument which purports to have or would have the effect of impairing the priority of or limiting any future advance which might ever be made under the Mortgage or (ii) if Mortgagor takes, suffers, or permits any action or occurrence which would adversely affect the priority of any future advance which might ever be made under the Mortgage.

3.    ASSIGNMENT OF RENTS.

3.1.    Assignment.  Mortgagor hereby irrevocably, absolutely, presently and unconditionally assigns to Mortgagee all rents, royalties, issues, profits, revenue, income and proceeds of the Property, whether now due, past due or to become due, including all prepaid rents and security deposits (collectively, the *"Rents"*), and confers upon Mortgagee the right to collect such Rents with or without taking possession of the Property.  In the event that anyone establishes and exercises any right to develop, bore for or mine for any water, gas, oil or mineral on or under the surface of the Property, any sums that may become due and payable to Mortgagor as bonus or royalty payments, and any damages or other compensation payable to Mortgagor in connection with the exercise of any such rights, shall also be considered Rents assigned under this *Section*.  THIS IS AN ABSOLUTE ASSIGNMENT, NOT AN ASSIGNMENT FOR SECURITY ONLY.

3.2.    Grant of License.  Notwithstanding the provisions of *Section 3.1*, Mortgagee hereby confers upon Mortgagor a license (*"License"*) to collect and retain the Rents as they become due and payable, so long as no Event of Default, as defined in *Section 6.2*, shall exist and be continuing.  If an Event of Default has occurred and is continuing, Mortgagee shall have the right, which it may choose to

-4-

exercise in its sole discretion, to terminate this License without notice to or demand upon Mortgagor, and without regard to the adequacy of the security for the Secured Obligations.

3.3.     Section 697.07 of the Florida Statutes.   The assignments of Rents contained in this Mortgage are intended to provide Mortgagee with all the rights and remedies of mortgagees pursuant to Section 697.07 of the Florida Statutes (hereinafter "*Section 697.07*"), as may be amended from time to time.  However, in no event shall this reference diminish, alter, impair, or affect any other rights and remedies of Mortgagee, including but not limited to, the appointment of a receiver as provided in *Section 6.3(b)* and *(c)* herein, nor shall any provision in this Section diminish, alter, impair or affect any rights or powers of the receiver in law or equity or as set forth in *Section 6.3(b)* and *(c)*, herein. In accordance with Section 697.07, the assignment of Rents contained herein shall be enforceable upon the Mortgagor's default and written demand for the Rents made by the Mortgagee to the Mortgagor, whereupon the Mortgagor shall turn over all Rents in the possession or control of the Mortgagor at the time of the written demand or collected thereafter to the Mortgagee, less the payment of any expenses which are authorized to be paid by the Mortgagee in writing. In addition, this assignment shall be fully operative without regard to value of the Property or without regard to the adequacy of the Property to serve as security for the obligations owed by Mortgagor to Mortgagee, and shall be in addition to any rights arising under Section 697.07.  Further, except for the notices required hereunder, if any, Mortgagor waives any notice of default or demand for turnover of rents by Mortgagee, together with any rights under Section 697.07 to apply to a court to deposit the Rents into the registry of the court or such other depository as the court may designate.

4.     SECURITY INTEREST IN RELATED PERSONALTY.

4.1.     Grant of Security Interest.   Mortgagor grants to Mortgagee a security interest in, and pledges and assigns to Mortgagee, all of Mortgagor's right, title and interest, whether presently existing or hereafter acquired in and to all of the following property (collectively, the "*Personalty*"):

(a)     All materials, supplies, goods, tools, furniture, fixtures, equipment, and machinery which in all cases is affixed or attached, or to be affixed or attached, in any manner on the Land or the Improvements;

(b)     All crops growing or to be grown on the Land (and after severance from the Land); all standing timber upon the Land (and after severance from the Land); all sewer, water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and all evidence of ownership rights pertaining to such water or water rights, ownership of which affect the Land; and all architectural and engineering plans, specifications and drawings which arise from or relate to the Land or the Improvements;

(c)     All permits, licenses and claims to or demands for the voluntary or involuntary conversion of any of the Land, Improvements, or other Property into cash or liquidated claims, proceeds of all present and future fire, hazard or casualty insurance policies relating to the Land and the Improvements, whether or not such policies are required by Mortgagee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or other Property or any part of them; and

(d)     All substitutions, replacements, additions, and accessions to any of the above property, and all books, records and files relating to any of the above property, including, without

-5-

limitation, all general intangibles related to any of the above property and all proceeds of the above property.

4.2. <u>Security Agreement</u>. This Mortgage constitutes a "Security Agreement" within the meaning of, and shall create a security interest under, the Florida Uniform Commercial Code, with respect to any and all fixtures and Personalty.

4.3. <u>Financing Statements</u>. Mortgagor agrees that Mortgagee may file financing statements without the signature of Mortgagor to perfect the Mortgagee's security interest. Mortgagor further agrees to and shall execute and deliver to Mortgagee, in form and substance satisfactory to Mortgagee, such financing statements, continuation statements, and such further assurances as Mortgagee may from time to time consider reasonably necessary to create, perfect, preserve and maintain in full force and effect Mortgagee's liens upon the fixtures and Personalty, and to give public notice thereof, and Mortgagee, at the expense of Mortgagor, may or shall cause such statements and assurances to be recorded and re-recorded, filed and re-filed, at such times and places as may be required or permitted by law to so create, perfect, preserve and maintain such liens and public notice thereof.

4.4. <u>Uniform Commercial Code</u>. Mortgagee shall have all the rights and remedies with respect to the fixtures and Personalty afforded to it by the Florida Uniform Commercial Code, in addition to, but not in limitation of, the other rights afforded Mortgagee by this Mortgage and any other Loan Document.

5. <u>RIGHTS AND DUTIES OF THE PARTIES</u>.

5.1. <u>Representations and Warranties</u>. Mortgagor represents and warrants that Mortgagor lawfully possesses and holds fee simple title to all of the Land and the Improvements.

5.2. <u>Taxes, Assessments, Liens and Encumbrances</u>. Mortgagor shall pay prior to delinquency all taxes, levies, charges and assessments, including assessments on appurtenant water stock, imposed by any public or quasi-public authority or utility company which are (or if not paid, may become) a lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it. Mortgagor shall immediately discharge any lien on the Property which Mortgagee has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now or hereafter encumbers or appears to encumber all or part of the Property, whether the lien, charge or encumbrance is or would be senior or subordinate to this Mortgage.

5.3. <u>Damages and Insurance and Condemnation Proceeds</u>.

(a) Mortgagor hereby absolutely and irrevocably assigns to Mortgagee, and authorizes the payor to pay to Mortgagee, the following claims, causes of action, awards, payments and rights to payment (collectively, the "***Claims***"):

(i) all awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of the Property or any interest in it;

(ii) all other awards, claims and causes of action, arising out of any breach of warranty or misrepresentation affecting all or any part of the Property, or for damage or injury to, or defect in, or decrease in value of all or part of the Property or any interest in it;

        (iii)     all proceeds of any insurance policies payable because of loss sustained to all or part of the Property, whether or not such insurance policies are required by Mortgagee; and

        (iv)     all interest which may accrue on any of the foregoing.

    (b)     Mortgagor shall immediately notify Mortgagee in writing if:

        (i)     any damage occurs or any injury or loss is sustained to all or part of the Property, or any action or proceeding relating to any such damage, injury or loss is commenced; or

        (ii)     any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Property.

If Mortgagee chooses to do so, it may in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on breach of warranty or misrepresentation, or for damage or injury to, defect in, or decrease in value of all or part of the Property, and it may make any compromise or settlement of the action or proceeding. Mortgagee, if it so chooses, may participate in any action or proceeding relating to condemnation or taking of all or part of the Property, and may join Mortgagor in adjusting any loss covered by insurance.

    (c)     All proceeds of the Claims assigned to Mortgagee under this *Section* shall be paid to Mortgagee. In each instance, Mortgagee shall apply those proceeds in accordance with the terms of the Loan Agreement. Mortgagor further authorizes Mortgagee, at Mortgagee's option and in Mortgagee's sole discretion, and regardless of whether there is any impairment of the Property, (i) to apply the balance of such proceeds, or any portion of them, to pay or prepay some or all of the Secured Obligations in such order or proportion as Mortgagee may determine, or (ii) to hold the balance of such proceeds, or any portion of them, in an interest-bearing account to be used for the cost of reconstruction, repair or alteration of the Property, or (iii) to release the balance of such proceeds, or any portion of them, to Mortgagor. If any proceeds are released to Mortgagor, Mortgagee shall not be obligated to see to, approve or supervise the proper application of such proceeds. If the proceeds are held by Mortgagee to be used to reimburse Mortgagor for the costs of restoration and repair of the Property, the Property shall be restored to the equivalent of its original condition, or such other condition as Mortgagee may approve in writing. Mortgagee may, at Mortgagee's option, condition disbursement of the proceeds on Mortgagee's approval of such plans and specifications prepared by an architect satisfactory to Mortgagee, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen, and such other evidence of costs, percentage of completion of construction, application of payments, and satisfaction of liens as Mortgagee may reasonably require.

   5.4.   <u>Insurance</u>. Mortgagor shall obtain and maintain insurance upon and relating to the Property in accordance with the terms of the Loan Agreement.

   5.5.   <u>Maintenance and Preservation of Property</u>.

    (a)     Mortgagor shall keep the Property in good condition and repair and shall not commit or allow waste of the Property. Mortgagor shall not remove or demolish the Property or any part of it, or alter, restore or add to the Property, or initiate or allow any change in any zoning

or other land use classification which affects the Property or any part of it, except with Mortgagee's express prior written consent in each instance.

(b)     If all or part of the Property becomes damaged or destroyed, Mortgagor shall promptly and completely repair and/or restore the Property in a good and workmanlike manner in accordance with sound building practices, regardless of whether or not Mortgagee agrees to disburse insurance proceeds or other sums to pay costs of the work of repair or reconstruction under *Section 5.3*.

(c)     Mortgagor shall not commit or allow any act upon or use of the Property which would violate any applicable Law or order of any Governmental Authority, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property.  Mortgagor shall not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Mortgagor on the Property or any part of it under this Mortgage.

(d)     Mortgagor shall perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

5.6.   Releases, Extensions, Modifications and Additional Security.  Without affecting the personal liability of any Person, including Mortgagor (or Obligor, if different from Mortgagor), for the payment of the Secured Obligations or the lien of this Mortgage on the remainder of the Property for the unpaid amount of the Secured Obligations, Mortgagee may from time to time and without notice:

(a)     release any Person liable for payment of any Secured Obligation;

(b)     extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligation;

(c)     accept additional real or personal property of any kind as security for any Secured Obligation, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security;

(d)     alter, substitute or release any property securing the Secured Obligations;

(e)     consent to the making of any plat or map of the Property or any part of it;

(f)     join in granting any easement or creating any restriction affecting the Property;

(g)     join in any subordination or other agreement affecting this Mortgage or the lien of it; or

(h)     release the Property or any part of it from the lien of this Mortgage.

5.7.   Release.  Except as otherwise provided in the Loan Agreement, when all of the Secured Obligations have been indefeasibly paid in full in cash and no further commitment to extend credit continues, Mortgagee shall release the Property, or so much of it as is then held under this Mortgage, from the lien of this Mortgage.

5.8.   Compensation and Reimbursement of Costs and Expenses.

-8-

(a)     Mortgagor agrees to pay reasonable fees as may be charged by Mortgagee for any services that Mortgagee may render in connection with this Mortgage, including Mortgagee's providing a statement of the Secured Obligations. Mortgagor shall also pay or reimburse all of Mortgagee's costs and expenses which may be incurred in rendering any such services.

(b)     Mortgagor further agrees to pay or reimburse Mortgagee for all costs, expenses and other advances (including, but not limited to, any Protective Advances and Overadvances) which may be incurred or made by Mortgagee to protect or preserve the Property or to enforce any terms of this Mortgage, including the exercise of any rights or remedies afforded to Mortgagee under *Section 6.3*, whether any lawsuit is filed or not, or in defending any action or proceeding arising under or relating to this Mortgage, including attorneys' fees and other legal costs, costs of any sale of the Property and any cost of evidence of title.

(c)     Mortgagor shall pay all obligations arising under this *Section* immediately upon demand by Mortgagee. Each such obligation shall be added to, and considered to be part of, the principal of the Secured Obligations, and shall bear interest from the date the obligation arises at the Maximum Rate. If more than one rate of interest is applicable to the Secured Obligations, the highest rate shall be used for purposes hereof.

5.9.    Exculpation and Indemnification.

(a)     Mortgagee shall not be directly or indirectly liable to Mortgagor or any other Person as a consequence of any of the following:

(i)      Mortgagee's exercise of or failure to exercise any rights, remedies or powers granted to it in this Mortgage;

(ii)     Mortgagee's failure or refusal to perform or discharge any obligation or liability of Mortgagor under any agreement related to the Property or under this Mortgage;

(iii)    Mortgagee's failure to produce Rents from the Property or to perform any of the obligations of the lessor under any lease covering the Property;

(iv)     any waste committed by lessees of the Property or any other parties, or any dangerous or defective condition of the Property; or

(v)      any loss sustained by Mortgagor or any third party resulting from any act or omission of Mortgagee in operating or managing the Property upon exercise of the rights or remedies afforded Mortgagee under *Section 6.3*, unless the loss is caused by the willful misconduct and bad faith of Mortgagee.

Mortgagor hereby expressly waives and releases all liability of the types described above, and agrees that no such liability shall be asserted against or imposed upon Mortgagee.

(b)     Mortgagor agrees to indemnify Mortgagee against and hold Mortgagee harmless from all losses, damages, liabilities, claims, causes of action, judgments, court costs, attorneys' fees and other legal expenses, cost of evidence of title, cost of evidence of value, and other costs and expenses which Mortgagee may suffer or incur in performing any act required or permitted by this Mortgage or by Law or because of any failure of Mortgagor to perform any of its obligations. This agreement by Mortgagor to indemnify Mortgagee shall survive the release and

cancellation of any or all of the Secured Obligations and the full or partial release of this Mortgage.

5.10. <u>Defense and Notice of Claims and Actions</u>. At Mortgagor's sole expense, Mortgagor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this Mortgage and the rights and powers of Mortgagee created under it, against all adverse claims. Mortgagor shall give Mortgagee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

5.11. <u>Representation and Warranty Regarding Hazardous Substances</u>. Based on that due diligence, Mortgagor represents and warrants that to the best of its knowledge, no Hazardous Substance has been disposed of or released or otherwise exists in, on, under or onto the Property, except as Mortgagor has disclosed to Mortgagee in writing. Mortgagor further represents and warrants that Mortgagor has complied, and will comply and cause all occupants of the Property to comply, with all Environmental Laws (as defined in the Loan Agreement), and all other current and future Laws, regulations and ordinances or other requirements of any Governmental Authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or Hazardous Substances (all of the foregoing, collectively, "***Environmental Laws***"). Mortgagor shall promptly, at Mortgagor's sole cost and expense, take all reasonable actions with respect to any Hazardous Substances or other environmental condition at, on, or under the Property necessary to (i) comply with all applicable Environmental Laws; (ii) allow continued use, occupation or operation of the Property; or (iii) maintain the fair market value of the Property. Mortgagor acknowledges that hazardous substances may permanently and materially impair the value and use of the Property. "***Hazardous Substance***" means any Hazardous Substance (as defined in the Loan Agreement) and any other substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local Law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

5.12. <u>Site Visits, Observation and Testing</u>. Mortgagee and its agents and representatives shall have the right at any reasonable time, after giving reasonable notice to Mortgagor, to enter and visit the Property for the purposes of performing appraisals, observing the Property, taking and removing environmental samples, and conducting tests on any part of the Property. Mortgagor shall reimburse Mortgagee on demand for the costs of any such environmental investigation and testing. Mortgagee will make reasonable efforts during any site visit, observation or testing conducted pursuant this ***Section*** to avoid interfering with Mortgagor's use of the Property. Mortgagee is under no duty, however, to visit or observe the Property or to conduct tests, and any such acts by Mortgagee will be solely for the purposes of protecting Mortgagee's security and preserving Mortgagee's rights under this Mortgage. No site visit, observation or testing or any report or findings made as a result thereof ("***Environmental Report***") (i) will result in a waiver of any default of Mortgagor; (ii) impose any liability on Mortgagee; or (iii) be a representation or warranty of any kind regarding the Property (including its condition or value or compliance with any Laws) or the Environmental Report (including its accuracy or completeness). In the event Mortgagee has a duty or obligation under applicable Laws, regulations or other requirements to disclose an Environmental Report to Mortgagor or any other party, Mortgagor authorizes Mortgagee to make such a disclosure. Mortgagee may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Mortgagee's judgment. Mortgagor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Mortgagor by Mortgagee or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Mortgagor) by Mortgagor without advice or assistance from Mortgagee.

6.      ACCELERATING TRANSFERS, DEFAULT AND REMEDIES.

6.1.   Accelerating Transfers.

(a)      "*Accelerating Transfer*" means (i) any sale, contract to sell, conveyance, encumbrance, or other transfer, whether voluntary, involuntary, by operation of law or otherwise, of all or any material part of the Property or any interest in it, including any transfer or exercise of any right to drill for or to extract any water (other than for Mortgagor's own use), oil, gas or other hydrocarbon substances or any mineral of any kind on or under the surface of the Property, or (ii) any Change of Control.

(b)      Mortgagor agrees that Mortgagor shall not make any Accelerating Transfer, unless the transfer is preceded by Mortgagee's express written consent to the particular transaction and transferee. Mortgagee may withhold such consent in its sole discretion. If any Accelerating Transfer occurs, Mortgagee in its sole discretion may declare all of the Secured Obligations to be immediately due and payable, and Mortgagee may invoke any rights and remedies provided by *Section 6.3* of this Mortgage.

6.2.   Events of Default.   The occurrence of any one or more of the following events, at the option of Mortgagee, shall constitute an event of default ("*Event of Default*") under this Mortgage:

(a)      The occurrence of any "Event of Default" under, and as defined in, the Loan Agreement;

(b)      Mortgagor fails to make any payment or perform any obligation which arises under this Mortgage;

(c)      Mortgagor makes or permits the occurrence of an Accelerating Transfer in violation of *Section 6.1*;

(d)      Any representation or warranty made in connection with this Mortgage or the Secured Obligations proves to have been false or misleading in any material respect when made; or

(e)      Any default occurs under any other mortgage on all or any part of the Property, or under any obligation secured by such mortgage, whether such mortgage is prior to or subordinate to this Mortgage.

6.3.   Remedies.   At any time after the occurrence of an Event of Default, Mortgagee shall be entitled to invoke any and all of the rights and remedies described below, as well as any other rights and remedies authorized by Law. All of such rights and remedies shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.

(a)      Mortgagee may declare any or all of the unpaid Secured Obligations to be due and payable immediately. Upon such declaration, all such Secured Obligations shall immediately become due and payable (as fully and to the same effect as if the date of such declaration were the date originally specified for the full payment or maturity thereof), all without presentment, demand, protest, notice of protest, notice of acceleration or of intention to accelerate or any other notice or declaration of any kind, all of which are hereby expressly waived by Mortgagor.

-11-

(b)     Mortgagee may apply to any court of competent jurisdiction to have a receiver appointed to enter upon and take possession of the Property, collect the Rents therefrom and apply the same as the court may direct, such receiver to have all of the rights and powers permitted under the laws of the State of Florida.  The right of the appointment of such receiver shall be a matter of strict right without regard to the value or the occupancy of the Property or the solvency or insolvency of Mortgagor.  The expenses, including receiver's fees, attorneys' fees, costs and agent's commission incurred pursuant to the powers herein contained, together with interest thereon at the default rate set forth in the Debt Instrument, shall be secured hereby and shall be due and payable by Mortgagor immediately without notice or demand.  Notwithstanding the appointment of any receiver or other custodian, Mortgagee shall be entitled as pledgee to the possession and control of any cash or deposits at the time held by, payable, or deliverable under the terms of this Mortgage to the Mortgagee, and the Mortgagee shall have the right to offset the unpaid Obligations against any such cash or deposits in such order as Mortgagee may elect.

(c)     Mortgagee, in person, by agent or by court-appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and in its own name or in the name of Mortgagor sue for or otherwise collect any and all Rents, including those that are past due, and may also do any and all other things in connection with those actions that Mortgagee may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage.  Such other things may include:  entering into, enforcing, modifying, or canceling leases on such terms and conditions as Mortgagee may consider proper; obtaining and evicting tenants; fixing or modifying Rents; completing any unfinished construction; contracting for and making repairs and alterations; performing such acts of cultivation or irrigation as necessary to conserve the value of the Property; and preparing for harvest, harvesting and selling any crops that may be growing on the property.  Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact to perform such acts and execute such documents as Mortgagee in its sole discretion may consider to be appropriate in connection with taking these measures, including endorsement of Mortgagor's name on any instruments.  Mortgagor agrees to deliver to Mortgagee all books and records pertaining to the Property, including computer-readable memory and any computer hardware or software necessary to access or process such memory, as may reasonably be requested by Mortgagee in order to enable Mortgagee to exercise its rights under this Section.

(d)     Mortgagee may cure any breach or default of Mortgagor, and if it chooses to do so in connection with any such cure, Mortgagee may also enter the Property and/or do any and all other things which it may in its sole discretion consider necessary and appropriate to protect the security of this Mortgage.  Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Mortgagee under, this Mortgage; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Mortgagee's sole judgment is or may be senior in priority to this Mortgage, such judgment of Mortgagee to be conclusive as among the parties to this Mortgage; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under this Mortgage; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate Persons to assist Mortgagee. Mortgagee may take any of the actions permitted hereunder either with or without giving notice to any Person.

(e)     Mortgagee may bring an action in any court of competent jurisdiction to institute proceedings for the partial or complete foreclosure of this Mortgage and Mortgagee may, pursuant to any final judgment of foreclosure, sell the Property as an entirety or in separate lots, units, or parcels or to obtain specific enforcement of any of the covenants or agreements of this

Mortgage. The Mortgagee is authorized to foreclose this Mortgage subject to the rights of any tenants of the Property, or Mortgagee may elect which tenants Mortgagee desires to name as parties defendant in such foreclosure and failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor be asserted by the Mortgagor to be, a defense to any proceedings instituted by the Mortgagee to collect the unpaid Secured Obligations or to collect any deficiency remaining unpaid after the foreclosure sale of the Property.

(f)    Mortgagee may exercise the remedies contained in the Debt Instrument or in any other instrument or agreement evidencing any of the Secured Obligations.

(g)    Mortgagee may proceed under the Uniform Commercial Code as to all or any part of the Personalty, and in conjunction therewith may exercise all of the rights, remedies and powers of a secured creditor under the Uniform Commercial Code. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Mortgagee may sell the Personalty at a public sale to be held at the time and place specified in the notice of sale. It shall be deemed commercially reasonable for the Mortgagee to dispose of the Personalty without giving any warranties as to the Personalty and specifically disclaiming all disposition warranties. Alternatively, Mortgagee may choose to dispose of some or all of the Property, in any combination consisting of both personal property and real property, in one sale to be held in accordance with the law and procedures applicable to real property, as permitted by Article 9 of the Uniform Commercial Code. Mortgagor agrees that such a sale of personal property together with real property constitutes a commercially reasonable sale of the personal property.

6.4.    Application of Sale Proceeds and Rents.

(a)    Mortgagee shall apply the proceeds of any sale of the Property in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs, fees and expenses of the sale, including costs of evidence of title in connection with the sale; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the Person or Persons entitled thereto.

(b)    Mortgagee shall apply any and all Rents collected by it, and any and all sums other than proceeds of any sale of the Property which Mortgagee may receive or collect under **Section 6.3**, in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation and collection that may be incurred by Mortgagee or any receiver; and, second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose. The remainder, if any, shall be remitted to the Person or Persons entitled thereto. Mortgagee shall have no liability for any funds which it does not actually receive.

7.    MISCELLANEOUS PROVISIONS.

7.1.    No Waiver or Cure.

(a)    Each waiver by Mortgagee must be in writing, and no waiver shall be construed as a continuing waiver. No waiver shall be implied from any delay or failure by Mortgagee to take action on account of any default of Mortgagor. Consent by Mortgagee to any act or omission by Mortgagor shall not be construed as a consent to any other or subsequent act or

omission or to waive the requirement for Mortgagee's consent to be obtained in any future or other instance.

(b)     If any of the events described below occurs, that event alone shall not cure or waive any breach, Event of Default or notice of default under this Mortgage or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed); or impair the security of this Mortgage; or prejudice Mortgagee or any receiver in the exercise of any right or remedy afforded any of them under this Mortgage; or be construed as an affirmation by Mortgagee of any tenancy, lease or option, or a subordination of the lien of this Mortgage:

(i)     Mortgagee, its agent or a receiver takes possession of all or any part of the Property;

(ii)     Mortgagee collects and applies Rents, either with or without taking possession of all or any part of the Property;

(iii)     Mortgagee receives and applies to any Secured Obligation proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Mortgagee under this Mortgage;

(iv)     Mortgagee makes a site visit, observes the Property and/or conducts tests thereon;

(v)     Mortgagee receives any sums under this Mortgage or any proceeds of any collateral held for any of the Secured Obligations, and applies them to one or more Secured Obligations;

(vi)     Mortgagee or any receiver performs any act which it is empowered or authorized to perform under this Mortgage or invokes any right or remedy provided under this Mortgage.

7.2.    Powers of Mortgagee.  Mortgagee may take any of the actions permitted under **Sections 6.3(b)** and/**or 6.3(c)** regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Mortgage.

7.3.    Nonborrower Mortgagor.

(a)     If any Mortgagor ("**Nonborrower Mortgagor**") is not the Obligor under the Debt Instrument described in **Section 2.1(a)**, such Nonborrower Mortgagor authorizes Mortgagee to perform any of the following acts at any time, all without notice to Nonborrower Mortgagor and without affecting Mortgagee's rights or Nonborrower Mortgagor's obligations under this Mortgage:

(i)     Mortgagee may alter any terms of the Debt Instrument or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Debt Instrument or any part of it;

-14-

(ii)     Mortgagee may take and hold security for the Debt Instrument, accept additional or substituted security for the Debt Instrument, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security;

(iii)    Mortgagee may apply any security now or later held for the Debt Instrument in any order that Mortgagee in its sole discretion may choose, and may direct the order and manner of any sale of all or any part of it and bid at any such sale;

(iv)    Mortgagee may release Obligor of its liability for the Debt Instrument or any part of it;

(v)     Mortgagee may substitute, add or release any one or more guarantors or endorsers of the Debt Instrument; and

(vi)    Mortgagee may extend other credit to Obligor, and may take and hold security for the credit so extended, whether or not such security also secures the Debt Instrument.

(b)     Nonborrower Mortgagor waives:

(i)     Any right it may have to require Mortgagee to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Mortgagee's power to pursue;

(ii)    Any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Mortgagee, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Mortgagor's obligations exceed or are more burdensome than those of Obligor;

(iii)   All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Mortgage and of the existence, creation, or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind;

(iv)    Any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Debt Instrument or any part of it; and

(v)     Until the Secured Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that the Mortgagee may have against Obligor, and all rights to participate in any security now or later to be held by Mortgagee for the Debt Instrument.

(c)     Nonborrower Mortgagor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Mortgagee, and agrees that Mortgagee shall have no duty to disclose to Nonborrower Mortgagor any information which Mortgagee may

-15-

receive about Obligor's financial condition, business operations, or any other circumstances bearing on its ability to perform.

(d)     No provision or waiver in this Mortgage shall be construed as limiting the generality of any other provision or waiver contained in this Mortgage.

(e)     For purposes of this *Section 7.3*, all references to the Debt Instrument shall also include any instrument or agreement executed by Obligor subsequent to the date of this Mortgage which is secured by this Mortgage in accordance with the provisions of *Sections 2.1(c)* and *2.1(d)*.

7.4.   Merger. No merger shall occur as a result of Mortgagee's acquiring any other estate in or any other lien on the Property unless Mortgagee consents to a merger in writing.

7.5.   Joint and Several Liability. If Mortgagor consists of more than one Person, each shall be jointly and severally liable for the faithful performance of all of Mortgagor's obligations under this Mortgage.

7.6.   Applicable Law. This Mortgage shall be governed by the laws of the State of Florida.

7.7.   Successors in Interest. The terms, covenants and conditions of this Mortgage shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties. However, this *Section* does not waive the provisions of *Section 6.1*.

7.8.   Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.

7.9.   Waiver of Class Actions. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Mortgagee, its subsidiaries and affiliates, on the one hand, and the other parties to this Mortgage, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. **THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.**

7.10.    Interpretation.  Whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The captions of the sections of this Mortgage are for convenience only and do not define or limit any terms or provisions.  The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to."  The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations.  It further includes all principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions.  No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Mortgage.  The Exhibits to this Mortgage are hereby incorporated in this Mortgage.

7.11.    Waiver of Marshaling.  Mortgagor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to direct the order in which any of the Property will be sold in the event of any sale under this Mortgage.  Each successor and assign of Mortgagor, including any holder of a lien subordinate to this Mortgage, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

7.12.    Severability.  If any provision of this Mortgage should be held unenforceable or void, that provision shall be deemed severable from the remaining provisions and in no way affect the validity of this Mortgage except that if such provision relates to the payment of any monetary sum, then Mortgagee may, at its option, declare all Secured Obligations immediately due and payable.

7.13.    Notices.  Mortgagor hereby requests that a copy of notice of default and notice of sale be mailed to it at the address set forth below.  That address is also the mailing address of Mortgagor as debtor under the Uniform Commercial Code.  Mortgagee's address given below is the address for Mortgagee as secured party under the Uniform Commercial Code.

Addresses for Notices to Mortgagor:        Big Storm Real Estate LLC
                                          12707 49th Street North
                                          Clearwater, FL 33762
                                          Attn:  Jonathan Golden


Address for Notices to Mortgagee:          Briar Capital Real Estate Fund, LLC
                                          1500 CityWest Boulevard, Suite 560
                                          Houston, Texas 77042
                                          Attn:  Frank Goldberg

7.14.    Loan Agreement Controls.  This Mortgage constitutes a Loan Document and, in the event of a conflict or inconsistency between the terms and provisions of this Mortgage and the terms and provisions of the Loan Agreement, the terms and provisions of the Loan Agreement shall govern and control.

*[Signature and acknowledgment are on the following page.]*

IN WITNESS WHEREOF, Mortgagor has caused this Mortgage to be executed and delivered as of the date set forth in the notary acknowledgement below, but to be effective as of the date first above written.

**MORTGAGOR:**

Witness:

Printed Name: _Tyler M Zacen_

Printed Name: _Kevin Olmstead_

**BIG STORM REAL ESTATE LLC,**
a Florida limited liability company

By: _____
     Leo Joseph Govoni
     Manager

STATE OF FLORIDA

COUNTY OF _Pinellas_

The foregoing instrument was executed, acknowledged and delivered before me by means of ☑ physical presence or ☐ online notarization, this _17_ day of _Sept_, 2020, by Leo Joseph Govoni, the Manager of BIG STORM REAL ESTATE LLC, a Florida limited liability company, on behalf of the limited liability company. He is personally known to me or has produced _Known to Me_ _____ as identification.

_____
Notary Public, State and County
Aforesaid
Print Name: _Michele M Parks_
My commission expires: _2/4/22_
My commission number: _GG182207_

(NOTARIAL SEAL)

MICHELE M. PARKS
MY COMMISSION # GG182207
EXPIRES: February 04, 2022

EXHIBIT A TO MORTGAGE

Exhibit A to MORTGAGE dated as of September 18, 2020, given by BIG STORM REAL ESTATE LLC, a Florida limited liability company, as "Mortgagor" to BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company, as "Mortgagee."

Description of Property

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

The North 160.0 feet of the South 405.0 feet of Lot 12, in the N.E. 1/4 of Section 9, Township 30 South, Range 16 East, as shown by the Plat of PINELLAS GROVES, INC., as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, LESS that portion lying within 50.0 feet of the centerline of 49th Street North as it is now constructed.

AND

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

That part of Lots 12 and 13 in the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas Groves, as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, more particularly described as follows:

The South 260.0 feet of the West 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the West 50.0 feet thereof for 49th Street North Right of Way and less the South 30.0 feet thereof for 126th Avenue North Right of Way.

Together with the West 165.00 feet of the East 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the North 995.81 feet thereof and less the South 30.00 feet thereof for 126th Avenue North Right of Way, and reserving the East 40.00 feet of said West 165.00 feet for street purposes.

Less that portion conveyed to Pinellas County in O.R. Book 7593, Page 1527, Public Records of Pinellas County Florida.

Street Address of Property: 12707 49th Street North, Clearwater, FL 33762

EXHIBIT A

# EXHIBIT D

**SECURITY AGREEMENT**

THIS SECURITY AGREEMENT (as amended, restated, supplemented, or otherwise modified from time to time, this "***Agreement***") is executed as of September 18, 2020, by BIG STORM REAL ESTATE LLC, a Florida limited liability company ("***Big Storm Real Estate***") and BIG STORM PINELLAS LLC, a Florida limited liability company ("***Big Storm Pinellas***", together with Big Storm Real Estate, collectively, "***Debtors***" and each individually, a "***Debtor***"), for the benefit of BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company ("***Secured Party***").

**RECITALS**

A.       Debtors and each other Person from time to time party thereto as a "Borrower" (together with Debtors, collectively, "***Borrowers***" and each individually, a "***Borrower***"), as borrowers, and Secured Party, as lender, have entered into that certain Loan Agreement dated as of the date hereof (as amended, restated, supplemented, or otherwise modified from time to time, the "***Loan Agreement***"), together with certain other Loan Documents.

B.       As a condition precedent to Secured Party's agreement to enter into the Loan Agreement and extend credit to Borrowers thereunder, Secured Party requires that Debtors execute this Agreement to further secure Borrowers' obligations under the Loan Agreement and the other Loan Documents.

C.       The execution and delivery of this Agreement is an integral part of the transactions contemplated by the Loan Documents and a condition precedent to Secured Party's obligations to extend credit or make loans under the Loan Agreement.

**AGREEMENTS**

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Debtor covenants and agrees with Secured Party as follows:

1.       <u>Certain Definitions</u>.  Each capitalized term used but not defined in this Agreement has the meaning given that term in the Loan Agreement or in the UCC.  If a defined term in the Loan Agreement conflicts with the definition given that term in the UCC, the Loan Agreement definition shall control to the extent allowed by Law.  As used in this Agreement, the following terms have the meanings indicated:

***Collateral*** is defined in ***Section 2*** of this Agreement.

***Obligation*** means the "Obligation" under, and as defined in, the Loan Agreement.

***Obligor*** means a Person that, with respect to an obligation secured by a security interest in the Collateral, (a) owes payment or other performance on the obligation, (b) has provided property or other security or credit support other than the Collateral to secure payment or other performance of the obligation, or (c) is otherwise accountable in whole or in part for payment or other performance of the obligation.  The term does not include issuers or nominated persons under a letter of credit.

***Security Interest*** means the security interests granted, and the transfers, pledges and assignments made, under ***Section 2*** of this Agreement.

***UCC*** means (a) the Uniform Commercial Code, as adopted and in effect from time to time in Texas, and (b) if the UCC provides that the Law of another jurisdiction governs certain matters, then, in

respect of such matters, the Uniform Commercial Code as adopted and in effect from time to time in such jurisdiction.

2.       Security Interest.   To secure the prompt, unconditional, and complete payment and performance of the Obligation when due, each Debtor hereby pledges and assigns to Secured Party, and grants to Secured Party a continuing security interest in and Lien on, all of such Debtor's right, title and interest in, to, and under the following, in each case wherever located and whether now owned or hereafter acquired or created (collectively, the "**Collateral**"):

       (a)       all Accounts;

       (b)       all Chattel Paper (including Electronic Chattel Paper and Tangible Chattel Paper), Instruments, contracts, Documents and General Intangibles (including, without limitation, all tax refund claims, guarantee claims, contract rights, Payment Intangibles, security interests, security deposits, and rights to indemnification);

       (c)       all Inventory;

       (d)       all Goods (other than Inventory), including, without limitation, Equipment, and Fixtures;

       (e)       all Investment Property;

       (f)       all Deposit Accounts, Money, and cash;

       (g)       all Letter-of-Credit Rights and Supporting Obligations;

       (h)       Commercial Tort Claims listed on **Schedule 2**;

       (i)       any other assets of such Debtor now or hereafter in the possession, custody or control of Secured Party or any agent or any parent, affiliate or Subsidiary of Secured Party or any participant with Secured Party in the Advances, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise);

       (j)       all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property; and

       (k)       all of such Debtor's books and records (including any digital or electronic records) relating to any of the foregoing and to such Debtor's business.

Notwithstanding the foregoing, the Collateral shall not include any Equipment of Big Storm Pinellas, whether now owned or hereafter acquired or created, and such Equipment of Big Storm Pinellas is expressly excluded from the security interest granted herein.

3.       Collateral Security; No Assumption or Modification.

       (a)       The Security Interest is given as security only.  Secured Party does not assume, and shall not be liable for, any Debtor's liabilities, duties or obligations under, or in connection with, the Collateral.  Secured Party's acceptance of this Agreement, or its taking any action in connection with this Agreement, does not constitute Secured Party's approval of the Collateral or

Secured Party's assumption of any liability, duty, or obligation under, or in connection with, the Collateral. This Agreement does not affect or modify any Debtor's obligations with respect to the Collateral.

(b)    Secured Party, in its sole discretion, without waiving or releasing any obligation, liability or duty of any Debtor or any other Person under this Agreement or any other Loan Document, may (but shall not be obligated to), from time to time acquire or accept an assignment of any Lien or claim asserted by any Person in, upon or against the Collateral. All amounts paid by Secured Party in respect thereof and all costs, fees and expenses including, without limitation, reasonable attorney fees, court costs, and other charges relating thereto and incurred by Secured Party, shall constitute a part of the Obligation and shall be payable by Borrowers to Secured Party on demand and, until paid, shall bear interest at the Maximum Rate.

4.    Fraudulent Conveyance. Notwithstanding anything contained in this Agreement to the contrary, each Debtor agrees that if, but for the application of this **Section 4**, the Obligation or any Security Interest would constitute a preferential transfer under 11 U.S.C. § 547, a fraudulent conveyance under 11 U.S.C. § 548 (or any successor section of that statute) or a fraudulent conveyance or transfer under any state fraudulent conveyance or fraudulent transfer Law or similar Law in effect from time to time (each a "**Fraudulent Conveyance**"), then the Obligation and each affected Security Interest will be enforceable to the maximum extent possible without causing the Obligation or any Security Interest to be a Fraudulent Conveyance, and shall be deemed to have been automatically amended to carry out the intent of this **Section 4**.

5.    Representations and Warranties. Each Debtor represents and warrants to Secured Party that:

(a)    Binding Obligation. The Security Interest in the Collateral created by this Agreement (i) is a valid and binding obligation of Debtors in favor of Secured Party and is enforceable against Debtors, except as such enforcement may be limited by Debtor Relief Laws, and (ii) will be duly perfected once the action required for perfection under applicable Law has been taken. Once perfected, the Security Interest will constitute a first and prior Lien on the Collateral, subject only to Permitted Liens. The creation, attachment and perfection of the Security Interest does not require the consent of any third party.

(b)    Certain Information. All of the information set forth on **Schedule 1** is true and correct. The failure of any description of locations of Collateral on **Schedule 1** to be accurate or complete will not impair the Security Interest in such Collateral.

(c)    No Prior Lien. Except for Permitted Liens, the Collateral is owned by Debtors free and clear of any Lien and no Debtor has executed any transfer, assignment, pledge or security interest covering the Collateral or any interest in the Collateral.

(d)    No Defenses. The amounts due Debtors are not subject to any material setoff, counterclaim, defense, allowance or adjustment (other than discounts for prompt payment shown on the invoice) or to any material dispute, objection or complaint by any account debtor or other Obligor.

6.    Covenants. Each Debtor covenants and agrees with Secured Party that until the Obligation is indefeasibly paid and performed in full in cash, such Debtor shall:

3

(a)    <u>No Assignment</u>.  Not sell, assign, or otherwise dispose of, or permit the sale, assignment or disposition of, any Collateral, except to the extent permitted under the Loan Agreement.

(b)    <u>Maintain Collateral</u>.  (i) Perform all of its obligations under or in connection with the Collateral in accordance with customary business practices, (ii) not amend, alter or modify, or permit the amendment, alteration or modification of, any material portion (individually or collectively) of the Collateral, and (iii) not do or permit any act which would impair any material portion of the Collateral.

(c)    <u>Hold Collateral In Trust</u>.  Upon the occurrence and during the continuation of a Default, hold in trust (and not commingle with its other assets) for Secured Party all Collateral that is Chattel Paper, Instruments or Documents at any time received by it and promptly deliver same to Secured Party unless Secured Party at its option gives Debtors written permission to retain such Collateral.  Upon the occurrence and during the continuation of a Default, at Secured Party's request, each Contract, Chattel Paper, Instrument or Document so retained shall be marked to state that it is assigned to Secured Party and each instrument shall be endorsed to the order of Secured Party (but failure to so mark or endorse shall not impair the Security Interest).

7.    <u>Authorization to File Financing Statements</u>.  Each Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that describe the Collateral (a) as "all assets of Debtor" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (b) as being of an equal or lesser scope or with greater detail.  Each Debtor agrees to provide any other information required by part 5 of Article 9 of the UCC, for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Debtor is an organization, the type of organization and any organizational identification number issued to such Debtor, and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  Each Debtor agrees to furnish any such information to Secured Party promptly upon Secured Party's request.

8.    <u>Further Assurances</u>.  To further the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's Security Interest in and lien upon the Collateral, and without limiting any Debtor's other obligations in this Agreement, each Debtor agrees, in each case at such Debtor's expense, to execute and deliver such further agreements and instruments, and take such further action, as may be necessary to further evidence or perfect Secured Party's Security Interest in and lien upon the Collateral, including, without limitation, taking such action as may be necessary to perfect Secured Party's Security Interest in and Lien upon the Collateral by "control" (as defined in the UCC) and delivering to Secured Party any original Collateral and endorsements in blank required in connection therewith.  Each Debtor further agrees, at the request and option of Secured Party, all to the extent applicable, to (a) take any and all other commercially reasonable actions Secured Party may determine to be necessary or useful for the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's Security Interest, and (b) cooperate with Secured Party in identifying all of such Debtor's personal property assets and proper descriptions of such assets for the purpose of including such assets as part of the Collateral.

9.    <u>Default; Remedies</u>.  Upon the occurrence and during the continuance of a Default, subject to the terms and conditions of the Loan Agreement, Secured Party has the following cumulative rights and remedies under this Agreement:

4

(a)    <u>UCC Rights</u>.   Secured Party may exercise any and all rights available to a secured party under the UCC, in addition to any and all other rights afforded by this Agreement and the other Loan Documents, at Law, in equity or otherwise, including, without limitation, (i) requiring Debtors to assemble all or part of the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to Debtors and Secured Party, (ii) applying by appropriate judicial proceedings for appointment of a receiver for all or part of the Collateral, (iii) applying to the Obligation any cash held by Secured Party under this Agreement, (iv) reducing any claim to judgment, (v) exercising the rights of offset or banker's lien against the interest of Debtors in and to every account and other property of Debtors in Secured Party's possession to the extent of the full amount of the Obligation, (vi) foreclosing the Security Interest and any other liens Secured Party may have or otherwise realize upon any and all of the rights Secured Party may have in and to the Collateral, or any part thereof, and (vii) bringing suit or other proceedings before any Governmental Authority either for specific performance of any covenant or condition contained in any of the Loan Documents or in aid of the exercise of any right granted to Secured Party in any of the Loan Documents.

(b)    <u>Notice</u>.   Reasonable notification of the time and place of any public sale of the Collateral, or reasonable notification of the time after which any private sale or other intended disposition of the Collateral is to be made, shall be sent to Debtors and to any other Person entitled to notice under the UCC; *provided that*, if any of the Collateral threatens to decline speedily in value or is of the type customarily sold on a recognized market, Secured Party may sell or otherwise dispose of the Collateral without notification, advertisement, or other notice of any kind.  It is agreed that notice sent or given not less than ten (10) calendar days prior to the taking of the action to which the notice relates is reasonable notification and notice for the purposes of this subparagraph.  It shall not be necessary that the Collateral be at the location of the sale.

(c)    <u>Standards for Exercising Rights and Remedies</u>.   To the extent that applicable Law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, each Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party (i) to fail to incur expenses reasonably deemed significant by Secured Party to prepare Collateral for disposition or otherwise to fail to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other Law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against account debtors or other Obligors, directly or through the use of collection agencies and other collection specialists, (iv) to fail to remove liens or encumbrances on or any adverse claims against Collateral, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as any Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, (xi) to purchase insurance or credit enhancements to insure Secured Party against risks of loss, collection or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection or disposition of any of the Collateral.  Each

5

Debtor acknowledges that the purpose of this *Section 9* is to provide non-exhaustive indications of what actions or omissions by Secured Party would fulfill Secured Party's duties under the UCC or other Law of any relevant jurisdiction in Secured Party's exercise of remedies against the Collateral and that other actions or omissions by Secured Party shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this *Section 9*.  Without limiting the foregoing, nothing contained in this *Section 9* shall be construed to grant any rights to any Debtor or to impose any duties on Secured Party that would not have been granted or imposed by this Agreement or by applicable Law in the absence of this *Section 9*.

(d)    <u>Debtor's Agent</u>.  Secured Party shall be deemed to be irrevocably appointed as each Debtor's agent and attorney-in-fact with all right and power to enforce all of each Debtor's rights and remedies under or in connection with the Collateral and this power is coupled with an interest.  All reasonable costs, expenses and liabilities incurred and all payments made by Secured Party as any Debtor's agent and attorney-in-fact, including, without limitation, reasonable attorney's fees and expenses, shall be considered a loan by Secured Party to Debtors which shall be repayable on demand and shall accrue interest at the Maximum Rate and shall constitute part of the Obligation.

(e)    <u>Account Debtors and Obligors</u>.  Secured Party may notify or require each account debtor or other Obligor to make payment directly to Secured Party and Secured Party may take control of the proceeds paid to Secured Party.  Until Secured Party elects to exercise these rights, each Debtor is authorized to collect and enforce the Collateral and to retain and expend all payments made on Collateral.  After Secured Party elects to exercise these rights, Secured Party shall have the right in its own name or in the name of each Debtor to (i) compromise or extend time of payment with respect to all or any portion of the Collateral for such amounts and upon such terms as Secured Party may reasonably determine, (ii) demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all amounts due or to become due with respect to Collateral, (iii) take control of cash and other proceeds of any Collateral, (iv) endorse any Debtor's name on any notes, acceptances, checks, drafts, money orders or other evidences of payment on Collateral that may come into Secured Party's possession, (v) sign any Debtor's name on any invoice or bill of lading relating to any Collateral, on any drafts against Obligors or other Persons making payment with respect to Collateral, on assignments and verifications of accounts or other Collateral and on notices to Obligors making payment with respect to Collateral, (vi) send requests for verification of obligations to any Obligor, and (vii) do all other acts and things reasonably necessary to carry out the intent of this Agreement.  If any Obligor or account party fails to make payment on any Collateral when due, Secured Party is authorized, in its sole discretion, either in its own name or in any Debtor's name, to take such action as Secured Party reasonably shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists.  Regardless of any other provision of this Agreement, however, Secured Party shall not be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral except for its own fraud, gross negligence, or willful misconduct, nor shall it be under any duty to anyone except the applicable Debtor to account for funds that it shall actually receive under this Agreement.  A receipt given by Secured Party to any Obligor or account debtor shall be a full and complete release, discharge, and acquittance to such Obligor or account party, to the extent of any amount so paid to Secured Party.  Secured Party may apply or set off amounts paid and the deposits against any liability of any Debtor to Secured Party.

(f)    Sale.

(i)    Secured Party's sale of less than all the Collateral shall not exhaust Secured Party's rights under this Agreement and Secured Party is specifically empowered to make successive sales until all the Collateral is sold.  If the proceeds of a sale of less than all the Collateral shall be less than the Obligation, this Agreement and the Security Interest shall remain in full force and effect as to the unsold portion of the Collateral just as though no sale had been made.  In the event any sale under this Agreement is not completed or is, in Secured Party's opinion, defective, such sale shall not exhaust Secured Party's rights under this Agreement and Secured Party shall have the right to cause a subsequent sale or sales to be made.

(ii)    Any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale under this Agreement as to nonpayment of the Obligation, or as to the occurrence and continuance of any Default, or as to Secured Party's having declared all of such Obligation to be due and payable, or as to notice of time, place and terms of sale and the properties to be sold having been duly given, or as to any other act or thing having been duly done by Secured Party, shall be taken as *prima facie* evidence of the truth of the facts so stated and recited, subject, however, to manifest error.  Secured Party may appoint or delegate any one or more Persons as agent to perform any act or acts necessary or incident to any sale held by Secured Party, including the sending of notices and the conduct of sale, but such acts must be done in the name and on behalf of Secured Party.

(g)    Existence of Default.  Regarding the existence of any Default for purposes of this Agreement, each Debtor agrees that the Obligors or account debtors on any Collateral may rely upon written certification from Secured Party that such a Default exists and is continuing and each Debtor expressly agrees that Secured Party shall not be liable to any Debtor for any claims, damages, costs, expenses or causes of action of any nature whatsoever in connection with, arising out of, or related to Secured Party's exercise of any rights, powers or remedies under any Loan Document except for its own fraud, gross negligence, or willful misconduct.

(h)    Application of Proceeds.  Secured Party shall apply the proceeds of any sale or other disposition of the Collateral under this **Section 9** in the following order:  (i) to the payment of all its expenses incurred in retaking, holding and preparing any of the Collateral for sale(s) or other disposition, in arranging for such sale(s) or other disposition, and in actually selling or disposing of the same (all of which are part of the Obligation); (ii) to repay Secured Party for amounts reasonably expended by Secured Party under **Section 10**; (iii) to payment of the balance of the Obligation in the order and manner specified in the Loan Agreement; and (iv) to make any payments required under Sections 9.608(a)(1)(C) and 9.615(a)(3) of the UCC.  Any surplus remaining shall be delivered to the applicable Debtor or as a court of competent jurisdiction may direct.

10.    Other Rights of Secured Party.

(a)    Performance.  In the event Debtors fail to preserve the priority of the Security Interest in any of the Collateral or, upon the occurrence and during the continuance of a Default, otherwise fails to perform any of its obligations under the Loan Documents with respect to the Collateral, then Secured Party may (but is not required to) prosecute or defend any suits in relation to the Collateral or take any other action which any Debtor is required to take under the Loan Documents, but has failed to take.  Any sum which may be reasonably expended or paid by

Secured Party under this ***Section 10*** (including, without limitation, court costs and reasonable attorneys' fees and expenses) shall bear interest from the date of expenditure or payment at the Maximum Rate until paid and, together with such interest, shall be payable by Debtors to Secured Party upon demand and shall be part of the Obligation.

(b)     <u>Collateral in Secured Party's Possession</u>.   If, while a Default exists, any Collateral comes into Secured Party's possession, Secured Party may use such Collateral for the purpose of preserving it or its value pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Secured Party in respect of such Collateral.   Each Debtor covenants to promptly reimburse and pay to Secured Party, at Secured Party's request, the amount of all reasonable expenses incurred by Secured Party in connection with its custody and preservation of such Collateral, and all such expenses, costs, Taxes and other charges shall bear interest at the Maximum Rate until repaid and, together with such interest, shall be payable by Debtors to Secured Party upon demand and shall be part of the Obligation.   However, the risk of accidental loss or damage to, or diminution in value of, Collateral is on Debtors, except for Secured Party's own fraud, gross negligence, or willful misconduct.   Secured Party shall have no liability for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured.   With respect to Collateral that is in the possession of Secured Party, Secured Party shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to account to Debtors for what it actually collects or receives thereon.

(c)     <u>Subrogation</u>.   If any of the proceeds of the Obligation are given in renewal or are extension of, or are applied toward the payment of, indebtedness secured by any Lien, Secured Party shall be, and is hereby, subrogated to all of the rights, titles, interests and Liens securing the indebtedness so renewed, extended or paid.

11.     <u>Miscellaneous</u>.

(a)     <u>Termination</u>.   Upon the indefeasible payment in full in cash of the Obligation without Secured Party having exercised its rights under this Agreement, this Agreement shall terminate; *provided that*, no Obligor or account debtor on any of the Collateral shall be obligated to inquire as to the termination of this Agreement, but shall be fully protected in making payment directly to Secured Party.

(b)     <u>No Release</u>.   The Security Interest and each Debtor's obligations and Secured Party's rights under this Agreement shall not be released, diminished, impaired or adversely affected by the occurrence of any one or more of the following events:  (i) the taking or accepting of any other security or assurance for any or all of the Obligation; (ii) any release, surrender, exchange, subordination or loss of any security or assurance at any time existing in connection with any or all of the Obligation; (iii) the modification of, amendment to, or waiver of compliance with any terms of any of the other Loan Documents without consent of any or all of the Debtors, except as required therein; (iv) the insolvency, bankruptcy or lack of corporate or trust power of any party at any time liable for the payment of any or all of the Obligation, whether now existing or hereafter occurring; (v) any renewal, extension or rearrangement of the payment of any or all of the Obligation, either with or without notice to or consent of any Debtor, or any adjustment, indulgence, forbearance or compromise that may be granted or given by Secured Party to any one or more Debtors, in each case, except as required by the Loan Documents; (vi) any neglect, delay, omission, failure or refusal of Secured Party to take or prosecute any action in connection with any other agreement, document, guaranty or instrument evidencing, securing or assuring the

payment of all or any of the Obligation; (vii) any failure of Secured Party to notify any Debtor of any renewal, extension, or assignment of the Obligation or any part thereof, or the release of any security under any other document or instrument, or of any other action taken or refrained from being taken by Secured Party against any Debtor or any new agreement between Secured Party and any Debtor, it being understood that, except as expressly required by the Loan Agreement, Secured Party shall not be required to give any Debtor any notice of any kind under any circumstances whatsoever with respect to or in connection with the Obligation, including, without limitation, notice of acceptance of this Agreement or any Collateral ever delivered to or for the account of Secured Party under this Agreement; (viii) the illegality, invalidity or unenforceability of all or any part of the Obligation against any third party obligated with respect thereto by reason of the fact that the Obligation, or the interest paid or payable with respect thereto, exceeds the amount permitted by Law, the act of creating the Obligation, or any part thereof, is *ultra vires*, or the officers, partners or trustees creating same acted in excess of their authority, or for any other reason; or (ix) if any payment by any party obligated with respect thereto is held to constitute a preference under applicable Laws or for any other reason Secured Party is required to refund such payment or pay the amount thereof to someone else.

(c)     <u>Waivers</u>.  Except to the extent expressly otherwise provided in this Agreement or in other Loan Documents, each Debtor waives (i) any right to require Secured Party to proceed against any other Person, to exhaust its rights in Collateral, or to pursue any other right which Secured Party may have, (ii) with respect to the Obligation, except as otherwise provided in the Loan Agreement or any one or more of the other Loan Documents, presentment and demand for payment, protest, notice of protest and nonpayment, notice of acceleration, and notice of the intention to accelerate; and (iii) all rights of marshaling in respect of any and all of the Collateral.

(d)     <u>Parties Bound</u>.  This Agreement shall be binding on each Debtor and its successors and assigns and shall inure to the benefit of Secured Party and its successors and assigns.

(e)     <u>Assignment</u>.  No Debtor may, without Secured Party's prior written consent, assign any rights, duties or obligations under this Agreement, except as permitted by the Loan Agreement.  In the event of an assignment of all or part of the Obligation permitted by the Loan Agreement, the Security Interest and other rights and benefits under this Agreement, to the extent applicable to the part of the Obligation so assigned, may be transferred with the Obligation.

(f)     <u>Notice</u>.  Any notice or communication required or permitted under this Agreement must be given as prescribed in the Loan Agreement.

(g)     <u>Amendments</u>.  This Agreement may only be amended by a writing executed by Debtors and Secured Party.

(h)     <u>Loan Agreement Controls</u>.  In the event of a conflict or inconsistency between the terms and provisions of this Agreement and the terms and provisions of the Loan Agreement, the terms and provisions of the Loan Agreement shall govern and control.

12.     <u>Multiple Counterparts and Electronic Signatures</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts must be construed together to constitute one and the same instrument.  This Agreement may be transmitted and signed by facsimile, portable documents format (PDF), or other electronic means, and shall have the same effect as manually-signed originals and shall be binding on Debtors and Secured Party.

9

13.    <u>Governing Law</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET OUT THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

14.    <u>Loan Document</u>.  This Agreement is a Loan Document and is therefore subject to the agreements, terms and provisions set forth in ***Article VIII*** of the Loan Agreement, all of which are incorporated herein by reference, *mutatis mutandis*, as if fully set forth herein at length.

15.    **<u>ENTIRETY</u>**.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG DEBTORS AND SECURED PARTY WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

[***Signatures appear on the following pages.***]

EXECUTED as of the date set forth in the preamble.

**DEBTORS:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By: _____
    Leo Joseph Govoni
    Manager


BIG STORM PINELLAS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
           Leo Joseph Govoni
           Manager

**SECURED PARTY:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

By:     Briar Capital, L.P.,
        its sole member

By:     Briar Capital General, LLC,
        its general partner

By:_____
        Frank S. Goldberg
        Chief Executive Officer

Attachments:

Schedule 1 - Information
Schedule 2 - Commercial Tort Claims

**SCHEDULE 1**

**Information**

**BIG STORM REAL ESTATE LLC**

(a)     The exact name of Big Storm Real Estate, as such name appears in its organizational documents.

Big Storm Real Estate LLC

(b)     Any change in Big Storm Real Estate's name, identity or legal structure within the past five years.

None.

(c)     The address of Big Storm Real Estate's chief executive office or principal place of business.

12707 49th Street N., Suite 500, Clearwater, Florida 33762

(d)     All real property owned by Big Storm Real Estate.

12707 49th Street N., Clearwater Florida 33762
12924 49th Street N., Clearwater, Florida 33760
610 Charlotte Street, Punta Gorda, Florida 33950

(e)     All real property leased by Big Storm Real Estate.

None.


**BIG STORM PINELLAS LLC**

(a)     The exact name of Big Storm Pinellas, as such name appears in its organizational documents.

Big Storm Pinellas LLC

(b)     Any change in Big Storm Pinellas' name, identity or legal structure within the past five years.

None.

(c)     The address of Big Storm Pinellas' chief executive office or principal place of business.

12707 49th Street N., Suite 500, Clearwater, Florida 33762

(d)     All real property owned by Big Storm Pinellas.

None.

(e)     All real property leased by Big Storm Pinellas.

12707 49th Street N., Clearwater, Florida 33762
4721 SE 10th Pl, Cape Coral, Florida 33904
430 W. Church Street, Orlando, FL 32801

**SCHEDULE 2**

**Commercial Tort Claims**

None.

# EXHIBIT E

## GUARANTY AGREEMENT
### (Entity Guarantors)

This GUARANTY AGREEMENT (this "**Guaranty**"), dated as of September 18, 2020, is made by BIG STORM BREWERY LLC, a Florida limited liability company ("**Big Storm Brewery**"), BIG STORM PASCO LLC, a  Florida limited liability company ("**Big Storm Pasco**"), BIG STORM CAPE CORAL LLC, a Florida limited liability company ("**Big Storm Cape Coral**"), BIG STORM CIDER AND MEAD LLC, a Florida limited liability company ("**Big Storm Cider and Mead**"), BIG STORM COCKTAILS LLC, a Florida limited liability company ("**Big Storm Cocktails**"), and BIG STORM COFFEE COMPANY LLC, a Florida limited liability company ("**Big Storm Coffee**", together with Big Storm Brewery, Big Storm Pasco, Big Storm Cape Coral, Big Storm Cider and Mead, and Big Storm Cocktails, individually and collectively, the "**Guarantor**"), whose address is 12707 49th Street N., Suite 500, Clearwater, Florida 33762, in favor of BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company ("**Lender**"), whose address for purposes of this Guaranty is 1500 CityWest Boulevard, Suite 560, Houston, Harris County, Texas 77042, Attn: Frank Goldberg.

## RECITALS

A.      Pursuant to that certain Loan Agreement dated as of the date hereof (as amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), among BIG STORM REAL ESTATE LLC, a Florida limited liability company ("**Big Storm Real Estate**"), BIG STORM PINELLAS LLC, a Florida limited liability company ("**Big Storm Pinellas**"), and each other Person from time to time party thereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "**Borrowers**," and each individually, a "**Borrower**"), as borrowers, and Lender, Lender has agreed, subject to the terms and conditions therein, to extend credit to Borrowers in the form of a term loan.

B.      Each Guarantor is an Affiliate of Borrowers and has agreed to enter into this Guaranty so that Borrowers can receive the benefits of the Guaranteed Obligation (as defined below).

C.      In Guarantor's judgment, the value of the consideration received and to be received by it under the Loan Documents is reasonably worth at least as much as its liability and obligation under this Guaranty, and such liability and obligation may reasonably be expected to benefit Guarantor directly or indirectly.

D.      It is expressly understood among Borrowers, Guarantor, and Lender that the execution and delivery of this Guaranty is a condition precedent to Lender's obligations to extend credit under the Loan Agreement.

E.      In satisfaction of the requirements under the Loan Agreement, Guarantor has agreed to enter into this Guaranty to guarantee, among other things, the Secured Obligations (defined below).

NOW, THEREFORE, in consideration of the premises and in order to induce Lender to enter into the Loan Agreement and extend credit thereunder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by Guarantor, Guarantor hereby agrees as follows:

SECTION 1.      <u>Defined Terms</u>. Capitalized terms used but not defined in this Guaranty shall have the meanings given them in the Loan Agreement, a true and correct copy of which Guarantor hereby acknowledges receipt of.  As used in this Guaranty, the following terms shall have the following meanings:

***Event of Default*** means a "Default" or an "Event of Default", in each case under, and as defined in, the Loan Agreement.

***Guaranteed Obligations*** is defined in ***Section 3***.

***Indemnitees*** is defined in ***Section 20***.

***Obligor*** means any Borrower, any Guarantor, and any other Person that has or that will have any liability (actual or contingent) and whether alone or jointly with any other Person and whether as principal debtor, guarantor or surety or otherwise (or as the equivalent obligor under the Laws of any jurisdiction) to Lender for the payment or repayment of any amounts outstanding or capable of becoming outstanding under the Loan Documents.

***Secured Obligations*** means the "Obligation" under, and as defined in, the Loan Agreement, and all other present and future obligations and liabilities (whether actual or contingent and whether now or hereafter owed jointly or severally or as principal debtor, guarantor, surety or otherwise or as the equivalent obligor under the Laws of any jurisdiction) of each Obligor to Lender under all or any of the Loan Documents, together with:

(a)     costs, charges and expenses incurred by Lender in connection with or the protection, preservation or enforcement by Lender of its rights under the Loan Documents;

(b)     any refinancing, novation, refunding, deferral, modification, renewal or extension of or increase in any of those obligations or liabilities;

(c)     any further advances which may be made by Lender to any Obligor under any agreement expressed to be supplemental to any of the Loan Documents and all interest, fees and costs in connection therewith;

(d)     any claim for damages or restitution in the event of rescission of any of those obligations or liabilities or otherwise in connection with the Loan Documents;

(e)     any claim against any Obligor flowing from the recovery by an Obligor of a payment or discharge in respect of any of those obligations or liabilities on grounds of preference or otherwise;

(f)     all other amounts now or in the future owed by an Obligor to Lender under any one or more of the Loan Documents; and

(g)     any amounts which would be included in any of the foregoing but for any discharge, non-provability, unenforceability or non-allowability of the same in any insolvency, bankruptcy or other proceedings.

SECTION 2.     Interpretation.

(a)     In this Guaranty, unless a clear contrary intention appears (i) the singular number includes the plural number and *vice versa*, (ii) reference to any gender includes each other gender, (iii) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Guaranty as a whole and not to any particular Section or other subdivision, (iv) reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Guaranty, and reference to a Person in a particular

capacity excludes such Person in any other capacity or individually, *provided that*, nothing in this *clause (iv)* is intended to authorize any assignment not otherwise permitted by this Guaranty or the Loan Agreement, (v) reference to any agreement (including this Guaranty), document or instrument means such agreement, document or instrument as amended, modified, supplemented or extended and in effect from time to time in accordance with the terms thereof and, if applicable, the terms of this Guaranty, and references to any note includes any note issued in renewal, rearrangement, reinstatement, enlargement, amendment, modification, extension, substitution or replacement for such note, (vi) unless the context indicates otherwise, reference to any Section, clause, paragraph, Schedule or Exhibit means such Section, clause or paragraph of this Guaranty or such Schedule or Exhibit to this Guaranty, (vii) the word "including" (and with correlative meaning "include") means including, without limiting the generality of any description preceding such term; the word "or" is not exclusive; and the word "all" includes "and" and the word "any" includes "all", (viii) with respect to the determination of any period of time, the word "from" means "from and including" and the word "to" means "to but excluding"; and (ix) reference to any Law, ordinance, statute, code, rule, regulation, interpretation or judgment means such Law, ordinance, statute, code, rule, regulation, interpretation or judgment as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time.

(b)     The Section and other headings in this Guaranty are for convenience only and shall not affect the construction of this Guaranty.

(c)     No provision of this Guaranty shall be interpreted or construed against any Person solely because that Person or its legal representative drafted such provision.

(d)     All references herein to "Guarantor" shall be deemed to refer to any or all of the Persons that are signatories hereto as Guarantors, both individually and collectively, as the context may require.

SECTION 3.     <u>Guaranty</u>.

(a)     Guarantor hereby absolutely, unconditionally and irrevocably guarantees (as primary obligor and not merely as surety) the complete and punctual payment and performance when due, whether at stated maturity, by acceleration or otherwise, of the Secured Obligations, and all other obligations and covenants of each Obligor now or hereafter existing under the Loan Agreement and the other Loan Documents, whether for principal, interest (including interest accruing or becoming owing both prior to and subsequent to the commencement of any proceeding against or with respect to any Obligor under any bankruptcy or insolvency proceeding), fees, commissions, expenses (including court costs and reasonable counsel fees and expenses), and agrees to pay all costs and expenses, if any, incurred by Lender in connection with enforcing any rights under this Guaranty.  The obligations of Guarantor to Lender under this Guaranty are referred to in this Guaranty as the "***Guaranteed Obligations***"; *provided that*, the Guaranteed Obligations of Guarantor under this Guaranty shall not exceed an amount that is $1.00 less than that amount that would render Guarantor's obligations under this Guaranty subject to avoidance under Section 548 of the Bankruptcy Code or any comparable provisions of any other applicable state or foreign Law.  Guarantor agrees that the Secured Obligations may at any time and from time to time exceed the Guaranteed Obligations of Guarantor without impairing this Guaranty or affecting the rights and remedies of Lender.

(b)     No payment made by any Obligor or any other guarantor (other than Guarantor making such payment) or any other Person or received or collected by Lender from any Obligor, any such other guarantor (other than Guarantor making such payment) or any other Person (other

than Guarantor making such payment) by virtue of any action or proceeding or any set-off or appropriation or application at any time in reduction of or in payment of the Secured Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of Guarantor for the Guaranteed Obligations under this Guaranty.

(c)    This Guaranty is an absolute, unconditional, present and continuing guaranty of payment and performance and not of collectability and is in no way conditioned upon any attempt to collect from any other Obligor or any other action, occurrence or circumstance whatsoever.

SECTION 4.    <u>Payment Under Guaranty; Guaranty Unconditional</u>.  Guarantor guarantees that the Guaranteed Obligations will be paid promptly within five (5) days after written demand by Lender. Subject to the termination of this Guaranty, until the payment in full of all Guaranteed Obligations in cash in accordance with ***Section 15***, the obligations of Guarantor under this Guaranty shall be absolute, unconditional and irrevocable, and shall be performed in accordance with the terms of this Guaranty, notwithstanding:

(a)    any extension, renewal, modification, settlement, compromise, waiver or release in respect of any Guaranteed Obligations;

(b)    any extension, renewal, amendment, modification, rescission, waiver or release in respect of any Loan Document;

(c)    any release, exchange, substitution, non perfection or invalidity of, or failure to exercise rights or remedies with respect to, any direct or indirect security for any Guaranteed Obligations, including the release of any Obligor or any other guarantor or other Person liable on any obligations of an Obligor under the Loan Documents;

(d)    any change in the existence, structure or ownership of any Obligor or any other guarantor or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligor, any guarantor or any of their respective assets;

(e)    the existence of any claim, defense, set-off or other rights or remedies which any other guarantor at any time may have against any Obligor, or any Obligor or any other guarantor may have at any time against Lender or any other Person, whether in connection with this Guaranty, the Loan Documents, the transactions contemplated hereby or thereby or any other transaction;

(f)    any invalidity or unenforceability for any reason of this Guaranty or the other Loan Documents, or any provision of Law purporting to prohibit the payment or performance by any Obligor or any other guarantor of the Guaranteed Obligations or the Loan Documents, or of any other obligation to Lender;

(g)    any failure to give notice of the occurrence of any Event of Default; or

(h)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

SECTION 5.    <u>Effect of Debtor Relief Laws</u>.  If, after receipt of any payment of, or proceeds of any security applied (or intended to be applied) to the payment of, all or any part of the Guaranteed Obligations, Lender is for any reason compelled to surrender such payment or proceeds to any Person (a) because such payment or application of proceeds is or may be under applicable Law avoided,

invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, fraudulent conveyance, fraudulent transfer, impermissible set-off or a diversion of trust funds, or (b) for any other reason under applicable Law, including (i) any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of its properties, or (ii) any settlement or compromise of any such claim effected by Lender with any such claimant (including any Obligor), then the Guaranteed Obligations or part thereof intended to be satisfied shall be reinstated and continue, and this Guaranty shall continue in full force as if such payment or proceeds have not been received, notwithstanding any revocation thereof or the cancellation of any instrument evidencing any Guaranteed Obligations or otherwise; and Guarantor shall be liable to pay Lender, and hereby does indemnify Lender and hold Lender harmless for the amount of such payment or proceeds so surrendered and all expenses (including reasonable attorneys' fees, court costs and expenses attributable thereto) incurred by Lender in the defense of any claim made against it that any payment or proceeds received by Lender in respect of all or part of the Guaranteed Obligations must be surrendered.  The provisions of this *Section 5* shall survive the termination of this Guaranty, and any satisfaction or discharge of any Obligor by virtue of any payment, court order or any foreign, federal or state Law.  If an Event of Default shall at any time have occurred and be continuing and declaration of such Event of Default shall at such time be prevented by reason of the pendency against any Obligor of a case or proceeding under a bankruptcy or insolvency Law, Guarantor agrees that, for purposes of this Guaranty and its obligations hereunder, the Secured Obligations shall be deemed to have been declared in default in accordance with the terms of the Loan Agreement or other applicable Loan Documents, and Guarantor shall forthwith pay the amounts specified by Lender to be paid thereunder, any interest thereon and any other amounts guaranteed under this Guaranty without further notice or demand.

SECTION 6.   Subrogation.   Notwithstanding any payment or payments made by Guarantor under this Guaranty, or any set off or application by Lender of any security or of any credits or claims, so long as any Obligation exists under any Loan Document, Guarantor hereby agrees that it will not, before the Secured Obligations have been paid in full, assert or exercise any rights of Lender or Guarantor against any other Obligor to recover the amount of any payment made by Guarantor to Lender under this Guaranty by way of any claim, remedy or subrogation, reimbursement, exoneration, contribution, indemnity, participation or otherwise arising by contract, by statute, under common law or otherwise, and Guarantor hereby agrees that it shall, before the Secured Obligations have been paid in full, have no right of recourse to or any claim against assets or property of any other Obligor, all of such rights being expressly waived by Guarantor.  If any amount shall nevertheless be paid to Guarantor by any other Obligor or another guarantor prior to payment in full of the Guaranteed Obligations, such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

SECTION 7.   Subordination.   Guarantor hereby subordinates all indebtedness owing to Guarantor from each Obligor to all indebtedness of each Obligor to Lender, and agrees that upon the occurrence and continuance of an Event of Default, Guarantor shall not be entitled to accept any payment of the same until payment in full of the Secured Obligations under the Loan Documents, and Guarantor shall not, under any circumstance whatsoever, attempt to set-off or reduce any obligations under this Guaranty because of such indebtedness.  If any amount shall nevertheless be paid to Guarantor by any other Obligor prior to payment in full of the Guaranteed Obligations and in violation of the terms of the Loan Agreement or any other Loan Document, such amount shall be held in trust for the benefit of Lender and, on demand by Lender, shall forthwith be paid to Lender to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

SECTION 8.   Waiver.

(a)    Except for the written demand provided for in ***Section 4*** of this Guaranty, Guarantor hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and any requirement that Lender institute suit, collection proceedings or take any other action to collect the Guaranteed Obligations, including any requirement that Lender protect, secure, perfect or insure any Lien against any property subject thereto or exhaust any right or take any action against any Obligor or any other Person or any collateral (it being the intention of Lender that this Guaranty is to be a guaranty of payment and not of collection).

(b)    It shall not be necessary for Lender, in order to enforce any payment by Guarantor under this Guaranty, to mitigate damages or to institute suit or exhaust its rights and remedies against any Obligor or any other Person, including others liable to pay any Guaranteed Obligations, or to enforce its rights against any security ever given to secure payment thereof.

(c)    Guarantor hereby waives marshaling of assets and liabilities, notice by Lender of any indebtedness or liability to which Lender applies or may apply any amounts received by Lender, and of the creation, advancement, increase, existence, extension, renewal, rearrangement and/or modification of the Guaranteed Obligations.

(d)    Guarantor waives any rights and defenses that Guarantor may have (i) arising from any impairment of Guarantor's rights of subrogation, reimbursement, indemnification, contribution, and any other rights and defenses that are or may become available to Guarantor under applicable law, (ii) by reason of any election of remedies by the creditor, and (iii) because the principal's note or other obligation is secured by real property or an estate for years.

SECTION 9.    <u>Representations and Warranties</u>.  Guarantor hereby represents and warrants as follows:

(a)    that Guarantor has had full and complete access to, and has received copies of, the Loan Agreement and the other Loan Documents and has reviewed same and is aware of their contents;

(b)    that Guarantor has the power and authority to execute, deliver and perform its obligations hereunder and under this Guaranty and any other Loan Documents to which it is a party.  The Loan Documents to which Guarantor is a party have been duly and validly executed and delivered by Guarantor and constitute valid and legally binding agreements of Guarantor, enforceable against Guarantor in accordance with the respective terms thereof, except, in each case, as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar Laws relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

(c)    that no authorization, consent, approval, license or exception of or filing or registration with any court or government department, commission, board, bureau, agency or instrumentality, or other Governmental Authority, is necessary for the valid execution, delivery or performance by Guarantor of this Guaranty or any other Loan Document to which it is a party; and

(d)    that the execution, delivery and performance of this Guaranty and the other Loan Documents to which it is a party does not (i) result in breach of, or constitute a default under, any contract, lease, instrument or other agreement to which Guarantor presently is a party, or

6

(ii) result in or require the creation or imposition of, any mortgage, deed of trust, pledge, lien, security interest (other than pursuant to this Guaranty or such other Loan Document) or other share or encumbrance of any nature upon or with respect to any of Guarantor's property or interests, be they tangible or intangible.  Except as previously disclosed to Lender in writing, Guarantor is not in violation of or in default under any material indenture, agreement, lease or instrument.

SECTION 10.   <u>Affirmative Covenants</u>.  Guarantor covenants and agrees to promptly execute and deliver to Lender upon reasonable notice and request all such other documents, agreements and instruments in compliance with the covenants and agreements of Guarantor herein as Lender may reasonably request from time to time.  Without limiting the generality of the foregoing, Guarantor agrees to deliver to Lender the financial statements of such Guarantor when and as required under Loan Agreement.

SECTION 11.   <u>Amendments</u>.  The terms of this Guaranty may be waived, altered or amended only by an instrument in writing duly executed by Guarantor and Lender.  Any such amendment or waiver shall be binding upon Lender, each holder of any of the Secured Obligations and Guarantor.

SECTION 12.   <u>Addresses for Notices</u>.  All notices and other communications provided for under or in connection with this Guaranty from one party to the other shall be in writing and sent by postage prepaid, certified mail, return receipt requested, or by reliable courier service addressed to (a) in the case of Guarantor, Guarantor's address as set forth at the beginning of this Guaranty, and (b) in the case of Lender, to its address as set forth at the beginning of this Guaranty.  Guarantor or Lender may designate another address for the receipt of notices and other communications, provided such new designation is provided in writing to the other party in accordance with this ***Section 12***.  Any notice so addressed and mailed by registered or certified mail, return receipt requested, shall be deemed to be given two days after the date on which it was so mailed, and any notice so delivered in person shall be deemed to be given when receipted for by, or actually received by, an authorized officer of Borrower Representative or Lender, as the case may be.

SECTION 13.   <u>No Waiver, Remedies</u>.  No failure on the part of Lender to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise thereof or the exercise of any other right.  The remedies in this Guaranty provided are cumulative and not exclusive of any remedies provided by Law.

SECTION 14.   <u>Right of Set-Off</u>.  Upon the occurrence and during the continuance of any Event of Default or default under the Loan Documents, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) of Guarantor at any time held and other indebtedness at any time owing by Lender (or either of them) to or for the credit or the account of Guarantor against any and all of the obligations of Guarantor now or hereafter existing under this Guaranty, irrespective of whether or not Lender shall have made any demand under this Guaranty and although such obligations may be contingent and unmatured.  Lender agrees promptly to notify Guarantor after any such set-off and application, *provided that*, the failure to give such notice shall not affect the validity of such set-off and application.  The rights of Lender under this ***Section 14*** are in addition to other rights and remedies (including, without limitation, other rights of set-off or banker's lien) which Lender may have.

SECTION 15.   <u>Continuing Guaranty; Successors and Assigns; Transfer of the Loan Documents</u>.  This Guaranty is a continuing guaranty and shall

(a)      remain in full force and effect until payment in full of the Guaranteed Obligations,

(b)      be binding upon Guarantor and Guarantor's heirs, legal representatives, successors, transferees and assigns, provided, however, that Guarantor shall not assign or transfer its rights or obligations under this Guaranty without the prior written consent of Lender, and

(c)      inure to the benefit of and be enforceable by Lender and its respective successors, transferees and assigns.

Without limiting the generality of the foregoing clause (c) of this **Section 15**, Lender may assign or otherwise transfer all or a portion of its interests, rights and obligations under the Loan Documents to which it is a party.  Any assignment in violation of this **Section 15** shall be void and without force or effect.

SECTION 16.    Separability.  Should any clause, sentence, paragraph, subsection or section of this Guaranty be judicially declared to be invalid, unenforceable or void, such decision will not have the effect of invalidating or voiding the remainder of this Guaranty, and the parties hereto agree that the part or parts of this Guaranty so held to be invalid, unenforceable or void will be deemed to have been stricken herefrom by the parties hereto, and the remainder will have the same force and effectiveness as if such stricken part or parts had never been included herein.

SECTION 17.    Usury.  Notwithstanding any other provisions contained in this Guaranty, no provision of this Guaranty shall require or permit the collection from Guarantor of interest in excess of the maximum non-usurious rate of interest permitted by applicable foreign, federal or state Law.

SECTION 18.    Survival.  All warranties and representations made by Guarantor herein or in any certificate or other instrument executed and delivered by Guarantor under this Guaranty shall be considered to have been relied upon by Lender and shall survive the execution and delivery of this Guaranty, regardless of any investigation made by or on behalf of any thereof.  All statements in any such certificate or other instrument shall constitute warranties and representations by Guarantor under this Guaranty.

SECTION 19.    Limitation by Law.  All rights, remedies and powers provided in this Guaranty may be exercised only to the extent that the exercise thereof does not violate any applicable provision of Law, and all the provisions of this Guaranty are intended to be subject to all applicable mandatory provisions of Law which may be controlling from time to time and to be limited to the extent necessary so that they will not render this Guaranty invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable Law.

SECTION 20.    INDEMNITY.  GUARANTOR AGREES TO INDEMNIFY AND SHALL INDEMNIFY LENDER AND ITS RESPECTIVE AFFILIATES, PARTICIPANTS, PARTNERS, SHAREHOLDERS, MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, ATTORNEYS, ACCOUNTANTS, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "*INDEMNITEES*" AND EACH INDIVIDUALLY, AN "*INDEMNITEE*") FROM, AND HOLD EACH OF THEM HARMLESS AGAINST, ANY AND ALL LOSSES, LIABILITIES, CLAIMS OR DAMAGES (INCLUDING REASONABLE LEGAL FEES AND EXPENSES) TO WHICH ANY OF THEM MAY BECOME SUBJECT, INSOFAR AS SUCH LOSSES, LIABILITIES, CLAIMS OR DAMAGES ARISE OUT OF OR RESULT FROM THIS GUARANTY OR ANY OTHER LOAN DOCUMENT TO WHICH GUARANTOR IS A PARTY OR ANY INVESTIGATION, LITIGATION OR OTHER PROCEEDING (INCLUDING ANY THREATENED INVESTIGATION OR

PROCEEDING) RELATING TO THE FOREGOING, AND GUARANTOR SHALL REIMBURSE EACH INDEMNITEE, UPON DEMAND FOR ANY EXPENSES (INCLUDING LEGAL FEES) REASONABLY INCURRED IN CONNECTION WITH ANY SUCH INVESTIGATION OR PROCEEDING; BUT EXCLUDING ANY SUCH LOSSES, LIABILITIES, CLAIMS, DAMAGES OR EXPENSES INCURRED BY REASON OF THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR UNLAWFUL ACTS OF SUCH INDEMNITEE. **WITHOUT LIMITING ANY PROVISION OF THIS GUARANTY, IT IS THE EXPRESS INTENTION OF GUARANTOR THAT EACH INDEMNITEE SHALL BE INDEMNIFIED AND HELD HARMLESS AGAINST ALL SUCH LOSSES, LIABILITIES, CLAIMS OR DAMAGES ARISING OUT OF OR RESULTING FROM THE SOLE, ORDINARY OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNITEE, BUT NOT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.** WITHOUT PREJUDICE TO THE SURVIVAL OF ANY OTHER OBLIGATIONS OF GUARANTOR UNDER THIS GUARANTY AND UNDER THE OTHER LOAN DOCUMENTS TO WHICH GUARANTOR IS A PARTY, THE OBLIGATIONS OF GUARANTOR UNDER THIS ***SECTION 20*** SHALL SURVIVE THE TERMINATION OF THIS GUARANTY AND THE OTHER LOAN DOCUMENTS AND THE PAYMENT OF THE SECURED OBLIGATIONS OR THE ASSIGNMENT OF THE LOAN DOCUMENTS.

SECTION 21.    <u>Governing Law and Jurisdiction</u>.

(a)    THIS GUARANTY AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET OUT THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

(b)    <u>Jurisdiction</u>.  Guarantor irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, any Lender or any Related Party of the foregoing in any way relating to this Guaranty or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of Texas sitting in Harris County, and of the United States District Court of the Southern District of Texas, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Guaranty or in any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Guaranty or any other Loan Document against Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(c)    <u>Waiver of Venue</u>.  Guarantor irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Guaranty or any other Loan Document in any court referred to in ***Section 21(b)***.  Guarantor hereby irrevocably waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Service of Process.  Guarantor irrevocably consents to service of process in the manner provided for notices in ***Section 12***.  Nothing in this Guaranty will affect the right of any party hereto to serve process in any other manner permitted by applicable Law.

**SECTION 22.    WAIVER OF JURY TRIAL.    GUARANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  GUARANTOR (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT, LENDER, AND THE OTHER LOAN PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY (IN THE CASE OF GUARANTOR) AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**SECTION 23.    FINAL AGREEMENT OF THE PARTIES.  THIS GUARANTY, THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS CONSTITUTE A "LOAN AGREEMENT" AS DEFINED IN SECTION 26.02(A) OF THE TEXAS BUSINESS AND COMMERCE CODE, AND REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN LENDER, ON THE ONE HAND, AND GUARANTOR AND THE OTHER OBLIGORS, ON THE OTHER HAND.**

*[**Signature and acknowledgment are on the following page.**]*

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first set forth above.

**GUARANTOR:**

BIG STORM BREWERY LLC,
a Florida limited liability company

By:   SEABOARD CRAFT BEER HOLDINGS LLC,
      as sole member and manager

         By: _____
            Leo Joseph Govoni
            Manager

BIG STORM PASCO LLC,
a Florida limited liability company

By:   BIG STORM BREWERY LLC,
      as sole member and manager

By:   SEABOARD CRAFT BEER HOLDINGS LLC,
      as sole member and manager

         By: _____
            Leo Joseph Govoni
            Manager

BIG STORM CAPE CORAL LLC,
a Florida limited liability company

By:   BIG STORM BREWERY LLC,
      as sole member and manager

By:   SEABOARD CRAFT BEER HOLDINGS LLC,
      as sole member and manager

         By: _____
            Leo Joseph Govoni
            Manager

Signature Page to Guaranty Agreement

BIG STORM COFFEE COMPANY LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
        as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By: _____
             Leo Joseph Govoni
             Manager


BIG STORM CIDER AND MEAD LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
        as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By: _____
             Leo Joseph Govoni
             Manager


BIG STORM COCKTAILS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
        as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By: _____
             Leo Joseph Govoni
             Manager


Signature Page to Guaranty Agreement

# EXHIBIT F

## GUARANTY AGREEMENT
### (Leo Joseph Govoni)

This GUARANTY AGREEMENT (this "*Guaranty*"), dated as of September 18, 2020, is made by LEO JOSEPH GOVONI, an individual ("*Guarantor*"), whose address is 14109 Spoonbill Lane, Clearwater, Florida 33765, in favor of BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company ("*Lender*"), whose address for purposes of this Guaranty is 1500 CityWest Boulevard, Suite 560, Houston, Harris County, Texas 77042, Attn: Frank Goldberg.

### RECITALS

A.    Pursuant to that certain Loan Agreement dated as of the date hereof (as amended, restated, supplemented, or otherwise modified from time to time, the "*Loan Agreement*"), among BIG STORM REAL ESTATE LLC, a Florida limited liability company ("*Big Storm Real Estate*"), BIG STORM PINELLAS LLC, a Florida limited liability company ("*Big Storm Pinellas*"), and each other Person from time to time party thereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "*Borrowers*," and each individually, a "*Borrower*"), as borrowers, and Lender, Lender has agreed, subject to the terms and conditions therein, to extend credit to Borrowers in the form of a term loan.

B.    Guarantor directly or indirectly owns equity interests in the Borrowers and has agreed to enter into this Guaranty so that Borrowers can receive the benefits of the Guaranteed Obligation (as defined below).

C.    In Guarantor's judgment, the value of the consideration received and to be received by it under the Loan Documents is reasonably worth at least as much as its liability and obligation under this Guaranty, and such liability and obligation may reasonably be expected to benefit Guarantor directly or indirectly.

D.    It is expressly understood among Borrowers, Guarantor, and Lender that the execution and delivery of this Guaranty is a condition precedent to Lender's obligations to extend credit under the Loan Agreement.

E.    In satisfaction of the requirements under the Loan Agreement, Guarantor has agreed to enter into this Guaranty to guarantee, among other things, the Secured Obligations (defined below).

NOW, THEREFORE, in consideration of the premises and in order to induce Lender to enter into the Loan Agreement and extend credit thereunder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by Guarantor, Guarantor hereby agrees as follows:

SECTION 1.    Defined Terms. Capitalized terms used but not defined in this Guaranty shall have the meanings given them in the Loan Agreement, a true and correct copy of which Guarantor hereby acknowledges receipt of.    As used in this Guaranty, the following terms shall have the following meanings:

*Event of Default* means a "Default" or an "Event of Default", in each case under, and as defined in, the Loan Agreement.

*Guaranteed Obligations* is defined in *Section 3*.

*Indemnitees* is defined in *Section 20*.

***Obligor*** means any Borrower, any Guarantor, and any other Person that has or that will have any liability (actual or contingent) and whether alone or jointly with any other Person and whether as principal debtor, guarantor or surety or otherwise (or as the equivalent obligor under the Laws of any jurisdiction) to Lender for the payment or repayment of any amounts outstanding or capable of becoming outstanding under the Loan Documents.

***Secured Obligations*** means the "Obligation" under, and as defined in, the Loan Agreement, and all other present and future obligations and liabilities (whether actual or contingent and whether now or hereafter owed jointly or severally or as principal debtor, guarantor, surety or otherwise or as the equivalent obligor under the Laws of any jurisdiction) of each Obligor to Lender under all or any of the Loan Documents, together with:

      (a)     costs, charges and expenses incurred by Lender in connection with or the protection, preservation or enforcement by Lender of its rights under the Loan Documents;

      (b)     any refinancing, novation, refunding, deferral, modification, renewal or extension of or increase in any of those obligations or liabilities;

      (c)     any further advances which may be made by Lender to any Obligor under any agreement expressed to be supplemental to any of the Loan Documents and all interest, fees and costs in connection therewith;

      (d)     any claim for damages or restitution in the event of rescission of any of those obligations or liabilities or otherwise in connection with the Loan Documents;

      (e)     any claim against any Obligor flowing from the recovery by an Obligor of a payment or discharge in respect of any of those obligations or liabilities on grounds of preference or otherwise;

      (f)     all other amounts now or in the future owed by an Obligor to Lender under any one or more of the Loan Documents; and

      (g)     any amounts which would be included in any of the foregoing but for any discharge, non-provability, unenforceability or non-allowability of the same in any insolvency, bankruptcy or other proceedings.

SECTION 2.     <u>Interpretation</u>.

      (a)     In this Guaranty, unless a clear contrary intention appears (i) the singular number includes the plural number and *vice versa*, (ii) reference to any gender includes each other gender, (iii) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Guaranty as a whole and not to any particular Section or other subdivision, (iv) reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Guaranty, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually, *provided that*, nothing in this *clause (iv)* is intended to authorize any assignment not otherwise permitted by this Guaranty or the Loan Agreement, (v) reference to any agreement (including this Guaranty), document or instrument means such agreement, document or instrument as amended, modified, supplemented or extended and in effect from time to time in accordance with the terms thereof and, if applicable, the terms of this Guaranty, and references to any note includes any note issued in renewal, rearrangement, reinstatement, enlargement, amendment, modification, extension,

substitution or replacement for such note, (vi) unless the context indicates otherwise, reference to any Section, clause, paragraph, Schedule or Exhibit means such Section, clause or paragraph of this Guaranty or such Schedule or Exhibit to this Guaranty, (vii) the word "including" (and with correlative meaning "include") means including, without limiting the generality of any description preceding such term; the word "or" is not exclusive; and the word "all" includes "and" and the word "any" includes "all", (viii) with respect to the determination of any period of time, the word "from" means "from and including" and the word "to" means "to but excluding"; and (ix) reference to any Law, ordinance, statute, code, rule, regulation, interpretation or judgment means such Law, ordinance, statute, code, rule, regulation, interpretation or judgment as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time.

(b)    The Section and other headings in this Guaranty are for convenience only and shall not affect the construction of this Guaranty.

(c)    No provision of this Guaranty shall be interpreted or construed against any Person solely because that Person or its legal representative drafted such provision.

SECTION 3.    Guaranty.

(a)    Guarantor hereby absolutely, unconditionally and irrevocably guarantees (as primary obligor and not merely as surety) the complete and punctual payment and performance when due, whether at stated maturity, by acceleration or otherwise, of the Secured Obligations, and all other obligations and covenants of each Obligor now or hereafter existing under the Loan Agreement and the other Loan Documents, whether for principal, interest (including interest accruing or becoming owing both prior to and subsequent to the commencement of any proceeding against or with respect to any Obligor under any bankruptcy or insolvency proceeding), fees, commissions, expenses (including court costs and reasonable counsel fees and expenses), and agrees to pay all costs and expenses, if any, incurred by Lender in connection with enforcing any rights under this Guaranty.  The obligations of Guarantor to Lender under this Guaranty are referred to in this Guaranty as the "***Guaranteed Obligations***"; *provided that*, the Guaranteed Obligations of Guarantor under this Guaranty shall not exceed an amount that is $1.00 less than that amount that would render Guarantor's obligations under this Guaranty subject to avoidance under Section 548 of the Bankruptcy Code or any comparable provisions of any other applicable state or foreign Law.  Guarantor agrees that the Secured Obligations may at any time and from time to time exceed the Guaranteed Obligations of Guarantor without impairing this Guaranty or affecting the rights and remedies of Lender.

(b)    No payment made by any Obligor or any other guarantor (other than Guarantor making such payment) or any other Person or received or collected by Lender from any Obligor, any such other guarantor (other than Guarantor making such payment) or any other Person (other than Guarantor making such payment) by virtue of any action or proceeding or any set-off or appropriation or application at any time in reduction of or in payment of the Secured Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of Guarantor for the Guaranteed Obligations under this Guaranty.

(c)    This Guaranty is an absolute, unconditional, present and continuing guaranty of payment and performance and not of collectability and is in no way conditioned upon any attempt to collect from any other Obligor or any other action, occurrence or circumstance whatsoever.

SECTION 4.    Payment Under Guaranty; Guaranty Unconditional.  Guarantor guarantees that the Guaranteed Obligations will be paid promptly within five (5) days after written demand by Lender.

3

Subject to the termination of this Guaranty, until the payment in full of all Guaranteed Obligations in cash in accordance with *Section 15*, the obligations of Guarantor under this Guaranty shall be absolute, unconditional and irrevocable, and shall be performed in accordance with the terms of this Guaranty, notwithstanding:

>        (a)        any extension, renewal, modification, settlement, compromise, waiver or release in respect of any Guaranteed Obligations;

>        (b)        any extension, renewal, amendment, modification, rescission, waiver or release in respect of any Loan Document;

>        (c)        any release, exchange, substitution, non perfection or invalidity of, or failure to exercise rights or remedies with respect to, any direct or indirect security for any Guaranteed Obligations, including the release of any Obligor or any other guarantor or other Person liable on any obligations of an Obligor under the Loan Documents;

>        (d)        any change in the existence, structure or ownership of any Obligor or any other guarantor or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligor, any guarantor or any of their respective assets;

>        (e)        the existence of any claim, defense, set-off or other rights or remedies which any other guarantor at any time may have against any Obligor, or any Obligor or any other guarantor may have at any time against Lender or any other Person, whether in connection with this Guaranty, the Loan Documents, the transactions contemplated hereby or thereby or any other transaction;

>        (f)        any invalidity or unenforceability for any reason of this Guaranty or the other Loan Documents, or any provision of Law purporting to prohibit the payment or performance by any Obligor or any other guarantor of the Guaranteed Obligations or the Loan Documents, or of any other obligation to Lender;

>        (g)        any failure to give notice of the occurrence of any Event of Default; or

>        (h)        any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

SECTION 5.    <u>Effect of Debtor Relief Laws</u>.  If, after receipt of any payment of, or proceeds of any security applied (or intended to be applied) to the payment of, all or any part of the Guaranteed Obligations, Lender is for any reason compelled to surrender such payment or proceeds to any Person (a) because such payment or application of proceeds is or may be under applicable Law avoided, invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, fraudulent conveyance, fraudulent transfer, impermissible set-off or a diversion of trust funds, or (b) for any other reason under applicable Law, including (i) any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of its properties, or (ii) any settlement or compromise of any such claim effected by Lender with any such claimant (including any Obligor), then the Guaranteed Obligations or part thereof intended to be satisfied shall be reinstated and continue, and this Guaranty shall continue in full force as if such payment or proceeds have not been received, notwithstanding any revocation thereof or the cancellation of any instrument evidencing any Guaranteed Obligations or otherwise; and Guarantor shall be liable to pay Lender, and hereby does indemnify Lender and hold Lender harmless for the amount of such payment or proceeds so surrendered and all expenses (including reasonable attorneys' fees, court costs and expenses attributable thereto) incurred by Lender in the

defense of any claim made against it that any payment or proceeds received by Lender in respect of all or part of the Guaranteed Obligations must be surrendered.  The provisions of this **Section 5** shall survive the termination of this Guaranty, and any satisfaction or discharge of any Obligor by virtue of any payment, court order or any foreign, federal or state Law.  If an Event of Default shall at any time have occurred and be continuing and declaration of such Event of Default shall at such time be prevented by reason of the pendency against any Obligor of a case or proceeding under a bankruptcy or insolvency Law, Guarantor agrees that, for purposes of this Guaranty and its obligations hereunder, the Secured Obligations shall be deemed to have been declared in default in accordance with the terms of the Loan Agreement or other applicable Loan Documents, and Guarantor shall forthwith pay the amounts specified by Lender to be paid thereunder, any interest thereon and any other amounts guaranteed under this Guaranty without further notice or demand.

SECTION 6.    Subrogation.   Notwithstanding any payment or payments made by Guarantor under this Guaranty, or any set off or application by Lender of any security or of any credits or claims, so long as any Obligation exists under any Loan Document, Guarantor hereby agrees that it will not, before the Secured Obligations have been paid in full, assert or exercise any rights of Lender or Guarantor against any other Obligor to recover the amount of any payment made by Guarantor to Lender under this Guaranty by way of any claim, remedy or subrogation, reimbursement, exoneration, contribution, indemnity, participation or otherwise arising by contract, by statute, under common law or otherwise, and Guarantor hereby agrees that it shall, before the Secured Obligations have been paid in full, have no right of recourse to or any claim against assets or property of any other Obligor, all of such rights being expressly waived by Guarantor.  If any amount shall nevertheless be paid to Guarantor by any other Obligor or another guarantor prior to payment in full of the Guaranteed Obligations, such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

SECTION 7.    Subordination.   Guarantor hereby subordinates all indebtedness owing to Guarantor from each Obligor to all indebtedness of each Obligor to Lender, and agrees that upon the occurrence and continuance of an Event of Default, Guarantor shall not be entitled to accept any payment of the same until payment in full of the Secured Obligations under the Loan Documents, and Guarantor shall not, under any circumstance whatsoever, attempt to set-off or reduce any obligations under this Guaranty because of such indebtedness.  If any amount shall nevertheless be paid to Guarantor by any other Obligor prior to payment in full of the Guaranteed Obligations and in violation of the terms of the Loan Agreement or any other Loan Document, such amount shall be held in trust for the benefit of Lender and, on demand by Lender, shall forthwith be paid to Lender to be credited and applied to the Guaranteed Obligations, whether matured or unmatured.

SECTION 8.    Waiver.

(a)    Except for the written demand provided for in **Section 4** of this Guaranty, Guarantor hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and waives presentment, demand of payment, notice of intent to accelerate, notice of acceleration, notice of dishonor or nonpayment and any requirement that Lender institute suit, collection proceedings or take any other action to collect the Guaranteed Obligations, including any requirement that Lender protect, secure, perfect or insure any Lien against any property subject thereto or exhaust any right or take any action against any Obligor or any other Person or any collateral (it being the intention of Lender that this Guaranty is to be a guaranty of payment and not of collection).

(b)    It shall not be necessary for Lender, in order to enforce any payment by Guarantor under this Guaranty, to mitigate damages or to institute suit or exhaust its rights and

remedies against any Obligor or any other Person, including others liable to pay any Guaranteed Obligations, or to enforce its rights against any security ever given to secure payment thereof.

(c)      Guarantor hereby waives marshaling of assets and liabilities, notice by Lender of any indebtedness or liability to which Lender applies or may apply any amounts received by Lender, and of the creation, advancement, increase, existence, extension, renewal, rearrangement and/or modification of the Guaranteed Obligations.

(d)      Guarantor waives any rights and defenses that Guarantor may have (i) arising from any impairment of Guarantor's rights of subrogation, reimbursement, indemnification, contribution, and any other rights and defenses that are or may become available to Guarantor under applicable law, (ii) by reason of any election of remedies by the creditor, and (iii) because the principal's note or other obligation is secured by real property or an estate for years.

SECTION 9.      Representations and Warranties.  Guarantor hereby represents and warrants as follows:

(a)      that Guarantor has had full and complete access to, and has received copies of, the Loan Agreement and the other Loan Documents and has reviewed same and is aware of their contents;

(b)      that Guarantor has the power and authority to execute, deliver and perform its obligations hereunder and under this Guaranty and any other Loan Documents to which it is a party.  The Loan Documents to which Guarantor is a party have been duly and validly executed and delivered by Guarantor and constitute valid and legally binding agreements of Guarantor, enforceable against Guarantor in accordance with the respective terms thereof, except, in each case, as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar Laws relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

(c)      that no authorization, consent, approval, license or exception of or filing or registration with any court or government department, commission, board, bureau, agency or instrumentality, or other Governmental Authority, is necessary for the valid execution, delivery or performance by Guarantor of this Guaranty or any other Loan Document to which it is a party; and

(d)      that the execution, delivery and performance of this Guaranty and the other Loan Documents to which it is a party does not (i) result in breach of, or constitute a default under, any contract, lease, instrument or other agreement to which Guarantor presently is a party, or (ii) result in or require the creation or imposition of, any mortgage, deed of trust, pledge, lien, security interest (other than pursuant to this Guaranty or such other Loan Document) or other share or encumbrance of any nature upon or with respect to any of Guarantor's property or interests, be they tangible or intangible.  Except as previously disclosed to Lender in writing, Guarantor is not in violation of or in default under any material indenture, agreement, lease or instrument.

SECTION 10.      Affirmative Covenants.  Guarantor covenants and agrees to promptly execute and deliver to Lender upon reasonable notice and request all such other documents, agreements and instruments in compliance with the covenants and agreements of Guarantor herein as Lender may reasonably request from time to time.  Without limiting the generality of the foregoing, Guarantor agrees

6

to deliver to Lender the financial statements of such Guarantor when and as required under Loan Agreement.

SECTION 11.    <u>Amendments</u>.  The terms of this Guaranty may be waived, altered or amended only by an instrument in writing duly executed by Guarantor and Lender.  Any such amendment or waiver shall be binding upon Lender, each holder of any of the Secured Obligations and Guarantor.

SECTION 12.    <u>Addresses for Notices</u>.  All notices and other communications provided for under or in connection with this Guaranty from one party to the other shall be in writing and sent by postage prepaid, certified mail, return receipt requested, or by reliable courier service addressed to (a) in the case of Guarantor, Guarantor's address as set forth at the beginning of this Guaranty, and (b) in the case of Lender, to its address as set forth at the beginning of this Guaranty.  Guarantor or Lender may designate another address for the receipt of notices and other communications, provided such new designation is provided in writing to the other party in accordance with this ***Section 12***.  Any notice so addressed and mailed by registered or certified mail, return receipt requested, shall be deemed to be given two days after the date on which it was so mailed, and any notice so delivered in person shall be deemed to be given when receipted for by, or actually received by, an authorized officer of Borrower Representative or Lender, as the case may be.

SECTION 13.    <u>No Waiver, Remedies</u>.  No failure on the part of Lender to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise thereof or the exercise of any other right.  The remedies in this Guaranty provided are cumulative and not exclusive of any remedies provided by Law.

SECTION 14.    <u>Right of Set-Off</u>.  Upon the occurrence and during the continuance of any Event of Default or default under the Loan Documents, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) of Guarantor at any time held and other indebtedness at any time owing by Lender (or either of them) to or for the credit or the account of Guarantor against any and all of the obligations of Guarantor now or hereafter existing under this Guaranty, irrespective of whether or not Lender shall have made any demand under this Guaranty and although such obligations may be contingent and unmatured.  Lender agrees promptly to notify Guarantor after any such set-off and application, *provided that*, the failure to give such notice shall not affect the validity of such set-off and application.  The rights of Lender under this ***Section 14*** are in addition to other rights and remedies (including, without limitation, other rights of set-off or banker's lien) which Lender may have.

SECTION 15.    <u>Continuing Guaranty; Successors and Assigns; Transfer of the Loan Documents</u>.  This Guaranty is a continuing guaranty and shall

(a)    remain in full force and effect until payment in full of the Guaranteed Obligations,

(b)    be binding upon Guarantor and Guarantor's heirs, legal representatives, successors, transferees and assigns, provided, however, that Guarantor shall not assign or transfer its rights or obligations under this Guaranty without the prior written consent of Lender, and

(c)    inure to the benefit of and be enforceable by Lender and its respective successors, transferees and assigns.

Without limiting the generality of the foregoing clause (c) of this **Section 15**, Lender may assign or otherwise transfer all or a portion of its interests, rights and obligations under the Loan Documents to which it is a party. Any assignment in violation of this **Section 15** shall be void and without force or effect.

SECTION 16.    Separability.   Should any clause, sentence, paragraph, subsection or section of this Guaranty be judicially declared to be invalid, unenforceable or void, such decision will not have the effect of invalidating or voiding the remainder of this Guaranty, and the parties hereto agree that the part or parts of this Guaranty so held to be invalid, unenforceable or void will be deemed to have been stricken herefrom by the parties hereto, and the remainder will have the same force and effectiveness as if such stricken part or parts had never been included herein.

SECTION 17.    Usury.   Notwithstanding any other provisions contained in this Guaranty, no provision of this Guaranty shall require or permit the collection from Guarantor of interest in excess of the maximum non-usurious rate of interest permitted by applicable foreign, federal or state Law.

SECTION 18.    Survival.   All warranties and representations made by Guarantor herein or in any certificate or other instrument executed and delivered by Guarantor under this Guaranty shall be considered to have been relied upon by Lender and shall survive the execution and delivery of this Guaranty, regardless of any investigation made by or on behalf of any thereof. All statements in any such certificate or other instrument shall constitute warranties and representations by Guarantor under this Guaranty.

SECTION 19.    Limitation by Law.   All rights, remedies and powers provided in this Guaranty may be exercised only to the extent that the exercise thereof does not violate any applicable provision of Law, and all the provisions of this Guaranty are intended to be subject to all applicable mandatory provisions of Law which may be controlling from time to time and to be limited to the extent necessary so that they will not render this Guaranty invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable Law.

SECTION 20.    INDEMNITY.   GUARANTOR AGREES TO INDEMNIFY AND SHALL INDEMNIFY LENDER AND ITS RESPECTIVE AFFILIATES, PARTICIPANTS, PARTNERS, SHAREHOLDERS, MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, ATTORNEYS, ACCOUNTANTS, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "**INDEMNITEES**" AND EACH INDIVIDUALLY, AN "**INDEMNITEE**") FROM, AND HOLD EACH OF THEM HARMLESS AGAINST, ANY AND ALL LOSSES, LIABILITIES, CLAIMS OR DAMAGES (INCLUDING REASONABLE LEGAL FEES AND EXPENSES) TO WHICH ANY OF THEM MAY BECOME SUBJECT, INSOFAR AS SUCH LOSSES, LIABILITIES, CLAIMS OR DAMAGES ARISE OUT OF OR RESULT FROM THIS GUARANTY OR ANY OTHER LOAN DOCUMENT TO WHICH GUARANTOR IS A PARTY OR ANY INVESTIGATION, LITIGATION OR OTHER PROCEEDING (INCLUDING ANY THREATENED INVESTIGATION OR PROCEEDING) RELATING TO THE FOREGOING, AND GUARANTOR SHALL REIMBURSE EACH INDEMNITEE, UPON DEMAND FOR ANY EXPENSES (INCLUDING LEGAL FEES) REASONABLY INCURRED IN CONNECTION WITH ANY SUCH INVESTIGATION OR PROCEEDING; BUT EXCLUDING ANY SUCH LOSSES, LIABILITIES, CLAIMS, DAMAGES OR EXPENSES INCURRED BY REASON OF THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR UNLAWFUL ACTS OF SUCH INDEMNITEE. **WITHOUT LIMITING ANY PROVISION OF THIS GUARANTY, IT IS THE EXPRESS INTENTION OF GUARANTOR THAT EACH INDEMNITEE SHALL BE INDEMNIFIED AND HELD HARMLESS AGAINST ALL SUCH LOSSES, LIABILITIES, CLAIMS OR DAMAGES ARISING OUT OF OR RESULTING FROM THE SOLE, ORDINARY OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNITEE, BUT**

**NOT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.** WITHOUT PREJUDICE TO THE SURVIVAL OF ANY OTHER OBLIGATIONS OF GUARANTOR UNDER THIS GUARANTY AND UNDER THE OTHER LOAN DOCUMENTS TO WHICH GUARANTOR IS A PARTY, THE OBLIGATIONS OF GUARANTOR UNDER THIS **SECTION 20** SHALL SURVIVE THE TERMINATION OF THIS GUARANTY AND THE OTHER LOAN DOCUMENTS AND THE PAYMENT OF THE SECURED OBLIGATIONS OR THE ASSIGNMENT OF THE LOAN DOCUMENTS.

SECTION 21.    Governing Law and Jurisdiction.

(a)    THIS GUARANTY AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET OUT THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

(b)    Jurisdiction.  Guarantor irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, any Lender or any Related Party of the foregoing in any way relating to this Guaranty or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of Texas sitting in Harris County, and of the United States District Court of the Southern District of Texas, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Guaranty or in any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Guaranty or any other Loan Document against Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(c)    Waiver of Venue.  Guarantor irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Guaranty or any other Loan Document in any court referred to in **Section 21(b)**.  Guarantor hereby irrevocably waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Service of Process.  Guarantor irrevocably consents to service of process in the manner provided for notices in **Section 12**.  Nothing in this Guaranty will affect the right of any party hereto to serve process in any other manner permitted by applicable Law.

**SECTION 22.    WAIVER OF JURY TRIAL.    GUARANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED**

ON CONTRACT, TORT OR ANY OTHER THEORY).  GUARANTOR (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT, LENDER, AND THE OTHER LOAN PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY (IN THE CASE OF GUARANTOR) AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 23.    FINAL AGREEMENT OF THE PARTIES.  THIS GUARANTY, THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS CONSTITUTE A "LOAN AGREEMENT" AS DEFINED IN SECTION 26.02(A) OF THE TEXAS BUSINESS AND COMMERCE CODE, AND REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN LENDER, ON THE ONE HAND, AND GUARANTOR AND THE OTHER OBLIGORS, ON THE OTHER HAND.

[*Signature and acknowledgment are on the following page.*]

10

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered as of the date set forth in the notarial acknowledgment below, to be effective for all purposes as of the date first above written.

GUARANTOR:

_____
Leo Joseph Govoni, an individual

STATE OF FLORIDA           §
                           §
COUNTY OF Pinellas         §

This instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization on _____September 17_____, 2020, by Leo Joseph Govoni, an individual, for the purpose and consideration herein stated.

_____
Notary Public in and for the State of Florida

MICHELE M. PARKS
MY COMMISSION # GG182207
EXPIRES: February 04, 2022

Signature and Acknowledgement Page to Guaranty Agreement

# EXHIBIT G

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (as amended, restated, supplemented, or otherwise modified from time to time, this "***Agreement***") is executed as of September 18, 2020, by BIG STORM BREWERY LLC, a Florida limited liability company ("***Big Storm Brewery***"), BIG STORM PASCO LLC, a Florida limited liability company ("***Big Storm Pasco***"), BIG STORM CAPE CORAL LLC, a Florida limited liability company ("***Big Storm Cape Coral***"), BIG STORM CIDER AND MEAD LLC, a Florida limited liability company ("***Big Storm Cider and Mead***"), BIG STORM COCKTAILS LLC, a Florida limited liability company ("***Big Storm Cocktails***"), and BIG STORM COFFEE COMPANY LLC, a Florida limited liability company ("***Big Storm Coffee***", together with Big Storm Brewery, Big Storm Pasco, Big Storm Cape Coral, Big Storm Cider and Mead, and Big Storm Cocktails, collectively, "***Debtors***" and each individually, a "***Debtor***"), for the benefit of BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company ("***Secured Party***").

## RECITALS

A.    BIG STORM REAL ESTATE LLC, a Florida limited liability company ("***Big Storm Real Estate***"), BIG STORM PINELLAS LLC, a Florida limited liability company ("***Big Storm Pinellas***"), and each other Person from time to time party thereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "***Borrowers***," and each individually, a "***Borrower***"), as borrowers, and Secured Party, as lender, have entered into that certain Loan Agreement dated as of the date hereof (as amended, restated, supplemented, or otherwise modified from time to time, the "***Loan Agreement***"), together with certain other Loan Documents.

B.    To guarantee the payment and performance of Borrowers' obligations under the Loan Agreement, Debtors have executed that certain Guaranty Agreement dated as of the date hereof (as amended, restated, or supplemented, the "***Guaranty***"), in favor of Secured Party.

C.    As a condition precedent to Secured Party's agreement to enter into the Loan Agreement and extend credit to Borrowers thereunder, Secured Party requires that Debtors execute this Agreement to further secure its obligations under the Guaranty.

D.    The execution and delivery of this Agreement is an integral part of the transactions contemplated by the Loan Documents and a condition precedent to Secured Party's obligations to extend credit or make loans under the Loan Agreement.

## AGREEMENTS

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Debtor covenants and agrees with Secured Party as follows:

1.    <u>Certain Definitions</u>.  Each capitalized term used but not defined in this Agreement has the meaning given that term in the Loan Agreement or in the UCC.  If a defined term in the Loan Agreement conflicts with the definition given that term in the UCC, the Loan Agreement definition shall control to the extent allowed by Law.  As used in this Agreement, the following terms have the meanings indicated:

***Collateral*** is defined in ***Section 2*** of this Agreement.

***Obligation*** means the "Guaranteed Obligations" under, and as defined in, the Guaranty.

*Obligor* means a Person that, with respect to an obligation secured by a security interest in the Collateral, (a) owes payment or other performance on the obligation, (b) has provided property or other security or credit support other than the Collateral to secure payment or other performance of the obligation, or (c) is otherwise accountable in whole or in part for payment or other performance of the obligation.  The term does not include issuers or nominated persons under a letter of credit.

*Security Interest* means the security interests granted, and the transfers, pledges and assignments made, under *Section 2* of this Agreement.

*UCC* means (a) the Uniform Commercial Code, as adopted and in effect from time to time in Texas, and (b) if the UCC provides that the Law of another jurisdiction governs certain matters, then, in respect of such matters, the Uniform Commercial Code as adopted and in effect from time to time in such jurisdiction.

2. <u>Security Interest</u>.  To secure the prompt, unconditional, and complete payment and performance of the Obligation when due, each Debtor hereby pledges and assigns to Secured Party, and grants to Secured Party a continuing security interest in and Lien on, all of such Debtor's right, title and interest in, to, and under the following, in each case wherever located and whether now owned or hereafter acquired or created (collectively, the "*Collateral*"):

(a)     all Accounts;

(b)     all Chattel Paper (including Electronic Chattel Paper and Tangible Chattel Paper), Instruments, contracts, Documents and General Intangibles (including, without limitation, all tax refund claims, guarantee claims, contract rights, Payment Intangibles, security interests, security deposits, and rights to indemnification);

(c)     all Inventory;

(d)     all Goods (other than Inventory), including, without limitation, Equipment, and Fixtures;

(e)     all Investment Property;

(f)     all Deposit Accounts, Money, and cash;

(g)     all Letter-of-Credit Rights and Supporting Obligations;

(h)     Commercial Tort Claims listed on *Schedule 2*;

(i)     any other assets of such Debtor now or hereafter in the possession, custody or control of Secured Party or any agent or any parent, affiliate or Subsidiary of Secured Party or any participant with Secured Party in the Advances, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise);

(j)     all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property; and

(k)     all of such Debtor's books and records (including any digital or electronic records) relating to any of the foregoing and to such Debtor's business.

2

3.      Collateral Security; No Assumption or Modification.

(a)      The Security Interest is given as security only.  Secured Party does not assume, and shall not be liable for, any Debtor's liabilities, duties or obligations under, or in connection with, the Collateral.  Secured Party's acceptance of this Agreement, or its taking any action in connection with this Agreement, does not constitute Secured Party's approval of the Collateral or Secured Party's assumption of any liability, duty, or obligation under, or in connection with, the Collateral.  This Agreement does not affect or modify any Debtor's obligations with respect to the Collateral.

(b)      Secured Party, in its sole discretion, without waiving or releasing any obligation, liability or duty of any Debtor or any other Person under this Agreement or any other Loan Document, may (but shall not be obligated to), from time to time acquire or accept an assignment of any Lien or claim asserted by any Person in, upon or against the Collateral.  All amounts paid by Secured Party in respect thereof and all costs, fees and expenses including, without limitation, reasonable attorney fees, court costs, and other charges relating thereto and incurred by Secured Party, shall constitute a part of the Obligation and shall be payable by Borrowers to Secured Party on demand and, until paid, shall bear interest at the Maximum Rate.

4.      Fraudulent Conveyance.  Notwithstanding anything contained in this Agreement to the contrary, each Debtor agrees that if, but for the application of this *Section 4*, the Obligation or any Security Interest would constitute a preferential transfer under 11 U.S.C. § 547, a fraudulent conveyance under 11 U.S.C. § 548 (or any successor section of that statute) or a fraudulent conveyance or transfer under any state fraudulent conveyance or fraudulent transfer Law or similar Law in effect from time to time (each a "*Fraudulent Conveyance*"), then the Obligation and each affected Security Interest will be enforceable to the maximum extent possible without causing the Obligation or any Security Interest to be a Fraudulent Conveyance, and shall be deemed to have been automatically amended to carry out the intent of this *Section 4*.

5.      Representations and Warranties.  Each Debtor represents and warrants to Secured Party that:

(a)      Binding Obligation.  The Security Interest in the Collateral created by this Agreement (i) is a valid and binding obligation of Debtors in favor of Secured Party and is enforceable against Debtors, except as such enforcement may be limited by Debtor Relief Laws, and (ii) will be duly perfected once the action required for perfection under applicable Law has been taken.  Once perfected, the Security Interest will constitute a first and prior Lien on the Collateral, subject only to Permitted Liens.  The creation, attachment and perfection of the Security Interest does not require the consent of any third party.

(b)      Certain Information.  All of the information set forth on *Schedule 1* is true and correct.  The failure of any description of locations of Collateral on *Schedule 1* to be accurate or complete will not impair the Security Interest in such Collateral.

(c)      No Prior Lien.  Except for Permitted Liens, the Collateral is owned by Debtors free and clear of any Lien and no Debtor has executed any transfer, assignment, pledge or security interest covering the Collateral or any interest in the Collateral.

(d)      No Defenses.  The amounts due Debtors are not subject to any material setoff, counterclaim, defense, allowance or adjustment (other than discounts for prompt payment shown

3

on the invoice) or to any material dispute, objection or complaint by any account debtor or other Obligor.

6.  <u>Covenants</u>.  Each Debtor covenants and agrees with Secured Party that until the Obligation is indefeasibly paid and performed in full in cash, such Debtor shall:

(a)  <u>No Assignment</u>.  Not sell, assign, or otherwise dispose of, or permit the sale, assignment or disposition of, any Collateral, except to the extent permitted under the Loan Agreement.

(b)  <u>Maintain Collateral</u>.  (i) Perform all of its obligations under or in connection with the Collateral in accordance with customary business practices, (ii) not amend, alter or modify, or permit the amendment, alteration or modification of, any material portion (individually or collectively) of the Collateral, and (iii) not do or permit any act which would impair any material portion of the Collateral.

(c)  <u>Hold Collateral In Trust</u>.  Upon the occurrence and during the continuation of a Default, hold in trust (and not commingle with its other assets) for Secured Party all Collateral that is Chattel Paper, Instruments or Documents at any time received by it and promptly deliver same to Secured Party unless Secured Party at its option gives Debtors written permission to retain such Collateral.  Upon the occurrence and during the continuation of a Default, at Secured Party's request, each Contract, Chattel Paper, Instrument or Document so retained shall be marked to state that it is assigned to Secured Party and each instrument shall be endorsed to the order of Secured Party (but failure to so mark or endorse shall not impair the Security Interest).

7.  <u>Authorization to File Financing Statements</u>.  Each Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that describe the Collateral (a) as "all assets of Debtor" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (b) as being of an equal or lesser scope or with greater detail.  Each Debtor agrees to provide any other information required by part 5 of Article 9 of the UCC, for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Debtor is an organization, the type of organization and any organizational identification number issued to such Debtor, and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. Each Debtor agrees to furnish any such information to Secured Party promptly upon Secured Party's request.

8.  <u>Further Assurances</u>.  To further the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's Security Interest in and lien upon the Collateral, and without limiting any Debtor's other obligations in this Agreement, each Debtor agrees, in each case at such Debtor's expense, to execute and deliver such further agreements and instruments, and take such further action, as may be necessary to further evidence or perfect Secured Party's Security Interest in and lien upon the Collateral, including, without limitation, taking such action as may be necessary to perfect Secured Party's Security Interest in and Lien upon the Collateral by "control" (as defined in the UCC) and delivering to Secured Party any original Collateral and endorsements in blank required in connection therewith.  Each Debtor further agrees, at the request and option of Secured Party, all to the extent applicable, to (a) take any and all other commercially reasonable actions Secured Party may determine to be necessary or useful for the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's Security Interest, and (b) cooperate with Secured Party in identifying all of

such Debtor's personal property assets and proper descriptions of such assets for the purpose of including such assets as part of the Collateral.

9.    <u>Default; Remedies</u>.  Upon the occurrence and during the continuance of a Default, subject to the terms and conditions of the Loan Agreement, Secured Party has the following cumulative rights and remedies under this Agreement:

(a)    <u>UCC Rights</u>.  Secured Party may exercise any and all rights available to a secured party under the UCC, in addition to any and all other rights afforded by this Agreement and the other Loan Documents, at Law, in equity or otherwise, including, without limitation, (i) requiring Debtors to assemble all or part of the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to Debtors and Secured Party, (ii) applying by appropriate judicial proceedings for appointment of a receiver for all or part of the Collateral, (iii) applying to the Obligation any cash held by Secured Party under this Agreement, (iv) reducing any claim to judgment, (v) exercising the rights of offset or banker's lien against the interest of Debtors in and to every account and other property of Debtors in Secured Party's possession to the extent of the full amount of the Obligation, (vi) foreclosing the Security Interest and any other liens Secured Party may have or otherwise realize upon any and all of the rights Secured Party may have in and to the Collateral, or any part thereof, and (vii) bringing suit or other proceedings before any Governmental Authority either for specific performance of any covenant or condition contained in any of the Loan Documents or in aid of the exercise of any right granted to Secured Party in any of the Loan Documents.

(b)    <u>Notice</u>.  Reasonable notification of the time and place of any public sale of the Collateral, or reasonable notification of the time after which any private sale or other intended disposition of the Collateral is to be made, shall be sent to Debtors and to any other Person entitled to notice under the UCC; *provided that*, if any of the Collateral threatens to decline speedily in value or is of the type customarily sold on a recognized market, Secured Party may sell or otherwise dispose of the Collateral without notification, advertisement, or other notice of any kind.  It is agreed that notice sent or given not less than ten (10) calendar days prior to the taking of the action to which the notice relates is reasonable notification and notice for the purposes of this subparagraph.  It shall not be necessary that the Collateral be at the location of the sale.

(c)    <u>Standards for Exercising Rights and Remedies</u>.  To the extent that applicable Law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, each Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party (i) to fail to incur expenses reasonably deemed significant by Secured Party to prepare Collateral for disposition or otherwise to fail to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other Law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against account debtors or other Obligors, directly or through the use of collection agencies and other collection specialists, (iv) to fail to remove liens or encumbrances on or any adverse claims against Collateral, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as any Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the

Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, (xi) to purchase insurance or credit enhancements to insure Secured Party against risks of loss, collection or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection or disposition of any of the Collateral.  Each Debtor acknowledges that the purpose of this **Section 9** is to provide non-exhaustive indications of what actions or omissions by Secured Party would fulfill Secured Party's duties under the UCC or other Law of any relevant jurisdiction in Secured Party's exercise of remedies against the Collateral and that other actions or omissions by Secured Party shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this **Section 9**.  Without limiting the foregoing, nothing contained in this **Section 9** shall be construed to grant any rights to any Debtor or to impose any duties on Secured Party that would not have been granted or imposed by this Agreement or by applicable Law in the absence of this **Section 9**.

(d)     Debtor's Agent.  Secured Party shall be deemed to be irrevocably appointed as each Debtor's agent and attorney-in-fact with all right and power to enforce all of each Debtor's rights and remedies under or in connection with the Collateral and this power is coupled with an interest.  All reasonable costs, expenses and liabilities incurred and all payments made by Secured Party as any Debtor's agent and attorney-in-fact, including, without limitation, reasonable attorney's fees and expenses, shall be considered a loan by Secured Party to Debtors which shall be repayable on demand and shall accrue interest at the Maximum Rate and shall constitute part of the Obligation.

(e)     Account Debtors and Obligors.  Secured Party may notify or require each account debtor or other Obligor to make payment directly to Secured Party and Secured Party may take control of the proceeds paid to Secured Party.  Until Secured Party elects to exercise these rights, each Debtor is authorized to collect and enforce the Collateral and to retain and expend all payments made on Collateral.  After Secured Party elects to exercise these rights, Secured Party shall have the right in its own name or in the name of each Debtor to (i) compromise or extend time of payment with respect to all or any portion of the Collateral for such amounts and upon such terms as Secured Party may reasonably determine, (ii) demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all amounts due or to become due with respect to Collateral, (iii) take control of cash and other proceeds of any Collateral, (iv) endorse any Debtor's name on any notes, acceptances, checks, drafts, money orders or other evidences of payment on Collateral that may come into Secured Party's possession, (v) sign any Debtor's name on any invoice or bill of lading relating to any Collateral, on any drafts against Obligors or other Persons making payment with respect to Collateral, on assignments and verifications of accounts or other Collateral and on notices to Obligors making payment with respect to Collateral, (vi) send requests for verification of obligations to any Obligor, and (vii) do all other acts and things reasonably necessary to carry out the intent of this Agreement.  If any Obligor or account party fails to make payment on any Collateral when due, Secured Party is authorized, in its sole discretion, either in its own name or in any Debtor's name, to take such action as Secured Party reasonably shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists.  Regardless of any other provision of this Agreement, however, Secured Party shall not be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral except for its own fraud, gross negligence, or willful misconduct, nor shall it be under any duty to anyone except the applicable Debtor to account for funds that it shall actually receive under this Agreement.  A receipt given by Secured Party to any Obligor or account debtor

6

shall be a full and complete release, discharge, and acquittance to such Obligor or account party, to the extent of any amount so paid to Secured Party. Secured Party may apply or set off amounts paid and the deposits against any liability of any Debtor to Secured Party.

    (f)    <u>Sale</u>.

    (i)    Secured Party's sale of less than all the Collateral shall not exhaust Secured Party's rights under this Agreement and Secured Party is specifically empowered to make successive sales until all the Collateral is sold. If the proceeds of a sale of less than all the Collateral shall be less than the Obligation, this Agreement and the Security Interest shall remain in full force and effect as to the unsold portion of the Collateral just as though no sale had been made. In the event any sale under this Agreement is not completed or is, in Secured Party's opinion, defective, such sale shall not exhaust Secured Party's rights under this Agreement and Secured Party shall have the right to cause a subsequent sale or sales to be made.

    (ii)    Any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale under this Agreement as to nonpayment of the Obligation, or as to the occurrence and continuance of any Default, or as to Secured Party's having declared all of such Obligation to be due and payable, or as to notice of time, place and terms of sale and the properties to be sold having been duly given, or as to any other act or thing having been duly done by Secured Party, shall be taken as *prima facie* evidence of the truth of the facts so stated and recited, subject, however, to manifest error. Secured Party may appoint or delegate any one or more Persons as agent to perform any act or acts necessary or incident to any sale held by Secured Party, including the sending of notices and the conduct of sale, but such acts must be done in the name and on behalf of Secured Party.

    (g)    <u>Existence of Default</u>. Regarding the existence of any Default for purposes of this Agreement, each Debtor agrees that the Obligors or account debtors on any Collateral may rely upon written certification from Secured Party that such a Default exists and is continuing and each Debtor expressly agrees that Secured Party shall not be liable to any Debtor for any claims, damages, costs, expenses or causes of action of any nature whatsoever in connection with, arising out of, or related to Secured Party's exercise of any rights, powers or remedies under any Loan Document except for its own fraud, gross negligence, or willful misconduct.

    (h)    <u>Application of Proceeds</u>. Secured Party shall apply the proceeds of any sale or other disposition of the Collateral under this **Section 9** in the following order: (i) to the payment of all its expenses incurred in retaking, holding and preparing any of the Collateral for sale(s) or other disposition, in arranging for such sale(s) or other disposition, and in actually selling or disposing of the same (all of which are part of the Obligation); (ii) to repay Secured Party for amounts reasonably expended by Secured Party under **Section 10**; (iii) to payment of the balance of the Obligation in the order and manner specified in the Loan Agreement; and (iv) to make any payments required under Sections 9.608(a)(1)(C) and 9.615(a)(3) of the UCC. Any surplus remaining shall be delivered to the applicable Debtor or as a court of competent jurisdiction may direct.

10.    <u>Other Rights of Secured Party</u>.

    (a)    <u>Performance</u>. In the event Debtors fail to preserve the priority of the Security Interest in any of the Collateral or, upon the occurrence and during the continuance of a Default,

otherwise fails to perform any of its obligations under the Loan Documents with respect to the Collateral, then Secured Party may (but is not required to) prosecute or defend any suits in relation to the Collateral or take any other action which any Debtor is required to take under the Loan Documents, but has failed to take.  Any sum which may be reasonably expended or paid by Secured Party under this *Section 10* (including, without limitation, court costs and reasonable attorneys' fees and expenses) shall bear interest from the date of expenditure or payment at the Maximum Rate until paid and, together with such interest, shall be payable by Debtors to Secured Party upon demand and shall be part of the Obligation.

(b)     Collateral in Secured Party's Possession.    If, while a Default exists, any Collateral comes into Secured Party's possession, Secured Party may use such Collateral for the purpose of preserving it or its value pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Secured Party in respect of such Collateral.  Each Debtor covenants to promptly reimburse and pay to Secured Party, at Secured Party's request, the amount of all reasonable expenses incurred by Secured Party in connection with its custody and preservation of such Collateral, and all such expenses, costs, Taxes and other charges shall bear interest at the Maximum Rate until repaid and, together with such interest, shall be payable by Debtors to Secured Party upon demand and shall be part of the Obligation.  However, the risk of accidental loss or damage to, or diminution in value of, Collateral is on Debtors, except for Secured Party's own fraud, gross negligence, or willful misconduct.  Secured Party shall have no liability for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured.  With respect to Collateral that is in the possession of Secured Party, Secured Party shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to account to Debtors for what it actually collects or receives thereon.

(c)     Subrogation.    If any of the proceeds of the Obligation are given in renewal or are extension of, or are applied toward the payment of, indebtedness secured by any Lien, Secured Party shall be, and is hereby, subrogated to all of the rights, titles, interests and Liens securing the indebtedness so renewed, extended or paid.

11.     Miscellaneous.

(a)     Termination.    Upon the indefeasible payment in full in cash of the Obligation without Secured Party having exercised its rights under this Agreement, this Agreement shall terminate; *provided that*, no Obligor or account debtor on any of the Collateral shall be obligated to inquire as to the termination of this Agreement, but shall be fully protected in making payment directly to Secured Party.

(b)     No Release.    The Security Interest and each Debtor's obligations and Secured Party's rights under this Agreement shall not be released, diminished, impaired or adversely affected by the occurrence of any one or more of the following events:  (i) the taking or accepting of any other security or assurance for any or all of the Obligation; (ii) any release, surrender, exchange, subordination or loss of any security or assurance at any time existing in connection with any or all of the Obligation; (iii) the modification of, amendment to, or waiver of compliance with any terms of any of the other Loan Documents without consent of any or all of the Debtors, except as required therein; (iv) the insolvency, bankruptcy or lack of corporate or trust power of any party at any time liable for the payment of any or all of the Obligation, whether now existing or hereafter occurring; (v) any renewal, extension or rearrangement of the payment of any or all of the Obligation, either with or without notice to or consent of any Debtor, or any adjustment,

8

indulgence, forbearance or compromise that may be granted or given by Secured Party to any one or more Debtors, in each case, except as required by the Loan Documents; (vi) any neglect, delay, omission, failure or refusal of Secured Party to take or prosecute any action in connection with any other agreement, document, guaranty or instrument evidencing, securing or assuring the payment of all or any of the Obligation; (vii) any failure of Secured Party to notify any Debtor of any renewal, extension, or assignment of the Obligation or any part thereof, or the release of any security under any other document or instrument, or of any other action taken or refrained from being taken by Secured Party against any Debtor or any new agreement between Secured Party and any Debtor, it being understood that, except as expressly required by the Loan Agreement, Secured Party shall not be required to give any Debtor any notice of any kind under any circumstances whatsoever with respect to or in connection with the Obligation, including, without limitation, notice of acceptance of this Agreement or any Collateral ever delivered to or for the account of Secured Party under this Agreement; (viii) the illegality, invalidity or unenforceability of all or any part of the Obligation against any third party obligated with respect thereto by reason of the fact that the Obligation, or the interest paid or payable with respect thereto, exceeds the amount permitted by Law, the act of creating the Obligation, or any part thereof, is *ultra vires*, or the officers, partners or trustees creating same acted in excess of their authority, or for any other reason; or (ix) if any payment by any party obligated with respect thereto is held to constitute a preference under applicable Laws or for any other reason Secured Party is required to refund such payment or pay the amount thereof to someone else.

(c)    Waivers.  Except to the extent expressly otherwise provided in this Agreement or in other Loan Documents, each Debtor waives (i) any right to require Secured Party to proceed against any other Person, to exhaust its rights in Collateral, or to pursue any other right which Secured Party may have, (ii) with respect to the Obligation, except as otherwise provided in the Loan Agreement or any one or more of the other Loan Documents, presentment and demand for payment, protest, notice of protest and nonpayment, notice of acceleration, and notice of the intention to accelerate; and (iii) all rights of marshaling in respect of any and all of the Collateral.

(d)    Parties Bound.  This Agreement shall be binding on each Debtor and its successors and assigns and shall inure to the benefit of Secured Party and its successors and assigns.

(e)    Assignment.  No Debtor may, without Secured Party's prior written consent, assign any rights, duties or obligations under this Agreement, except as permitted by the Loan Agreement.  In the event of an assignment of all or part of the Obligation permitted by the Loan Agreement, the Security Interest and other rights and benefits under this Agreement, to the extent applicable to the part of the Obligation so assigned, may be transferred with the Obligation.

(f)    Notice.  Any notice or communication required or permitted under this Agreement must be given as prescribed in the Loan Agreement.

(g)    Amendments.  This Agreement may only be amended by a writing executed by Debtors and Secured Party.

(h)    Loan Agreement Controls.  In the event of a conflict or inconsistency between the terms and provisions of this Agreement and the terms and provisions of the Loan Agreement, the terms and provisions of the Loan Agreement shall govern and control.

12.    Multiple Counterparts and Electronic Signatures.  This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All

counterparts must be construed together to constitute one and the same instrument.  This Agreement may be transmitted and signed by facsimile, portable documents format (PDF), or other electronic means, and shall have the same effect as manually-signed originals and shall be binding on Debtors and Secured Party.

13.    <u>Governing Law</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET OUT THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

14.    <u>Loan Document</u>.  This Agreement is a Loan Document and is therefore subject to the agreements, terms and provisions set forth in **Article VIII** of the Loan Agreement, all of which are incorporated herein by reference, *mutatis mutandis*, as if fully set forth herein at length.

15.    **<u>ENTIRETY</u>**.    **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG DEBTORS AND SECURED PARTY WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

[*Signatures appear on the following pages.*]

EXECUTED as of the date set forth in the preamble.

**DEBTORS:**

BIG STORM BREWERY LLC,
a Florida limited liability company

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
           Leo Joseph Govoni
           Manager

BIG STORM PASCO LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
           Leo Joseph Govoni
           Manager

BIG STORM CAPE CORAL LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
           Leo Joseph Govoni
           Manager

BIG STORM COFFEE COMPANY LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
        as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By: _____
            Leo Joseph Govoni
            Manager


BIG STORM CIDER AND MEAD LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
        as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By: _____
            Leo Joseph Govoni
            Manager


BIG STORM COCKTAILS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
        as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By: _____
            Leo Joseph Govoni
            Manager


Signature Page to Security Agreement

**SECURED PARTY:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

By:    Briar Capital, L.P.,
        its sole member

By:    Briar Capital General, LLC,
        its general partner

        By: _____
              Frank S. Goldberg
              Chief Executive Officer

Attachments:

Schedule 1 - Information
Schedule 2 - Commercial Tort Claims

**SCHEDULE 1**

**Information**

**BIG STORM BREWERY LLC**

(a)     The exact name of Big Storm Brewery, as such name appears in its organizational documents.

Big Storm Brewery LLC

(b)     Any change in Big Storm Brewery's name, identity or legal structure within the past five years.

None.

(c)     The address of Big Storm Brewery's chief executive office or principal place of business.

12707 49th Street N., Suite 500, Clearwater, Florida 33762

(d)     All real property owned by Big Storm Brewery.

None.

(e)     All real property leased by Big Storm Brewery.

None.

**BIG STORM PASCO LLC**

(a)     The exact name of Big Storm Pasco, as such name appears in its organizational documents.

Big Storm Pasco LLC

(b)     Any change in Big Storm Pasco's name, identity or legal structure within the past five years.

None.

(c)     The address of Big Storm Pasco's chief executive office or principal place of business.

12707 49th Street N., Suite 500, Clearwater, Florida 33762

(d)     All real property owned by Big Storm Pasco.

None.

(e)     All real property leased by Big Storm Pasco.

Lease dated April 27, 2015 for 2330 Success Drive, Odessa, Florida 33556.

**BIG STORM CAPE CORAL LLC**

(a)     The exact name of Big Storm Cape Coral, as such name appears in its organizational documents.

Big Storm Cape Coral LLC

(b)     Any change in Big Storm Cape Coral's name, identity or legal structure within the past five years.

None.

(c)     The address of Big Storm Cape Coral's chief executive office or principal place of business.

12707 49th Street N., Suite 500, Clearwater, Florida 33762

(d)     All real property owned by Big Storm Cape Coral.

None.

(e)     All real property leased by Big Storm Cape Coral.

Lease dated December 1, 2017 for 837-843 Miramar Street, Cape Coral, Florida 33904.


**BIG STORM CIDER AND MEAD LLC**

(a)     The exact name of Big Storm Cider and Mead, as such name appears in its organizational documents.

Big Storm Cider and Mead LLC

(b)     Any change in Big Storm Cider and Mead's name, identity or legal structure within the past five years.

None.

(c)     The address of Big Storm Cider and Mead's chief executive office or principal place of business.

12707 49th Street N., Suite 500, Clearwater, Florida 33762

(d)     All real property owned by Big Storm Cider and Mead.

None.

(e)     All real property leased by Big Storm Cider and Mead.

None.

**BIG STORM COCKTAILS LLC**

(a)     The exact name of Big Storm Brewery, as such name appears in its organizational documents.

Big Storm Cocktails LLC

(b)     Any change in Big Storm Cocktails' name, identity or legal structure within the past five years.

None.

(c)     The address of Big Storm Cocktails' chief executive office or principal place of business.

12707 49th Street N., Suite 500, Clearwater, Florida 33762

(d)     All real property owned by Big Storm Cocktails.

None.

(e)     All real property leased by Big Storm Cocktails.

None.

**BIG STORM COFFEE LLC**

(a)     The exact name of Big Storm Coffee, as such name appears in its organizational documents.

Big Storm Coffee Company LLC

(b)     Any change in Big Storm Coffee's name, identity or legal structure within the past five years.

None.

(c)     The address of Big Storm Coffee's chief executive office or principal place of business.

12707 49th Street N., Suite 500, Clearwater, Florida 33762

(d)     All real property owned by Big Storm Coffee.

None.

(e)     All real property leased by Big Storm Coffee.

Lease dated February 28, 2020 for a coffee kiosk located at Bill Currie Ford, 5815 N. Dale Mabry Hwy, Tampa, Florida 33614.

**SCHEDULE 2**

**Commercial Tort Claims**

None.

# EXHIBIT H

<u>DEPOSIT ACCOUNT CONTROL AGREEMENT</u>

This Deposit Account Control Agreement (this "**Agreement**") is entered into as of the <u>18th</u> day of September, 2020 (the "**Effective Date**") by and among <u>Briar Capital Real Estate Fund LLC</u> (the "**Secured Party**"), <u>Big Storm Real Estate LLC</u> (the "**Debtor**"), and American Momentum Bank, a Texas banking corporation (the "**Bank**").

BACKGROUND

The Debtor is the Bank's customer with respect to one or more demand deposit accounts identified by the account numbers specified in Section B.1. below (individually and collectively, as re-numbered and including any funds in the account or accounts, the ("**Deposit Account**"). The Debtor has granted the Secured Party a security interest in the Deposit Account. The Debtor is requesting that the Bank enter into this Agreement. The Bank is willing to do so upon the terms contained in this Agreement.

This Agreement includes the General Terms, the Specific Terms and the Exhibits, each as defined or referred to below.

AGREEMENTS

A.   <span style="font-variant: small-caps">General Terms</span>.

     1.   **Definitions and Rules of Interpretation**.  In this Agreement (a) terms defined in the UCC and not otherwise defined in this Agreement have the same meanings in this Agreement as in the UCC, (b) the rules of interpretation in Article 1 of the UCC apply to the interpretation of this Agreement and (c) the term "or" is not exclusive.  Unless otherwise stated, section references are to sections of these General Terms.  In addition, the following terms in this Agreement have the following meanings or interpretations:

"**Business Day**" means (i) for communications to the Bank, a day other than a day (A) that is not a "business day" as defined in Federal Reserve Board Regulation CC, 12 CFR Part 229, (B) on which the office, branch or department of the Bank specified as the Bank's address in the Exhibit is closed, or (C) on which commercial banks are closed in the city or cities set forth in the Specific Terms; and (ii) for communications to any other party, a day, other than a Saturday or Sunday, on which the other party is open for business at the location to which the communication is sent.

"**Claim**" means a claim, loss, cost or expense, and includes out-of-pocket or allocable internal legal fees and expenses incurred in bringing or defending a claim.

A "**communication**" includes, without limitation, the Sole Control Instruction, a Disposition Instruction and any written notice.

"**Deposit-related Agreements**" means, collectively, the deposit account agreement and any other agreements between the Bank and the Debtor governing the Deposit Account and any cash management or similar services provided by the Bank to the Debtor in connection with the Deposit Account.

"**Disposition Instruction**" means an instruction to the Bank directing the disposition of the funds in the Deposit Account.

"**Exhibits**" means the Exhibits attached to this Agreement and incorporated herein.

"**Order or Process**" means an order, judgment, decree or injunction, or a garnishment, restraining notice or other legal process, directing, or prohibiting or otherwise restricting, the disposition of the funds in the Deposit Account.

"**Outside Time**" means, unless an earlier Outside Time is stated in the Specific Terms, the opening of business on the second (2nd) Business Day after the Business Day on which the Sole Control Instruction in substantially the form of Exhibit B attached hereto is actually received at the address for the Bank specified in Exhibit B attached hereto.  If the Sole Control Instruction is actually received at that address after 3:00 pm, local time, at that address, then in determining the Outside Time, the Sole Control Instruction will be considered to have been actually received on the following Business Day.

"**Sole Control Instruction**" means each instruction to the Bank, in substantially the form attached hereto as Exhibit B, originated by the Secured Party directing that the Bank no longer comply with the Debtor's Disposition Instructions.  The Sole Control Instruction may also contain a Disposition Instruction originated by the Secured Party.

"**Specific Terms**" means the terms contained in Part B of this Agreement.

"**UCC**" means the Uniform Commercial Code of the jurisdiction whose law governs this Agreement or, if relevant to any matter other than the meaning of a defined term, the Uniform Commercial Code of the jurisdiction whose law applies to the matter under the choice of law rules of the jurisdiction whose law governs this Agreement.

A "**writing**" means a tangible writing, including a facsimile and, if the Specific Terms permit, an electronic record; "written" refers to a communication in the form of a writing.

2.	**Acknowledgment of Security Interest**.  Debtor and Bank acknowledge and confirm that although the Deposit Account shall remain in the name of Debtor, all funds now or at any time hereafter deposited to the Deposit Account and all of Debtor's rights regarding such Deposit Account constitute part of the collateral in which Debtor has granted a security interest to Secured Party.  If the Debtor maintains one or more lockboxes with Bank, as identified on Exhibit A (the "**Lockboxes**"), the Lockbox Collateral (as defined on Exhibit A) shall also constitute part of the collateral in which Debtor has granted a security interest to Secured Party, and all funds and other items coming into such Lockboxes shall be deposited into the Deposit Account.  This Agreement constitutes a separate agreement with respect to the Deposit Account and is intended by Debtor and Secured Party to evidence Secured Party's control over the Deposit Account and shall serve as instructions for the disposition of the funds in the Deposit Account without the further consent of or notice to Debtor.

3.	**The Debtor's Dealings with the Deposit Account**.

(a)	Except as provided in Section 3(b), the Bank may comply with the Debtor's Disposition Instructions in accordance with the Deposit-related Agreements.

(b)	The Bank will not comply with the Debtor's Disposition Instructions after the Outside Time.  In its discretion the Bank may cease complying with the Debtor's Disposition Instructions at an earlier time as permitted by Section 5(a)(iv).

4.    **The Secured Party's Right to Give Instructions as to the Deposit Account**. The Bank will comply with the Sole Control Instruction, and with any Disposition Instructions originated by the Secured Party, in each case (i) without the Debtor's further consent or notice, and (ii) even if following the instruction results in the dishonoring by the Bank of items presented for payment from the Deposit Account or the Bank otherwise not complying with the Debtor's Disposition Instructions. The Sole Control Instruction may not be rescinded or otherwise modified without the Bank's or the Secured Party's written consent.

5.    **Exculpation of the Bank**.

(a)    Notwithstanding the Bank's agreements in Sections 3 and 4, the Bank will not be liable to any other party for:

(i)    either failing to follow a Sole Control Instruction that (A) is not substantially in the form of Exhibit B, (B) does not specify the address to which the Sole Control Instruction was to have been sent, or (C) is not otherwise substantially completed;

(ii)    failing to follow a Disposition Instruction originated by the Secured Party (A) before the Outside Time, (B) that requires the disposition of the funds in the Deposit Account by a method not available to the Debtor under the Deposit-related Agreements, (C) that the Bank determines, in its reasonable discretion, would result in the Bank's failing to comply with a statute, rule or regulation, or an Order or Process, binding upon the Bank, (D) that requires the disposition of funds that are not immediately available in the Deposit Account, (E) intentionally deleted, or (F) for which the Bank has not received evidence reasonably required by the Bank as to the authority of the person giving the Disposition Instruction to act for the Secured Party;

(iii)    complying with the Debtor's Disposition Instructions, or otherwise completing a transaction involving the Deposit Account, that the Bank or an affiliate had started to process before the receipt of Secured Party's Sole Control Instruction; or

(iv)    after the Bank becomes aware that the Secured Party has sent the Sole Control Instruction, but before the Outside Time, complying with the Sole Control Instruction or a Disposition Instruction originated by the Secured Party, notwithstanding any fact or circumstance and even if the Sole Control Instruction (A) has not been actually received at the address specified in the Exhibit, (B) fails to have attached to it a copy of this Agreement as fully executed, or (C) is not completed or otherwise fails to be in the form of Sole Control Instruction set forth on the Exhibit.

(b)    The Bank will not be liable to any other party for:

(i)    wrongful dishonor of any item as a result of the Bank following the Sole Control Instruction or any Disposition Instruction originated by the Secured Party,

(ii)    failing to comply or delaying in complying with the Sole Control Instruction, any Disposition Instruction or any provision of this Agreement due to a computer malfunction, interruption of communication facilities, labor difficulties, act of God, war, terrorist attack, or other cause, in each case beyond the Bank's reasonable control,

(iii)    any other Claim, except to the extent directly caused by the Bank's negligence or willful misconduct, or

(iv)    any indirect, special, consequential or punitive damages.

(c)    The Bank will have no fiduciary duties under this Agreement to any other party, whether as trustee, agent, bailee or otherwise.  The Bank will have no duties to the Secured Party except as expressly set forth in this Agreement.  The Bank will have no duty to inquire into or determine the existence or enforceability of the Debtor's obligations to the Secured Party or whether, under any separate agreement between the Debtor and the Secured Party, the Debtor's obligations to the Secured Party are in default, the Debtor may originate a Disposition Instruction or the Secured Party may originate the Sole Control Instruction or any Disposition Instruction.

6.    **The Bank's Recourse to the Deposit Account**.

(a)    Except for amounts referred to in Section 6(b), the Bank (i) subordinates any security interest, lien or other encumbrance against the Deposit Account to the Secured Party's security interest and (ii) will not exercise any right of recoupment, setoff or debit against the Deposit Account.  This subordination will not apply to any security interest that the Bank has in an item under UCC Article 4 as a collecting bank.

(b)    Notwithstanding Section 6(a), and regardless of any agreement of the Debtor to compensate the Bank by means of balances in the Deposit Account, the Bank may charge the Deposit Account, to the extent permitted by any of the Deposit-related Agreements or applicable law, for:

(i)    the face amount of a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item (A) deposited in or credited to the Deposit Account, whether before or after the Effective Date, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (B) subject to a claim against the Bank for breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (C) for a merchant card transaction, against which a contractual demand for chargeback has been made;

(ii)    normal service charges or fees payable to the Bank in connection with the Deposit Account or any related services; and

(iii)    any adjustments or corrections of any posting or encoding errors.

(iv)    reimbursements for reasonable out-of-pocket or allocable internal legal fees and expenses in connection with the administration or enforcement of this Agreement by the Bank.

7.    **Indemnification and Reimbursement**.

(a)    The Debtor indemnifies the Bank and Secured Party against all Claims incurred, sustained or payable by the Bank arising out of this Agreement except to the extent directly caused by the Bank's or Secured Party's negligence or willful misconduct.

(b)    The Secured Party agrees to reimburse the Bank for any charge against the Deposit Account under Section 6(b) for which there were insufficient funds in the Deposit Account to satisfy the charge.  Such reimbursement will be limited to the aggregate amount transferred from the Deposit Account as a result of the Bank's acting upon Disposition Instructions originated by the Secured Party or pursuant

to Section 10(b).  Any demand by the Bank for reimbursement must be made within the number of days after the termination of this Agreement set forth in the Specific Terms.  The Bank may not make a Claim for reimbursement under this subsection unless (i) the Debtor fails to satisfy the Claim within fifteen (15) days after the Bank makes a demand on the Debtor under Section 7(a) or (ii) the Bank is enjoined, stayed or prohibited by operation of law from making the demand on the Debtor.

(c)        The Secured Party's reimbursement obligations under Section 7(b) will not apply to:  (i) a charge for reimbursement of or indemnification for any out-of-pocket or allocable internal legal fees and expenses incurred by the Bank in connection with any claim or defense by the Bank against the Secured Party relating to this Agreement or (ii) the amount of any loss incurred by the Bank to the extent directly caused by the Bank's negligence or willful misconduct.  If the Bank satisfies any Claim against the Debtor referred to in the foregoing clause (i) by charging the Deposit Account, the amount of the Secured Party's maximum liability for reimbursement obligations under Section 7(b) will be reduced by the amount of the Claim so satisfied.

(d)        If the Secured Party fails to reimburse the bank for any amount under Section 7(b), the Secured Party will pay the Bank's reasonable out-of-pocket or allocable internal legal fees and expenses in collecting from the Secured Party the amount payable as finally determined by a competent jurisdiction.

(e)        The Secured Party indemnifies the Bank against all other Claims incurred, sustained or payable by the Bank arising from the Bank following an Sole Control Instruction or a Disposition Instruction originated by the Secured Party, or from the Bank's remittance of funds pursuant to Section 10(b), except to the extent directly caused by the Bank's negligence or willful misconduct.

8.        **Representations and Warranties; Agreements with Other Persons**.  The Bank represents and warrants to the Secured Party that the Bank (i) is an organization engaged in the business of banking and is a "Bank" as such term is defined in the UCC §9-102(a)(8), (ii) maintains the Deposit Account as a demand deposit account as such term is defined in the UCC §9-102(a)(29) or accounts in the ordinary course of the Bank's business, (iii) has not entered into any currently effective agreement with any person under which the Bank may be obligated to comply with Disposition Instructions originated by a person other than the Debtor or the Secured Party, and (iv) the records of the Bank with respect to the Deposit Account shall recognize and reflect the security interest in favor of Secured Party.  The Bank will not enter into any written or oral agreement with any person under which the Bank may be obligated to comply with Disposition Instructions originated by a person other than the Debtor or the Secured Party.

9.        **Deposit Account Information**.  The Bank will provide to the Secured Party, whether by Internet access or otherwise, a copy of each periodic account statement relating to the Deposit Account ordinarily furnished by the Bank to the Debtor.  The Debtor authorizes the Bank to provide to the Secured Party, whether by Internet access or otherwise, any other information concerning the Deposit Account that the Bank may agree to provide to the Secured Party at the Secured Party's request.

10.        **Termination; Closure of the Deposit Account**.

(a)        Neither the Debtor nor the Bank will close the Deposit Account prior to termination of this Agreement.  This Agreement may not be terminated by the Debtor except by a notice to the Bank given jointly by the other parties.  This Agreement may be terminated (i) by the Secured Party at any time by notice to the other parties and (ii) by the Bank (A) immediately upon notice to the other parties if the Bank becomes obligated to terminate this Agreement or to close the Deposit Account under any statute, rule or regulation, or any Order or Process, binding upon the Bank, (B) upon five (5) Business Days' notice to the other parties if any other party is in material breach of any of the Deposit-related Agreements or this Agreement, and (C) otherwise upon 30 days' notice to the other parties.

(b)     If the Bank terminates this Agreement pursuant to clause (A) of Section 10(a)(ii), the Bank will remit any funds in the Deposit Account on the date of termination (i) at the direction of the Secured Party if the direction is received by the Bank prior to the date of termination of this Agreement or (ii) if no such direction is received by the Bank prior to such date, by check mailed to the address of the Secured Party for receiving communications under this Agreement.  If the Bank terminates this Agreement pursuant to clause (B) or (C) of Section 10(a)(ii), the Bank will remit any funds in the Deposit Account on the date of termination at the direction of the Secured Party only if the direction is received by the Bank prior to the date of termination of this Agreement.  Any obligation of the Bank to remit any funds to or at the direction of the Secured Party under this subsection is subject to clauses (B) through (F) of Section 5(a)(ii).

(c)     Except as provided in Section 10(b) and in any event if the Secured Party has communicated to the Bank that the Secured Party does not wish to receive or direct the disposition of the funds, the Secured Party will not receive from the Bank any remittance of funds from the Deposit Account upon termination of this Agreement by the Bank.

(d)     The termination of this Agreement will not affect any rights created or obligations incurred under this Agreement before the termination.  Sections 5 and 7 will survive the termination of this Agreement for actions taken or omitted before the termination.  Sections 10(b) and (c) will survive the termination of this Agreement, and Section 6 will survive the termination of this Agreement solely for any funds to be remitted to or at the direction of the Secured Party pursuant to Section 10(b).

11.    **Communications**.

(a)     All communications under this Agreement must be in writing and must be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by facsimile to the party addressee.  If the Specific Terms permit a writing to include an electronic record, a communication, may be sent by email.

(b)     For a communication under this Agreement to be effective, it must be received (i) for the Sole Control Instruction, at the Bank's address specified on Exhibit B and (ii) in all other cases, at the party's address indicated below the party's signature in this Agreement, in each case subject to any change in address provided in Section 11(c).  Receipt of the Sole Control Instruction does not occur until it is received by the person or persons or department specified on the "attention" line on Exhibit B.  If more than one person is specified, receipt occurs when the Sole Control Instruction is received by one of the persons.

(c)     The Bank may communicate to the Secured Party changes in the address for the Sole Control Instruction, and any party may communicate to the other parties changes in its address for communications under this Agreement.

12.    **Successors and Transferees**.

(a)     This Agreement will inure to the benefit of, and be binding upon, the parties and their respective successors and other transferees permitted under this Section.  Except as provided in this Section, a voluntary transfer of a party's rights or duties under this Agreement without the written consent of the other parties will be void.

(b)     The Bank may transfer its rights and duties under this Agreement to a transferee to which, by contract or operation of law, the Bank transfers substantially all of its rights and duties under the Deposit-related Agreements.  Bank shall provide five (5) days' prior written notice to Debtor and Secured Party notifying each party of Bank's transfer of this Agreement.

(c)     The Secured Party may transfer its rights and duties under this Agreement to:  (i) a transferee to which, by contract or operation of law, the Secured Party transfers substantially all of its rights and duties under the financing or other arrangements between the Secured Party and the Debtor for which the Deposit Account acts as collateral security or (ii) if the Secured Party is acting as a trustee, indenture trustee, agent, collateral agent, or other representative in whose favor a security interest is created or provided for, a transferee that is a successor trustee, indenture trustee, agent, collateral agent, or other representative.

(d)     No transfer by Debtor under this Section will be binding upon Secured Party or Bank until the Debtor notifies Secured Party and Bank in a writing signed by the transferee that identifies the transferee, gives the transferee's address for communications under this Agreement, and states that the transferee is a successor of the Debtor or other transferee permitted under this Section and is entitled to the benefit of the Debtor's rights and has assumed all of Debtor's duties under this Agreement.

(e)     A non-transferring party need not request proof of any transfer or that the transferee is a successor of the transferor or other transferee permitted by this Section.  If the Bank or the Secured Party, as a non-transferring party, requests such proof, then the effectiveness of the notification of transfer as to the non-transferring party will be suspended until the proof is provided.

(f)     When a transfer becomes binding on the non-transferring parties, the transferring party will not be entitled to exercise any rights, and will be relieved of its obligations, accruing under this Agreement from and after that time.  Those rights may be exercised and those obligations will be incurred by the transferee.

13.     **Entire Agreement; Relation to Other Agreements**.

(a)     This Agreement constitutes the entire agreement of the parties, and supersedes all previous and contemporaneous negotiations, understandings and agreements, with respect to its subject matter, all of which have become merged and finally integrated into this Agreement.

(b)     If a term in the Specific Terms conflicts with a term of this Agreement not in the Specific Terms, the term in the Specific Terms controls.

(c)     If this Agreement conflicts with any of the Deposit-related Agreements, this Agreement will control.  However, this Agreement will not (i) derogate from any Claim or defense that the Bank may have against the Debtor under any of the Deposit-related Agreements or (ii) create any third party beneficiary rights under any of the Deposit-related Agreements in favor of the Secured Party.

(d)     This Agreement does not amend or otherwise modify any of the agreements between the Debtor and the Secured Party or provide any rights for the Debtor to originate a Disposition Instruction in contravention of any agreement between the Debtor and the Secured Party.

14.     **Governing Law, Depositary Bank's Jurisdiction and Waiver of Jury Trial**.

(a)     Except as otherwise required by Article 9 of the UCC, this Agreement will be governed by the law of that jurisdiction set forth in the Specific Terms without giving effect to any choice of law rule that would require the application of the law of another jurisdiction.

(b)     If the Specific Terms are completed expressly to designate the Bank's jurisdiction for purposes of part 3 of Article 9 of the UCC, then the Deposit-related Agreements are amended to provide that for those purposes that jurisdiction is the Bank's jurisdiction so designated.

(c)    To the extent permitted by applicable law, each party waives all rights to trial by jury in any action, claim or proceeding (including any counterclaim) of any type arising out of or directly or indirectly relating to this Agreement.

15.    **Miscellaneous**.

(a)    No amendment to this Agreement will be binding on any party unless it is in writing and signed by all of the parties.  Any provision of this Agreement benefiting a party may be waived only by a writing signed by that party.

(b)    If a provision of this Agreement is held invalid or unenforceable in any respect, the validity or enforceability of the remaining provisions will not in any way be affected, it being understood that the invalidity or unenforceability of an affected provision in a particular jurisdiction will not in and of itself affect the validity or enforceability of the provision in any other jurisdiction.

B.    S̲PECIFIC̲ T̲ERMS̲.  The following terms (the "Specific Terms") complete, supplement or modify the General Terms:

1.    **Deposit Account (see "Background" above)**.  The following account or accounts comprise the Deposit Account [list by account number]:

_____███████370_____

2.    **Business Day (see definition of "Business Day" in Section 1 of the General Terms)**:

A day will not be considered as a "Business Day" if commercial banks in the following city or cities are closed on that day:  Plano, Texas.  If the preceding sentence is not completed, no additional days are excluded from the definition of "Business Day".

3.    **Outside Time (see definition of "Outside Time" in Section 1 of the General Terms)**:

If the Outside Time is to be based on a period of less than two (2) Business Days, the following is the earlier period:  Second Business Day.  If an earlier period is not inserted in the preceding sentence, then the Outside Time will be based on two (2) Business Days.

4.    **Disposition of less than all or multi-disposition of funds (see Section 5(a)(ii)(E) of the General Terms)**:

The following is any computation or formula by which a Disposition Instruction originated by the Secured Party may provide for a disposition of less than all of the funds in the Deposit Account and whether there may be multiple recipients of the funds:
_____Intentionally        Left        Blank_____
_____
_____.

If the preceding paragraph is not completed to permit a disposition of less than all of the funds in the Deposit Account, then a Disposition Instruction originated by the Secured Party must be for a disposition of all of the funds.  If the preceding paragraph is not completed to permit a disposition of the

funds in the Deposit Account to multiple recipients, then a Disposition Instruction originated by the Secured Party must require that the funds be sent to a single recipient.

5. **Reimbursement Claim Period (see Section 7(b) of the General Terms)**:

The number of days following the termination of the Agreement in which a reimbursement claim must be made against the Secured Party under Section 7(b) of the General Terms is thirty (30) days. If a number is not inserted in the preceding sentence, the number is ninety (90).

6. **Electronic Records (see definition of "writing" in Section 1 of the General Terms)**:

Checking this line _X_ means that the parties permit a writing to include an electronic record and permit communications by email. Otherwise, the parties do not permit a writing to include an electronic record and do not permit communications by email.

7. **Governing Law (see Section 14(a) of the General Terms)**:

The jurisdiction whose law governs this Agreement is College Station, Texas. If a jurisdiction is not inserted in the preceding sentence, the jurisdiction will be determined by applicable law.

8. **Bank's Jurisdiction for UCC Purposes (see Section 14(b) of the General Terms)**:

The Bank's jurisdiction for purposes of part 3 of UCC Article 9 is College Station, Texas. If the Bank's jurisdiction for such purposes is not inserted in the preceding sentence, the Bank's jurisdiction for such purposes will be determined by applicable law.

9. **Additional Provisions (see Section 13(b) of the General Terms)**:

The following provisions modify or supplement the General Terms:

If no provisions are inserted above in this Section 9, then there are no modifications to or supplements of the General Terms.

C.   <u>EXHIBIT</u>. The parties have completed and incorporate herein Exhibit A and Exhibit B attached hereto.

D.   SINGLE AGREEMENT; COUNTERPARTS. The General Terms, the Specific Terms and the Exhibit shall be read and construed together with the other provisions of this Agreement as a single agreement. Delivery of executed copies of this Agreement may be made by facsimile or by another form of electronic transmission. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which collectively shall constitute a single agreement.

[remainder of page intentionally left blank]

*Signature Page to Deposit Account Control Agreement*

Debtor: Big Storm Real Estate LLC

By: _____

Name: Leo J. Govoni
Title:   Managing Member

Address:  12707 49th Street North Ste 500
                 Clearwater Florida 33762

Telephone Number (for information only): ____7▮▮▮▮▮▮_____
Facsimile Number: ▮▮▮▮▮▮▮▮▮
Electronic mail address (if Section 6 of Part B permits): ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Signature Page to Deposit Account Control Agreement*

Secured Party: Briar Capital Real Estate Fund LLC
                A Texas Limited Liability Company
                (together with it's successors and assigns)

        By:    Briar Capital, L.P.,
               its sole member

        By:    Briar Capital General, LLC,
               its general partner

        By:    _____
               Frank S. Goldberg
               Chief Executive Officer

        Address:    1500 CityWest Boulevard
                   Suite 560
                   Houston, TX 77042

Telephone Number (for information only): _(█████████████_____
Facsimile Number: _____
Electronic mail address (if Section 6 of Part B permits): _____

*Signature Page to Deposit Account Control Agreement*

Bank:

**AMERICAN MOMENTUM BANK**

By: _Sherry Lilly_
Name: ___Sherry Lilly___
Title: _VP Treasury Management_____

Address: 4830 West Kennedy Blvd____
         Ste. 200_____
         Tampa, FL  33609_____
         _____

Telephone Number (for information only):  813-549-4723
Facsimile Number: _____
Electronic mail address (if Section 7 of Part B permits):   _slilly@americanmomentum.bank_____
____

Exhibit A

"**Lockbox Collateral**" means that certain lockbox number(s) (listed <u>below</u>) operated by Bank for the benefit of Debtor (the "**<u>Lockbox</u>**" or "**<u>Lockboxes</u>**"), along with all checks, drafts, collection remittances, money orders, instruments, cash and other items at any time received in any such Lockbox for deposit in any Deposit Account (subject to specific lockbox instructions in effect for processing items received in any such Lockbox), and all wire transfers of funds, automated clearing house ("**<u>ACH</u>**") entries, credits from a merchant card transaction and other electronic funds transfers or other funds deposited in, credited to, or held for deposit in or credit to, any Deposit Account through lockbox processing, and all proceeds of any of the foregoing.

**Lockbox Numbers**

<u>Exhibit B</u>

[LETTERHEAD OF THE SECURED PARTY]

<u>DEPOSIT ACCOUNT CONTROL AGREEMENT</u>

<u>SOLE CONTROL INSTRUCTION</u>

[Date]

_____

[Name of Bank]

_____
_____

[Address of Bank]

Attention:    _____**[TBD]**
                        [Person or Persons or Department] *[See Note 1 below]*

Ladies and Gentlemen:

     This is the Sole Control Instruction as defined in the Deposit Account Control Agreement dated [____], 20__, among you, (secured Party) and (the "**Debtor**") (as currently in effect, the "**Control Agreement**").  A copy of the Control Agreement as fully executed is attached.  Capitalized terms used in this Sole Control Instruction have the meanings given them in the Control Agreement

     This Sole Control Instruction directs the Bank no longer to comply with the Debtor's Disposition Instructions.

     [As an included Disposition Instruction, we direct you to send the funds in the Deposit Account to us by the method and at the address indicated below.  We recognize that your obligation to comply with this Disposition Instruction is subject to the other provisions of Section 5(a)(ii) of the General Terms. *[See Note 2 below]*

     Funds transfer instructions:

     Receiving bank:  _____.

     ABA routing number for domestic wire:  _____.

     ABA routing number for ACH transaction:  _____.

     International:  Swift Code No. _____.

     Reference details:  _____.]

Very truly yours,

**Secured Party**

By:
Name: _____
Title: _____

*Notes to the person completing this form of Sole Control Instruction:*

*1.      The "attention" line should be completed with particular care.  Until the Sole Control Instruction is actually received by the person or persons or department at the Bank designated in the "attention" line, the time period by which the Bank must comply with the Sole Control Instruction will not commence. Accordingly, it is advisable to provide in the "attention" line a specific department or specific officer or officers at the Bank by title rather than by name.  If an individual at the Bank is to be designated by title or even by name, it is advisable that one or more additional individuals at the Bank be designated as alternatives to receive the Sole Control Instruction if the first individual is not available.*

*2.      The bracketed language relating to a Disposition Instruction (including funds transfer instructions) is optional. Not including this language does not preclude the Secured Party from subsequently giving a Disposition Instruction.*

# EXHIBIT I

## AUTHORIZATION AGREEMENT
## FOR DIRECT ACH PAYMENTS
## (ACH DEBITS)

This Authorization Agreement for Direct ACH Payments (the "***Agreement***") is issued pursuant to, and is subject to all terms and conditions of, that certain Loan Agreement, dated as of September 18, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "***Loan Agreement***"), by and between BIG STORM REAL ESTATE LLC, a Florida limited liability company ("***Big Storm Real Estate***"), BIG STORM PINELLAS LLC, a Florida limited liability company ("***Big Storm Pinellas***"), and each other Person from time to time party thereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "***Borrowers***," and each individually, a "***Borrower***"), and BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company ("***Lender***"). Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

## AUTHORIZATION:

Borrowers hereby authorize Lender to initiate periodic automatic debit entries to the accounts of the Borrowers as set forth on Exhibit "A" attached hereto, at the depository institution set forth on Exhibit "A" attached hereto, and to debit from such accounts, an amount equal to the payments or other amounts due under the Loan Agreement and related Loan Documents at such periodic intervals as required under the Loan Agreement and related Loan Documents, via automated clearing house ("***ACH***") debit transaction. Borrowers hereby acknowledge that the origination of the ACH transactions contemplated by this Agreement must comply with the provisions of U.S. law.

This authorization shall be irrevocable and shall remain in full force and effect until Borrowers have been notified by Lender, in writing that the authorization provided for herein can be terminated.

Borrowers agree and acknowledge that Lender will assess a fee for each ACH debit transaction that is refused as a result of insufficient funds or for any other reason, other than bank electronic error beyond the control of the Borrowers.

***[Signatures are on the following page.]***

IN WITNESS WHEREOF, the undersigned have executed and delivered this Authorization Agreement.

                                        **BORROWERS:**

                                        BIG STORM REAL ESTATE LLC,
                                        a Florida limited liability company

                                        By: _____
                                            Leo Joseph Govoni
                                            Manager


                                        BIG STORM PINELLAS LLC,
                                        a Florida limited liability company

                                        By:    BIG STORM BREWERY LLC,
                                               as sole member and manager

                                        By:    SEABOARD CRAFT BEER HOLDINGS LLC,
                                               as sole member and manager

                                        By: _____
                                            Leo Joseph Govoni
                                            Manager

**LENDER:**

BRIAR CAPITAL REAL ESTATE FUND, LLC,
a Texas limited liability company

By:     Briar Capital, L.P.,
        its sole member

By:     Briar Capital General, LLC,
        its general partner

        By:_____
            Frank S. Goldberg
            Chief Executive Officer

**EXHIBIT A**


CREDIT PARTY ACCOUNTS

Bank:                        American Momentum Bank
                             4830 W. Kennedy Blvd., Suite 200
                             Tampa, Florida  33609

Bank Routing No.:            ████████

Account Name:                Big Storm Real Estate LLC Deposit Account

Account No.:                 ████████5370


EXHIBIT A

# EXHIBIT J

**PREPARED BY AND WHEN
RECORDED MAIL TO:**

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Attention: Jason T. Lloyd

## SUBORDINATION OF OCCUPANCY RIGHTS

September 18, 2020

   **WHEREAS**, BIG STORM REAL ESTATE LLC, a Florida limited liability company ("***Big Storm Real Estate***"), owns the real property and improvements thereon located at 12707 49th Street North, Clearwater, Florida 33762 and described more particularly in ***Exhibit A*** attached hereto (the "***Property***");

   **WHEREAS**, Each of BOSTON ASSET MANAGEMENT, INC, a Florida corporation ("***BAM***"), GLOBAL LITIGATION CONSULTANTS LLC, a Florida corporation ("***GLC***"), AUSTIN COLBY CO, a Florida corporation ("***ACC***", and together with BAM and GLC, collectively, "***Occupants***," and each individually, an "***Occupant***"), occupies and operates its business out of the Property pursuant to an informal arrangement, but does not lease or have any leasehold interest in the Property;

   **WHEREAS**, BIG STORM PINELLAS LLC, a Florida limited liability company ("***Big Storm Pinellas***", and together with Big Storm Real Estate and Big Storm Pinellas, collectively, "***Borrowers***," and each individually, a "***Borrower***") have or will enter into a Loan Agreement (as amended, restated, refinanced, replaced, supplemented or otherwise modified from time to time, the "***Loan Agreement***"), among Borrowers and Briar Capital Real Estate Fund, LLC (together with its successors and assigns, "***Lender***"), pursuant to which Lender has agreed to make one or more loans to Borrowers (collectively, the "***Loan***"), on the terms and subject to the conditions therein;

   **WHEREAS**, in connection with the Loan Agreement, Borrowers have executed or will execute one or more mortgages, deeds of trust, assignments of leases and rents, security agreements and UCC financing statements for fixture filing (in each case, as amended, restated, supplemented, or otherwise modified from time to time, the "***Security Instrument***"), for the benefit of Lender, thereby creating a deed of trust or mortgage lien, as applicable, upon the Property for the purpose of securing the complete payment and performance of the Loan and any other "Obligation" under, and as defined in, the Loan Agreement;

   **WHEREAS**, Lender is relying upon the warranties, representations and agreements contained herein as an inducement to Lender in making the Loan to Borrowers; and

1

10697489v3

**WHEREAS**, Each Occupant desires to subordinate any rights it may now or hereafter have, whether arising at contract, at law, or otherwise, to occupy or operate its business on the Property to the Security Instrument and the lien created thereby in favor of Lender.

**NOW, THEREFORE**, for and in consideration of the premises and other valuable consideration, the receipt of which is hereby acknowledged, Occupants, Big Storm Real Estate, and Lender hereby agree as follows:

1.      There is no lease or other similar agreement in place pursuant to which Occupants occupy, access, or use the property, and no Occupant nor Big Storm Real Estate will execute or enter into any such lease or other agreement with respect to the Property (or any portion thereof).

2.      All of each Occupant's rights with respect to the Property, including any rights it may now or hereafter have or claim to have to occupy, access, use, or otherwise operate its business on the Property (whether or not any such rights constitute a leasehold estate), and any and all options or other rights that any Occupant may now or hereafter have or claim with respect to all or any portion of the Property (including, but not limited to, any right of first refusal and any option or right to acquire all or any portion of the Property), in each case whether now or hereafter existing or arising, are and shall at all times be subordinate and inferior to the Security Instrument, including the lien on the Property and the assignment of leases in favor of Lender provided for in the Security Instrument.

3.      If the interest of Big Storm Real Estate in the Property is acquired by Lender or any third party by reason of foreclosure of the Security Instrument or other proceedings brought to enforce the rights of the holder of the Security Instrument, by deed in lieu of foreclosure or by any other method, it is agreed that any rights of Occupants with respect to the Property shall immediately terminate unless otherwise elected by Lender or any applicable third party transferee, and Occupants shall immediately vacate the Property.

4.      Each Occupant acknowledges and agrees that the Loan Agreement, the Security Instrument, and other documents and instruments executed in connection therewith, include provisions which govern the manner in which insurance and condemnation provisions with respect to the Property (or any portion thereof) shall be applied, and to the extent required under the Loan Agreement, such proceeds will be applied to the repayment of the indebtedness arising under the Loan Agreement and not to the restoration or rebuilding of the Property. Each Occupant hereby waives any rights it may now or hereafter have or claim to have with respect to the application of insurance and condemnation proceeds which are inconsistent with the terms of the Loan Agreement, the Security Instrument, and any other documents and instruments executed in connection therewith.

5.      The effectiveness of this Agreement, the rights of Lender hereunder, and the obligations of Big Storm Real Estate and Occupants hereunder, shall not be affected by, and shall extend to, any amendment, restatement, supplement, or other modification of the Loan Agreement, the Security Instrument, and any other documents and instruments executed in connection therewith, including, without limitation, any change in the manner or time of payment, any renewal or extension of the term thereof, or any increase in the indebtedness due thereunder.

6.      THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES, shall be binding upon the parties hereto and their respective successors and assigns, and may not be modified, amended or altered except by a writing signed by each of the parties hereto. This Agreement may be executed in multiple counterparts by

2

facsimile, portable document format (PDF), and other electronic means, all of which shall be construed as a single document and shall have the same force and effect as a manually-signed original.

[*Signatures and acknowledgments appear on the following pages.*]

EXECUTED on the dates set out in the acknowledgments below, but effective for all purposes as of the date first written above.

BOSTON ASSET MANAGEMENT, INC,
a Florida corporation

By: _____
Name: LEO JOSEPH GOVONI
Title: PRESIDENT

STATE OF ___F___

COUNTY OF __Pinellus__

The foregoing instrument was executed, acknowledged and delivered before me by means of ☑ physical presence or ☐ online notarization, this 17 day of ___Sept___, 2020, by Leo Govoni _____, the __President__ of BOSTON ASSET MANAGEMENT, INC, a Florida corporation, on behalf of the corporation. He or she is personally known to me or has produced __known to me__ _____as identification.

_____
Notary Public, State and County
Aforesaid
Print Name: Michele M Parks
My commission expires: 2-14-22
My commission number: GG 182207

(NOTARIAL SEAL)
MICHELE M. PARKS
MY COMMISSION # GG182207
EXPIRES: February 04, 2022

Signature and Acknowledgment Page to Subordination of Occupancy Rights

GLOBAL LITIGATION CONSULTANTS LLC,
a Florida corporation

By: _____

Name: Leo Joseph Govoni

Title: MANAGER

STATE OF ___Fl___

COUNTY OF ___Pinellas___

The foregoing instrument was executed, acknowledged and delivered before me by means of ☑ physical presence or ☐ online notarization, this 17 day of __Sept__, 2020, by Leo Govoni _____, the __Manager__ of GLOBAL LITIGATION CONSULTANTS LLC, a Florida limited liability company, on behalf of the limited liability company. He or she is personally known to me or has produced _____known to me_____ as identification.

_____
Notary Public, State and County
Aforesaid
Print Name: Michele M Parks
My commission expires: 2/4/22
My commission number: GG182207

(NOTARIAL SEAL)

MICHELE M. PARKS
MY COMMISSION # GG182207
EXPIRES: February 04, 2022

Signature and Acknowledgment Page to Subordination of Occupancy Rights

AUSTIN COLBY CO,
a Florida corporation

By: _____

Name: LEO JOSEPH GOVONI

Title: Director

STATE OF _____ FL _____

COUNTY OF _____ Pinellas _____

      The foregoing instrument was executed, acknowledged and delivered before me by means of ☑ physical presence or ☐ online notarization, this __17__ day of __Sept__, 2020, by __Leo Govoni__, the __Director__ of AUSTIN COLBY CO, a Florida corporation, on behalf of the corporation. He is personally known to me or has produced __Known to me__ _____ as identification.

_____
Notary Public, State and County
Aforesaid
Print Name: Michele M Parks
My commission expires: 2/4/22
My commission number: GG182207

(NOTARIAL SEAL)

MICHELE M. PARKS
MY COMMISSION # GG182207
EXPIRES: February 04, 2022

Signature and Acknowledgment Page to Subordination of Occupancy Rights

**LENDER:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

By:    Briar Capital, L.P.,
        its sole member

By:    Briar Capital General, LLC,
        its general partner

        By: _____
             Frank S. Goldberg
             Chief Executive Officer

STATE OF TEXAS        §
                      §
COUNTY OF HARRIS    §

    This instrument was acknowledged before me on this 16th day of September, 2020, by Frank S. Goldberg, Chief Executive Officer of Briar Capital General, LLC, in its capacity as the general partner of Briar Capital, L.P., in its capacity as the sole member of Briar Capital Real Estate Fund, LLC, a Texas limited liability company, for and on behalf of said company, and for the purpose and consideration herein stated.



NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

Signature and Acknowledgment Page to Subordination of Occupancy Rights

**BIG STORM REAL ESTATE:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By: _____
Leo Joseph Govoni
Manager

STATE OF FLORIDA

COUNTY OF _____Pinellas_____

The foregoing instrument was executed, acknowledged and delivered before me by means of ☑ physical presence or ☐ online notarization, this _17_ day of _Sept_, 2020, by Leo Joseph Govoni, the Manager of BIG STORM REAL ESTATE LLC, a Florida limited liability company, on behalf of the limited liability company. He is personally known to me or has produced _Known to me_ _____ as identification.

_____
Notary Public, State and County
Aforesaid
Print Name: _Michele M Parks_
My commission expires: _2/4/22_
My commission number: _GG182207_

(NOTARIAL SEAL)

MICHELE M. PARKS
MY COMMISSION # GG182207
EXPIRES: February 04, 2022

Signature and Acknowledgment Page to Subordination of Occupancy Rights

**EXHIBIT A**
**TO**
**SUBORDINATION OF OCCUPANCY RIGHTS**

**Property Description**

The property located at or about 12707 49th Street North, Clearwater, Florida 33762, having Assessor's Parcel Number 09-30-16-70992-100-1207, described more particularly as follows:

Description of Property

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

The North 160.0 feet of the South 405.0 feet of Lot 12, in the N.E. 1/4 of Section 9, Township 30 South, Range 16 East, as shown by the Plat of PINELLAS GROVES, INC., as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, LESS that portion lying within 50.0 feet of the centerline of 49th Street North as it is now constructed.

AND

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

That part of Lots 12 and 13 in the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas Groves, as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, more particularly described as follows:

The South 260.0 feet of the West 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the West 50.0 feet thereof for 49th Street North Right of Way and less the South 30.0 feet thereof for 126th Avenue North Right of Way.

Together with the West 165.00 feet of the East 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the North 995.81 feet thereof and less the South 30.00 feet thereof for 126th Avenue North Right of Way, and reserving the East 40.00 feet of said West 165.00 feet for street purposes.

Less that portion conveyed to Pinellas County in O.R. Book 7593, Page 1527, Public Records of Pinellas County Florida.

Street Address of Property: 12707 49th Street North, Clearwater, FL 33762

# EXHIBIT K

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE**
**FINANCING STATEMENT FORM**

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

2020 Sep 18 03:00 PM

****** 202004810228 ******

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Cheri Olivo 713-226-6518

B. Email Address  colivo@porterhedges.com

C. SEND ACKNOWLEDGEMENT TO:
Name    Porter Hedges LLP

Address  1000 Main Street, 36th Floor

Address

City/State/Zip  Houston Texas 77002

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (**1a OR 1b**) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME Big Storm Real Estate LLC | | | |
|---|---|---|---|
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One 12707 49th Street N., Suite 500 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Clearwater | STATE FL | POSTAL CODE 33762 | COUNTRY USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (**2a OR 2b**) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY **ONE** SECURED PARTY (**3a OR 3b**)

| 3.a ORGANIZATION'S NAME BRIAR CAPITAL REAL ESTATE FUND, LLC | | | |
|---|---|---|---|
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One 1500 CityWest Boulevard, Suite 560 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Houston | STATE TX | POSTAL CODE 77042 | COUNTRY USA |

4. This **FINANCING STATEMENT** covers the following collateral:

All assets wherever located, whether now owned or hereafter acquired.

5. ALTERNATE DESIGNATION (if applicable)  ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR
☐ AG LIEN  ☐ NON-UCC FILING  ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX
☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**
009514-0070 Loan Agreement (September 2020)    FL SOS

1148051.8

STANDARD FORM - FORM UCC-1 (REV.05/2013)    Filing Office Copy    Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE
# FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Cheri Olivo 713-226-6518

**B. Email Address** colivo@porterhedges.com

**C. SEND ACKNOWLEDGEMENT TO:**
Name    Porter Hedges LLP

Address   1000 Main Street, 36th Floor

Address

City/State/Zip   Houston Texas 77002

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (1a **OR** 1b) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Big Storm Real Estate LLC | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One | | | |
| 12707 49th Street N., Suite 500 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

(row values) CITY Clearwater; STATE FL; POSTAL CODE 33762; COUNTRY USA

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (2a **OR** 2b) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY **ONE** SECURED PARTY (3a **OR** 3b)

| 3.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BRIAR CAPITAL REAL ESTATE FUND, LLC | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One | | | |
| 1500 CityWest Boulevard, Suite 560 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

(row values) CITY Houston; STATE TX; POSTAL CODE 77042; COUNTRY USA

**4.** This **FINANCING STATEMENT** covers the following collateral:

All assets, including, without limitation, all fixtures located on or affixed to (and all personal property located on or affixed to) the real property described in Exhibit A attached hereto, in each case together with all proceeds thereof, and all rights and privileges with respect thereto.

**5. ALTERNATE DESIGNATION** (if applicable)   ☐ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐ BAILEE/BAILOR
   ☐ AG LIEN   ☐ NON-UCC FILING   ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**
009514-0070 Loan Agreement (September 2020)    FL SOS

---

STANDARD FORM - FORM UCC-1 (REV.05/2013)     Filing Office Copy     Approved by the Secretary of State, State of Florida

## EXHIBIT A

## LEGAL DESCRIPTION

The property located at or about 12707 49th Street North, Clearwater, Florida 33762, described more particularly as follows:

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

The North 160.0 feet of the South 405.0 feet of Lot 12, in the N.E. 1/4 of Section 9, Township 30 South, Range 16 East, as shown by the Plat of PINELLAS GROVES, INC., as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, LESS that portion lying within 50.0 feet of the centerline of 49th Street North as it is now constructed.

AND

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:
That part of Lots 12 and 13 in the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas Groves, as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, more particularly described as follows:

The South 260.0 feet of the West 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the West 50.0 feet thereof for 49th Street North Right of Way and less the South 30.0 feet thereof for 126th Avenue North Right of Way.

Together with the West 165.00 feet of the East 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the North 995.81 feet thereof and less the South 30.00 feet thereof for 126th Avenue North Right of Way, and reserving the East 40.00 feet of said West 165.00 feet for street purposes.

Less that portion conveyed to Pinellas County in O.R. Book 7593, Page 1527, Public Records of Pinellas County Florida.

EXHIBIT A

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM**

| A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON |
|---|
| Cheri Olivo 713-226-6518 |
| B. Email Address  colivo@porterhedges.com |
| C. SEND ACKNOWLEDGEMENT TO: |
| Name    Porter Hedges LLP |
| Address  1000 Main Street, 36th Floor |
| Address |
| City/State/Zip  Houston Texas 77002 |

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

2020 Sep 18 03:00 PM

****** 202004810236 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| Big Storm Pinellas LLC |  |  |  |

| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 1.c MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 12707 49th Street N., Suite 500 | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  | Clearwater | FL | 33762 | USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
|  |  |  |  |

| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 2.c MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
|  | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  |  |  |  |  |

**3. SECURED PARTY'S NAME**  (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)

| 3.a ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| BRIAR CAPITAL REAL ESTATE FUND, LLC |  |  |  |

| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
|  |  |  |  |

| 3.c MAILING ADDRESS Line One | | | | |
|---|---|---|---|---|
| 1500 CityWest Boulevard, Suite 560 | This space not available. | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
|  | Houston | TX | 77042 | USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

All assets (other than equipment) wherever located, whether now owned or hereafter acquired.

---

| 5. ALTERNATE DESIGNATION (if applicable) | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR |
|---|---|---|---|
|  | AG LIEN | NON-UCC FILING | SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE BOX**

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

009514-0070 Loan Agreement (September 2020)          FL SOS

1148051.7

---

STANDARD FORM - FORM UCC-1 (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM**

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

2020 Sep 18 03:00 PM

****** 202004810295 ******

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Cheri Olivo 713-226-6518

B. Email Address   colivo@porterhedges.com

C. SEND ACKNOWLEDGEMENT TO:
Name    Porter Hedges LLP

Address   1000 Main Street, 36th Floor

Address

City/State/Zip   Houston Texas 77002

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (**1a OR 1b**) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME Big Storm Brewery LLC | | | |
|---|---|---|---|
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One 12707 49th Street N., Suite 500 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Clearwater | STATE FL | POSTAL CODE 33762 | COUNTRY USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (**2a OR 2b**) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME**   (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (**3a OR 3b**)

| 3.a ORGANIZATION'S NAME BRIAR CAPITAL REAL ESTATE FUND, LLC | | | |
|---|---|---|---|
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One 1500 CityWest Boulevard, Suite 560 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Houston | STATE TX | POSTAL CODE 77042 | COUNTRY USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

All assets wherever located, whether now owned or hereafter acquired.

**5.** ALTERNATE DESIGNATION (if applicable)    ☐ LESSEE/LESSOR    ☐ CONSIGNEE/CONSIGNOR    ☐ BAILEE/BAILOR
☐ AG LIEN    ☐ NON-UCC FILING    ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE BOX**

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**
009514-0070 Loan Agreement (September 2020)    FL SOS

1148051.1

STANDARD FORM - FORM UCC-1 (REV.05/2013)    **Filing Office Copy**    Approved by the Secretary of State, State of Florida

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM**

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

2020 Sep 18 03:00 PM

****** **202004810287** ******

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Cheri Olivo 713-226-6518

B. Email Address  colivo@porterhedges.com

C. SEND ACKNOWLEDGMENT TO:
Name    Porter Hedges LLP

Address  1000 Main Street, 36th Floor

Address

City/State/Zip   Houston Texas 77002

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

---

**1.  DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Big Storm Cape Coral LLC | | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1.c MAILING ADDRESS Line One 12707 49th Street N., Suite 500 | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY Clearwater | | STATE FL | POSTAL CODE 33762 | COUNTRY USA |

**2.  ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |

**3.  SECURED PARTY'S NAME**  (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)

| 3.a ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| BRIAR CAPITAL REAL ESTATE FUND, LLC | | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3.c MAILING ADDRESS Line One 1500 CityWest Boulevard, Suite 560 | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY Houston | | STATE TX | POSTAL CODE 77042 | COUNTRY USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

All assets wherever located, whether now owned or hereafter acquired.

---

| 5. ALTERNATE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR |
|---|---|---|---|
| | ☐ AG LIEN | ☐ NON-UCC FILING | ☐ SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE BOX**

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**
009514-0070 Loan Agreement (September 2020)        FL SOS

1148051.2

---

STANDARD FORM - FORM UCC-1 (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

2020 Sep 18 03:00 PM

****** 202004810279 ******

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Cheri Olivo 713-226-6518

B. Email Address   colivo@porterhedges.com

C. SEND ACKNOWLEDGEMENT TO:

Name    Porter Hedges LLP

Address    1000 Main Street, 36th Floor

Address

City/State/Zip    Houston Texas 77002

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME Big Storm Cider and Mead LLC | | | |
|---|---|---|---|
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One 2707 49th Street N., Suite 500 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Clearwater | STATE FL | POSTAL CODE 33762 | COUNTRY USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)

| 3.a ORGANIZATION'S NAME BRIAR CAPITAL REAL ESTATE FUND, LLC | | | |
|---|---|---|---|
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One 1500 CityWest Boulevard, Suite 560 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Houston | STATE TX | POSTAL CODE 77042 | COUNTRY USA |

**4. This FINANCING STATEMENT** covers the following collateral:

All assets wherever located, whether now owned or hereafter acquired.

**5. ALTERNATE DESIGNATION** (if applicable)

- [ ] LESSEE/LESSOR
- [ ] AG LIEN
- [ ] CONSIGNEE/CONSIGNOR
- [ ] NON-UCC FILING
- [ ] BAILEE/BAILOR
- [ ] SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX

- [x] All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
- [ ] Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**
009514-0070 Loan Agreement (September 2020)        FL SOS

1148051.3

STANDARD FORM - FORM UCC-1 (REV.05/2013)        Filing Office Copy        Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

FLORIDA SECURED TRANSACTION REGISTRY

# FILED
2020 Sep 18 03:00 PM
****** 202004810260 ******

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Cheri Olivo 713-226-6518

**B. Email Address** colivo@porterhedges.com

**C. SEND ACKNOWLEDGMENT TO:**
Name    Porter Hedges LLP

Address    1000 Main Street, 36th Floor

Address

City/State/Zip    Houston Texas 77002

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Big Storm Cocktails LLC | | | |

| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1.c MAILING ADDRESS Line One | | | |
|---|---|---|---|
| 12707 49th Street N., Suite 500 | This space not available. | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | Clearwater | FL | 33762 | USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2.c MAILING ADDRESS Line One | | | |
|---|---|---|---|
| | This space not available. | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)

| 3.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BRIAR CAPITAL REAL ESTATE FUND, LLC | | | |

| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3.c MAILING ADDRESS Line One | | | |
|---|---|---|---|
| 1500 CityWest Boulevard, Suite 560 | This space not available. | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | Houston | TX | 77042 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All assets wherever located, whether now owned or hereafter acquired.

**5. ALTERNATE DESIGNATION (if applicable)**

| LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR |
|---|---|---|
| AG LIEN | NON-UCC FILING | SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**
009514-0070 Loan Agreement (September 2020)    FL SOS

1148051.4

STANDARD FORM - FORM UCC-1 (REV.05/2013)    Filing Office Copy    Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

FLORIDA SECURED TRANSACTION REGISTRY

## FILED

2020 Sep 18 03:00 PM

****** 202004810252 ******

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Cheri Olivo 713-226-6518

B. Email Address  colivo@porterhedges.com

C. SEND ACKNOWLEDGEMENT TO:
Name    Porter Hedges LLP

Address   1000 Main Street, 36th Floor

Address

City/State/Zip   Houston Texas 77002

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME Big Storm Coffee Company LLC | | | |
|---|---|---|---|
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One 2707 49th Street N., Suite 500 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Clearwater | STATE FL | POSTAL CODE 33762 | COUNTRY USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)

| 3.a ORGANIZATION'S NAME BRIAR CAPITAL REAL ESTATE FUND, LLC | | | |
|---|---|---|---|
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One 1500 CityWest Boulevard, Suite 560 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Houston | STATE TX | POSTAL CODE 77042 | COUNTRY USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

All assets wherever located, whether now owned or hereafter acquired.

| **5. ALTERNATE DESIGNATION** (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR |
|---|---|---|---|
| | ☐ AG LIEN | ☐ NON-UCC FILING | ☐ SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**
009514-0070 Loan Agreement (September 2020)    FL SOS

1148051.5

STANDARD FORM - FORM UCC-1 (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

FLORIDA SECURED TRANSACTION REGISTRY

## FILED
2020 Sep 18 03:00 PM
****** 202004810244 ******

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Cheri Olivo 713-226-6518

B. Email Address  colivo@porterhedges.com

C. SEND ACKNOWLEDGEMENT TO:
Name    Porter Hedges LLP

Address  1000 Main Street, 36th Floor

Address

City/State/Zip  Houston Texas 77002

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (**1a OR 1b**) – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME Big Storm Pasco LLC | | | | | |
|---|---|---|---|---|---|
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1.c MAILING ADDRESS Line One 12707 49th Street N., Suite 500 | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY Clearwater | STATE FL | POSTAL CODE 33762 | COUNTRY USA | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (**2a OR 2b**) – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY | |

**3. SECURED PARTY'S NAME**  (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY **ONE** SECURED PARTY (**3a OR 3b**)

| 3.a ORGANIZATION'S NAME BRIAR CAPITAL REAL ESTATE FUND, LLC | | | | | |
|---|---|---|---|---|---|
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3.c MAILING ADDRESS Line One 1500 CityWest Boulevard, Suite 560 | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY Houston | STATE TX | POSTAL CODE 77042 | COUNTRY USA | |

**4.** This **FINANCING STATEMENT** covers the following collateral:

All assets wherever located, whether now owned or hereafter acquired.

**5. ALTERNATE DESIGNATION** (if applicable)  ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR
☐ AG LIEN  ☐ NON-UCC FILING  ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX
☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**
009514-0070 Loan Agreement (September 2020)    FL SOS

1148051.6

STANDARD FORM - FORM UCC-1 (REV.05/2013)    Filing Office Copy    Approved by the Secretary of State, State of Florida

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM**

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

2020 Sep 18 03:00 PM

****** 202004810236 ******

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Cheri Olivo 713-226-6518

B. Email Address  colivo@porterhedges.com

C. SEND ACKNOWLEDGMENT TO:
Name    Porter Hedges LLP

Address    1000 Main Street, 36th Floor

Address

City/State/Zip    Houston Texas 77002

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE DEBTOR NAME (1a OR 1b)** – Do Not Abbreviate or Combine Names

| 1.a ORGANIZATION'S NAME Big Storm Pinellas LLC | | | |
|---|---|---|---|
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One 2707 49th Street N., Suite 500 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Clearwater | STATE FL | POSTAL CODE 33762 · COUNTRY USA |

2. **ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE DEBTOR NAME (2a OR 2b)** – Do Not Abbreviate or Combine Names

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE · COUNTRY |

3. **SECURED PARTY'S NAME**  (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY **ONE SECURED PARTY (3a OR 3b)**

| 3.a ORGANIZATION'S NAME BRIAR CAPITAL REAL ESTATE FUND, LLC | | | |
|---|---|---|---|
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One 1500 CityWest Boulevard, Suite 560 | This space not available. | | |
| MAILING ADDRESS Line Two | CITY Houston | STATE TX | POSTAL CODE 77042 · COUNTRY USA |

4. This **FINANCING STATEMENT** covers the following collateral:

All assets (other than equipment) wherever located, whether now owned or hereafter acquired.

| 5. ALTERNATE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR |
|---|---|---|---|
| | ☐ AG LIEN | ☐ NON-UCC FILING | ☐ SELLER/BUYER |

6. Florida **DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE BOX**

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

7. **OPTIONAL FILER REFERENCE DATA**
009514-0070 Loan Agreement (September 2020)    FL SOS

1148051.7

STANDARD FORM - FORM UCC-1 (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT AMENDMENT FORM

| FLORIDA SECURED TRANSACTION REGISTRY |
|---|
| FILED |
| 2025 Apr 18 02:48 PM |
| ****** 202500982880 ****** |

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Allyson A. Adame - 713.226.6598

Email Address  aadame@porterhedges.com

**B. SEND ACKNOWLEDGEMENT TO:**
Name    Porter Hedges LLP

Address  1000 Main Street, 36th Floor

Address

City/State/Zip Houston, Texas 77002

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

---

**1a. INITIAL FINANCING STATEMENT FILE #**
202004810228  (09/18/2020)

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

---

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Big Storm Real Estate LLC | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

---

**4.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5.** ■ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6.** **ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

**7.** ☐ **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

**Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.**

☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.   ☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.   ☐ **ADD** name: Complete item 9a or 9b, and 9c.

---

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9.a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 9.c MAILING ADDRESS Line One | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

---

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral ☐ ASSIGN collateral

---

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

---

**12. OPTIONAL FILER REFERENCE DATA**  014944.0070 | Credit Agreement | FL SOS

---

STANDARD FORM - FORM UCC-3 (REV.05/2013)         Filing Office Copy         Approved by the Secretary of State, State of Florida

FLORIDA SECURED TRANSACTION REGISTRY

# STATE OF FLORIDA UNIFORM COMMERCIAL COD
# FINANCING STATEMENT AMENDMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Allyson A. Adame - 713.226.6598

Email Address  aadame@porterhedges.com

**B. SEND ACKNOWLEDGEMENT TO:**
Name    Porter Hedges LLP

Address  1000 Main Street, 36th Floor

Address

City/State/Zip Houston, Texas 77002

FILED

2025 Apr 18 02:48 PM

****** 20250098283X ******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ | This FINANCING STATEMENT AMENDMENT is to be filed |
|---|---|---|
| 202004810228  (09/18/2020) | | [for record] (or recorded) in the REAL ESTATE RECORDS. |

## 2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Big Storm Real Estate LLC | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

## 3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**4. ☐ TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5. ☐ CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6. ☐ ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

**7. ☑ AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☑ Secured Party of record. Check only one of these two boxes.

**Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.**

☑ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.
☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.
☐ **ADD** name: Complete item 9a or 9b, and 9c.

## 8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

## 9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names

| 9.a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | | |
| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 9.c MAILING ADDRESS Line One | | This space not available. | | |
| 8584 Katy Freeway, Suite 419 | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | Houston | TX | 77024 | USA |

## 10. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral      ☐ ASSIGN collateral

## 11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

## 12. OPTIONAL FILER REFERENCE DATA  014944.0070 | Credit Agreement | FL SOS

| STANDARD FORM - FORM UCC-3 (REV.05/2013) | Filing Office Copy | Approved by the Secretary of State, State of Florida |
|---|---|---|

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE
## FINANCING STATEMENT AMENDMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Allyson A. Adame - 713-226-6598

**Email Address** aadame@porterhedges.com

**B. SEND ACKNOWLEDGEMENT TO:**
Name    Porter Hedges LLP

Address  1000 Main Street, 36th Floor

Address

City/State/Zip Houston, Texas 77002

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE # <br> I: 2020280246 BK: 21172 PG: 1656  09/21/2020 | 1b. ✔ | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|---|

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME <br> Big Storm Real Estate LLC | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME <br> Briar Capital Real Estate Fund, LLC | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**4.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5.** ■ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6.** ☐ **ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; also give name of assignor in item 11.

**7.** ☐ **AMENDMENT** (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

**Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.**
☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.  ☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.  ☐ **ADD** name: Complete item 9a or 9b, and 9c.

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 9.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral    ☐ ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME <br> Briar Capital Real Estate Fund, LLC | | | |
|---|---|---|---|
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**12. OPTIONAL FILER REFERENCE DATA** 014944.0070 | Credit Agreement | Pinellas County, FL

STANDARD FORM - FORM UCC-3 (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE
# FINANCING STATEMENT AMENDMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Allyson A. Adame - 713.226.6598
Email Address aadame@porterhedges.com

**B. SEND ACKNOWLEDGEMENT TO:**
Name    Porter Hedges LLP
Address 1000 Main Street, 36th Floor
Address
City/State/Zip Houston, Texas 77002

**FLORIDA SECURED TRANSACTION REGISTRY**

**FILED**

2025 Apr 18 02:48 PM

****** 202500982880 ******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE # 202004810228 (09/18/2020) | 1b. ☐ | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|---|

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME  Big Storm Real Estate LLC | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME  Briar Capital Real Estate Fund, LLC | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**4. ☐ TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5. ☑ CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6. ☐ ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

**7. ☐ AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

**Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.**
☐ CHANGE name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.
☐ DELETE name: Give record name to be deleted in item 8a or 8b.
☐ ADD name: Complete item 9a or 9b, and 9c.

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9.a ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 9.c MAILING ADDRESS Line One | | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |

**10. AMENDMENT (COLLATERAL CHANGE): check only one box.**
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral    ☐    ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME  Briar Capital Real Estate Fund, LLC | | | |
|---|---|---|---|
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**12. OPTIONAL FILER REFERENCE DATA** 014944.0070 | Credit Agreement | FL SOS

STANDARD FORM - FORM UCC-3 (REV.05/2013)    Filing Office Copy    Approved by the Secretary of State, State of Florida

FLORIDA SECURED TRANSACTION REGISTRY

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT AMENDMENT FORM

FILED

2025 Apr 18 02:48 PM

****** 202500982821 ******

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Allyson A. Adame - 713.226.6598
Email Address  aadame@porterhedges.com

**B. SEND ACKNOWLEDGEMENT TO:**
Name    Porter Hedges LLP

Address  1000 Main Street, 36th Floor

Address

City/State/Zip Houston, Texas 77002

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|---|
| 202004810295  09/18/2020 | | |

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Big Storm Brewery LLC | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**4.** ☐  **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5.** ■  **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6.** ☐  **ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

**7.** ☐  **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.

☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.    ☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.    ☐ **ADD** name: Complete item 9a or 9b, and 9c.

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ( | | | |

| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 9.c MAILING ADDRESS Line One | | This space not available. | | | |
|---|---|---|---|---|---|

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral    ☐ ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**12. OPTIONAL FILER REFERENCE DATA**  014944.0070 | Credit Agreement | FL SOS

STANDARD FORM - FORM UCC-3 (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

FLORIDA SECURED TRANSACTION REGISTRY

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE**
**FINANCING STATEMENT AMENDMENT FORM**

FILED

2025 Apr 18 02:48 PM

****** 202500982872 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Allyson A. Adame - 713.226.6598
Email Address  aadame@porterhedges.com

B. SEND ACKNOWLEDGEMENT TO:
Name    Porter Hedges LLP
Address  1000 Main Street, 36th Floor
Address
City/State/Zip Houston, Texas 77002

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. | This FINANCING STATEMENT AMENDMENT is to be filed |
|---|---|---|
| 202004810236   09/18/2020 | | [for record] (or recorded) in the REAL ESTATE RECORDS. |

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Big Storm Pinellas LLC | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

4. [ ] **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

5. [■] **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

6. [ ] **ASSIGNMENT** [ ] Full or [ ] Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

7. [ ] **AMENDMENT (PARTY INFORMATION):** This Amendment affects [ ] Debtor or [ ] Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.

[ ] CHANGE name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.     [ ] DELETE name: Give record name to be deleted in item 8a or 8b.     [ ] ADD name: Complete item 9a or 9b. and 9c.

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9.a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 9.c MAILING ADDRESS Line One | | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral [ ] DELETE or [ ] ADD, or give entire [ ] RESTATE collateral description, or describe collateral     [ ] ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment)..If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here [ ] and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**12. OPTIONAL FILER REFERENCE DATA**  014944.0070 | Credit Agreement | FL SOS

STANDARD FORM - FORM UCC-3 (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT AMENDMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Allyson A. Adame - 713.226.6598
Email Address  aadame@porterhedges.com

**B. SEND ACKNOWLEDGEMENT TO:**
Name    Porter Hedges LLP

Address  1000 Main Street, 36th Floor

Address

City/State/Zip Houston, Texas 77002

FLORIDA SECURED TRANSACTION REGISTRY

FILED

2025 Apr 18 02:48 PM

****** 202500982813 ******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| **1a. INITIAL FINANCING STATEMENT FILE #** 202004810287   09/18/2020 | **1b.** ☐ | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|---|

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME Big Storm Cape Coral LLC | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME Briar Capital Real Estate Fund, LLC | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**4.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5.** ■ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6.** ☐ **ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

**7.** ☐ **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.

☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.

☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.

☐ **ADD** name: Complete item 9a or 9b, and 9c.

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 9.c MAILING ADDRESS Line One | | This space not available. | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral ☐ ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME Briar Capital Real Estate Fund, LLC | | | |
|---|---|---|---|
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**12. OPTIONAL FILER REFERENCE DATA**  014944.0070 | Credit Agreement | FL SOS

STANDARD FORM - FORM UCC-3  (REV.05/2013)                 Filing Office Copy                 Approved by the Secretary of State, State of Florida

FLORIDA SECURED TRANSACTION REGISTRY

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE**
**FINANCING STATEMENT AMENDMENT FORM**

FILED

| A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON |
| Allyson A. Adame - 713.226.6598 |
| Email Address  aadame@porterhedges.com |

2025 Apr 18 02:48 PM

****** 202500982805 ******

| B. SEND ACKNOWLEDGEMENT TO: |
| Name    Porter Hedges LLP |
| Address  1000 Main Street, 36th Floor |
| Address |
| City/State/Zip Houston, Texas 77002 |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. | ☐ This FINANCING STATEMENT AMENDMENT is to be filed |
| 202004810279  09/18/2020 | | [for record] (or recorded) in the REAL ESTATE RECORDS. |

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME |
| Big Storm Cider and Mead LLC |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME |
| Briar Capital Real Estate Fund, LLC |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

4. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

5. ■ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

6. ☐ **ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

7. ☐ **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

**Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.**

| ☐ CHANGE name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c. | ☐ DELETE name: Give record name to be deleted in item 8a or 8b. | ☐ ADD name: Complete item 9a or 9b. and 9c. |

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME |
| |

| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9.a ORGANIZATION'S NAME |
| |

| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 9.c MAILING ADDRESS Line One | This space not available. |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral ☐ ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME |
| Briar Capital Real Estate Fund, LLC |

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**12. OPTIONAL FILER REFERENCE DATA**  014944.0070 | Credit Agreement | FL SOS

STANDARD FORM - FORM UCC-3  (REV.05/2013)            Filing Office Copy            Approved by the Secretary of State, State of Florida

FLORIDA SECURED TRANSACTION REGISTRY

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE
# FINANCING STATEMENT AMENDMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Allyson A. Adame - 713.226.6598
Email Address aadame@porterhedges.com

**B. SEND ACKNOWLEDGEMENT TO:**
Name    Porter Hedges LLP

Address 1000 Main Street, 36th Floor

Address

City/State/Zip Houston, Texas 77002

FILED

2025 Apr 18 02:48 PM

****** 202500982864 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ | This FINANCING STATEMENT AMENDMENT is to be filed |
|---|---|---|
| 202004810260    09/18/2020 | | [for record] (or recorded) in the REAL ESTATE RECORDS. |

**2. CURRENT RECORD INFORMATION – DEBTOR NAME –** INSERT ONLY ONE DEBTOR NAME (2a OR 2b)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Big Storm Cocktails LLC | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME –** INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

4. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

5. ■ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

6. ☐ **ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

7. ☐ **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.
☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b;
Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.
☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.
☐ **ADD** name: Complete item 9a or 9b, and 9c.

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) –** Do Not Abbreviate or Combine Names

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) –** Do Not Abbreviate or Combine Names

| 9.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 9.c MAILING ADDRESS Line One | | This space not available. | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral ☐ ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**12. OPTIONAL FILER REFERENCE DATA** 014944.0070 | Credit Agreement | FL SOS

STANDARD FORM - FORM UCC-3 (REV.05/2013)        Filing Office Copy        Approved by the Secretary of State, State of Florida

FLORIDA SECURED TRANSACTION REGISTRY

FILED

2025 Apr 18 02:48 PM

****** 202500982856 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE
# FINANCING STATEMENT AMENDMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Allyson A. Adame - 713.226.6598
Email Address aadame@porterhedges.com

**B. SEND ACKNOWLEDGEMENT TO:**
Name   Porter Hedges LLP
Address 1000 Main Street, 36th Floor
Address
City/State/Zip Houston, Texas 77002

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|---|
| 202004810252  09/18/2020 | ☐ | |

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Big Storm Coffee Company LLC | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**4.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6.** ☐ **ASSIGNMENT** ☐ Full or ☐ Partial: Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

**7.** ☐ **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.
☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.
☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.
☐ **ADD** name: Complete item 9a or 9b. and 9c.

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 9.c MAILING ADDRESS Line One | This space not available. | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral   ☐ ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Briar Capital Real Estate Fund, LLC | | | |
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**12. OPTIONAL FILER REFERENCE DATA** 014944.0070 | Credit Agreement | FL SOS

STANDARD FORM - FORM UCC-3 (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

FLORIDA SECURED TRANSACTION REGISTRY

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT AMENDMENT FORM

FILED

2025 Apr 18 02:48 PM

****** 202500982848 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Allyson A. Adame - 713.226.6598
Email Address  aadame@porterhedges.com

**B. SEND ACKNOWLEDGEMENT TO:**
Name   Porter Hedges LLP
Address  1000 Main Street, 36th Floor
Address
City/State/Zip Houston, Texas 77002

| 1a. INITIAL FINANCING STATEMENT FILE # 202004810244  09/18/2020 | 1b. ☐ | This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|---|

**2. CURRENT RECORD INFORMATION – DEBTOR NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

| 2a. ORGANIZATION'S NAME Big Storm Pasco LLC | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**3. CURRENT RECORD INFORMATION – SECURED PARTY NAME – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME Briar Capital Real Estate Fund, LLC | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**4. ☐  TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5. ☒  CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6. ☐  ASSIGNMENT ☐ Full or ☐ Partial:** Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

**7. ☐  AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.

☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.    ☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.    ☐ **ADD** name: Complete item 9a or 9b, and 9c.

**8. CURRENT RECORD INFORMATION – INSERT ONLY ONE NAME (8a OR 8b) – Do Not Abbreviate or Combine Names**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**9. CHANGED (NEW) OR ADDED INFORMATION: – INSERT ONLY ONE NAME (9a OR 9b) – Do Not Abbreviate or Combine Names**

| 9.a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 9.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 9.c MAILING ADDRESS Line One | | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | | STATE | POSTAL CODE | COUNTRY |

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ DELETE or ☐ ADD, or give entire ☐ RESTATE collateral description, or describe collateral    ☐    ASSIGN collateral

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 11a. ORGANIZATION'S NAME Briar Capital Real Estate Fund, LLC | | | |
|---|---|---|---|
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**12. OPTIONAL FILER REFERENCE DATA**  014944.0070 | Credit Agreement | FL SOS

STANDARD FORM - FORM UCC-3  (REV.05/2013)          Filing Office Copy          Approved by the Secretary of State, State of Florida

# EXHIBIT L

# FIRST AMENDMENT TO LOAN AGREEMENT

THIS FIRST AMENDMENT TO LOAN AGREEMENT (this "*Amendment*") is entered into effective as of March 22, 2023 (the "*Effective Date*") between BIG STORM REAL ESTATE LLC, a Florida limited liability company ("*Big Storm Real Estate*"), BIG STORM PINELLAS LLC, a Florida limited liability company ("*Big Storm Pinellas*"), and each other Person from time to time party hereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "*Borrowers*," and each individually, a "*Borrower*") as borrowers, and BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas liability company (the "*Lender*"), as lender.

R E C I T A L S

A.    Borrowers and Lender are parties to that certain Loan Agreement dated as of September 18, 2020 (as may be renewed, extended, modified, amended or supplemented from time to time, the "*Loan Agreement*"), pursuant to which Lender has agreed to make certain loans to Borrowers.

B.    Borrowers and Lender have agreed to make certain amendments to the Loan Agreement, subject to the terms and conditions set forth in this Amendment.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Amendments to Loan Agreement</u>. As of the Effective Date:

(a)    Each of the following definitions are hereby added to *Appendix 1* of the Loan Agreement in the proper alphabetical order:

"*SOFR* means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator."

"*SOFR Administrator* means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate)."

"*Term SOFR* means the Term SOFR Reference Rate for a tenor of one (1) month on the first Business Day of each month (such day, the "*Periodic Term SOFR Determination Day*"), as such rate is published by the Term SOFR Administrator; *provided that*, if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day, the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator, then Term SOFR will be the Term SOFR Reference Rate for one (1) month as published by the Term SOFR Administrator on the first preceding Business Day for which such Term SOFR Reference Rate for one (1) month was published by the Term SOFR Administrator so long as such first preceding Business Day is not more than three (3) Business Days prior to such lookback date. Notwithstanding anything in this definition to the contrary, if "*Term SOFR*" shall be less than 0.25%, then such rate shall be deemed to be 0.25% for purposes of this Agreement. If Term SOFR or the Term SOFR Reference Rate shall cease to be published or is published infrequently or sporadically, or does not reflect Lender's cost of capital, then (i) Lender may substitute another index or benchmark acceptable to Lender to replace Term SOFR and the Term SOFR Reference Rate, as applicable, which index or

benchmark shall be selected by Lender in its sole and absolute discretion, with such floors, spread adjustments, and other adjustments as may be selected by Lender in its sole discretion, and Lender may make such amendments to the Loan Documents (including adjustments to the interest rates provided for herein) as Lender may determine to be necessary in connection therewith, and (ii) if Lender is unable to substitute another index or benchmark (whether as a result of any automatic stay or proceeding commenced under any Debtor Relief Laws, as a result of any judicial order, or otherwise), Term SOFR shall be replaced with the Prime Rate and all references herein to Term SOFR shall be deemed to refer to the Prime Rate."

"*Term SOFR Administrator*" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Agent in its reasonable discretion).

"*Term SOFR Reference Rate*" means the forward-looking term rate based on SOFR.

(b)     The following definition set forth in *Appendix 1* of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"*Business Day*" means as any day except for a Saturday, Sunday or a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in US government securities.

(c)     The definition of "*LIBOR Rate*" is hereby deleted from *Appendix 1* of the Loan Agreement.

(d)     *Section 2.03(a)*[1] (Interest Rates and Payments) is hereby amended and restated in its entirety as follows:

"(a)     The Term Principal Amount shall accrue interest at an annual rate equal to the *lower of* (i) the *greater of* (A) Term SOFR *plus* 9.34% per annum, and (B) the applicable Prime Rate *plus* 6.00% per annum, and (ii) the Maximum Rate."

(e)     *Section 2.03(b)* (Interest Rates and Payments) is hereby amended and restated in its entirety as follows:

"(b)     Term SOFR and the Prime Rate shall be adjusted on the first Business Day of each month using Term SOFR or the Prime Rate, as applicable, in effect on such day, and such rate or rates shall continue in effect until the Business Day of the next month on which such rate or rates are adjusted as provided herein."

2.     <u>Representations and Warranties</u>. Each Loan Party represents and warrants to Lender that (a) such Loan Party possesses all requisite power and authority to execute, deliver and comply with the terms of this Amendment, (b) this Amendment has been duly authorized and approved by all requisite company or other organizational action on the part of such Loan Party, (c) no other consent of any Person

---

[1] The SOFR spread has been adjusted by 9bps, which represents 2bps more favorable to the Borrower than the <u>ARRC recommendation</u> of 11bps for a L30 replacement

(other than Lender) is required for this Amendment to be effective, (d) the execution and delivery of this Amendment does not violate such Loan Party's Organizational Documents, (e) the representations and warranties in each Loan Document to which such Loan Party is a party are true and correct in all material respects on and as of the date of this Amendment as though made on the date of this Amendment (*except to the extent that such representations and warranties speak to a specific date*), (f) the Loan Parties are in full compliance with all covenants and agreements contained in each Loan Document to which each is a party, and (g) no Default has occurred and is continuing. The representations and warranties made in this Amendment shall survive the execution and delivery of this Amendment. No investigation by Lender is required for Lender to rely on the representations and warranties in this Amendment.

3.    <u>Scope of Amendment</u>. All references to the Loan Agreement shall refer to the Loan Agreement as amended by this Amendment. Except as affected by this Amendment, the Loan Documents are unchanged and continue in full force and effect. However, in the event of any inconsistency between the terms of the Loan Agreement (as amended by this Amendment) and any other Loan Document, the terms of the Loan Agreement shall control and such other document shall be deemed to be amended to conform to the terms of the Loan Agreement.

4.    <u>Guarantor's Consent and Agreement</u>. Each Guarantor consents to this Amendment and agrees that this Amendment shall in no way release, diminish, impair, reduce or otherwise adversely affect the obligations and liabilities of any Guarantor under the Guaranty executed by any such Guarantor in connection with the Loan Agreement, or under any Loan Documents, agreements, documents or instruments executed by any Guarantor to create Liens, security interests, assignments, or other encumbrances to secure all or any portion of the Indebtedness, all of which is in full force and effect.

5.    <u>Reaffirmation</u>.

(a)    Each Loan Party hereby reaffirms its obligations under the Loan Documents to which it is a party and agrees that all Loan Documents to which it is a party remain in full force and effect and continue to be legal, valid, and binding obligations enforceable in accordance with their terms (as the same are affected by this Amendment).

(b)    Each Guarantor (i) is party to a Guaranty, guaranteeing payment of the Obligation, (ii) has reviewed this Amendment, and (iii) waives any defense arising by reason of any disability, lack of organizational authority or power, or other defense of Borrower or any other Guarantor, and agrees that according to its terms the Guaranty executed by such Guarantor will continue in full force and effect to guaranty the Obligation.

(c)    Each Loan Party (i) is a party to certain Loan Documents securing and supporting the Obligation, (ii) has reviewed this Amendment, and (iii) waives any defense arising by reason of any disability, lack of organizational authority or power, or other defense of any other Loan Party, and agrees that according to their terms the Loan Documents to which each such Loan Party is a party will continue in full force and effect to secure the Obligation, and (iv) acknowledges, represents, and warrants that the Liens and security interests created by the Loan Documents are valid and subsisting and create a first-priority perfected security interest in the Mortgaged Property and the other Collateral in favor of Lender to secure the Obligation, subject only to Permitted Liens.

(d)    The execution and delivery of this Amendment by any Guarantor does not indicate or establish a requirement that any Loan Document require any Guarantor's approval of any amendments or supplements to, or any modifications of, the Loan Agreement or any other Loan Document.

6.  RELEASE.  EACH LOAN PARTY HEREBY ACKNOWLEDGES AS OF THE DATE HEREOF THAT IT HAS NO KNOWLEDGE OF ANY DEFENSE, COUNTERCLAIM, OFFSET, CROSS COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT HAS BEEN OR CAN BE ASSERTED BY IT OR ANY OTHER PERSON AGAINST LENDER OR ANY OTHER RELEASED PARTY (AS DEFINED BELOW), OR TO REDUCE OR ELIMINATE ALL OR ANY PART OF THEIR LIABILITY TO REPAY ANY ADVANCES, LOANS, OR EXTENSIONS OF CREDIT FROM LENDER TO BORROWER UNDER THE LOAN DOCUMENTS OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM LENDER OR ANY OTHER RELEASED PARTY.  FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, EACH LOAN PARTY HEREBY, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, FULLY AND WITHOUT RESERVE, RELEASES AND FOREVER DISCHARGES, AND COVENANTS NOT TO SUE, LENDER, ITS PARENT COMPANIES, PARTNERS, AND AFFILIATES, ALL OF THEIR RESPECTIVE HEIRS, ESTATES, SUCCESSORS AND ASSIGNS, AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES, TRUSTEES, ATTORNEYS, AGENTS AND AFFILIATES (COLLECTIVELY, THE "*RELEASED PARTIES*" AND EACH INDIVIDUALLY, A "*RELEASED PARTY*"), FROM ANY AND ALL ACTIONS, CLAIMS, DEMANDS, CAUSES OF ACTION, JUDGMENTS, EXECUTIONS, SUITS, DEBTS, LIABILITIES, COSTS, DAMAGES, EXPENSES OR OTHER OBLIGATIONS OF ANY KIND AND NATURE WHATSOEVER, KNOWN OR UNKNOWN, DIRECT AND/OR INDIRECT, AT LAW OR IN EQUITY, WHETHER NOW EXISTING OR HEREAFTER ASSERTED (INCLUDING, WITHOUT LIMITATION, ANY OFFSETS, REDUCTIONS, REBATEMENT, CLAIMS OF USURY, CLAIMS OF LENDER LIABILITY, AND CLAIMS WITH RESPECT TO THE NEGLIGENCE OF ANY RELEASED PARTY), FOR OR BECAUSE OF ANY MATTERS OR THINGS OCCURRING, EXISTING OR ACTIONS DONE, OMITTED TO BE DONE, OR SUFFERED TO BE DONE BY ANY OF THE RELEASED PARTIES, IN EACH CASE, ON OR PRIOR TO THE EFFECTIVE DATE AND IN ANY WAY DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AMENDMENT, ANY OTHER LOAN DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (COLLECTIVELY, THE "*RELEASED MATTERS*"). EACH LOAN PARTY BY ITS EXECUTION HEREOF, HEREBY ACKNOWLEDGES AND AGREES THAT THE AGREEMENTS IN THIS *SECTION 6* ARE INTENDED TO COVER AND BE IN FULL SATISFACTION OF ANY AND ALL ACTUAL OR ALLEGED INJURIES OR DAMAGES NOW EXISTING OR HEREAFTER ARISING IN CONNECTION WITH THE RELEASED MATTERS.

7.  Miscellaneous.

(a)  Form.  Each agreement, document, instrument or other writing to be furnished Lender under any provision of this Amendment must be in form and substance satisfactory to Lender and its counsel.

(b)  Headings.  The headings and captions used in this Amendment are for convenience only and will not be deemed to limit, amplify or modify the terms of this Amendment, the Loan Agreement, or the other Loan Documents.

(c)  Costs, Expenses and Attorneys' Fees.  The Loan Parties agree to pay or reimburse Lender on demand for all its reasonable out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, and execution of this Amendment, including, without limitation, the reasonable fees and disbursements of Lender's counsel.

(d)  Successors and Assigns.  This Amendment shall be binding upon and inure to the benefit of each of the undersigned and their respective successors and permitted assigns.

(e)     <u>Multiple Counterparts</u>.  This Amendment may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts must be construed together to constitute one and the same instrument.  This Amendment may be transmitted and signed by facsimile or portable document format (PDF).  The effectiveness of any such documents and signatures shall, subject to applicable law, have the same force and effect as manually-signed originals and shall be binding on the Loan Parties and Lender.  Lender may also require that any such documents and signatures be confirmed by a manually-signed original; *provided that*, the failure to request or deliver the same shall not limit the effectiveness of any facsimile or PDF document or signature.

(F)     <u>GOVERNING LAW</u>.   THIS AMENDMENT AND THE OTHER LOAN DOCUMENTS MUST BE CONSTRUED, AND THEIR PERFORMANCE ENFORCED, UNDER TEXAS LAW.

(G)     <u>ENTIRETY</u>.    THE LOAN DOCUMENTS (AS AMENDED HEREBY) REPRESENT THE FINAL AGREEMENT AMONG THE LOAN PARTIES AND LENDER AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

**[*Signatures are on the following pages.*]**

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first set forth above.

**BORROWERS:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By: _____

Name: LEO J. GOVONI

Title: Managing Member

BIG STORM PINELLAS LLC,
a Florida limited liability company

By: _____

Name: LEO J. GOVONI

Title: Managing Member

**GUARANTORS:**

_____
Leo Joseph Govoni, individually

BIG STORM BREWERY LLC,
a Florida limited liability company

By:_____
Name: Leo J Govoni
Title: Managing Member

BIG STORM PASCO LLC,
a Florida limited liability company

By:_____
Name: Leo J. Govoni
Title: Managing Member

BIG STORM CAPE CORAL LLC,
a Florida limited liability company

By:_____
Name: Leo J Govoni
Title: Managing Member

BIG STORM COFFEE COMPANY LLC,
a Florida limited liability company

By:_____
Name: Leo J Govoni
Title: Managing Member

BIG STORM CIDER AND MEAD LLC,
a Florida limited liability company

By:_____
Name: Leo J Govoni
Title: Managing Member

Signature Page to First Amendment to Loan Agreement

**LENDER:**

**BRIAR CAPITAL REAL ESTATE FUND, LLC**, a
Texas limited liability company

By:    Briar Capital, L.P.,
       its sole member

By:    Briar Capital General, LLC,
       its general partner

By:_____
       Frank Goldberg

Signature Page to First Amendment to Loan Agreement

# EXHIBIT M

## AMENDED AND RESTATED TERM NOTE

$3,250,000.00                        Houston, Texas                        As of June 22, 2023

FOR VALUE RECEIVED, BIG STORM REAL ESTATE LLC, a Florida limited liability company ("*Big Storm Real Estate*"), BIG STORM PINELLAS LLC, a Florida limited liability company ("*Big Storm Pinellas*"), and each other Person from time to time party hereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "*Borrowers*," and each individually, a "*Borrower*"), hereby promise to pay to the order of BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company ("*Lender*") on or before the Term Loan Maturity Date, the principal amount of $3,250,000.00, or so much thereof as may be disbursed and outstanding under this note, together with interest, as described in this note.

This note has been executed and delivered under, and is subject to the terms of, that certain Loan Agreement dated as of the date hereof (as amended by the First Amendment to Loan Agreement dated as of March 22, 2023, the Second Amendment to Loan Agreement dated as of June 22, 2023, and as further amended, restated, supplemented, or otherwise modified from time to time, the "*Loan Agreement*"), between Borrower and the other parties from time to time parties thereto as "Borrowers", the Guarantors from time to time party thereto, and Lender, and is the *Term Note* referred to in the Loan Agreement. Unless defined in this note, or the context requires otherwise, capitalized terms used in this note have the meanings given to such terms in the Loan Agreement. Reference is made to the Loan Agreement for provisions affecting this note regarding applicable interest rates, principal and interest payment dates, final maturity, voluntary and mandatory prepayments, acceleration of maturity, exercise of rights, payment of attorneys' fees, court costs and other costs of collection, certain waivers by Borrower and others now or hereafter obligated for payment of any sums due under this note, and security for the payment of this note. This note is a Loan Document and, therefore, is subject to the applicable provisions of *Article VIII* of the Loan Agreement, all of which applicable provisions are incorporated into this note by reference as if set forth in this note verbatim.

Specific reference is made to *Section 8.06* of the Loan Agreement for usury savings provisions.

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE DETERMINED SOLELY FROM WRITTEN AGREEMENTS, DOCUMENTS, AND INSTRUMENTS, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO SUCH WRITINGS. THIS NOTE, THE LOAN AGREEMENT, AND THE OTHER WRITTEN LOAN DOCUMENTS EXECUTED BY BORROWERS AND LENDER (OR BY ANY BORROWER FOR THE BENEFIT OF LENDER) REPRESENT THE FINAL AGREEMENT BETWEEN BORROWERS AND LENDER WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This note amends and restates in its entirety and is issued in replacement of, but does not constitute a novation or an accord and satisfaction of, that certain Term Note dated September 18, 2020, executed by Borrowers and made payable to the order of Lender in the original principal amount of $2,500,000.00.

THIS NOTE MUST BE CONSTRUED — AND ITS PERFORMANCE ENFORCED — UNDER TEXAS LAW.

*[Signature is on the following page.]*

EXECUTED as of the date first written above.

**BORROWERS:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By:    BOSTON HOLDING REAL ESTATE LLC,
        as sole member and manager

By:    BOSTON HOLDING COMPANY LLC,
        as sole member and manager

        By:_____
           Leo Joseph Govoni
           Manager


BIG STORM PINELLAS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
        as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By:_____
           Leo Joseph Govoni
           Manager

# EXHIBIT N

## SECOND AMENDMENT TO LOAN AGREEMENT

THIS SECOND AMENDMENT TO LOAN AGREEMENT (this "*Amendment*") is entered into effective as of June 22, 2023 (the "*Effective Date*") between BIG STORM REAL ESTATE LLC, a Florida limited liability company ("*Big Storm Real Estate*"), BIG STORM PINELLAS LLC, a Florida limited liability company ("*Big Storm Pinellas*"), and each other Person from time to time party hereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "*Borrowers*," and each individually, a "*Borrower*") as borrowers, and BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company (the "*Lender*"), as lender.

## R E C I T A L S

A.      Borrowers and Lender are parties to that certain Loan Agreement dated as of September 18, 2020 (as amended by the First Amendment to Loan Agreement dated as of March 22, 2023, and as further amended, restated, supplemented, or otherwise modified from time to time, the "*Loan Agreement*"), pursuant to which Lender has agreed to make certain loans to Borrowers.

B.      Borrowers and Lender have agreed to make certain amendments to the Loan Agreement, subject to the terms and conditions set forth in this Amendment.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      Amendments to Loan Agreement.  The Loan Agreement (including all exhibits and schedules thereto) is hereby amended to read as reflected on *Annex A* attached hereto.

2.      Conditions.  This Amendment shall be effective as of the Effective Date once each of the following have been delivered to Lender, in each case in Acceptable Form:

(a)      this Amendment duly executed by Borrowers, the Guarantors, and Lender;

(b)      an Amended and Restated Term Note executed by Borrowers and made payable to the order of Lender;

(c)      an amendment to the Mortgage on the Mortgaged Property executed by Big Storm Real Estate in favor of Lender;

(d)      an officer's certificate for each Borrower and each Entity Guarantor, certifying as to each such Loan Party's Organizational Documents (or that no amendments thereto or other modifications thereof have been entered into or authorized since the date of the certificate delivered to Lender on the Closing Date), incumbency of officers, specimen signatures, and resolutions authorizing and approving this Amendment and the transactions contemplated herein;

(e)      certificates of existence and good standing with respect to each Borrower and each Entity Guarantor;

(f)      UCC searches with respect to each Borrower and each Entity Guarantor;

(g)      a satisfactory title commitment or pro forma loan policy with respect to the Mortgaged Property;

14021756v3

(h)     a new mortgagee title insurance policy, or an endorsement to Lender's existing mortgagee title policy, insuring the validity and priority of Lender's Lien on the Mortgaged Property for an amount equal to the Maximum Loan Amount;

(i)     a settlement statement executed by the title company and Borrowers;

(j)     payment in immediately available funds of an amendment fee to Lender in the amount of $8,380.00, and all of Lender's fees and expenses incurred in connection with the preparation and negotiation of this Amendment and the transactions contemplated herein (including, without limitation, the reasonable fees and expenses of Lender's legal counsel); and

(k)     such other agreements, instruments, and other items as Lender may request.

3.     <u>Representations and Warranties</u>.  Each Loan Party represents and warrants to Lender that (a) such Loan Party possesses all requisite power and authority to execute, deliver and comply with the terms of this Amendment, (b) this Amendment has been duly authorized and approved by all requisite company or other organizational action on the part of such Loan Party, (c) no other consent of any Person (other than Lender) is required for this Amendment to be effective, (d) the execution and delivery of this Amendment does not violate such Loan Party's Organizational Documents, (e) the representations and warranties in each Loan Document to which such Loan Party is a party are true and correct in all material respects on and as of the date of this Amendment as though made on the date of this Amendment (*except* to the extent that such representations and warranties speak to a specific date), (f) the Loan Parties are in full compliance with all covenants and agreements contained in each Loan Document to which each is a party, and (g) no Default has occurred and is continuing.  The representations and warranties made in this Amendment shall survive the execution and delivery of this Amendment.  No investigation by Lender is required for Lender to rely on the representations and warranties in this Amendment.

4.     <u>Scope of Amendment</u>.  All references to the Loan Agreement shall refer to the Loan Agreement as amended by this Amendment.  Except as affected by this Amendment, the Loan Documents are unchanged and continue in full force and effect.  However, in the event of any inconsistency between the terms of the Loan Agreement (as amended by this Amendment) and any other Loan Document, the terms of the Loan Agreement shall control and such other document shall be deemed to be amended to conform to the terms of the Loan Agreement.

5.     <u>Guarantor's Consent and Agreement</u>.  Each Guarantor consents to this Amendment and agrees that this Amendment shall in no way release, diminish, impair, reduce or otherwise adversely affect the obligations and liabilities of any Guarantor under the Guaranty executed by any such Guarantor in connection with the Loan Agreement, or under any Loan Documents, agreements, documents or instruments executed by any Guarantor to create Liens, security interests, assignments, or other encumbrances to secure all or any portion of the Indebtedness, all of which is in full force and effect.

6.     <u>Reaffirmation</u>.

(a)     Each Loan Party hereby reaffirms its obligations under the Loan Documents to which it is a party and agrees that all Loan Documents to which it is a party remain in full force and effect and continue to be legal, valid, and binding obligations enforceable in accordance with their terms (as the same are affected by this Amendment).

(b)     Each Guarantor (i) is party to a Guaranty, guaranteeing payment of the Obligation, (ii) has reviewed this Amendment, and (iii) waives any defense arising by reason of any disability, lack of organizational authority or power, or other defense of Borrower or any other Guarantor, and agrees that

2

according to its terms the Guaranty executed by such Guarantor will continue in full force and effect to guaranty the Obligation.

(c)    Each Loan Party (i) is a party to certain Loan Documents securing and supporting the Obligation, (ii) has reviewed this Amendment, and (iii) waives any defense arising by reason of any disability, lack of organizational authority or power, or other defense of any other Loan Party, and agrees that according to their terms the Loan Documents to which each such Loan Party is a party will continue in full force and effect to secure the Obligation, and (iv) acknowledges, represents, and warrants that the Liens and security interests created by the Loan Documents are valid and subsisting and create a first-priority perfected security interest in the Mortgaged Property and the other Collateral in favor of Lender to secure the Obligation, subject only to Permitted Liens.

(d)    The execution and delivery of this Amendment by any Guarantor does not indicate or establish a requirement that any Loan Document require any Guarantor's approval of any amendments or supplements to, or any modifications of, the Loan Agreement or any other Loan Document.

7.    <u>RELEASE</u>. EACH LOAN PARTY HEREBY ACKNOWLEDGES AS OF THE DATE HEREOF THAT IT HAS NO KNOWLEDGE OF ANY DEFENSE, COUNTERCLAIM, OFFSET, CROSS COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT HAS BEEN OR CAN BE ASSERTED BY IT OR ANY OTHER PERSON AGAINST LENDER OR ANY OTHER RELEASED PARTY (AS DEFINED BELOW), OR TO REDUCE OR ELIMINATE ALL OR ANY PART OF THEIR LIABILITY TO REPAY ANY ADVANCES, LOANS, OR EXTENSIONS OF CREDIT FROM LENDER TO BORROWER UNDER THE LOAN DOCUMENTS OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM LENDER OR ANY OTHER RELEASED PARTY. FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, EACH LOAN PARTY HEREBY, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, FULLY AND WITHOUT RESERVE, RELEASES AND FOREVER DISCHARGES, AND COVENANTS NOT TO SUE, LENDER, ITS PARENT COMPANIES, PARTNERS, AND AFFILIATES, ALL OF THEIR RESPECTIVE HEIRS, ESTATES, SUCCESSORS AND ASSIGNS, AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES, TRUSTEES, ATTORNEYS, AGENTS AND AFFILIATES (COLLECTIVELY, THE "***RELEASED PARTIES***" AND EACH INDIVIDUALLY, A "***RELEASED PARTY***"), FROM ANY AND ALL ACTIONS, CLAIMS, DEMANDS, CAUSES OF ACTION, JUDGMENTS, EXECUTIONS, SUITS, DEBTS, LIABILITIES, COSTS, DAMAGES, EXPENSES OR OTHER OBLIGATIONS OF ANY KIND AND NATURE WHATSOEVER, KNOWN OR UNKNOWN, DIRECT AND/OR INDIRECT, AT LAW OR IN EQUITY, WHETHER NOW EXISTING OR HEREAFTER ASSERTED (INCLUDING, WITHOUT LIMITATION, ANY OFFSETS, REDUCTIONS, REBATEMENT, CLAIMS OF USURY, CLAIMS OF LENDER LIABILITY, AND CLAIMS WITH RESPECT TO THE NEGLIGENCE OF ANY RELEASED PARTY), FOR OR BECAUSE OF ANY MATTERS OR THINGS OCCURRING, EXISTING OR ACTIONS DONE, OMITTED TO BE DONE, OR SUFFERED TO BE DONE BY ANY OF THE RELEASED PARTIES, IN EACH CASE, ON OR PRIOR TO THE EFFECTIVE DATE AND IN ANY WAY DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AMENDMENT, ANY OTHER LOAN DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (COLLECTIVELY, THE "***RELEASED MATTERS***"). EACH LOAN PARTY BY ITS EXECUTION HEREOF, HEREBY ACKNOWLEDGES AND AGREES THAT THE AGREEMENTS IN THIS ***SECTION 7*** ARE INTENDED TO COVER AND BE IN FULL SATISFACTION OF ANY AND ALL ACTUAL OR ALLEGED INJURIES OR DAMAGES NOW EXISTING OR HEREAFTER ARISING IN CONNECTION WITH THE RELEASED MATTERS.

8.      <u>Miscellaneous</u>.

        (a)     <u>Form</u>.  Each agreement, document, instrument or other writing to be furnished Lender under any provision of this Amendment must be in form and substance satisfactory to Lender and its counsel.

        (b)     <u>Headings</u>.  The headings and captions used in this Amendment are for convenience only and will not be deemed to limit, amplify or modify the terms of this Amendment, the Loan Agreement, or the other Loan Documents.

        (c)     <u>Costs, Expenses and Attorneys' Fees</u>.  The Loan Parties agree to pay or reimburse Lender on demand for all its reasonable out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, and execution of this Amendment, including, without limitation, the reasonable fees and disbursements of Lender's counsel.

        (d)     <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of each of the undersigned and their respective successors and permitted assigns.

        (e)     <u>Multiple Counterparts</u>.  This Amendment may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts must be construed together to constitute one and the same instrument.  This Amendment may be transmitted and signed by facsimile or portable document format (PDF).  The effectiveness of any such documents and signatures shall, subject to applicable law, have the same force and effect as manually-signed originals and shall be binding on the Loan Parties and Lender.  Lender may also require that any such documents and signatures be confirmed by a manually-signed original; *provided that*, the failure to request or deliver the same shall not limit the effectiveness of any facsimile or PDF document or signature.

        (F)     <u>GOVERNING LAW</u>.  THIS AMENDMENT AND THE OTHER LOAN DOCUMENTS MUST BE CONSTRUED, AND THEIR PERFORMANCE ENFORCED, UNDER TEXAS LAW.

        (G)     <u>ENTIRETY</u>.  THE LOAN DOCUMENTS (AS AMENDED HEREBY) REPRESENT THE FINAL AGREEMENT AMONG THE LOAN PARTIES AND LENDER AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

**[*Signatures are on the following pages.*]**

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first set forth above.

**BORROWERS:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By:    BOSTON HOLDING REAL ESTATE LLC,
        as sole member and manager

By:    BOSTON HOLDING COMPANY LLC,
        as sole member and manager

        By:_____
            Leo Joseph Govoni
            Manager


BIG STORM PINELLAS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
        as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
        as sole member and manager

        By:_____
            Leo Joseph Govoni
            Manager

**GUARANTORS:**

_____
Leo Joseph Govoni, individually

BIG STORM BREWERY LLC,
a Florida limited liability company

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
           Leo Joseph Govoni
           Manager

BIG STORM PASCO LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
           Leo Joseph Govoni
           Manager

BIG STORM COFFEE COMPANY LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager

       By: _____
           Leo Joseph Govoni
           Manager

Signature Page to Second Amendment to Loan Agreement

**LENDER:**

BRIAR CAPITAL REAL ESTATE FUND, LLC,
a Texas limited liability company

By: Briar Capital, L.P.,
   its sole member

By: Briar Capital General, LLC,
   its general partner

    By:_____
      Frank Goldberg
      Chief Executive Officer

Signature Page to Second Amendment to Loan Agreement

**ANNEX A**

**Conformed Loan Agreement**

[See attached]

**LOAN AGREEMENT**

**between**

**BIG STORM REAL ESTATE LLC**
**and**
**BIG STORM PINELLAS LLC,**
*as Borrowers*

**and**

**BRIAR CAPITAL REAL ESTATE FUND, LLC,**
*as Lender*

**Dated September 18, 2020**

14021695v4

**Table of Contents**

**Page**

## ARTICLE I
## GENERAL TERMS

| | | |
|---|---|---|
| Section 1.01 | Other Definitions | 1 |
| Section 1.02 | Accounting Principles | 1 |
| Section 1.03 | References to Documents | 1 |
| Section 1.04 | Time | 1 |

## ARTICLE II
## LOAN COMMITMENT AND TERMS

| | | |
|---|---|---|
| Section 2.01 | The Term Loan | 2 |
| Section 2.02 | Advance Procedure | 2 |
| Section 2.03 | Interest Rates and Payments | 3 |
| Section 2.04 | Late Charge | 3 |
| Section 2.05 | Computation | 4 |
| Section 2.06 | Voluntary Prepayments | 4 |
| Section 2.07 | Mandatory Prepayments | 4 |
| Section 2.08 | General Payment Terms; Application of Payments. | 5 |
| Section 2.09 | Fees | 5 |
| Section 2.10 | Waivers | 6 |
| Section 2.11 | Escrow Fund | 6 |
| Section 2.12 | Certain Waivers Relating to Fair Market Value and Deficiencies | 7 |

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 3.01 | Existence, Power, and Authorization | 8 |
| Section 3.02 | No Conflict, Lien, or Consent | 8 |
| Section 3.03 | Financial Condition | 8 |
| Section 3.04 | Liabilities, Litigation, and Default | 9 |
| Section 3.05 | Taxes | 9 |
| Section 3.06 | Titles, Collateral, Permits | 9 |
| Section 3.07 | Use of Proceeds | 9 |
| Section 3.08 | Compliance with the Law | 9 |
| Section 3.09 | Subsidiaries; Equity Interests | 9 |
| Section 3.10 | Status of Mortgaged Property | 10 |
| Section 3.11 | Foreign Person | 10 |
| Section 3.12 | Leases | 10 |
| Section 3.13 | Benefit of Term Loan Proceeds | 11 |

## ARTICLE IV
## AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| Section 4.01 | Financial Statements and Reports | 11 |
| Section 4.02 | Compliance with Laws; Payment of Taxes and Other Claims | 13 |
| Section 4.03 | Maintenance; Improvements to Mortgaged Property | 14 |
| Section 4.04 | Performance of Obligations | 15 |

i

Section 4.05    Reimbursement of Expenses ................................................................... 15
Section 4.06    Insurance ............................................................................................. 15
Section 4.07    Right of Inspection; Appraisals.............................................................. 18
Section 4.08    Leases; SNDAs ..................................................................................... 18
Section 4.09    Further Assurances ............................................................................... 19
Section 4.10    Segregated Account .............................................................................. 19

## ARTICLE V
## NEGATIVE COVENANTS

Section 5.01    Debts, Guaranties and Other Obligations................................................ 19
Section 5.02    Liens.................................................................................................... 20
Section 5.03    Investments, Loans and Advances ......................................................... 20
Section 5.04    Restricted Payments ............................................................................. 21
Section 5.05    Disposition of Properties ...................................................................... 21
Section 5.06    Nature of Business, Ownership, Management ......................................... 21
Section 5.07    Mergers, Consolidations, Acquisition, Etc.............................................. 21
Section 5.08    Changes in Accounting Method or Fiscal Year ....................................... 21
Section 5.09    Transactions With Affiliates .................................................................. 21
Section 5.10    Use of Proceeds.................................................................................... 21
Section 5.11    Compliance with Laws .......................................................................... 22
Section 5.12    Management Fees.................................................................................. 22
Section 5.13    Minimum Tangible Net Worth................................................................ 22

## ARTICLE VI
## EVENTS OF DEFAULT

Section 6.01    Events .................................................................................................. 22
Section 6.02    Remedies .............................................................................................. 24
Section 6.03    Right of Set-off .................................................................................... 24

## ARTICLE VII
## CONDITIONS

Section 7.01    Conditions to Term Loan ...................................................................... 24
Section 7.02    Conditions to All Advances ................................................................... 26

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01    Notices ................................................................................................ 26
Section 8.02    Amendments, Waivers, Cumulative Rights ............................................ 27
Section 8.03    Invalidity ............................................................................................. 27
Section 8.04    Successors and Assigns; Survival .......................................................... 27
Section 8.05    Participations ....................................................................................... 27
Section 8.06    Maximum Rate...................................................................................... 27
Section 8.07    Multiple Originals ................................................................................ 28
Section 8.08    Governing Law and Jurisdiction ............................................................ 28
Section 8.09    No Third-Party Beneficiaries ................................................................ 29
Section 8.10    Release of Liability .............................................................................. 29
Section 8.11    INDEMNIFICATION ............................................................................ 29
Section 8.12    **Waiver of Trial by Jury** ...................................................................... 30

Section 8.13    Joint and Several Liability; Cross-Guaranty; Borrower Representative. .................30
Section 8.14    Loan Agreement Controls. .....................................................................................32
Section 8.15    Collateral Protection Insurance. ............................................................................32
Section 8.16    **Final Agreement**....................................................................................................32

## <u>SCHEDULES, APPENDICES, AND EXHIBITS</u>

Schedule 1          Land
Schedule 3.09       Company Information; Equity Interests
Appendix 1          Other Defined Terms

Exhibit A           Form of Term Note

**LOAN AGREEMENT**

THIS LOAN AGREEMENT (this "***Agreement***") is made and entered into as of September 18, 2020, by and between BIG STORM REAL ESTATE LLC, a Florida limited liability company ("***Big Storm Real Estate***"), BIG STORM PINELLAS LLC, a Florida limited liability company ("***Big Storm Pinellas***"), and each other Person from time to time party hereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "***Borrowers***," and each individually, a "***Borrower***"), as borrowers, and BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company (together with its successors and assigns, "***Lender***"), as lender.

**RECITALS**

A.    Borrowers have requested that Lender extend credit to Borrowers in the form of a term loan facility.

B.    Lender is willing to extend the requested credit on the terms and conditions of this Agreement.

Accordingly, for and in consideration of the premises, mutual covenants and agreements set out in this Agreement, Borrowers and Lender agree as follows:

**ARTICLE I**
**GENERAL TERMS**

Section 1.01    <u>Other Definitions</u>.  Capitalized terms used but not defined in this Agreement shall have the respective meanings given such terms in the UCC.  All references to "Borrower" herein shall mean any or all of the Persons identified in the Preamble above as a "Borrower."  Other defined terms used in this Agreement are set out on ***Appendix 1***.

Section 1.02    <u>Accounting Principles</u>.  Accounting principles are applied under this Agreement in accordance with GAAP on a "consistent basis" when the accounting principles applied in a current period are comparable in all material respects to those accounting principles applied in a preceding period.

Section 1.03    <u>References to Documents</u>.    Unless otherwise expressly provided in this Agreement, (a) references to corporate formation or governance documents, contractual agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements, substitutions, and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document, and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.04    <u>Time</u>.  Unless otherwise indicated, all time references (e.g., 11:00 a.m.) are to Central time (daylight or standard, as applicable).

# ARTICLE II
# LOAN COMMITMENT AND TERMS

Section 2.01     <u>The Term Loan</u>. Subject to the terms and conditions of this Agreement:

(a)     Lender agrees to make a term loan to Borrowers in multiple Advances in an aggregate amount not to exceed the Maximum Loan Amount which, when paid or prepaid, may not be reborrowed (collectively, the "***Term Loan***").

(b)     The initial Advance under the Term Loan in the amount of $2,500,000 was made to Borrowers by Lender on the Closing Date. Borrowers hereby acknowledge and agree that, as of the Second Amendment Effective Date (and prior to giving effect to the Second Advance), (i) the outstanding principal balance of such initial Advance (excluding accrued and unpaid interest) is $2,411,327.45, (ii) such Advance constitutes a portion of the Obligation and is secured by the Loan Documents, (iii) Lender's Commitment to make such initial Advance was terminated on the Closing Date, and (iv) neither the First Amendment, the Second Amendment, the Second Advance, or any subsequent amendment, modification, or Advance constitutes or shall be deemed to constitute a discharge or a novation of, or an accord and satisfaction of, such initial Advance or any subsequent Advance.

(c)     The second Advance under the Term Loan in the amount of $838,672.55 (the "***Second Advance***") shall be made on the Second Amendment Effective Date. Lender's Commitment to make the Second Advance shall terminate on the Second Amendment Effective Date.

Section 2.02     <u>Advance Procedure</u>.

(a)     Lender shall make the Advance under the Term Loan available to Borrowers by funding such Advance into an escrow account maintained with the applicable title company that is handling the closing of the Term Loan, or by funding the amount thereof directly into the Segregated Account (after deducting the payment of all closing fees and expenses and the amounts necessary to fund the Escrow Fund).

(b)     Lender may, but shall not be obligated to, (i) make one or more Advances (each such Advance, a "***Protective Advance***") for any reason at any time in its sole discretion, without Borrowers' compliance with any of the conditions of this Agreement and without the consent of any Borrower, and regardless of whether any Default or Event of Default has occurred and is continuing or whether such Advance would constitute an Overadvance, (ii) disburse the proceeds of any Protective Advance directly to third Persons in order to protect or preserve Lender's interest in the Collateral or to perform any obligation of any Loan Party under this Agreement or any other Loan Document, or otherwise to enhance the likelihood of repayment of the Obligation, and/or (iii) apply the proceeds of any Protective Advance to the Obligation then due and payable in such order as Lender may elect in its sole discretion. All Protective Advances shall be treated as Advances under this Agreement for all purposes, shall constitute part of the Obligation, shall be payable upon demand, and unless otherwise agreed by Lender, shall accrue interest at the Default Rate until repaid.

(c)     No Protective Advance made by Lender is intended to, and no Protective Advance shall, operate as a waiver of any rights or remedies of Lender, and does not (and will not) constitute or operate as (i) a waiver of (or a consent to) any such Default or Event of Default, or any other default, event of default, or other violation of, or noncompliance with, any covenant,

term, condition, or other provision of this Agreement or any of the other Loan Documents, (ii) an agreement to waive any existing or future Default or Event of Default, or to forebear from exercising any rights or remedies or otherwise refrain from taking any action with respect to any existing or future Default or Event of Default, (iii) a waiver by Lender of any of its rights and remedies, whether under this Agreement, the other Loan Documents, at Law, in equity, or otherwise, or (iv) a waiver of Lender's right to insist upon strict compliance with each term, covenant, condition and provision of this Agreement and the other Loan Documents.

Section 2.03    Interest Rates and Payments.  The Term Principal Amount shall accrue interest at the following rates and principal and interest shall be due and payable, subject to **Section 6.02**, as follows:

(a)    The Term Principal Amount shall accrue interest at an annual rate equal to the *lower of* (i) the *greater of* (A) Term SOFR *plus* 9.34% per annum, and (B) the applicable Prime Rate *plus* 6.00% per annum, and (ii) the Maximum Rate.

(b)    Term SOFR and the Prime Rate shall be adjusted on the first Business Day of each month using Term SOFR or the Prime Rate, as applicable, in effect on such day, and such rate or rates shall continue in effect until the Business Day of the next month on which such rate or rates are adjusted as provided herein.

(c)    Upon the occurrence of a Default or an Event of Default (regardless of whether the Obligation has been accelerated), principal, past due interest, fees, and expenses (in each case, to the extent permitted by Law) in respect of the Obligation shall accrue interest at an annual rate equal to the Maximum Rate (the "**Default Rate**").  Interest calculations are subject to certain recapture provisions set out herein.

(d)    Payments of principal and accrued and unpaid interest on the Term Loan in the amount of $41,633.84 are due and payable monthly on the first day of each month, beginning July 1, 2023 and continuing through the Term Loan Maturity Date.  The remaining Term Principal Amount, together with all accrued and unpaid interest, and any other portion of the Obligation that remains outstanding, is due and payable in full on the Term Loan Maturity Date. Lender shall have the right, in its sole discretion, to re-amortize any payments hereunder to account for or otherwise reflect any interest rate fluctuations.

(e)    Each Borrower hereby irrevocably authorizes and instructs Lender to make payments of any amounts payable under or in connection with this Agreement or any other Loan Document by debiting any Borrower's deposit accounts, by an automated clearing house (ACH) process, or by Lender making an Advance (which amount shall be, in Lender's sole discretion, added to the Term Principal Amount).  Each Borrower shall enter into an ACH Agreement. Borrowers shall not allow the balance of any deposit account subject to such ACH Agreement to exceed the maximum amount of deposit insurance therefor available through the FDIC.  No Borrower will change or modify the terms of any ACH Agreement without the prior written consent of Lender.  If Lender determines that the bank that is party to any ACH Agreement or at which any funds of any Borrower are deposited is unacceptable for any reason, such Borrower shall, upon written notice from Lender, transfer Borrower's cash balances and deposit account relationship to a bank acceptable to Lender.

Section 2.04    Late Charge.  If any payment required under this Agreement, any Note, or any other Loan Document is not paid within ten (10) days after such payment is due, then Borrowers shall pay a late charge to Lender equal to five percent (5.0%) of the amount of such payment to compensate Lender for administrative expenses and other costs associated with delinquent payments.  Such late charge shall

3

be immediately due and payable and shall be in addition to, and not in lieu of, all other rights and remedies available to Lender.  The ten (10) day period referenced in this ***Section 2.04*** shall not be construed in any way as extending the due date of any payment.

Section 2.05    Computation.  Interest on the Obligation will be calculated on the basis of actual number of days elapsed (including the first day but excluding the last day), but computed as if each calendar year consisted of 360 days (unless computation would result in an interest rate in excess of the Maximum Rate, in which event the computation is made on the basis of a year of 365 or 366 days, as the case may be).  All interest rate determinations and calculations by Lender, as applicable, are conclusive and binding, absent manifest error.

Section 2.06    Voluntary Prepayments.

(a)    Notwithstanding anything in this Agreement or in any other Loan Document to the contrary, Borrowers shall not be entitled to voluntarily prepay, refinance, or otherwise repay or defease any portion of the Term Principal Amount prior to the scheduled due date or maturity thereof except as expressly provided in this ***Section 2.06***.

(b)    Borrowers shall have the right to prepay the Term Principal Amount only if the following conditions are satisfied:  (i) Borrower Representative provides written notice to Lender of Borrowers' intention to fully repay the Obligation not less than ten (10) days prior to the date of such prepayment; (iii) such prepayment is in full payment of the outstanding Obligation; (iv) such prepayment occurs on a scheduled payment date; and (v) Borrowers shall pay to Lender the amount of the Early Termination Fee.

Section 2.07    Mandatory Prepayments.

(a)    If the Term Principal Amount at any time exceeds the Maximum Loan Amount (as such amount may be adjusted from time to time in accordance with the terms of this Agreement), then Borrowers shall immediately repay the Term Principal Amount, in at least the amount of that excess, together with all accrued and unpaid interest on the Term Principal Amount so repaid.

(b)    If the value of the Mortgaged Property decreases (as evidenced by the most recent appraisal thereof), then Lender shall give notice to Borrower Representative and within thirty (30) days of such notice, Borrowers shall (a) provide additional Collateral to Lender, which Collateral shall have a value acceptable to Lender (as determined by Lender in its sole discretion) and shall be otherwise acceptable to Lender in all respects, (b) prepay the Term Principal Amount by an amount requested by Lender, or (c) take such other action as Lender may request in its reasonable credit judgment.

(c)    Borrower shall pay the following amounts to Lender on the date such amounts are received by, or for the account of, any Borrower, in each case in the form received and with any necessary endorsements or assignments:

(i)    100% of all Net Proceeds from insurance in respect of any casualty event affecting any Collateral;

(ii)    100% of all Net Proceeds from an Eminent Domain Event affecting any Collateral; and

4

(iii)       100% of the Net Proceeds from the Disposition of any Collateral.

Notwithstanding the foregoing, provided that no Default or Event of Default has occurred and is continuing, Lender may, in its sole discretion, release all or any portion of any Net Proceeds described in *clause (i)* above to Borrowers, and Borrowers shall use such Net Proceeds payable in respect of any (A) casualty event to repair or restore the applicable Collateral, and (B) business interruption or loss of business income to continue regular and customary business operations.

Section 2.08     General Payment Terms; Application of Payments.

(a)      Except as otherwise expressly provided in this Agreement (i) all payments by Borrowers under this Agreement shall be made to Lender in Dollars and in immediately available funds not later than 1:00 p.m. on the date specified herein, and (ii) all payments received by Lender after 1:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. All payments to be made by Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.

(b)      If any payment or prepayment to be made by Borrowers shall come due on a day other than a Business Day, payment shall be made on the next Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)      All payments shall be applied in the following order: (i) to all fees, expenses, late charges, collection costs, and other charges, costs and expenses for which Lender has not been paid or reimbursed under the Loan Documents; (ii) to accrued and unpaid interest on the Term Principal Amount; (iii) to the remaining Term Principal Amount in the order Lender elects; and (iv) to the remaining Obligation in the order and manner Lender elects, with any remaining balance payable to Borrowers or any other applicable Person entitled thereto under applicable Law.

(d)      All prepayments shall be applied as specified in ***Section 2.08(c)***, *provided that*, if an Event of Default has occurred and is continuing, all payments or prepayments shall be applied to the Obligation in the order and manner Lender elects in its sole discretion. All proceeds of Collateral from the exercise of any rights shall be applied among principal, interest, fees, expenses, late charges, collection costs, and other charges, costs and expenses, which have not been paid or reimbursed under the Loan Documents, at the sole discretion of Lender.

Section 2.09     Fees.

(a)      Early Termination Fee. If (i) payment of the Term Principal Amount is accelerated by Lender upon the occurrence of an Event of Default, or (ii) the Term Principal Amount (or any portion thereof) is prepaid, refinanced, or otherwise paid prior to the scheduled due date therefor or maturity thereof, then in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of Lender's lost profits as a result thereof, Borrowers shall pay Lender upon the effective date of such prepayment a fee (the "***Early Termination Fee***") which shall be calculated as follows: (A) four percent (4%) of the Maximum Loan Amount if the prepayment occurs on or before June 22, 2024; (B) three percent (3%) of the Maximum Loan Amount if the prepayment occurs after June 22, 2024, but on or before June 22, 2025; or (C) two (2%) of the Maximum Loan Amount if the prepayment occurs after June 22, 2025. The Early Termination Fee shall be presumed to be the amount of damages sustained by Lender as the result of an early termination,

and Borrowers acknowledge that it is reasonable under the circumstances currently existing. The fee provided for in this ***Section 2.09(a)*** shall be deemed included in the Obligation.

(b)    <u>Closing Fee</u>.  Borrowers shall pay to Lender a closing fee in the amount of $25,000.00, which fee shall be fully non-refundable and duly earned and payable on the Closing Date.

(c)    <u>Fees Generally</u>.  To the extent permitted by Law, the fees described in this ***Section 2.09*** (i) do not constitute compensation for the use, detention, or forbearance of money, (ii) are in addition to, and not in lieu of, interest and expenses otherwise described in this Agreement or in any other Loan Document, (iii) are payable without offset, counterclaim or deduction, and in funds that will be available for immediate use by 1:00 p.m. on the date due, (iv) are fully earned and are non-refundable, (v) accrue interest, if not paid when due, at the Default Rate, and (vi) are calculated on the basis of actual number of days elapsed (including the first day but excluding the last day), but computed as if each calendar year consisted of 360 days (unless computation would result in an interest rate in excess of the Maximum Rate, in which event the computation is made on the basis of a year of 365 or 366 days, as the case may be).  The fees described in this ***Section 2.09*** are in all events subject to the provisions of ***Section 8.06***.

Section 2.10    <u>Waivers</u>.  Borrowers and each surety, Guarantor, endorser, and other party ever liable for payment of any sums of money payable pursuant to this Agreement jointly and severally waive notice, presentment, demand for payment, protest, notice of protest and non-payment or dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, diligence in collecting, grace, and all other formalities of any kind, and consent to all extensions without notice for any period or periods of time and partial payments, before or after maturity, and any impairment of any collateral securing this Agreement, all without prejudice to Lender.

Section 2.11    <u>Escrow Fund</u>.  Borrowers shall pay to Lender at closing an amount equal to (a) three (3) months in respect of insurance premiums, and (b) ten (10) months of the estimated ad valorem taxes to be paid in connection with the ownership of the Mortgaged Property for 2020. Thereafter, Borrowers shall pay an amount equal to (i) one-twelfth (1/12) (or such other amount as may be required by Lender) of the amount which would be sufficient to pay the Property Taxes and the Other Charges which are payable, or estimated by Lender to be payable, during the following period of twelve (12) months, plus (ii) if requested by Lender, one-twelfth (1/12) (or such other amount as may be required by Lender) of the amount which would be sufficient to pay the insurance premiums (which amounts may be estimated by Lender) for the renewal of the insurance policies for the Mortgaged Property or otherwise required under the Loan Documents.  The Escrow Fund, together with the payments of interest and principal required under this Agreement, shall be added together and shall be paid as an aggregate sum by Borrowers to Lender.  Each Borrower hereby pledges to Lender any and all monies now or hereafter deposited in the Escrow Fund as additional security for the Obligations.  Lender will apply the Escrow Fund to payments of Property Taxes, insurance premiums, and Other Charges to the extent Lender elects to do so in its sole discretion.  If the Escrow Fund is not sufficient to pay any such Property Taxes, insurance premiums, or Other Charges, Borrowers shall promptly pay to Lender, upon demand, an amount that Lender shall estimate as sufficient to make up the deficiency.  Upon the occurrence of an Event of Default, Lender may apply any sums then on deposit in the Escrow Fund to the payment of the following items in any order in Lender's sole discretion:

(A)    Property Taxes;

(B)    insurance premiums;

(C)        Other Charges; and

(D)        the Obligation.

Until expended or applied as above provided, any amounts in the Escrow Fund shall constitute additional security for the Obligation.  The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender.  No earnings or interest on the Escrow Fund shall be payable to Borrowers.

Section 2.12        Certain Waivers Relating to Fair Market Value and Deficiencies.

(a)        If the Mortgaged Property is sold at a foreclosure sale pursuant to the terms of the Mortgage and the sales price results in a deficiency, Borrowers knowingly, intelligently, and voluntarily waives Borrowers' rights to request a judicial finding of the fair market value of the real property as of the date of the foreclosure sale as a defense or set-off against any deficiency. Without limiting the foregoing, notwithstanding the provisions of §§ 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time) or any other applicable Law, and to the extent permitted by Law, Borrowers agree that Lender shall be entitled to seek a deficiency judgment from Borrowers and any other Loan Party equal to the difference between the Obligation and the amount for which the Mortgaged Property was sold pursuant to a judicial or non-judicial foreclosure sale.  Borrowers expressly recognize that this *Section 2.12* constitutes a waiver of the above-cited provisions of the Texas Property Code and any other applicable Law which would otherwise permit Borrowers independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of any Mortgaged Property as of the date of foreclosure and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value.  Borrowers further recognize and agree that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by any Borrower or any other Loan Party against whom recovery of a deficiency is sought.  The foregoing to the contrary notwithstanding, nothing herein shall prevent Lender from pursuing its remedies directly against any Loan Party prior to any foreclosure. Alternatively, in the event the waiver provided for herein is determined by a court of competent jurisdiction to be unenforceable, then notwithstanding the provisions of §§ 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time) or any other applicable Law, and to the extent permitted by Law, Borrowers agree that Lender shall be entitled to seek a deficiency judgment from Borrowers and each other Loan Party equal to the difference between the Obligation and the fair market value of the Mortgaged Property.  The provisions of *Section 2.12(b)* shall be the basis for the finder of fact's determination of the fair market value of the Mortgaged Property as of the date of the foreclosure sale in proceedings governed by §§ 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time) or any other Applicable Law.

(b)        This *Section 2.12(b)* shall apply in the event an arbitrator or court of competent jurisdiction determines that the waiver by Borrowers set out in *Section 2.12(a)* is unenforceable. Borrowers stipulate and agree that for purposes of determining the fair market value of any Mortgaged Property (or any portion thereof), as such term is used in Section 51.003 of the Texas Property Code (as amended from time to time) or any other applicable Law, which is sold at a non-judicial foreclosure sale pursuant to the terms of any Deed of Trust or Mortgage (and in accordance with Section 51.002 of the Texas Property Code) or other applicable Law, the following factors shall be used to determine such Mortgaged Property's fair market value, for such purposes:  (a) the Mortgaged Property shall be valued "AS IS" without any value being

7

anticipated for any improvements or refurbishing to be conducted, or constructed, after the date of the foreclosure sale; (b) the intention of the purchaser to re-sell the Mortgaged Property promptly, without any extensive holding period; (c) any re-sale shall be for cash only, without financing by the seller; (d) all reasonable costs of closing a re-sale shall be deducted from the estimate of fair market value, such as attorneys' fees, title policy premiums, surveyor fees and expenses, the then prevailing broker's or salesman commission, and unpaid ad valorem tax amounts; and (e) the application of a discount to the value to be applied to any future sales price to arrive at its then current fair market value.  Borrowers further stipulate that any value given to any Mortgaged Property in connection with the closing of the Term Loan or at any other time or times, shall not be used and shall not be considered for guidance in determining the fair market value of such Mortgaged Property on the date of any such foreclosure sale.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

On the Effective Date, and until the Obligation is indefeasibly paid in full and the Commitment has been irrevocably terminated, Borrowers and the other Loan Parties make the following representations and warranties and each request for an Advance constitutes a renewal of these representations and warranties as of the date of the request:

Section 3.01     Existence, Power, and Authorization.  Each Borrower and each Entity Guarantor is (a) duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it is organized and in which it transacts business, (b) duly authorized to execute, deliver and perform this Agreement and the other Loan Documents, to which each is a party, and (c) has taken all actions to authorize the due execution, delivery and performance of this Agreement and the other Loan Documents to which such Borrower is a party.

Section 3.02     No Conflict, Lien, or Consent.  The execution of this Agreement and the other Loan Documents to which each Borrower and each Entity Guarantor is a party does not violate any provisions of the Organizational Documents of any such Borrower or Entity Guarantor or any material agreement to which any Borrower or any Entity Guarantor is a party, will not result in the creation or imposition of any lien upon any Properties of any Borrower or any Entity Guarantor, and does not require the consent or approval of any other Person, including, without limitation, any Governmental Authority.

Section 3.03     Financial Condition.

(a)     No Material Adverse Event has occurred which has not been disclosed to Lender in writing.

(b)     None of the financial statements, reports, rent rolls, projections, forecasts, or other information (collectively, the "***Closing Financial Statements***") furnished by any of the Loan Parties to Lender reflecting the Loan Parties' condition as of the most recently ended fiscal quarter ending at least 45 days before the Effective Date, or to be furnished by any of the Loan Parties to Lender with respect to the Loan Parties contain, as of their respective dates, any untrue statement of material fact or omit to state any material fact necessary to make the information therein not misleading.

(c)     Each Borrower and each other Loan Party, on an individual basis, is Solvent and will continue to be Solvent after the execution and performance by each Borrower of this Agreement and the funding of the Term Loan.

Section 3.04     Liabilities, Litigation, and Default.  Except as described in the Closing Financial Statements, or as otherwise disclosed to Lender in writing, no Borrower nor any other Loan Party (a) has any material liabilities, direct or contingent, (b) has any litigation or other action of any nature pending or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party, or (c) is in default under any indenture, mortgage, deed of trust, agreement or other instrument to which such Loan Party is a party or by which such Loan Party is bound (including this Agreement and the other Loan Documents).

Section 3.05     Taxes.  Each Loan Party has filed all tax returns and reports it is required to file and has paid all Property Taxes and other taxes (including, but not limited to, income taxes, franchise taxes, and property and other ad valorem taxes) which have become due and payable.

Section 3.06     Titles, Collateral, Permits.  Each Borrower and each Entity Guarantor has (a) indefeasible title to its real property, (b) a vested leasehold interest in all of its leased property, and (c) good and marketable title to its personal property, all as reflected on the Current Financials and, in each case such title is free and clear of all liens except for Permitted Liens.  All Collateral required under the Loan Documents is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except for Permitted Liens.  Each Borrower and each Entity Guarantor possesses all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade name rights, patent rights, copyrights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

Section 3.07     Use of Proceeds.  The proceeds of the Term Loan will be used by Borrowers (a) to further develop and make improvements to the Mortgaged Property in accordance with *Section 4.03(c)*, (b) to finance the construction of improvements having an aggregate cost of up to $450,000 at other locations or owned by Big Storm Real Estate, (c) for working capital, and (d) for other lawful purposes expressly permitted under *Section 3.13*.  None of such proceeds will be used for, and no Borrower is engaged in, the business of extending credit for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 221).

Section 3.08     Compliance with the Law.  Each Loan Party (a) is in compliance with any Law to which such Loan Party or any of its respective Properties are subject, including, but not limited to, RICO and the Anti-Terrorism Laws, and (b) is in compliance in all material respects with the applicable provisions of ERISA, and no "reportable event," as such term is defined in Section 4043 of ERISA, has occurred with respect to any ERISA Plan of such Loan Party.  None of the execution, delivery, and performance of this Agreement nor any of the other Loan Documents, nor the use of proceeds of the Advances, will violate the Trading with the Enemy Act, as amended, or any of the foreign asset control regulations of OFAC or any enabling legislation or executive order relating thereto.  No Loan Party (nor any Person owning an Equity Interest in any Loan Party) (i) is in violation of any of the country or list-based economic and trade sanctions administered and enforced by OFAC, (ii) is a Prohibited Person, (iii) engages in any transactions or dealings with any Prohibited Person, (iv) has any assets located in or with any Prohibited Person, or (v) derives revenues from investments in, or transactions with, any Prohibited Person.  Each Loan Party is in compliance, in all material respects, with the Patriot Act.

Section 3.09     Subsidiaries; Equity Interests.  Borrowers have no Subsidiaries.  For each Borrower, *Schedule 3.09* sets out such Borrower's name, the address of its chief executive office, U.S. taxpayer identification number, entity type and jurisdiction of organization, the amount of issued and outstanding Equity Interests of such Borrower, and the names of the owners of its Equity Interests. Except as set forth on *Schedule 3.09*, there are no outstanding subscriptions, warrants, options, calls, commitments, convertible securities or other agreements to which a Borrower is a party or by which it is

bound, calling for the issuance of any Equity Interests or securities convertible or exchangeable into Equity Interests of such Borrower.

Section 3.10    Status of Mortgaged Property.

(a)    Borrowers have obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Mortgaged Property and the conduct of their respective businesses and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and are not subject to revocation, suspension, forfeiture or modification.

(b)    The Mortgaged Property and the present and contemplated use and occupancy thereof is in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other applicable Laws.

(c)    The Mortgaged Property is served by all utilities required for the current or contemplated use thereof.  All utility services for the Mortgaged Property are provided by public utilities.

(d)    All public roads and streets necessary for service of and access to the Mortgaged Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public.

(e)    The Mortgaged Property is free from damage caused by fire or other casualty.

(f)    All costs and expenses of any and all labor, materials, supplies and equipment used in the construction, development, or repair of any portion of the Mortgaged Property have been paid in full.

(g)    Borrowers have paid in full for, and are the owners of, all furnishings and fixtures used in connection with the operation of the Mortgaged Property (other than moveable equipment), free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created hereby.

(i)    No portion of the Mortgaged Property is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Regulations.

(j)    All of the Improvements lie within the boundaries of the Land and do not encroach on any adjoining property.

(k)    The Mortgaged Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting Mortgaged Property, and no other such land or improvements are assessed and taxed together with the Mortgaged Property or any portion thereof.

Section 3.11    Foreign Person.  No Borrower is a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations.

Section 3.12    Leases.  Except for the Big Storm Pinellas Lease, there are no Leases in place as of the Closing Date.  Without limiting the provisions of ***Section 4.08***, with respect to the Big Storm

Pinellas Lease and any other Lease that any Borrower enters into after the Closing Date, Borrowers represent and warrant that (a) the applicable Borrower is the sole landlord or lessor under each of the Leases now in existence; (b) the Leases are valid and enforceable and are in full force and effect; (c) no party under the Leases is in default (except that the agreement of Big Storm Real Estate to abate rental payments under the Big Storm Pinellas Lease, consistent with past practices, shall not constitute a breach of this *clause (c)*); (d) all rentals due and payable under the Leases have been paid or otherwise satisfied in full (except that the agreement of Big Storm Real Estate to abate rental payments under the Big Storm Pinellas Lease, consistent with past practices, shall not constitute a breach of this *clause (d)*); (e) the terms of all alterations, modifications and amendments to the Leases are reflected in the tenant estoppel certificate (if any) delivered to and approved by Lender; (f) none of the rents reserved in the Leases have been assigned or otherwise pledged or hypothecated other than to Lender; (g) none of the rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (h) the premises demised under the Leases have been completed and the lessees or tenants have accepted the same and have taken possession of the same on a rent paying basis; (i) there exist no offsets or defenses to the payment of any portion of the rents and no Borrower has any monetary obligation to any lessee or tenant; (j) no Borrower has received notice from any lessee or tenant challenging the validity or enforceability of any Lease; (k) there are no agreements with any lessee or tenant other than as expressly set forth in the Leases (as amended) and disclosed to Lender in writing; (l) the Leases are valid and enforceable against the lessees and tenants that are parties thereto; (m) the Leases contain no option to purchase, right of first refusal to purchase, right of first refusal to relet, or any other similar provisions; (n) no person or entity has any possessory interest in, or right to occupy, the Mortgaged Property except under and pursuant to the Leases; (o) there are no security deposits relating to any of the Leases; and (p) no brokerage commissions or finders' fees are due and payable regarding any of the Leases.

Section 3.13    Benefit of Term Loan Proceeds. Borrowers and the Entity Guarantors are under common ownership and Control and operate as a common enterprise, and each of them expects to benefit, directly and indirectly, from the proceeds of the Term Loan. Without limiting the foregoing, Big Storm Pinellas occupies and operates its business on the Mortgaged Property and acknowledges and agrees that, subject to the requirements of **Sections 3.13** and **4.03(c)**, proceeds of the Term Loan will be used (a) to directly benefit the Mortgaged Property, (b) to pay taxes, insurance, and other costs associated therewith, (c) to the extent approved by Lender (which approval shall not be unreasonably withheld), to finance the construction of tenant improvements at other locations operated by Big Storm Pinellas, and (d) to finance the construction of further improvements to the Mortgaged Property to the extent permitted under this Agreement, and in each such case such usage of the Term Loan proceeds will benefit Big Storm Pinellas directly and indirectly.

## ARTICLE IV
## AFFIRMATIVE COVENANTS

Borrowers and the other Loan Parties will at all times comply with the covenants contained in this **Article IV**, from the date hereof until the Obligation is indefeasibly paid in full and the Commitment has been irrevocably terminated.

Section 4.01    Financial Statements and Reports. The Loan Parties will promptly furnish to Lender:

(a)    Annual Financial Statements.

(i)    As soon as available, and in any event not later than 90 days after the end of each fiscal year of Big Storm Real Estate, financial statements (including statements of

income, statements of retained earnings and cash flows and a balance sheet) showing the consolidated and consolidating financial condition and results of operations of Big Storm Real Estate as of, and for the year ended on that last day, setting out, in each case, in comparative form, the figures for the previous fiscal year, which shall be in Acceptable Form and certified by a Responsible Officer of Big Storm Real Estate as being prepared in accordance with GAAP and presenting fairly, in all material respects, the consolidated financial condition and results of operations of Big Storm Real Estate.

(ii)    As soon as available, and in any event not later than 120 days after the end of each fiscal year of the Big Storm Brewery, financial statements (including statements of income, statements of retained earnings and cash flows and a balance sheet) reviewed by a firm of independent certified public accountants acceptable to Lender, showing the consolidated and consolidating financial condition and results of operations of Big Storm Brewery and its Subsidiaries (including, but not limited to, Big Storm Pinellas) as of, and for the year ended on that last day, setting out, in each case, in comparative form, the figures for the previous fiscal year, which shall be in Acceptable Form and accompanied by a report from such firm of independent certified public accountants confirming that the financial statements were prepared in accordance with GAAP and present fairly, in all material respects, the consolidated financial condition and results of operations of Big Storm Brewery and its Subsidiaries.

(iii)    As soon as available, and in any event not later than 90 days after the end of each year, for each Individual Guarantor, a financial statement (in the form previously reviewed by Lender) through December 31 of the immediately preceding year, which shall be in Acceptable Form and signed by such Individual Guarantor and shall include, in detail, a balance sheet and a list of such Individual Guarantor's contingent liabilities for the then-current calendar year.

(b)    Quarterly Deliverables.

(i)    As soon as available, and in any event not later than 30 days after the end of each March, June, September, and December, financial statements (including statements of income, statements of retained earnings and cash flows and a balance sheet) showing the consolidated and consolidating financial condition and results of operations of Big Storm Real Estate as of, and for the year ended on that last day, setting out, in each case, in comparative form, the figures for the previous fiscal year, which shall be in Acceptable Form and certified by a Responsible Officer of Big Storm Real Estate as being prepared in accordance with GAAP and presenting fairly, in all material respects, the consolidated financial condition and results of operations of Big Storm Real Estate.

(ii)    As soon as available, and in any event not later than 30 days after the end of each March, June, September, and December, to the extent applicable, a copy of each Borrower's and each Entity Guarantor's IRS Form 941 with proof of payment of applicable payroll taxes.

(c)    Monthly Deliverables.  Promptly after preparation, and not later than 20 days after the end of each month, Borrowers shall deliver the following to Lender, all of which shall be in Acceptable Form:  (i) unaudited financial statements (including statements of income, statements of retained earnings and cash flows and a balance sheet) showing the consolidated and consolidating financial condition and results of operations of Big Storm Brewery and its Subsidiaries for the prior month and for the period from the beginning of the current fiscal year to

12

the last day of that month, which shall be in Acceptable Form and certified by a Responsible Officer of Big Storm Brewery; (ii) an aging of all accounts payable and accounts receivable of Big Storm Brewery and its Subsidiaries, showing each such account which is 30, 60, 90 and over 90 days from the applicable due date; and (iii) a monthly inventory report.

(d)    Annual Budget, Operating Plan, and Tax Returns.  As soon as available, and in any event (i) within 90 days after the beginning of each fiscal year of Big Storm Brewery and its Subsidiaries, a copy of that year's budget, including pro forma monthly income statements and balance sheets, and (ii) within 10 days after each applicable filing date, the federal tax returns for (A) Boston Holding and its Subsidiaries, (B) Seaboard Craft Beer, (C) Individual Guarantor, and (D) to the extent not included in immediately preceding *clauses (A)* through *(C)*, each other Loan Party (and, if requested by Lender, copies of any extensions of the filing date therefor), all of which shall be certified by a Responsible Officer of such Person, as applicable, and shall be in Acceptable Form.

(e)    Property Tax Receipts.  As soon as available, and in any event not later than (i) 30 days prior to the scheduled due date thereof (or, if earlier, promptly following the payment thereof), each Borrower shall deliver copies of statements for Property Taxes assessed against the Mortgaged Property, and (ii) 10 days after the scheduled due date thereof (or, if earlier, promptly following the payment thereof), each Borrower shall deliver payment receipts or other evidence satisfactory to Lender evidencing that all applicable Property Taxes have been fully paid.

(f)    Borrower Estoppel Certificate.  Promptly following any request therefor by Lender, and in any event within 7 days after such request, each Borrower, shall furnish a duly acknowledged written statement in Acceptable Form setting forth the unpaid amount of the Obligation (including the Term Principal Amount, all accrued and interest thereon, and any fees and other amounts payable with respect thereto), and stating either that no offsets or defenses exist against the obligation to pay such unpaid amount of the Obligation, or if such offsets or defenses are alleged to exist, the nature and extent thereof, and containing such other information and statements as Lender shall reasonably request.

(g)    Notice.  Written notice, promptly after any Loan Party receives notice of, or otherwise becomes aware of, (i) the institution of any litigation involving any Loan Party for which the monetary amount at issue is greater than $100,000, (ii) the institution of any litigation involving injunctive relief, (iii) any liability or alleged liability under any Environmental Law arising out of, or directly affecting, the properties or operations of such Borrower, (iv) any substantial dispute with any Governmental Authority, (v) the incurrence of any material contingent Debt, (vi) a default in respect of any Debt (including any contingent Debt) or any Investment Property, (vii) a Default or Event Default, specifying the nature thereof and what action each Borrower has taken, is taking, or proposes to take, (viii) any actual or alleged breach or default by any Borrower or any lessee or tenant under, and any notice of termination or cancellation of, any Lease, (ix) the assertion by any Person of any Lien on any Collateral that is not a Permitted Lien, and (x) the occurrence of any Material Adverse Event.

(h)    Other Requested Information.  Promptly upon reasonable request by Lender, such other information, agreements, and materials not otherwise required to be furnished under the Loan Documents respecting the business affairs, assets and liabilities of the Loan Parties.

Section 4.02    Compliance with Laws; Payment of Taxes and Other Claims.  Each Borrower will, and will cause each other Loan Party to, (a) observe and comply in all material respects with all Laws (including Environmental Laws) applicable to it or its Property (including the Collateral), and

(b) pay and discharge promptly, and in any event at least thirty (30) days before the date on which the failure to so pay could result in a lien upon any Property of any Loan Party, all Property Taxes and other taxes, assessments, governmental charges, levies, fees, rent, charges, and Other Charges of every kind and nature now or hereafter assessed or imposed upon any Loan Party or any of its Property (including upon the income of any Property), as well as all claims of any kind (including claims for labor, materials, supplies and rent) which, if unpaid, could become a lien upon any or all of the Property of any Loan Party.  The certificate, advice or bill of the appropriate Governmental Authority or official (or other applicable Person designated by Law to receive payment of any such amounts) indicating or evidencing the non-payment of any such amount shall be conclusive evidence (as between Lender and Borrowers) that such amount is due and unpaid, and Lender may rely thereon.

Section 4.03    Maintenance; Improvements to Mortgaged Property.

(a)    Each Borrower will, and will cause each other Loan party to, maintain (i) its partnership, company or corporate existence, as applicable, and its rights and franchises; and (ii) proper and accurate books and records, all in accordance with GAAP, consistently applied.

(b)    Borrower will, and will cause each other Loan party to, keep the Mortgaged Property in first class order, repair, operating condition and appearance, causing all necessary repairs, renewals, replacements, additions and improvements to be promptly made, and will not allow any of the Mortgaged Property to be misused, abused or wasted or to deteriorate. Notwithstanding the foregoing, Borrowers shall not, without the prior written consent of Lender, (i) remove from the Mortgaged Property any fixtures or personal property covered by any Mortgage or Deed of Trust, except such as is replaced by Borrowers by a replacement asset of equal suitability and value, or (ii) make any structural alteration to the Mortgaged Property or any other alteration thereto which materially impairs the value thereof.  If any act or occurrence of any kind or nature (including any Eminent Domain Event or any casualty for which insurance was not obtained or obtainable) shall result in damage to or any loss or destruction of any Mortgaged Property, Borrowers shall give prompt written notice thereof to Lender and Borrowers shall promptly, at Borrowers' sole cost and expense and regardless of whether insurance or condemnation proceeds (if any) shall be available or sufficient for the purpose, commence and continue diligently to completion to restore, repair, replace and rebuild the Mortgaged Property as nearly as possible to its value, condition and character immediately prior to such Eminent Domain Event or damage, loss or destruction, as applicable.

(c)    Borrowers shall have the right from time to time to make changes and alterations in or to the Mortgaged Property, at Borrowers' expense, *provided that*, (i) no structural change or alteration or other change which would impair the value of any of the Mortgaged Property may be made without Lender's prior written consent, (ii) subject to *subclause (iii)* below, no structural change or alteration involving an estimated cost of more than $50,000.00, shall be undertaken without the prior written consent of Lender, and (iii) to the extent that Borrowers desire to use proceeds of the Term Loan to further develop and make improvements to the Mortgage Property, Borrowers shall submit a written request therefor to Lender along with such plans and other materials as Lender may reasonably request, and Lender will not unreasonably withhold its consent to such request.

(d)    Subject to the requirements of ***Section 4.03(c)***, Big Storm Real Estate shall use not less than $1,250,000 of the proceeds of the Term Loan to further develop and make improvements to the Mortgaged Property.

14

Section 4.04    Performance of Obligations.  Each Borrower will do and perform every act and discharge all of the obligations provided to be performed and discharged by such Borrower under the Loan Documents.

Section 4.05    Reimbursement of Expenses.  Each Borrower shall promptly pay upon demand (a) all reasonable costs, fees and expenses paid or incurred by Lender in connection with the negotiation, preparation, delivery and execution of any Loan Document, and any related or subsequent amendment, waiver, or consent or any negotiation, workout or restructure (including in each case, the reasonable fees and expenses of Lender's counsel), and (b) all due diligence, closing, and post-closing costs.

Section 4.06    Insurance.  Borrowers shall, and shall cause each other applicable Loan Party to, at Borrowers' expense, at all times maintain in full force and effect the following:

(a)    Insurance against loss or damage to the Mortgaged Property by fire, windstorm, tornado and hail and against loss and damage by such other, further and additional risks as may be now or hereafter embraced by an "all-risk" form of insurance policy.  The amount of such insurance shall not be less than one hundred percent (100%) of the full replacement (insurable) cost of the Improvements, furniture, furnishings, fixtures, equipment and other items (whether personalty or fixtures) included in the Mortgaged Property and owned by a Borrower from time to time, without reduction for depreciation.  The determination of the replacement cost amount shall be adjusted annually to comply with the requirements of the insurer issuing such coverage or, at Lender's election, by reference to such indices, appraisals or information as Lender determines in its reasonable discretion.  Full replacement cost, as used herein, means, with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor, and means, with respect to such furniture, furnishings, fixtures, equipment and other items, the cost of replacing the same, in each case, with inflation guard coverage to reflect the effect of inflation, or annual valuation.  Each policy or policies shall contain a replacement cost endorsement and either an agreed amount endorsement (to avoid the operation of any co-insurance provisions) or a waiver of any co-insurance provisions, all subject to Lender's approval.

(b)    Comprehensive Commercial General Liability Insurance for personal injury, bodily injury, death and property damage liability in amounts not less than $1,000,000 per occurrence, $2,000,000 aggregate and with total excess and umbrella coverage totaling $4,000,000 (or such lesser amount as Lender may approve in its discretion).  During any construction on the Mortgaged Property, each contractor having a contract for construction in an amount equal to or greater than $100,000 shall also provide the insurance required in this *clause (b)*, except that the minimum required coverages shall be $1,000,000 per occurrence and $2,000,000 in the aggregate (both inclusive of umbrella coverage).  Lender hereby retains the right to periodically review the amount of said liability insurance being maintained by Borrowers and to require an increase in the amount of said liability insurance should Lender deem any increase to be commercially reasonable under then existing circumstances.

(c)    General boiler and machinery insurance coverage is required if steam boilers or other pressure-fired vessels are in operation at the Mortgaged Property.  Minimum liability amount per accident must equal the greater of (i) the replacement (insurable) value of the Improvements housing such boiler or pressure-fired machinery or (ii) $2,000,000.

(d)    If the Mortgaged Property or any part thereof is identified by any Governmental Authority (or any department, agency or division thereof) as being situated in an area now or

15

subsequently designated as having special flood hazards, flood insurance in an amount equal to the *lesser of* (i) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement basis (or the unpaid balance of the indebtedness secured hereby if replacement cost coverage is not available for the type of building insured); and (ii) the maximum insurance available under the appropriate National Flood Insurance Administration program.  Lender shall have the right to obtain a flood certification to location of each Mortgaged Property as to any proximate flood plain, and Borrowers shall reimburse Lender for such expense. Notwithstanding anything to the contrary, Borrowers shall bear the sole responsibility for maintaining continuous flood insurance.

(e)     During the period of any construction on the Mortgaged Property or renovation or alteration of the Improvements, a so-called "Builder's All-Risk Completed Value" or "Course of Construction" insurance policy in non-reporting form for any Improvements under construction, renovation or alteration in an amount approved by Lender and Worker's Compensation Insurance covering all persons engaged in such construction, renovation or alteration.

(f)     [reserved].

(g)     Such other insurance on the Mortgaged Property or on any replacement or substitutions thereof or additions thereto as may from time to time be required by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, law and ordinance, sinkhole, mine subsidence, earthquake, and environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

(h)     All such insurance shall (i) be with insurers authorized to do business in the state within which each Mortgaged Property is located and who have and maintain a rating of at least "AA" (or its equivalent) from Standard & Poor's, a Division of The McGraw-Hill Companies, Inc. or any other nationally recognized statistical agency selected by Lender; (ii) contain the complete address of the Mortgaged Property (or a complete legal description); (iii) be for terms of at least one year; (iv) contain deductibles which do not exceed $10,000 or, with respect to the policy described in *clause (d)* above $3,000; and (v) be subject to the approval of Lender as to insurance companies, amounts, content, forms of policies, method by which premiums are paid and expiration dates.  Without limiting the generality of the foregoing, the comprehensive all-risk insurance and business income insurance policies required pursuant to this ***Section 4.06*** shall be required to cover perils of terrorism and acts of terrorism.

(i)     Borrowers shall deliver to Lender evidence that said insurance policies have been paid current and certified copies of such insurance policies and original certificates of insurance signed by an authorized agent of the applicable insurance companies evidencing such insurance satisfactory to Lender.   Borrowers shall renew all such insurance and deliver to Lender certificates evidencing such renewals at least 15 days before any such insurance shall expire. Without limiting the required endorsements to the insurance policies, Borrowers further agree that all such policies shall include a standard, non-contributory, mortgagee clause naming:

> Briar Capital Real Estate Fund, LLC
> its successors and assigns
> 8584 Katy Freeway, Suite 419
> Houston, Texas  77024

16

(i) as an additional insured under all liability insurance policies; (ii) as the first mortgagee on all property insurance policies; and (iii) as the loss payee on all loss of rents or loss of business income insurance policies.  Borrowers further agree that all such insurance policies: (1) shall provide for at least 30 days' prior written notice to Lender prior to any cancellation or termination thereof and prior to any modification thereof which affects the interest of Lender; (2) shall contain an endorsement or agreement by the insurer that any loss shall be payable to Lender in accordance with the terms of such policy notwithstanding any act or negligence of any Loan Party which might otherwise result in forfeiture of such insurance; (3) shall waive all rights of subrogation against Lender; and (4) in the event that any Land or any Improvements constitute a legal non-conforming use under applicable building, zoning or land use laws or ordinances, shall include an ordinance or law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to Replacement Cost With Agreed Value Endorsement), Coverage B: "Demolition Cost", and Coverage C: "Increased Cost of Construction" coverages.  Lender agrees that such insurance policies may be in the form of a blanket policy, *provided that*, in the event that any such coverage is provided in the form of a blanket policy, each Borrower hereby acknowledges and agrees that failure to pay any portion of the premium therefor which is not allocable to the Mortgaged Property or by any other action not relating to the Mortgaged Property which would otherwise permit the issuer thereof to cancel the coverage thereof, would require the Mortgaged Property to be insured by a separate, single-property policy.  The blanket policy must properly identify and fully protect the Mortgaged Property as if a separate policy were issued for one hundred percent (100%) of replacement cost at the time of loss and otherwise meet all of Lender's applicable insurance requirements set forth in this ***Section 4.06***.  The delivery to Lender of the insurance policies or the certificates of insurance as provided above shall constitute an assignment of all proceeds payable under such insurance policies relating to the Mortgaged Property by each Borrower to Lender as further security for the indebtedness secured hereby.  In the event of foreclosure of any Deed of Trust or Mortgage, or other transfer of title to any Mortgaged Property in extinguishment in whole or in part of any Obligation secured by any Loan Document, all right, title and interest of each Borrower in and to all proceeds payable under such policies then in force concerning the Mortgaged Property shall thereupon vest in the purchaser at such foreclosure, or in Lender (or any other applicable transferee) in the event of such other transfer of title.  Approval of any insurance by Lender shall not be a representation of the solvency of any insurer or the sufficiency of any amount of insurance.  In the event any Borrower fails to provide, maintain, keep in force or deliver and furnish to Lender the policies of insurance required under this Agreement or evidence of their renewal as required herein, Lender may, but shall not be obligated to, procure such insurance and Borrowers shall pay all amounts advanced by Lender therefor (and, for the avoidance of doubt, shall be entitled, in its sole discretion, to disburse or otherwise utilize any funds on deposit in the Escrow Fund to pay such amounts), together with interest thereon at the Maximum Rate from and after the date advanced by Lender until actually repaid by Borrowers, promptly upon demand by Lender.  Any amount so advanced by Lender, together with interest thereon, shall constitute a portion of the Obligation and shall be secured by each Deed of Trust and Mortgage and by all of the other Loan Instruments securing all or any part of the Obligation.  Lender shall not be responsible for nor incur any liability for the insolvency of the insurer or other failure of the insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of any Borrower to furnish such insurance.  Borrowers shall not obtain insurance for the Mortgaged Property in addition to that required by Lender without the prior written consent of Lender, which consent will not be unreasonably withheld, *provided that* (i) Lender is named on such insurance; (ii) Lender receives complete copies of all policies evidencing such insurance; and (iii) such insurance and the related insurer comply with all of the applicable requirements set forth herein.

Section 4.07    <u>Right of Inspection; Appraisals</u>.

(a)    Borrower will permit, and will cause each other Loan Party to permit, any officer, employee, agent, or representative of Lender, to visit and inspect any Mortgaged Property or any of the other Properties of Borrowers, to examine Borrowers' books and records, to take copies and extracts therefrom, and to discuss the affairs, finances and accounts of Borrowers with Borrowers' current and former officers, employees, accountants and auditors, all at such times and as often as Lender may desire and without prior notice to any Borrower or any other Person. Borrowers shall reimburse Lender for its out-of-pocket expenses incurred in connection with any of the foregoing, *provided that*, so long as no Event of Default has occurred and is continuing, the first such visit and inspection in each fiscal year shall be at Lender's cost and expense.

(b)    Lender may obtain appraisals of the Mortgaged Property (or any portion thereof) at any time from time to time at Borrowers' sole cost and expense.

Section 4.08    <u>Leases; SNDAs</u>.

(a)    Borrowers have furnished to Lender true and correct executed copies of all Leases of any portion of the Mortgaged Property (and any amendments and supplements thereto, and any extensions, restatements, and other modifications thereof).  Except for any such Leases delivered to Lender, there are no Leases of any portion of the Mortgaged Property.

(b)    Except with respect to the Big Storm Pinellas Lease, Borrowers shall not lease any portion of the Mortgaged Property.  Without limiting the foregoing, if Borrowers desire to enter into any Lease of all or any portion of the Mortgaged Property, Borrowers shall notify Lender at least ten (10) Business Days prior to entering into any Lease and, upon Lender's request, shall deliver a copy or draft of such Lease to Lender.  All new Leases of the Mortgaged Property and renewals of any Leases (other than extensions or renewals which, under the terms of any Lease, may be effected by unilateral notice or agreement by the lessee or tenant) shall be subject to the prior written approval of Lender.

(c)    Borrowers shall (i) observe and perform or cause to be observed and performed all of the obligations imposed upon the landlord lessor under each Lease if the failure to perform or observe the same would materially and adversely affect the value of the Mortgaged Property taken as a whole, and shall not do or permit to be done anything to impair the value of any Lease; (ii) promptly send copies to Lender of all notices of default under any Lease which any Borrower sends or receives; (iii) enforce in a commercially reasonable manner all of the terms, covenants and conditions contained in each Lease upon the part of the lessee or tenant thereunder to be observed or performed; (iv) not collect any of the rentals or other payments due under any Lease more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (v) not execute any other assignment of the landlord's or lessor's interest in any Lease or rents or other amounts payable from time to time thereunder; (vi) not (A) materially alter, modify or change the terms of any Lease without the prior written consent of Lender, or (B) cancel or terminate any Lease or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of any Mortgaged Property or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees or tenants thereunder; (vii) not alter, modify or change the terms of any guaranty of the obligations of the lessee or tenant under any Lease, or cancel or terminate such guaranty without the prior written consent of Lender; (viii) not consent to any assignment of or subletting under any Lease not in accordance with their terms, without the prior written consent of Lender; and

18

(ix) notify Lender of any lease payments (including, but not limited to, any rental payments) that are more than 30 days in arrears.

(d)     Upon Lender's request, Borrowers shall cause each of lessee or tenant of any Mortgaged Property to enter into an SNDA, pursuant to which such lessees and tenants will, among other things, agree to subordinate the Leases to Lender's Lien on the Mortgaged Property and covenant and agree with Lender to make all payments of rent and other amounts payable by them under the Leases to Lender to the extent provided in such SNDA.

(e)     Nothing in this ***Section 4.08*** or in any other provision in this Agreement or any other Loan Document shall be deemed to permit or authorize any Borrower to enter into, or a consent by Lender with respect to, any Lease with respect to all or any portion of any Mortgaged Property.

Section 4.09    <u>Further Assurances</u>.   Each Borrower will cure promptly any defects in the execution and delivery of the Loan Documents, the description of any Collateral, or the perfection of any security interest or Lien in favor of Lender.  Each Borrower, at such Borrower's expense, will promptly execute and deliver to Lender upon its request all such other and further documents, agreements and instruments in order to (a) effectuate the purpose and intent of the Loan Documents, (b) further evidence and more fully describe any Collateral, (c) correct any errors or omissions in the Loan Documents, (d) more fully state the security obligations set out herein or in any of the Loan Documents, or (e) perfect, protect or preserve any Liens created pursuant to any of the Loan Documents.  Each Borrower further agrees to make any recordings, to file any notices, or obtain any consents, in each case as may be requested by Lender or as may be necessary or appropriate in connection with any of the foregoing.

Section 4.10    <u>Segregated Account</u>.   Big Storm Real Estate shall at all times hold the proceeds of the Term Loan in the Segregated Account, and shall not transfer or disburse any such proceeds from the Segregated Account except for purposes expressly permitted under this Agreement.  The Segregated Account shall at all times be subject to a deposit account control agreement in favor of Lender and in Proper Form, and shall not be subject to any Lien other than Liens in favor of Lender.

## ARTICLE V
## NEGATIVE COVENANTS

Borrowers and the other Loan Parties will at all times comply with the covenants contained in this ***Article V***, from the date hereof until the Obligation is indefeasibly paid in full and the Commitment has been irrevocably terminated.

Section 5.01    <u>Debts, Guaranties and Other Obligations</u>.   Neither any Borrower nor any Entity Guarantor will incur, create, assume or in any manner become or be liable in respect of any Debt, other than (a) the Obligation, (b) trade payables arising in the ordinary course of business, (c) Subordinated Debt owed by Big Storm Pinellas to Boston Finance pursuant to the Boston Finance Credit Agreement in an aggregate principal amount not to at any time exceed $20,000,000, *provided that*, such Debt is at all times subject to a Subordination Agreement, (d) Subordinated Debt owed by Big Storm Real Estate to Boston Finance in an aggregate principal amount not to at any time exceed $10,000,000, pursuant to that certain Revolving Line of Credit Promissory Note dated as of January 1, 2015, executed by Big Storm Real Estate and made payable to Boston Finance in the original principal amount of $10,000,000, *provided that*, such Debt is at all times subject to a Subordination Agreement, (e) Debt owed by Big Storm Real Estate to MJMRBM, LLC in an aggregate principal amount of up to $499,000, *provided that*, such Debt is not secured by a Lien on any Collateral and is secured solely by Liens permitted under ***Section 5.02(d)***, (f) Debt owed by Big Storm Real Estate to Pedro Falcon, an individual, in an aggregate

principal amount of up to $765,000, *provided that*, such Debt is not secured by a Lien on any Collateral and is secured solely by Liens permitted under **Section 5.02(e)**, (g) Debt of Big Storm Brewery consisting of Economic Injury Disaster Loans from the U.S. Small Business Administration incurred in accordance with applicable Laws and in an aggregate principal amount of up to $150,000, (h) unsecured Subordinated Debt of one or more of the Entity Guarantors owed to Broadleaf Property Management LLC in an aggregate principal amount of up to $46,000, *provided that*, such Debt is at all times subject to a Subordination Agreement, (i) unsecured Subordinated Debt of one or more of the Entity Guarantors owed to BFG Investment Holdings, LLC in an aggregate principal amount of up to $300,000, *provided that*, such Debt is at all times subject to a Subordination Agreement, (j) Subordinated Debt consisting of intercompany loans made using proceeds of Subordinated Debt permitted under *clause (c)* above, *provided that*, such intercompany Subordinated Debt is at all times subject to a Subordination Agreement, (k) Debt of Big Storm Pinellas and the Entity Guarantors consisting of purchase money indebtedness and capital lease obligations, and other Debt secured solely by equipment of Big Storm Pinellas not constituting Collateral, in an aggregate principal amount under this *clause (k)* not to at any time exceed $100,000, and (l) any other Debt approved by Lender in writing from time to time in its sole discretion.

Section 5.02    Liens.  Neither any Borrower nor any Entity Guarantor will create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except for the following (collectively, "**Permitted Liens**"):

(a)    Liens securing the payment of the Obligation or any other Debt to Lender;

(b)    Liens for taxes which (i) are not delinquent, or (ii) for which (A) no Lien has been filed of record with respect to such taxes, (B) no Collateral or any portion thereof or interest therein would be in any danger of sale, forfeiture or loss by reason of the contest for such taxes, and (C) such Loan Party has set aside on its books adequate reserves against such taxes;

(c)    encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not secure any Debt and do not, individually or in the aggregate, materially affect the value of the assets encumbered thereby or materially impair the ability of a Loan Party to use such assets in its business, and none of which is violated in any material aspect by any existing or proposed Improvements or land use;

(d)    Liens on the real estate owned by Big Storm Real Estate and located at 12924 49th St N, Clearwater, Florida 33762, which secure Debt permitted under **Section 5.01(e)**;

(e)    Liens on the real estate owned by Big Storm Real Estate and located at 610 Charlotte St, Punta Gorda, Florida 33950, which secure Debt permitted under **Section 5.01(f)**;

(f)    Liens on assets of Big Storm Brewery which secure Debt permitted under **Section 5.01(g)** above; and

(g)    Liens which secure Debt permitted under **Section 5.01(k)**, *provided that*, such Liens only encumber the assets financed by such Debt and do not encumber any Mortgaged Property or any other Collateral.

Section 5.03    Investments, Loans and Advances.  No Borrower nor any Entity Guarantor will make or permit to remain outstanding any loans or advances to, or investments in, any Person, except for the following:  (a) Debt permitted under **Section 5.01(j)**; (b) investments by Big Storm Brewery in its Subsidiaries that are Loan Parties; (c) investments by Loan Parties (other than Borrowers) in other Loan Parties; and (d) investments by a Borrower in another Borrower.

Section 5.04    <u>Restricted Payments</u>.  No Borrower nor any Entity Guarantor may make any Restricted Payment, *other than* (a) Tax Distributions, *provided that*, no Default or Event of Default exists at the time of, or would exist immediately after giving effect to, any such Tax Distribution, (b) Distributions declared or made by a Borrower wholly in the form of its Equity Interests, (c) Restricted Payments in respect of Subordinated Debt to the extent such payments are permitted under the applicable Subordination Agreement, *provided that*, at the time of and immediately after giving effect to any such payment described in *clause (c)*, (i) no Default or Event of Default exists and (ii) such payment is permitted under the applicable Subordination Agreement.

Section 5.05    <u>Disposition of Properties</u>.

(a)    No Borrower nor any Entity Guarantor will sell, transfer, lease, or otherwise dispose of all of its Properties, except for the sale of inventory in the ordinary course of business and the sale of equipment that is worn-out, obsolete, or no longer used or useful in the business of any such Person.

(b)    No Borrower will at any time lease or otherwise allow any Person to occupy or use all or any portion of any Mortgaged Property to any Person without Lender's prior written consent, except that (i) Big Storm Pinellas may occupy the Mortgaged Property pursuant to the Big Storm Pinellas Lease, and (ii) Affiliates of Borrowers may occupy the Mortgaged Property so long as each such Person has executed and delivered to Lender a subordination of occupancy rights or other applicable agreement in Proper Form.

Section 5.06    <u>Nature of Business, Ownership, Management</u>.  Borrowers and the Entity Guarantors will not permit (a) any change to be made in the direct or indirect ownership of the Equity Interests of any Borrower or any Entity Guarantor that would result in a Change of Control, (b) any change in the nature and/or character of its business or the business of any Entity Guarantor as carried on at the Closing Date, or (c) any Key Management Person to cease his or her involvement in the day-to-day management or operation of any Borrower or any Entity Guarantor.

Section 5.07    <u>Mergers, Consolidations, Acquisition, Etc</u>.  No Borrower nor any Entity Guarantor will (a) amend its Organizational Documents, (b) change its name or structure, (c) consolidate with or merge into or acquire any Person, or permit any other Person to consolidate with or merge into or acquire any Borrower, (d) acquire any Equity Interests in any Person, (e) create or acquire any Subsidiary after the Closing Date, or (f) acquire all or a substantial portion of the assets of any Person, in each case without Lender's prior written consent.

Section 5.08    <u>Changes in Accounting Method or Fiscal Year</u>.  No Borrower nor any Entity Guarantor will make any change in its accounting method as in effect on the date of this Agreement or change its fiscal year ending date.

Section 5.09    <u>Transactions With Affiliates</u>.  No Borrower nor any Entity Guarantor will, directly or indirectly, enter into any transaction (including, but not limited to, the sale or exchange of property or the rendering of any service) with any Affiliate, other than (a) in the ordinary course of its business and upon substantially the same or better terms as it could obtain in an arm's length transaction with a Person who is not an Affiliate, and (b) transactions permitted under ***Sections 5.01*** through ***5.04***.

Section 5.10    <u>Use of Proceeds</u>.  Borrowers will not use the proceeds of this Agreement for purposes other than those set out in ***Section 3.07***.

Section 5.11   <u>Compliance with Laws</u>.  No Borrower nor any Entity Guarantor will violate any Laws in any material respect.

Section 5.12   <u>Management Fees</u>.  Borrowers shall not pay, or become obligated to pay, any management fees with respect to any of the Mortgaged Property except pursuant to a written management agreement submitted to and approved by Lender in its sole discretion in writing, which agreement shall provide that (a) all fees thereunder are fully subordinated to the complete and prior indefeasible payment in full of the Obligation Term Loan, and (b) that such agreement is terminable by Lender upon 30 days' notice after any Event of Default occurs.

Section 5.13   <u>Minimum Tangible Net Worth</u>.  The Tangible Net Worth of Big Storm Brewery and its Subsidiaries shall not at any time be less than $3,000,000.  The financial covenant set forth in this ***Section 5.13*** shall be calculated and tested monthly as of the last day of each month, beginning September 30, 2020.

## ARTICLE VI
## EVENTS OF DEFAULT

Section 6.01   <u>Events</u>.  The occurrence of any of the following events shall constitute an "***Event of Default***":

(a)   <u>Payments</u>.  Any Borrower shall fail to pay (i) any principal of or interest on the Obligation when due, (ii) any other amount due under this Agreement or any Loan Document when due, (iii) any Property Taxes when due, or (iv) any Other Charges when due and any applicable grace period for the payment of such Other Charges shall have expired; or

(b)   <u>Representations and Warranties</u>.  Any representation or warranty made or deemed made by any Loan Party (or any officer or representative thereof) in this Agreement, any other Loan Document, or in any amendment of this Agreement or any other Loan Document, or in any certificate, report, notice, or financial statement furnished at any time in connection with this Agreement, any other Loan Document, or in any amendment of this Agreement or any other Loan Document, shall prove to have been incorrect when made or deemed to have been made; or

(c)   <u>Affirmative Covenants</u>.  Any failure by any Loan Party to observe or perform any of the covenants or agreements contained in ***Article IV*** of this Agreement; or

(d)   <u>Negative Covenants</u>.  Any failure by any Loan Party to observe or perform of any of the covenants or agreements contained in ***Article V*** of this Agreement; or

(e)   <u>Other Loan Document Obligations</u>.  Any failure in the due observance or performance by any Loan Party of any of the covenants or agreements contained in any Loan Document other than this Agreement; or

(f)   <u>Involuntary Bankruptcy Proceedings</u>.  A receiver, conservator, custodian, liquidator, creditors' committee, board of inspectors, or trustee is appointed for any Loan Party, or of any of their Properties, or is created, engaged, retained, procured, authorized, or appointed in the U.S. or under any Law of any foreign country by the order or decree of any court or agency or supervisory authority having jurisdiction; or any Loan Party becomes a debtor under any Debtor Relief Law, or is the subject of an order for relief, or becomes bankrupt or insolvent; or any of the Loan Party's Property is sequestered, seized, or attached in the U.S. or under any law of any foreign country by court order or decree; or a complaint, petition, or similar pleading is

commenced against any Loan Party or any Property thereof under any Debtor Relief Law, whether such law is now in existence or hereafter in effect; or

(g)    <u>Voluntary Petitions, Assignments, Etc.</u>    Any Loan Party (i) voluntarily commences any proceeding or files any petition seeking liquidation, reorganization, or other relief under any Debtor Relief Law now or hereafter in effect, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any proceeding or petition described in ***Section 6.01(f)***, (iii) applies for or consents to an appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for such Person or for any of its assets, (iv) files an answer admitting a material allegation of a petition filed against it in any such proceeding, (v) makes a general assignment for the benefit of creditors, or (vi) takes any corporate or other organizational action for the purpose of effecting any of the foregoing; or

(h)    <u>Insolvency</u>.    Any Loan Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(i)    <u>Discontinuance of Business</u>.    Any Borrower or any Entity Guarantor discontinues its usual business; or

(j)    <u>Default Under Other Agreements</u>.

(i)    Any Loan Party fails to make any payment due on any Debt (including, but not limited to, any Subordinated Debt), or defaults or breaches its obligations, or otherwise fails to comply with any such obligations, in respect of any Debt (including, but not limited to, any Subordinated Debt);

(ii)    Without limiting *subclause (i)* above, any default or event of default (however defined) occurs under the Boston Finance Credit Agreement or any other agreement, document, or instrument governing or evidencing any Subordinated Debt; or

(iii)    Any Loan Party breaches or fails to comply with any of the terms of any Subordination Agreement.

(k)    <u>Undischarged Judgments; Forfeiture</u>.    One or more judgments for the payment of money, in an aggregate amount for all such judgments in excess of $100,000, are rendered by any court or other Governmental Authority against any Loan Party and such Loan Party does not immediately discharge the same or provide for its immediate discharge in accordance with its terms, or procure a stay of execution thereof within 10 days from the date of entry thereof, or any action is instituted to levy upon or cause any forfeiture of any assets of any Loan Party; or

(l)    <u>Fraudulent Transfers</u>.    Any Loan Party shall have concealed, removed, or permitted to be concealed or removed, any part of its Property, with intent to hinder, delay, or defraud its creditors or any of them; or

(m)    <u>Overadvance</u>.    An Overadvance occurs or exists and Borrower fails to (i) repay the Term Principal Amount in at least the amount of the excess, together with accrued and unpaid interest on the principal amount so repaid, or (ii) provide Lender with additional collateral of a type and in an amount acceptable to Lender in its sole discretion; or

(n)    <u>Change of Control</u>.    A Change of Control occurs; or

(o) <u>Eminent Domain Events</u>.  An Eminent Domain Event occurs and affects any Mortgaged Property or any part thereof which Lender deems to be a material or significant part; or

(p) <u>Leases</u>.  Any Borrower defaults under, or otherwise breaches or fails to timely comply with its obligations under, any Lease and any applicable grace or cure period provided for in such Lease shall have expired (except that the agreement of Big Storm Real Estate to abate rental payments under the Big Storm Pinellas Lease, consistent with past practices, shall not constitute an Event of Default under this *clause (p)*); or

(q) <u>Validity and Enforceability of Loan Documents</u>. Any Lien granted under any Loan Document ceases to be a first priority Lien on any applicable Loan Party's assets (except with respect to Liens on assets of Big Storm Brewery which are permitted under ***Section 5.02(f)***), or any Loan Document at any time after its execution and delivery (i) ceases to be in effect in any material respect or is declared by a Governmental Authority to be null and void, or (ii) its validity or enforceability is contested by a Loan Party or a Loan Party denies that it has any further liability or obligations under any Loan Document; or

(r) <u>Material Adverse Event</u>.  A Material Adverse Event occurs.

Section 6.02    <u>Remedies</u>.  Upon the occurrence of any Event of Default, Lender may take any or all of the following actions:  (a) declare the entire Obligation then outstanding (including, but not limited to, the Term Principal Amount and all accrued and unpaid interest thereon) to be immediately due and payable (*provided that*, the occurrence of any event described in ***Sections 6.01(f)***, ***(g)*** or ***(h)*** shall automatically accelerate the maturity of the Obligation, without the necessity of any action by Lender) without presentment, demand, protest, notice of protest or dishonor, notice of default, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or other notice of any kind, all of which are hereby expressly waived by the each Borrower and each Guarantor; (b) foreclose or otherwise enforce all Liens or security interests securing payment of the Obligation, or any part thereof, (c) demand payment from the Guarantors (or any of them); and (d) take any and all other actions available to Lender under this Agreement or the other Loan Documents at Law, in equity or otherwise; and in each such case, all obligations, if any, of Lender hereunder shall immediately cease and terminate.  The failure of Lender to exercise any of the foregoing options shall not constitute a waiver of the right to exercise the same upon the occurrence of a subsequent Event of Default.

Section 6.03    <u>Right of Set-off</u>.  Lender is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrowers), to set-off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Debt at any time owing by Lender to or for the credit or the account of any Loan Party against any and all of the Obligation, irrespective of whether or not Lender shall have made any demand under this Agreement and although such obligations may be unmatured.

## ARTICLE VII
## CONDITIONS

Section 7.01    <u>Conditions to Term Loan</u>.  This Agreement shall become effective once all parties have executed and delivered this Agreement.  The obligation of Lender to make the Term Loan is subject to Borrowers' satisfaction of the following conditions:

(a) <u>Executed Loan Documents</u>.  Duly executed copies of this Agreement, the Term Note, the Deeds of Trust and Mortgages over the Mortgaged Properties, a Guaranty executed by

each Guarantor, each applicable Subordination Agreement, to the extent requested by Lender, an SNDA executed by each of the tenants of the Mortgaged Property, Borrower, and Lender; and all of the other Loan Documents requested by Lender to be delivered on or before the Closing Date, each in Acceptable Form;

(b)      Corporate Documents.  For each Borrower and each Entity Guarantor:

(i)      Officer's Certificates.  A certificate of a Responsible Officer of such Person, certifying as to the items described in **Sections 7.01(b)(ii)-(v)**;

(ii)      Organizational Documents.  The Organizational Documents of such Person;

(iii)      Resolutions.  Copies of resolutions of the Board of Directors of such Person approving the transactions contemplated by this Agreement and the other Loan Documents to which it is a party, and authorizing certain officers of such Person to negotiate, execute, and deliver the Loan Documents to which it is a party;

(iv)      Incumbency.  An incumbency certificate of such Person certified by a secretary or assistant secretary (or other authorized officer) of such Person to be true and correct as of the Closing Date;

(v)      Good Standing.  Copies of certificates of good standing, existence, or their equivalent with respect to such Person, certified as of a recent date by the appropriate Governmental Authority of its jurisdiction of organization and, to the extent requested by Lender, any other jurisdiction in which such Person transacts business; and

(vi)      Tax Identification Number.  The tax identification number (if any) of such Person;

(c)      Reserved.

(d)      Leases.  Fully-executed copies of the Leases and all amendments to, and extensions and modifications of, the Leases;

(e)      Insurance.  Evidence that the Loan Parties maintain all insurance policies required by this Agreement, together with mortgagee endorsements and other appropriate endorsements in favor of Lender with respect to all insurance policies covering any Collateral;

(f)      Appraisals.  Appraisals of each of the Mortgaged Properties in Acceptable Form.

(g)      Environmental Reports.  Environmental assessments of each of the Mortgaged Properties in Acceptable Form;

(h)      Surveys.  A survey of each of the Mortgaged Properties in Acceptable Form;

(i)      Title Commitments.  Binding title commitments or pro forma policies, each in Acceptable Form, insuring Lender's Liens on the Mortgaged Properties;

(j)      UCC Search.  A UCC search acceptable to Lender;

25

(k)     Payoff Letters and Lien Releases.  A customary payoff letter and lien release in Acceptable Form, executed by each Person (a) that has a Lien on any Mortgaged Property as security for any Debt, or (b) that is owed any Debt by any Loan Party that is not permitted under this Agreement;

(l)     Fees and Expenses.  Payment by Borrowers of all fees, expenses, and other amounts payable to Lender;

(m)     Material Adverse Event.  Evidence satisfactory to Lender that, since December 31, 2018, no Material Adverse Event has occurred;

(n)     Due Diligence.  Lender shall have completed its due diligence and results of such due diligence shall be satisfactory to Lender in its sole discretion;

(o)     IRS Forms.  Lender shall have received and approved a duly completed IRS Form 8821 for each Borrower; and

(p)     Other.  Such other documents, instruments, agreements or information as may be reasonably requested by Lender.

Section 7.02     Conditions to All Advances.    At the time of any Advance (other than Overadvances and Protective Advances, which shall be made solely in Lender's discretion), and after giving effect to such Advance, each of the following conditions shall be satisfied to the satisfaction of Lender:  (a) no Default or Event of Default may exist; (b) no Material Adverse Event shall have occurred; (c) each representation and warranty of any Loan Party made or referred to in each Loan Document or in any certificate delivered to Lender pursuant is true and correct in all material respects (except for any such representation or warranty that is qualified by Material Adverse Effect or materiality, which shall be true and correct in all respects); (d) the Closing Financial Statements, the Current Financials, and all other financial information required by Lender shall have been furnished and shall be, as of the date of the requested Advance, true and correct in all material respects; and (e) all legal matters concerning Borrowers and the Guarantors shall be acceptable to Lender and its legal counsel.  Borrowers' request for the Advance under the Term Loan shall constitute a representation and warranty by Borrowers that the conditions set forth in this *Article VII* have been satisfied.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01     Notices.  All notices and communications under or in connection with this Agreement shall be in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid, sent by facsimile, or personally delivered to an officer of the receiving party. All such notices communications shall be mailed, faxed, or delivered (a) if to any Borrower or Borrower Representative, 12707 49th Street North, Clearwater, Florida 33762, Attention:  Jonathan Golden, fax: (727) 497-1666, or to such other address or fax number, or to such individual's or department's attention as Borrower Representative may have furnished Lender in writing, and (b) if to Lender, Briar Capital Real Estate Fund, LLC, 8584 Katy Freeway, Suite 419, Houston, Texas 77024, Attention:  Frank Goldberg, fax: (713) 532-3430, or to such other address or fax  number, or to such individual's or department's attention as it may have furnished to Borrower Representative in writing.  Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, certified mail, postage prepaid, return receipt requested, (ii) if faxed, when transmitted, provided that a fax received after 5 p.m. on any day will be deemed received on the immediately following Business Day, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram

or mailgram), when delivered.  Any instrument in writing received by Lender in connection with this Agreement, which purports to be dispatched or signed by or on behalf of any Borrower, shall conclusively be deemed to have been signed by such party, and Lender may rely thereon and shall have no obligation, duty or responsibility to determine the validity or genuineness thereof or authority of the Person or Persons executing or dispatching the same.

Section 8.02    <u>Amendments, Waivers, Cumulative Rights</u>.  This Agreement and the other Loan Documents may be amended, modified, supplemented or be the subject of a waiver only by a writing executed by Lender and Borrowers.  No course of dealing on the part of Lender or its officers, employees, consultants or agent's, nor any failure or delay by Lender with respect to exercising any right, power or privilege of Lender under this Agreement or any other Loan Document shall operate as a waiver thereof.  The rights and remedies of Lender under this Agreement and each other Loan Document shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

Section 8.03    <u>Invalidity</u>.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby, and (b) the parties shall engage in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 8.04    <u>Successors and Assigns; Survival</u>.  This Agreement is binding upon, and inures to the benefit of the parties to this Agreement and their respective successors and permitted assigns.  Unless otherwise provided in the Loan Documents, all covenants, agreements, indemnities, representations and warranties made in any of the Loan Documents survive and continue in effect as long as the Commitment is in effect or the Obligation is outstanding.  No Loan Party nor any Person acting on behalf of any of them may assign any of their rights or obligations hereunder or any other Loan Document without the prior written consent of Lender.  Lender may assign any of its rights or obligations under this Agreement and the other Loan Documents at any time and from time to time, without notice to or the consent of any Loan Party or any other Person.

Section 8.05    <u>Participations</u>.  Lender may, at any time and from time to time, and without notice to or the consent of any Loan Party or any other Person, sell to one or more Persons (each a "**_Participant_**") participating interests in the Obligation.  Lender may furnish any information concerning the Loan Parties in its possession or under its control from time to time to assignees and Participants (including prospective assignees and Participants).

Section 8.06    <u>Maximum Rate</u>.  It is the intent of Lender and Borrowers to conform to and contract in strict compliance with applicable usury law from time to time in effect.  All agreements between Lender and Borrowers are hereby limited by the provisions of this **_Section 8.06_** which shall override and control all such agreements, whether now existing or hereafter arising and whether written or oral.  In no way, nor in any event or contingency (including but not limited to prepayment or acceleration of the maturity date of the Obligation), shall the interest taken, reserved, contracted for, charged, or received under this Agreement or otherwise, exceed the maximum non-usurious amount permissible under applicable Law.  If, from any possible construction of any of the Loan Documents or any other document, interest would otherwise be payable in excess of the maximum non-usurious amount, any such construction shall be subject to the provisions of this paragraph and interest owing pursuant to such documents shall be automatically reduced to the maximum non-usurious amount permitted under applicable Law, without the necessity of execution of any amendment or new document.  If Lender shall

27

ever receive anything of value which is characterized as interest on the Obligation under applicable Law and which would, apart from this provision, be in excess of the maximum lawful amount, an amount equal to the amount which would have been excessive interest shall, without penalty, be applied to the reduction of the Term Principal Amount and not to the payment of interest, or refunded to Borrowers or the other payor thereof if and to the extent such amount which would have been excessive exceeds the Term Principal Amount. The right to demand payment of the Obligation does not include the right to receive any interest which has not otherwise accrued on the date of such demand, and Lender does not intend to charge or receive any unearned interest in the event of such demand. All interest paid or agreed to be paid to Lender with respect to the Obligation shall, to the extent permitted by applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term (including any renewal or extension) of the Term Loan so that the amount of interest on account of the Obligation does not exceed the maximum non-usurious amount permitted by applicable Law.

Section 8.07    Multiple Originals.  Each Loan Document may be executed in any number of counterparts with the same effect as if all signatories had signed the same document. All counterparts must be construed together to constitute one and the same instrument. Loan Documents may be transmitted and signed by facsimile, portable document format (PDF), and other electronic means and shall have the same effect as manually-signed originals and shall be binding on the Loan Parties and Lender.

Section 8.08    Governing Law and Jurisdiction.

(a)    This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set out therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the lawS of the State of Texas.

(b)    Jurisdiction.  Each Borrower and each other Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, any Lender or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of Texas sitting in Harris County, and of the United States District Court of the Southern District of Texas, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(c)    Waiver of Venue.  Each Borrower and each other Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in *Section 8.08(b)*. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    <u>Service of Process</u>.    Each Borrower and each other Loan Party irrevocably consents to service of process in the manner provided for notices in **Section 8.01**.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable Law.

(e)    <u>Litigation Priority</u>.    Each Borrower and each other Loan Party irrevocably waives, to the fullest extent permitted by applicable Law, any claim that any action or proceeding commenced by Lender relating in any way to this Agreement should be dismissed or stayed by reason, or pending the resolution, of any action or proceeding commenced by any Borrower or any other Loan Party relating in any way to this Agreement whether or not commenced earlier. To the fullest extent permitted by applicable Law, each Loan Party shall take all measures necessary for any such action or proceeding commenced Lender to proceed to judgment prior to the entry of judgment in any such action or proceeding commenced by any Loan Party.

Section 8.09    <u>No Third-Party Beneficiaries</u>.    This Agreement is for the sole and exclusive benefit of Borrowers and Lender, and there shall be no third-party beneficiaries under this Agreement. This Agreement does not create, and is not intended to create, any rights in favor of or enforceable by any other Person.  This Agreement may be amended or modified without notice to, or the consent of or approval of any other Person.

Section 8.10    <u>Release of Liability</u>.    To the maximum extent permitted by Law from time to time in effect, each Borrower and each other Loan Party hereby knowingly, voluntarily and intentionally (and after it has consulted with its own attorney) irrevocably and unconditionally agrees that no claim may be made by Borrowers or any other Loan Party against Lender or any of Lender's respective Affiliates, participants, partners, shareholders, members, directors, managers, officers, employees, attorneys, accountants, successors and assigns (collectively, the "***Indemnitees***" and each individually, an "***Indemnitee***"), for any special, indirect, consequential or punitive damages in respect of any breach or wrongful conduct (whether the claim is based on contract, tort or statute) arising out of, or related to, the transactions contemplated by this Agreement, any of the other Loan Documents, or any other related documents, or any act, omission, or event occurring in connection herewith or therewith.  In furtherance of the foregoing, each Loan Party hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor, and each Loan Party shall indemnify and hold harmless each Indemnitee of and from any such claims. Without prejudice to the survival of any other obligations of the Loan Parties under this Agreement or any other Loan Documents to which any Loan Party is a party, the obligations of the Loan Parties under this **Section 8.10** shall survive the termination of this Agreement and the other Loan Documents and the payment of the Obligation.

Section 8.11    <u>INDEMNIFICATION</u>.    WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT ARE CONSUMMATED, EACH LOAN PARTY SHALL INDEMNIFY AND HOLD HARMLESS EACH INDEMNITEE FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, DEMANDS, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES AND DISBURSEMENTS (INCLUDING FEES AND EXPENSES OF COUNSEL) OF ANY KIND OR NATURE WHATSOEVER WHICH MAY AT ANY TIME BE IMPOSED ON, INCURRED BY OR ASSERTED AGAINST ANY SUCH INDEMNITEE IN ANY WAY RELATING TO OR ARISING OUT OF OR IN CONNECTION WITH (A) THE EXECUTION, DELIVERY, ENFORCEMENT, PERFORMANCE OR ADMINISTRATION OF ANY LOAN DOCUMENT OR ANY OTHER AGREEMENT, LETTER OR INSTRUMENT DELIVERED IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED THEREBY OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED THEREBY, (B) ANY COMMITMENT, ADVANCE OR THE USE OR PROPOSED USE OF THE PROCEEDS

THEREFROM, OR (C) **ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF ANY HAZARDOUS MATERIAL ON OR FROM ANY PROPERTY CURRENTLY OR FORMERLY OWNED OR OPERATED BY ANY LOAN PARTY, OR ANY LIABILITY IN RESPECT OF ANY ENVIRONMENTAL LAW RELATED IN ANY WAY TO ANY LOAN PARTY, OR** (D) ANY ACTUAL OR PROSPECTIVE LITIGATION, CLAIM, OR INVESTIGATION RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY (INCLUDING ANY INVESTIGATION OF, PREPARATION FOR, OR DEFENSE OF ANY PENDING OR THREATENED CLAIM, INVESTIGATION, LITIGATION OR PROCEEDING) AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO (ALL THE FOREGOING, COLLECTIVELY, THE "*INDEMNIFIED LIABILITIES*"), **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE NEGLIGENCE OF THE INDEMNITEE**; *PROVIDED THAT*, SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, DEMANDS, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES OR DISBURSEMENTS ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NON-APPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE. ALL AMOUNTS DUE UNDER THIS *SECTION 8.11* SHALL BE PAYABLE WITHIN 10 (TEN) BUSINESS DAYS AFTER WRITTEN DEMAND. THE AGREEMENTS IN THIS *SECTION 8.11* SHALL SURVIVE THE TERMINATION OF THE COMMITMENT, THE REPAYMENT, SATISFACTION OR DISCHARGE OF THE OBLIGATION, AND THE TERMINATION OF THE LOAN DOCUMENTS.

Section 8.12    **Waiver of Trial by Jury.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 8.13    Joint and Several Liability; Cross-Guaranty; Borrower Representative.

(a)    Notwithstanding anything herein to the contrary, except (in the case of any Guarantor) as otherwise set forth in the Guaranty executed by any Guarantor, each Person executing this Agreement identified as a "Borrower" or a "Guarantor" hereunder shall be jointly and severally liable to Lender and its successors and assigns for the full and prompt payment and performance of all of the Obligation; *provided that*, the maximum amount of each Borrower's and each Guarantor's joint and several liability hereunder is limited, to the extent, if any, required so that its liability is not subject to avoidance under any Debtor Relief Law. Each Borrower and each Guarantor shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligation.

(b)    Each Borrower and each Guarantor hereby agrees that, except (in the case of any Guarantor) as otherwise set forth in the Guaranty executed by such Guarantor, all of them are

30

jointly and severally liable for, and hereby absolutely and unconditionally guarantee to Lender and its successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of the Obligation. Each Borrower agrees that its guaranty obligations hereunder are continuing guaranties of payment and performance and not of collection, that its obligations under this Agreement and the other Loan Documents shall not be discharged until the Obligation has been indefeasibly paid and performed in full, and that its obligations under this ***Section 8.13*** shall be absolute and unconditional, irrespective of, and unaffected by, (i) the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other Loan Document or any Loan Document, document or instrument to which any Loan Party is or may become a party, (ii) the absence of any action to enforce this Agreement (including this ***Section 8.13***) or any other Loan Document or the waiver or consent by Lender with respect to any of the provisions thereof, (iii) the existence, value or condition of, or failure to perfect its lien against, any security for the Obligation or any action, or the absence of any action, by Lender in respect thereof (including the release of any such security), (iv) the insolvency of any Borrower, and Guarantor, or any other obligor, or (v) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

(c)     Each Borrower hereby designates Big Storm Real Estate as its representative and agent on its behalf for the purposes of giving instructions with respect to the disbursement of the proceeds of the Advances, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents, and taking all other actions on behalf of any Borrower or all of Borrowers under the Loan Documents. Big Storm Real Estate hereby accepts such appointment. Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or Borrowers hereunder to Borrower Representative on behalf of such Borrower or Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

(d)     Each Borrower expressly (i) waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution, and any other claim which such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligation hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property which is Collateral for the Obligation), arising from the existence or performance of this Agreement, and (ii) fully subordinates all other Debt owed to such Borrower by any other Borrower or Guarantor to the complete payment and performance of the Obligation, in each case until the Commitments have been irrevocably terminated and the Obligation has been indefeasibly paid in full.

(e)     Without limiting the foregoing, each Borrower waives any rights and defenses that such Borrower may have (i) arising from any impairment of such Borrower's rights of subrogation, reimbursement, indemnification, contribution, and any other rights and defenses that are or may become available to such Borrower under applicable Law, (ii) by reason of any election of remedies by the creditor, and (iii) because the principal's note or other obligation is secured by real property or an estate for years.

Section 8.14    <u>Loan Agreement Controls</u>.  In the event of a conflict or inconsistency between the terms and provisions of this Agreement and the terms and provisions of any of the other Loan Documents, the terms and provisions of this Agreement shall govern and control.

Section 8.15    <u>Collateral Protection Insurance</u>.  TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION INSURANCE NOTICE:  (a) EACH BORROWER IS REQUIRED TO (i) KEEP THE PROPERTIES INSURED AGAINST DAMAGE IN THE AMOUNT LENDER SPECIFIES; (ii) PURCHASE THE INSURANCE FROM AN INSURER OR AN ELIGIBLE SURPLUS LINES INSURER; AND (iii) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS; (b) BORROWERS MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (c) IF BORROWERS FAIL TO MEET ANY REQUIREMENT LISTED IN CLAUSE (a) OR (b), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWERS AT BORROWERS' EXPENSE.

Section 8.16    **Final Agreement**.  **THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[**Signatures are on the following page.**]*

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed as of the date first above written.

**BORROWERS:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By:    BOSTON HOLDING REAL ESTATE LLC,
          as sole member and manager

By:    BOSTON HOLDING COMPANY LLC,
          as sole member and manager


By:_____
          Leo Joseph Govoni
          Manager


BIG STORM PINELLAS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
          as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
          as sole member and manager


By:_____
          Leo Joseph Govoni
          Manager

**LENDER:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

By:    Briar Capital, L.P.,
        its sole member

By:    Briar Capital General, LLC,
        its general partner


By:_____
        Frank S. Goldberg
        Chief Executive Officer

Signature Page to Loan Agreement

Each of the undersigned hereby acknowledges and agrees to the terms and conditions of this Agreement, and agrees to be bound thereby, in all respects.

**GUARANTORS:**

_____
      Leo Joseph Govoni, individually


BIG STORM BREWERY LLC,
a Florida limited liability company


By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager


       By:_____
            Leo Joseph Govoni
            Manager


BIG STORM PASCO LLC,
a Florida limited liability company


By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager


       By:_____
            Leo Joseph Govoni
            Manager

BIG STORM COFFEE COMPANY LLC,
a Florida limited liability company


By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager


By:_____
       Leo Joseph Govoni
       Manager

**SCHEDULE 1**

**Land**

The property located at or about 12707 49th Street North, Clearwater, Florida 33762, having a Pinellas County Property Appraiser's Parcel Number of 09-30-16-70992-100-1207, described more particularly as follows:

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

The North 160.0 feet of the South 405.0 feet of Lot 12, in the N.E. 1/4 of Section 9, Township 30 South, Range 16 East, as shown by the Plat of PINELLAS GROVES, INC., as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, LESS that portion lying within 50.0 feet of the centerline of 49th Street North as it is now constructed.

AND

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

That part of Lots 12 and 13 in the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas Groves, as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, more particularly described as follows:

The South 260.0 feet of the West 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the West 50.0 feet thereof for 49th Street North Right of Way and less the South 30.0 feet thereof for 126th Avenue North Right of Way.

Together with the West 165.00 feet of the East 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the North 995.81 feet thereof and less the South 30.00 feet thereof for 126th Avenue North Right of Way, and reserving the East 40.00 feet of said West 165.00 feet for street purposes.

Less that portion conveyed to Pinellas County in O.R. Book 7593, Page 1527, Public Records of Pinellas County Florida.

**SCHEDULE 3.09**

**Company Information; Equity Interests**

A.      **Company Information**

| Company Name | Address of Chief Executive Office | Organizational ID No. | Entity Type | Jurisdiction of Formation | U.S. Taxpayer Identification Number |
|---|---|---|---|---|---|
| Big Storm Real Estate LLC | 12707 49th Street N. Suite 500 Clearwater, Florida 33762 | L15000011199 | Limited Liability Company | Florida | 47-2955495 |
| Big Storm Pinellas LLC | 12707 49th Street N. Suite 500 Clearwater, Florida 33762 | L14000180884 | Limited Liability Company | Florida | 47-3226518 |

B.      **Equity Interests**

| Borrower | Owners | Percent Owned |
|---|---|---|
| Big Storm Real Estate LLC | Boston Holding Real Estate LLC | 100% |
| Big Storm Pinellas LLC | Big Storm Brewery LLC | 100% |

**APPENDIX 1**
**OTHER DEFINED TERMS**

As used in this Agreement and the Loan Documents, the following terms shall have the following meanings, unless the context otherwise requires:

*Acceptable Form* means in form and substance acceptable to Lender.

*ACH Agreement* means an agreement in Acceptable Form among Borrower, Lender, and a Depository Bank allowing Lender to automatically debit an amount sufficient to make any payments from time to time required under this Agreement.

*Advance* means any (a) advance of funds by Lender in respect of the Term Loan, or (b) any other amount (including any Protective Advance) disbursed by Lender under the Loan Documents for any reason.

*Affiliate* means, as to any Person, any other Person that directly or indirectly Controls, or is Controlled by, or is under common Control with, that Person. For purposes of this definition, (a) the term "*Affiliate*" when used in respect of any Borrower includes each shareholder, member, partner, officer, director, or manager of such Borrower, and (b) each of the following are "*Affiliates*" of the others: (i) each Guarantor; (ii) each Borrower; (iii) any shareholder, member, partner, officer, director, or manager of any Borrower; (iv) any corporation, partnership or limited liability company whose primary shareholders, partners or members are the spouse, children or other family member of any Individual Guarantor (or any other natural person who directly or indirectly controls Borrower); and (v) any trust whose primary beneficiaries are the spouse, children or other family member of any Individual Guarantor (or any other natural person who directly or indirectly controls Borrower).

*Agreement* means this Loan Agreement and all schedules and exhibits to this Loan Agreement.

*Anti-Terrorism Laws* means any and all present and future judicial decisions, Laws, rulings, permits, certificates, and orders of any Governmental Authority relating to terrorism or money laundering, including, without limiting the generality of the foregoing, the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*Patriot Act*"); the Trading with the Enemy Act (50 U.S.C.A. App. I et. seq.) (the "*Trading with the Enemy Act*"); the International Emergency Economic Powers Act (50 U.S.C.A. § 1701-06); Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"); each list from time to time maintained by OFAC with respect to Sanctioned Entities and Sanctioned Persons.

*Bankruptcy Code* means the Bankruptcy Code in Title 11 of the United States Code, as amended, modified, succeeded or replaced from time to time.

*Big Storm Brewery* means Big Storm Brewery LLC, a Florida limited liability company.

*Big Storm Coffee* means Big Storm Coffee Company LLC, a Florida limited liability company.

*Big Storm Pasco* means Big Storm Pasco LLC, a Florida limited liability company.

*Big Storm Pinellas Lease* means that certain Lease Agreement dated as of February 4, 2015, between Big Storm Real Estate, as landlord, and Big Storm Pinellas, as tenant, pursuant to which Big Storm Pinellas leases the Mortgaged Property from Big Storm Real Estate, as such Lease Agreement may

be amended, extended, renewed, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof.

**Board of Directors** means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person, (b) in the case of any limited liability company, the board of managers, sole member, managing member, or other governing body of such Person, (c) in the case of any partnership, the Board of Directors of the general partner of such Person, and (d) in any other case, the functional equivalent of the foregoing.

**Borrower** means each of, and **Borrowers** means all of, Big Storm Real Estate, Big Storm Pinellas, and each other Person from time to time party hereto as a "Borrower" (including any trustee or other fiduciary hereafter appointed as the legal representative for any or all such Persons or with respect to the property of the estate of any or all such Persons, whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case, and the successor upon conclusion of the Chapter 11 Case of each such Person).

**Borrower Representative** means Big Storm Real Estate.

**Boston Finance Credit Agreement** means that certain Revolving Line of Credit Agreement dated effective as of December 1, 2014, among Big Storm Pinellas, as the debtor thereunder, and Boston Finance, as the lender thereunder, as amended, restated, supplemented, replaced, refinanced, or otherwise modified from time to time in accordance with the terms thereof and hereof.

**Boston Finance** means Boston Finance Group, LLC, a Florida limited liability company.

**Boston Holding** means Boston Holding Company, LLC, a Florida limited liability company.

**Business Day** means any day except for a Saturday, Sunday or a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in US government securities.

**CERCLA** shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986), and as now or hereafter amended.

**Change of Control** means that (a) Leo Joseph Govoni fails to own and control, directly or indirectly, 95% or more, of the Equity Interests of Big Storm Real Estate, (b) Leo Joseph Govoni and Leo John Govoni fail to collectively own and control, directly or indirectly, 90% or more of the Equity Interests of Big Storm Pinellas and each Entity Guarantor having the right to vote for the election of members of such Person's Board of Directors, or (c) a majority of the members of the Board of Directors of any Borrower or any Entity Guarantor were not nominated or approved by Leo Joseph Govoni and Leo John Govoni.

**Closing Date** means the date all conditions precedent to Lender's obligation to make the initial Advances described in **Section 7.01** have been satisfied or waived in writing by Lender.

**Closing Financial Statements** is defined in **Section 3.03**.

**Collateral** means all Property of Borrowers and the Entity Guarantors.

***Commitment*** means Lender's obligation and commitment to make the Term Loan in an amount not to exceed the Maximum Loan Amount.

***Control*** means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controls," "Controlling," and "Controlled" shall have meanings correlative thereto.

***Current Financials*** means, when determined, the consolidated financial statements most recently delivered to Lender under ***Section 4.01***.

***Debt*** means (without duplication), for any Person, all obligations required by GAAP to be classified upon such Person's balance sheet as liabilities.

***Debtor Relief Laws*** means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, fraudulent transfer, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

***Default*** means the occurrence of any event or the existence of any circumstance that would, with the giving of notice or lapse of time, or both, become an Event of Default.

***Depository Bank*** means a commercial bank whose deposits are insured by the FDIC and is otherwise acceptable to Lender.

***Deed of Trust*** means each deed of trust and assignment of leases and rents in Acceptable Form and executed by a Borrower, as grantor, in favor of the trustee named therein, for the benefit of Lender, to secure the Obligation.

***Disposition*** means the sale, assignment, transfer, license, lease (as lessor), exchange, or other disposition of any asset by any Person (including any sale and leaseback transaction), or the granting of any option or other right to do any of the foregoing.

***Distribution*** means (a) any dividend, distribution, or other payment (whether in cash, securities, or other property) in respect of the Equity Interests of a Person, (b) any redemption, purchase, retirement or other acquisition by a Person of any of its Equity Interests, including under any put option or call option, or (c) the establishment of any fund for any such distribution, dividend, payment, redemption, purchase, retirement, or acquisition, including any sinking fund or similar arrangement.

***Dollars*** and ***$*** mean lawful money of the United States of America.

***Effective Date*** means the date of this Agreement.

***Eminent Domain Event*** means any Governmental Authority, or any Person acting under, for, or on behalf of, a Governmental Authority, institutes proceedings to condemn, seize or appropriate all or part of any Mortgaged Property or other Collateral.

***Entity Guarantor*** means (a) Big Storm Brewery, (b) Big Storm Pasco, (c) Big Storm Coffee, and (d) any other Person (other than a natural person) that executes a Guaranty in favor of Lender.

*Environmental Indemnity* means each of, and *Environmental Indemnities* means all of, (a) that certain Environmental Indemnity Agreement dated as of the Closing Date, among Borrowers, as indemnitors, and Lender, and (b) each other Environmental Indemnity Agreement executed by any other Person for the benefit of Lender, in each case, as amended, restated, or supplemented from time to time.

*Environmental Law* shall mean, collectively, CERCLA the Hazardous Materials Transportation Act (49 U.S. C. Section 1802 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.), the Safe Drinking Water Act (42 U.S.C. Section 300f et seq.), the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), the Clean Air Act (42 U.S.C. Section 7401 et seq.), and all other federal, state or local statutes, ordinances, codes, rules, regulations, judgments, orders and decrees regulating, relating to the pollution or protection of the environment, the release of any materials into the environment, or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material as now or at any time hereafter in effect, each as now or hereafter amended, and all permits, licenses, authorizations, concessions, grants, franchises, agreements or other governmental restrictions or requirements relating to the protection of the environment or to any Hazardous Substance.

*Equity Interests* means, as to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

*ERISA* means the Employee Retirement Income Security Act of 1974.

*ERISA Plan* means any plan subject to Title IV of ERISA and maintained by a Borrower or any affiliate thereof, or any such plan to which a Borrower is required to contribute on behalf of its employees.

*Escrow Fund* shall mean the amounts of money necessary to fund the Property Taxes and insurance premiums, in each case as set forth in *Section 2.11* hereof.

*Event of Default* is defined in *Section 6.01*.

*Exchange Act* means the Securities Exchange Act of 1934, as in effect from time to time.

*FDIC* means the Federal Deposit Insurance Corporation or any successor thereto.

*First Amendment* means the First Amendment to Loan Agreement dated as of March 22, 2023, among Borrowers, the Guarantors, and Lender.

*Flood Insurance Regulations* means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, et seq.), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto, and in each case, any regulations promulgated thereunder.

*GAAP* means generally accepted accounting principles in the U.S. set out in the opinions and pronouncements of the of the Accounting Principles Board of the American Institute of Certified Public Accountants and the Financial Accounting Standards Board as in effect from time to time.

*Governmental Authority* means any nation, state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

*Guarantor* means each of, and "*Guarantors*" means all of, (a) each Entity Guarantor, and (b) each Individual Guarantor.

*Guaranty* means a guaranty agreement in Acceptable Form.

*Hazardous Substance* shall mean: (a) any "hazardous substance" as such term is presently defined in CERCLA; (b) any additional substances or materials which are hereafter incorporated in or added to the definition of "hazardous substance" for the purposes of CERCLA; (c) any element, substance, compound or mixture, including disease-causing agents, now or hereafter designated as, or containing components designated as, hazardous, dangerous, toxic, harmful, and/or subject to regulation by any Environmental Law, including asbestos in any form and any substance containing asbestos, mold, urea formaldehyde foam insulation, transformers or other equipment which contains dielectric fluid or polychlorinated biphenyls, flammable explosives, lead, radioactive materials, chemicals known to cause cancer or reproductive toxicity, pollutants, effluents, contaminants, emissions or related materials and any waste, substance or material now or hereafter regulated by any Environmental Law; (d) any radioactive material, including any source, special nuclear or by-product material as defined at 42 U.S.C. Section 2014, as now or hereafter amended; (e) any lead-based paint; and (f) mold, fungus, micro bacterial contamination or pathogenic organisms.

*Improvements* means, collectively, all buildings, structures, fixtures, and other improvements constructed or situated on, or attached or otherwise affixed to, all or any portion of the Land, in each case whether now existing or hereafter created or constructed.

*Individual Guarantor* means each of, and "*Individual Guarantors*" means all of (a) Leo Joseph Govoni, an individual, and (b) any other natural person that executes a Guaranty in favor of Lender.

*Key Management Person* means Leo Joseph Govoni and Leo John Govoni.

*Land* means the parcels of real property and all related rights and interests owned by Borrowers and described on *Schedule 1*.

*Laws* means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority (whether or not such orders, requests, licenses, authorizations, permits or agreements have the force of law).  The term "*Law*" shall have a correlative meaning.

*Lease* or *Leases* shall mean the Big Storm Pinellas Lease any of the other leases now in existence between any Borrower and any other party as lessee or tenant, and all agreements for use and occupancy of all or any part of the Mortgaged Property, now existing or hereafter entered into, including (a) the

entire landlord's or lessor's interest in all present and future leases (including subleases), licenses and concessions (including rights in respect of lessees or tenants holding over and tenancies following attornment) covering all or any portion of the Mortgaged Property, (b) all agreements for the use or occupancy of any portion of the Mortgaged Property, (c) any and all guaranties of the performance of any lessee, tenant, or other party under any lease, license or concession, (d) all cash or securities deposited with such Borrower to secure performance of any lessee's or tenant's obligations under such lease, and (e) any and all extensions, modifications, renewals or supplements to any such lease, license or concession (including any guaranty or other item included in this definition of "Leases").

**Lender** is defined in the preamble to this Agreement.

**Lien** means any lien (including statutory liens), mortgage, security interest, financing statement, collateral assignment, pledge, negative pledge assignment, charge, encumbrance, hypothecation, deposit arrangement, purchase option, right of first refusal, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever, or encumbrance of any kind, and any other right of or arrangement with any creditor (whether based on common law, constitutional provision, statute or contract) to have its claim satisfied out of any Property or assets, or their proceeds, before the claims of the general creditors of the owner of such Property or assets.

**Loan Documents** means this Agreement, the Term Note, all Guaranties, all Deeds of Trust and Mortgages, all Environmental Indemnities, all SNDAs, all Subordination Agreements, all security agreements, pledge agreements, and other documents and instruments from time to time executed to create or perfect a lien on any Collateral, all other documents, instruments, certificates and requests from time to time executed with any of the foregoing, and all annexes, appendices, exhibits and schedules to any of the foregoing, in each case as amended, restated, supplemented, or otherwise modified from time to time.

**Loan Party** means each of, and **Loan Parties** means all of, Borrowers and Guarantors.

**Material Adverse Event** means any circumstance or event that, individually or collectively with other circumstances or events, could reasonably be expected to result in the impairment of any Loan Party's ability to perform any material obligations, or enforce any rights under, any Loan Document, a material adverse effect upon the enforceability of any Loan Document, or a material and adverse change in, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise), or prospects of any Loan Party as represented in the Closing Financial Statements.

**Maximum Loan Amount** means $3,250,000 as such amount may be adjusted from time to time by Lender in its sole discretion based on any appraisal of the Mortgaged Property (or any portion thereof) obtained by Lender pursuant to this Agreement.

**Maximum Rate** means the maximum rate of non-usurious interest permitted from day-to-day by applicable Law, including Chapter 303 of the Texas Finance Code (the "**Finance Code**") (and as the same may be incorporated by reference in other Texas statutes).  To the extent that Chapter 303 of the Finance Code is relevant to Lender for the purposes of determining the Maximum Rate, Lender may elect to determine such applicable legal rate pursuant to the "weekly ceiling," from time to time in effect, as referred to and defined in Chapter 303 of the Finance Code; subject, however, to the limitations on such applicable ceiling referred to and defined in the Finance Code, and further subject to any right Lender may have subsequently, under applicable Law, to change the method of determining the Maximum Rate.

**Mortgage** means each mortgage and assignment of leases and rents in Acceptable Form and executed by a Borrower, as mortgagor, for the benefit of Lender, to secure the Obligation.

***Mortgaged Property*** means each of, and ***Mortgaged Properties*** means all of, the Land, Improvements, and other assets constituting "Mortgaged Property" under, and as defined in, each Deed of Trust and Mortgage.

***Net Proceeds*** means (a) with respect to any Disposition of any asset by any Person, the aggregate amount of cash and non-cash proceeds from such Disposition received by, or paid to or for the account of, such Person, net of customary and reasonable out-of-pocket costs, fees, and expenses, (b) with respect to any amount payable under any insurance policy, all cash proceeds received by, or paid to or for the account of, any Loan Party or Lender from an insurer under any insurance policy maintained by any such Loan Party, and (c) with respect to any Eminent Domain Event, all cash proceeds received by, or paid to or for the account of, any Loan Party from any Governmental Authority net of attorney's fees and other customary and reasonable out of pocket costs, fees, and expenses.  Non-cash proceeds include any cash proceeds received by way of deferred payment of principal pursuant to a note, installment receivable, purchase price adjustment receivable, or otherwise, but only as and when received.

***Obligation*** means all present and future Debt, liabilities and other obligations, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, and all renewals, increases and extensions thereof, or any part thereof, now or in the future owed to Lender by any Loan Party under any Loan Document, *together with* all interest accruing thereon, reasonable fees, costs and expenses payable under the Loan Documents or in connection with the enforcement of rights under the Loan Documents, including (a) fees and expenses payable or reimbursable under ***Section 4.05***, and (b) interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

***OFAC*** means the Office of Foreign Assets Control of the U.S. Department of the Treasury, and any successor office, agency, or department.

***Organizational Documents*** means, for any Person, (a) the articles of incorporation or certificate of formation and bylaws of such Person if such Person is a corporation, (b) the articles of organization or certificate of formation and regulations or limited liability company agreement (or other similar governing document) of such Person if such Person is a limited liability company, (c) the certificate of limited partnership or certificate of formation and the limited partnership agreement of such Person if such Person is a limited partnership, or (d) the documents under which such Person was created and is governed if such person is not a corporation, limited liability company or limited partnership.

***Other Charges*** shall mean all ground rents, maintenance charges, governmental impositions, appraisal fees, fees in respect of environmental assessments, and other similar charges in respect of or otherwise affecting any Mortgaged Property or other Collateral, and any other fees, charges, or expenses incurred by Lender in connection with this Agreement or otherwise assessed against or in connection with the Mortgaged Property.

***Overadvance*** means any Advance (or any portion thereof) that, when made, would cause the Term Principal Amount to exceed the Maximum Loan Amount.

***Permitted Debt*** means the Debt permitted under ***Section 5.01***.

***Permitted Liens*** is defined in ***Section 5.02***.

**Person** means any individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, Governmental Authority or other entity or organization of whatever nature.

**Prime Rate** means the rate of interest per annum quoted in the "Money Rates" section of *The Wall Street Journal* (or, if such source is not available, such alternate source as determined or selected by the Lender) on the first Business Day of each month and designated as the "Prime Rate" for the U.S. If such prime rate, as so quoted, is split between two or more different interest rates, then the Prime Rate shall be the highest of such interest rates; *provided that*, if at any time the Prime Rate is less than 3.25%, the Prime Rate shall be deemed to be 3.25% for purposes of this Agreement. If such prime rate shall cease to be published or is published infrequently or sporadically, then the Prime Rate shall be (a) the rate of interest per annum designated from time to time by Lender as its base or prime rate, which may not necessarily be the lowest interest rate charged by Lender and is set by Lender in its sole discretion, or (b) if Lender does not designate or announce a base or prime rate, or does so infrequently or sporadically, then the Prime Rate shall be determined by reference to another base rate, prime rate or similar lending rate index selected by Lender in its sole and absolute discretion.

**Prohibited Person** means any Person that (a) is a Sanctioned Entity or a Sanctioned Person, (b) is specifically named or listed in, or otherwise prohibited from engaging in transactions with Lender due to, any Anti-Terrorism Laws, (c) is owned or controlled by, or acting for or on behalf of, any Person specifically named or listed in, or otherwise prohibited from engaging in transactions with Lender due to, any Anti-Terrorism Laws, (d) Lender is prohibited from dealing with, or engaging in any transaction with, pursuant to any Anti-Terrorism Laws, or (e) is affiliated with any Person described in *clauses (a)-(d)* of this definition.

**Property** means any interest in any kind of asset, whether real, personal or mixed, or tangible or intangible. The term "**Properties**" shall have a correlative meaning.

**Property Taxes** shall mean ad valorem taxes, assessments, water rates, and sewer rents, now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof.

**Protective Advance** is defined in ***Section 2.02(b)***.

**Related Parties** means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

**Responsible Officer** means, for any Person, its chief executive officer, president, any vice president, or treasurer.

**Restricted Payment** means (a) any Distribution, (b) any amount paid by any Borrower or any of its Subsidiaries in repayment, redemption, retirement, repurchase, direct or indirect, of any Subordinated Debt, (c) any payment by any Borrower or any of its Subsidiaries of any management fees, consulting fees or other similar fees to any of its Affiliates, whether pursuant to a management agreement or otherwise, or (d) any voluntary or mandatory repayment, prepayment, defeasance, or other payment in respect of any Subordinated Debt.

**RICO** means the Racketeer Influence and Corrupt Organization Act of 1970, as amended.

**Sanctioned Entity** means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its

government, or (d) a Person resident in a country, in each case, that is subject to a country sanctions program administered and enforced by OFAC.

***Sanctioned Person*** means a Person named on the Specially Designated Nationals and Blocked Persons List maintained by OFAC or in Section 1 of the Anti-Terrorism Order, as amended.

***Seaboard Craft Beer*** means Seaboard Craft Beer Holdings LLC, a Florida limited liability company.

***Second Advance*** is defined in ***Section 2.01(c)***.

***Second Amendment*** means the First Amendment to Loan Agreement dated as of the Second Amendment Effective Date, among Borrowers, the Guarantors, and Lender.

***Second Amendment Effective Date*** means June 22, 2023.

***Segregated Account*** means a deposit account established by Big Storm Real Estate and maintained at American Momentum Bank, which shall be subject to a deposit account control agreement in favor of Lender and in Proper Form, and into which the proceeds of the Term Loan (after deducting all closing fees and expenses and the amounts necessary to fund the Escrow Fund) will be deposited and held until used for purposes permitted under this Agreement.

***SNDA*** means a Subordination, Non-Disturbance and Attornment Agreement in Acceptable Form, among one or more lessees or tenants of any Mortgaged Property, the applicable Loan Party, and Lender.

***SOFR*** means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

***SOFR Administrator*** means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

***Solvent*** means, with respect to any Person as of a particular date, that on such date (a) such Person is able to pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (b) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature in their ordinary course, (c) such Person is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Person's assets would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which such Person is engaged or is to engage and (d) the book value of the assets of such Person as set out on such Person's balance sheet is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person.  In computing the amount of contingent liabilities at any time, it is intended that such liabilities will be computed as the amount which, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

***Subordinated Debt*** means Debt which is contractually subordinated in right of payment, collection, enforcement and lien rights to the prior payment in full of the Obligation on terms satisfactory to Lender.

***Subordination Agreement*** means a subordination agreement in Proper Form.

*Subsidiary* of a Person means another Person of which a majority of the voting Equity Interests are at the time beneficially owned or Controlled by, or the management of which is otherwise Controlled, in each case directly or indirectly through one or more intermediaries, or both, by such Person.

*Tangible Net Worth* means, when determined for Big Storm Brewery and its Subsidiaries on a consolidated basis and without duplication, (a) the aggregate amount at which all assets of Big Storm Brewery and its Subsidiaries would be shown on a balance sheet at such date, *minus* (b) Total Liabilities of Big Storm Brewery and its Subsidiaries, after deducting (i) patents, copyrights, trademarks, trade names, franchises, goodwill, experimental expenses and other similar intangibles net of accumulated amortization; (ii) unamortized debt discount and expense; (iii) assets located, and notes and accounts receivable due from obligors domiciled, outside the U.S.; (iv) obligations due to Big Storm Brewery and its Subsidiaries from their respective Affiliates to the extent such obligations exceed the liabilities of Big Storm Brewery and its Subsidiaries to such Affiliates as of such date, calculated in accordance with GAAP and shown on the Closing Financial Statements or the Current Financials, (v) capitalized research and development costs, and (vi) such other assets as are properly classified as "intangible assets," *plus* (c) Subordinated Debt of Big Storm Brewery and its Subsidiaries.

*Tax Distribution* means, for any period or portion thereof in which Borrowers are pass-through entities (including a disregarded entity or partnership) for U.S. federal income tax purposes, cash Distributions made by Borrowers to the respective holders of their Equity Interests on or prior to each estimated payment date in an aggregate amount not greater than the amount estimated to be necessary for such members to pay their estimated state and U.S. federal income tax liabilities (calculated at the highest marginal rate applicable to any such holder of Equity Interests) in respect of income earned by Borrowers during the applicable period, taking into account (a) any taxable losses of Borrowers allocated to such members in prior periods but not previously utilized as an offset against income or gains, (b) the deductibility of U.S. state taxes, and (c) the character of any income, gains, deductions, losses or credits.

*Term Loan* is defined *Section 2.01*.

*Term Loan Maturity Date* means the *earlier* of (a) June 22, 2026, (b) the acceleration of the Obligation in accordance with *Section 6.02*.

*Term Note* means a promissory note substantially in the form of *Exhibit A*, executed by Borrowers and made payable to the order of Lender.

*Term Principal Amount* means, when determined, the aggregate outstanding principal amount of the Term Loan.

*Term SOFR* means the Term SOFR Reference Rate for a tenor of one (1) month on the first Business Day of each month (such day, the "*Periodic Term SOFR Determination Day*"), as such rate is published by the Term SOFR Administrator; *provided that*, if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day, the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator, then Term SOFR will be the Term SOFR Reference Rate for one (1) month as published by the Term SOFR Administrator on the first Business Day of such month for which such Term SOFR Reference Rate for one (1) month was published by the Term SOFR Administrator. Notwithstanding anything in this definition to the contrary, if "*Term SOFR*" shall be less than 0.25%, then such rate shall be deemed to be 0.25% for purposes of this Agreement. If Term SOFR or the Term SOFR Reference Rate shall cease to be published or is published infrequently or sporadically, or does not reflect Lender's cost of capital, then (i) Lender may substitute another index or benchmark acceptable to Lender to replace Term SOFR and the Term SOFR Reference Rate, as applicable, which index or benchmark shall be selected by Lender in its sole and absolute discretion, with

such floors, spread adjustments, and other adjustments as may be selected by Lender in its sole discretion, and Lender may make such amendments to the Loan Documents (including adjustments to the interest rates provided for herein) as Lender may determine to be necessary in connection therewith, and (ii) if Lender is unable to substitute another index or benchmark (whether as a result of any automatic stay or proceeding commenced under any Debtor Relief Laws, as a result of any judicial order, or otherwise), then the interest rate applicable under *Section 2.03(a)* shall be determined based solely on the Prime Rate.

*Term SOFR Administrator* means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Agent in its reasonable discretion).

*Term SOFR Reference Rate* means the forward-looking term rate based on SOFR.

*U.S.* means United States of America.

*UCC* means (a) the Uniform Commercial Code in effect in Texas from time to time, or (b) if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of Lender's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Texas, the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions of this Agreement relating to such perfection or effect of perfection or non-perfection.

**EXHIBIT A**

**FORM OF AMENDED AND RESTATED TERM NOTE**

| $3,250,000.00 | Houston, Texas | As of _____, 2023 |
|---|---|---|

FOR VALUE RECEIVED, BIG STORM REAL ESTATE LLC, a Florida limited liability company ("***Big Storm Real Estate***"), BIG STORM PINELLAS LLC, a Florida limited liability company ("***Big Storm Pinellas***"), and each other Person from time to time party hereto as a "Borrower" (together with Big Storm Real Estate and Big Storm Pinellas, collectively, "***Borrowers***," and each individually, a "***Borrower***"), hereby promise to pay to the order of BRIAR CAPITAL REAL ESTATE FUND, LLC, a Texas limited liability company ("***Lender***") on or before the Term Loan Maturity Date, the principal amount of $3,250,000.00, or so much thereof as may be disbursed and outstanding under this note, together with interest, as described in this note.

This note has been executed and delivered under, and is subject to the terms of, that certain Loan Agreement dated as of the date hereof (as amended by the First Amendment to Loan Agreement dated as of March 22, 2023, the Second Amendment to Loan Agreement dated as of June 22, 2023, and as further amended, restated, supplemented, or otherwise modified from time to time, the "***Loan Agreement***"), between Borrower and the other parties from time to time parties thereto as "Borrowers", the Guarantors from time to time party thereto, and Lender, and is the *Term Note* referred to in the Loan Agreement. Unless defined in this note, or the context requires otherwise, capitalized terms used in this note have the meanings given to such terms in the Loan Agreement.  Reference is made to the Loan Agreement for provisions affecting this note regarding applicable interest rates, principal and interest payment dates, final maturity, voluntary and mandatory prepayments, acceleration of maturity, exercise of rights, payment of attorneys' fees, court costs and other costs of collection, certain waivers by Borrower and others now or hereafter obligated for payment of any sums due under this note, and security for the payment of this note.  This note is a Loan Document and, therefore, is subject to the applicable provisions of ***Article VIII*** of the Loan Agreement, all of which applicable provisions are incorporated into this note by reference as if set forth in this note verbatim.

Specific reference is made to ***Section 8.06*** of the Loan Agreement for usury savings provisions.

**THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE DETERMINED SOLELY FROM WRITTEN AGREEMENTS, DOCUMENTS, AND INSTRUMENTS, AND ANY PRIOR ORAL AGREEMENTS BETWEEN THE PARTIES ARE SUPERSEDED BY AND MERGED INTO SUCH WRITINGS.  THIS NOTE, THE LOAN AGREEMENT, AND THE OTHER WRITTEN LOAN DOCUMENTS EXECUTED BY BORROWERS AND LENDER (OR BY ANY BORROWER FOR THE BENEFIT OF LENDER) REPRESENT THE FINAL AGREEMENT BETWEEN BORROWERS AND LENDER WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

This note amends and restates in its entirety and is issued in replacement of, but does not constitute a novation or an accord and satisfaction of, that certain Term Note dated September 18, 2020, executed by Borrowers and made payable to the order of Lender in the original principal amount of $2,500,000.00.

THIS NOTE MUST BE CONSTRUED — AND ITS PERFORMANCE ENFORCED — UNDER TEXAS LAW.

***[Signature is on the following page.]***

Exhibit A

EXECUTED as of the date first written above.

**BORROWERS:**

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By:    BOSTON HOLDING REAL ESTATE LLC,
       as sole member and manager

By:    BOSTON HOLDING COMPANY LLC,
       as sole member and manager


By:_____
       Leo Joseph Govoni
       Manager


BIG STORM PINELLAS LLC,
a Florida limited liability company

By:    BIG STORM BREWERY LLC,
       as sole member and manager

By:    SEABOARD CRAFT BEER HOLDINGS LLC,
       as sole member and manager


By:_____
       Leo Joseph Govoni
       Manager


Signature Page to Amended and Restated Term Note

# EXHIBIT O

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Attn: Jason T. Lloyd

THIS SPACE ABOVE FOR RECORDER'S USE

## NOTICE OF FUTURE ADVANCE AND RECEIPT AND FIRST AMENDMENT TO MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

NOTE TO RECORDER:

DOCUMENTARY STAMP TAX AND NON-RECURRING INTANGIBLE TAX ARE DUE ON THE FUTURE ADVANCE (AS DEFINED IN THIS AMENDMENT), IN THE AMOUNT OF $838,672.55, ADVANCED BY THE MORTGAGEE AS OF THE DATE HEREOF. THE FUTURE ADVANCE IS SECURED BY THE MORTGAGE (AS HEREINAFTER DEFINED), AS AMENDED AND MODIFIED BY THIS AMENDMENT AND DOCUMENTARY STAMP TAX IN THE AMOUNT OF $2,935.45 AND NON-RECURRING INTANGIBLE TAX IN THE AMOUNT OF $ 1,677.35 ARE DUE ON THE FUTURE ADVANCE AND HAVE BEEN PAID UPON THE RECORDING OF THIS AMENDMENT IN THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.

DOCUMENTARY STAMP TAX AND NON-RECURRING INTANGIBLE TAX ON THE ORIGINAL DEBT IN THE AMOUNT OF $2,500,000.00, WERE TIMELY PAID ON THE RECORDATION OF THAT CERTAIN MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING DATED SEPTEMBER 18, 2020, AND RECORDED SEPTEMBER 21, 2020, AS INSTRUMENT NUMBER 2020280245, IN OFFICIAL RECORDS BOOK 21172, PAGE 1637 IN THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA (THE "*MORTGAGE*"), WHICH MORTGAGE IS BEING AMENDED AND MODIFIED HEREBY.

14035398v7

**NOTICE OF FUTURE ADVANCE AND RECEIPT AND FIRST AMENDMENT TO
MORTGAGE, ASSIGNMENT RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

THIS NOTICE OF FUTURE ADVANCE AND RECEIPT AND FIRST AMENDMENT TO
MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this
"*Amendment*"), dated as of June 22, 2023, is executed by BIG STORM REAL ESTATE LLC, a Florida
limited liability company, as mortgagor ("*Mortgagor*"), to Briar Capital Real Estate Fund, LLC, a Texas
limited liability company, as mortgagee (together with its successors and assigns, "*Mortgagee*").
Capitalized terms used by not defined in this Amendment shall have the meaning given to them in the
Mortgage or in the Loan Agreement, as applicable.

**RECITALS**

A.      Mortgagor, as borrower, and Mortgagee, as lender, have previously entered into that
certain Loan Agreement dated as of September 18, 2020 (as amended by the First Amendment to Loan
Agreement dated as of March 22, 2023, and as amended, restated, supplemented, or otherwise modified
from time to time, the "*Loan Agreement*").

B.      The obligations under the Loan Agreement are secured by, among other things, that
certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of September 18,
2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "*Mortgage*"),
executed by Mortgagor to Mortgagee, and recorded September 21, 2020, as Instrument Number
2020280245, in Official Records Book 21172, Page 1637 in the Public Records of Pinellas County,
Florida.

C.      Mortgagor and Mortgagee have entered into that certain Second Amendment to Loan
Agreement dated as of the date hereof (the "*Second Amendment to Loan Agreement*"), pursuant to
which Mortgagor and Mortgagee have agreed, among other things, upon the terms and conditions upon
which Mortgagee may make an additional Advance in the aggregate amount of up to $838,672.55 (the
"*Future Advance*") to Mortgagor and increase the Maximum Loan Amount (as defined in the Loan
Agreement) to $3,250,000.

D.      As a condition to making the Future Advance to Mortgagor, Mortgagee requires that
Mortgagor execute and deliver this Amendment to Mortgagee in order to amend the Mortgage to further
secure the Future Advance on the terms and subject to the conditions set forth herein.

In consideration of the mutual promises contained herein, and other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, Mortgagor and Mortgagee
agree to amend the Mortgage as follows:

1.      Amendments to Mortgage; Future Advance

(a)      *Section 2.1(a)(i)* of the Mortgage is hereby amended and restated in its entirety
as follows:

"(i)      A certain Amended and Restated Term Note dated as of June 22, 2023
(as further amended, restated, extended, renewed, replaced, supplemented, or otherwise
modified from time to time, the "*Note*"), payable by Obligor as maker in the stated
principal amount of Three Million Two Hundred Fifty Thousand and 00/100 Dollars

2

($3,250,000.00) to the order of Mortgagee, the terms of which are incorporated herein by reference."

(b)      *Section 2.1(a)(ii)* of the Mortgage is hereby amended and restated in its entirety as follows:

"(ii)     A certain Loan Agreement dated as of September 18, 2020 (as amended by that certain First Amendment to Loan Agreement dated as of March 22, 2023, and as further amended, restated, supplemented, or otherwise modified from time to time, the "*Loan Agreement*"), between Obligor and Mortgagee, which provides for a Term Loan in a principal amount of up to Three Million Two Hundred and Fifty Thousand and 00/100 Dollars ($3,250,000.00), and certain Protective Advances and Overadvances, the terms of which are incorporated herein by reference."

(c)      *Section 2.1(a)(iii)* of the Mortgage is hereby amended and to delete any references to: "Big Storm Cape Coral LLC a Florida limited liability company", "Big Storm Cider and Mead LLC, a Florida limited liability company", and "Big Storm Cocktails LLC, a Florida limited liability company".

(d)      This Amendment, the Note, and the Loan Agreement evidence the extension of the Future Advance by Mortgagee to Mortgagor.

2.      Scope of Amendment.   Except as specifically amended by this Amendment, the Mortgage is unchanged and continues in full force and effect.  Mortgagor hereby ratifies and confirms the terms of the Mortgage (as the same are affected by this Amendment), reaffirms its obligations under the Mortgage, and agrees that the Mortgage remains in full force and effect and continues to be a legal, valid, and binding obligation enforceable in accordance with its terms (as the same are affected by this Amendment).

3.      Lien Continuation.   The liens granted in the Mortgage are hereby ratified and confirmed as continuing to secure the payment of the indebtedness described therein, including but not limited to, the Secured Obligations.   Nothing herein shall in any manner diminish, impair or extinguish the indebtedness under the Loan Agreement or the liens securing such Secured Obligations.   Neither this Amendment, the Second Amendment to Loan Agreement, nor any other Loan Document or other document or instrument executed in connection herewith or therewith, shall constitute or be deemed to constitute a novation, discharge, or an accord and satisfaction of, any of the Secured Obligations or other obligations outstanding under the Loan Documents, or any Lien or security interest securing all or any portion of such Secured Obligations or other obligations, all of which are hereby ratified by Mortgagor and remain in full force and effect.

4.      GOVERNING LAW.   THIS AMENDMENT AND THE MORTGAGE MUST BE CONSTRUED, AND ITS PERFORMANCE ENFORCED, UNDER THE LAWS OF THE STATE OF FLORIDA.

5.      Severability of Provisions.   Any provision of this Amendment which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

6.      Execution in Counterparts.   This Amendment may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which counterpart, when so

3

executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Amendment.

7. <u>Successors and Assigns</u>. This Amendment binds Mortgagor and its successors and assigns, and inures to the benefit of Lender and its successors and assigns.

8. <u>Miscellaneous</u>. This Amendment constitutes a Loan Document (as defined in the Loan Agreement). The provisions of **Section 7** of the Mortgage are hereby incorporated herein by reference, mutatis mutandis, as if set forth herein at length.

9. <u>Entire Agreement</u>. THE MORTGAGE (AS AMENDED BY THIS AMENDMENT), THE LOAN AGREEMENT, AND THE OTHER LOAN DOCUMENTS (AS DEFINED IN THE LOAN AGREEMENT) REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

*[Signatures and acknowledgments appear on following pages.]*

IN WITNESS WHEREOF, this Notice of Future Advance and Receipt and First Amendment to Mortgage, Assignment of Rents, Security Agreement and Fixture Filing is executed as of the dates set forth in the notary acknowledgements below but is to be effective for all purposes as of the date set forth in the preamble to this Amendment.

**MORTGAGOR:**

Witness:

BIG STORM REAL ESTATE LLC,
a Florida limited liability company

By:    BOSTON HOLDING REAL ESTATE LLC,
        as sole member and manager

By:    BOSTON HOLDING COMPANY LLC,
        as sole member and manager

By: _____
      Leo Joseph Govoni
      Manager

Printed Name: _____ KIM ELLIS

Printed Name: _____ Brett Walrath

STATE OF FLORIDA      §
                      §
COUNTY OF PINELLAS  §

The foregoing instrument was executed, acknowledged and delivered before me by means of (check one) ☑ physical presence or ☐ online notarization, this 21 day of June , 2023, by Leo Joseph Govoni, the Manager of BOSTON HOLDING COMPANY LLC, a Florida limited liability company, as the sole member and manager of BOSTON HOLDING REAL ESTATE LLC, a Florida limited liability company, as the sole member and manager of BIG STORM REAL ESTATE LLC, a Florida limited liability company, for and on behalf of each such limited liability company. He is personally known to me or has produced _____ Known to me _____ as identification.

MICHELE M. PARKS
MY COMMISSION # HH 203434
EXPIRES: February 4, 2026
Bonded Thru Notary Public Underwriters

_____
Notary Public, State and County Aforesaid

Print Name: _____ Michele M Parks
My commission expires: _____ 2/4/26
My commission number: _____ HH 203434

(NOTARIAL SEAL)

Signature and Acknowledgement Page to Notice of Future Advance and Receipt and
First Amendment to Mortgage, Assignment of Rents, Security Agreement and Fixture Filing

**BENEFICIARY:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

By:     Briar Capital, L.P.,
        its sole member

By:     Briar Capital General, LLC,
        its general partner

By: _____
        Frank S. Goldberg
        Chief Executive Officer

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

    This instrument was acknowledged before me on June 21ˢᵗ, 2023, by Frank S. Goldberg, Chief Executive Officer of Briar Capital General, LLC, a Texas limited liability company, general partner of Briar Capital, L.P., a Texas limited partnership, sole member of Briar Capital Real Estate Fund, LLC, a Texas limited liability company, for and on behalf of said company, and for the purpose and consideration herein stated.

_____
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

RECORD AND RETURN TO:

Porter Hedges LLP
1000 Main, 36ᵗʰ Floor
Houston, Texas 77002
Attn: Jason T. Lloyd



Kristin Yowell
ID 1111763-1
My Commission Expires
November 27, 2023

# EXHIBIT P

## OFFICER'S CERTIFICATE

## BIG STORM REAL ESTATE LLC

September 18, 2020


The undersigned certifies to Briar Capital Real Estate Fund, LLC, a Texas limited liablity company ("***Lender***"), that the undersigned is the duly elected and presently incumbent manager of **Big Storm Real Estate LLC**, a Florida limited liability company (the "***Company***"), and further certifies as follows:

1. <u>Articles of Organization</u>. Articles of Organization, together with all amendments, attached hereto as ***Exhibit A***, is a true, correct, and complete copy of the Company's Articles of Organization as it may have been amended, and such document is in full force and effect as of the date hereof.

2. <u>Operating Agreement.</u> The Operating Agreement of Big Storm Real Estate LLC, together with all amendments, attached hereto as ***Exhibit B***, is a true, correct, and complete copy of the Company's Operating Agreement as it may have been amended, and such document is in full force and effect as of the date hereof.

3. <u>Recitals and Resolutions</u>. The copy attached hereto as ***Exhibit C*** is an authentic copy of recitals and resolutions that have been duly adopted by the Company's Governing Body (as defined therein) by written consent. Such recitals and resolutions have not been amended or repealed and are in full force and effect.


[***Remainder of page intentionally left blank; signatures are on the following page.***]

4.    <u>Incumbency</u>.  The following individuals are duly elected, qualified, and acting officers of the Company in the offices set out beside their names and have been duly authorized to execute any and all Loan Agreements, promissory notes, security documents, and all other documents and instruments now or at any time hereafter to be executed and delivered to Lender or any of its affiliates.  The signatures beside their names are their true signatures.

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| Leo Joseph Govoni | Manager | |
| Jonathan Golden | Vice President | |

EXECUTED as of date first written above.

Big Storm Real Estate LLC, a Florida limited liability company

By: Boston Holding Real Estate LLC, a Florida limited liability company, and the Sole Member and Manager

By: Boston Holding Company LLC, a Florida limited liability company, and the Sole Member and Manager

By:    Leo Joseph Govoni
Title:    Manager

## CERTIFICATION

I, Jonathan Golden, the duly elected and presently incumbent Vice President of the Company, do hereby certify that Leo J. Govoni is the duly elected and presently incumbent Manager of the Company, and the signature set forth above is his genuine signature.

Jonathan Golden

Signature Page to Officer's Certificate

**EXHIBIT A**

**Articles of Organization**


[See attached]

# Electronic Articles of Organization For
# Florida Limited Liability Company

L15000011199
FILED 8:00 AM
January 20, 2015
Sec. Of State
tbrown

## Article I

The name of the Limited Liability Company is:

BIG STORM REAL ESTATE LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

4912 CREEKSIDE DRIVE
CLEARWATER, FL.  33760

The mailing address of the Limited Liability Company is:

4912 CREEKSIDE DRIVE
CLEARWATER, FL.  33760

## Article III

The name and Florida street address of the registered agent is:

JONATHAN  GOLDEN
4912 CREEKSIDE DRIVE
CLEARWATER, FL.  33760

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   JONATHAN GOLDEN

# Article IV

The name and address of person(s) authorized to manage LLC:

L15000011199
FILED 8:00 AM
January 20, 2015
Sec. Of State
tbrown

   Title:  MGRM
   LEO J GOVONI
   4912 CREEKSIDE DRIVE
   CLEARWATER, FL.  33760

Signature of member or an authorized representative

Electronic Signature: LEO J. GOVONI

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

**EXHIBIT B**

**Operating Agreement**

[See attached]

# OPERATING AGREEMENT
## OF
## BIG STORM REAL ESTATE LLC
*A Florida Limited Liability Company*

This operating agreement (this "Agreement") is entered into by the undersigned (the "Member"), effective as of January 20, 2015.

## RECITAL

The Member has formed BIG STORM REAL ESTATE LLC, a limited liability company (the "Company") under the Florida Revised Limited Liability Company Act, for the purposes set forth in this Agreement and, accordingly, desires to enter into this Agreement in order to set forth the terms and conditions of the business and affairs of the Company and to determine the rights and obligations of its Member.

NOW, THEREFORE, the Member, intending to be legally bound by this Agreement, agrees that the limited liability company operating agreement of the Company shall be as follows:

## ARTICLE I

## DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below.

1.1     "Act" means the Florida Revised Limited Liability Company Act, F.S. Chapter 605 (or the corresponding provision(s) of any succeeding law).

1.2     "Capital Contribution(s)" means the amount of cash and the agreed value of property, services rendered, or a promissory note or other obligation to contribute cash or property or to perform services contributed by the Member for the Member's interest in the Company, equal to the Member's initial capital contribution plus the Member's additional capital contributions, if any, made under Sections 4.1 and 4.2, respectively, less payments or distributions made under Section 5.1 that are deemed a return of capital under the Act.

1.3     "Code" means the Internal Revenue Code of 1986 and the regulations promulgated thereunder (or any corresponding provisions of succeeding law).

1.4     "Managing Member" means the undersigned or such other Person as may be designated the managing member of the Company pursuant to the terms of this Agreement.

1.5    "Member" means the undersigned or a Person admitted as a Member under this Agreement.

1.6    "Person" means any individual, partnership, firm, corporation, limited liability company, joint-stock company, trust, or other entity.

**ARTICLE II**

**FORMATION**

2.1    **Organization.** The Member has organized the Company as a single-member Florida limited liability company under the provisions of the Act.

2.2    **Effective Date.** The Company came into being on, and this Agreement shall take effect from, January 20, 2015, the date the Articles of Organization of the Company were filed with the Florida Department of State.

2.3    **Operating Agreement; Invalid Provisions.** The Member, by executing this Agreement, agrees to the terms and conditions of this Agreement, as they may from time to time be amended. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be deemed to be amended to the least extent necessary in order to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way as to validate any provision of this Agreement that was formerly invalid, that provision shall be considered to be valid from the effective date of the amendment or interpretation.

**ARTICLE III**

**PURPOSE; NATURE OF BUSINESS**

3.1    **Purpose; Nature of Business.** The purpose of the Company shall be to engage in any lawful business that may be engaged in by a limited liability company organized under the Act, as business activities may be determined by the Member from time to time. The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in this Section 3.1.

3.2    **Powers.** The Company shall have all powers of a limited liability company under the Act and the power to do all things necessary or convenient to accomplish its purpose and operate its business as described in Section 3.1.

## ARTICLE IV

## MEMBER AND CAPITAL

4.1    **Member and Initial Capital Contribution.** The name and initial Capital Contribution of the Member are set forth on Schedule A attached hereto.

4.2    **Additional Capital Contributions.** The Member shall have no obligation to make any additional Capital Contributions to the Company. The Member may make additional Capital Contributions to the Company as the Member determines are necessary, appropriate or desirable.

## ARTICLE V

## DISTRIBUTIONS AND ALLOCATIONS

5.1    **Distributions and Allocations.** All distributions of cash or other assets of the Company shall be made and paid to the Member at the time and in the amounts as the Member may determine. All items of income, gain, loss, deduction, and credit shall be allocated to the Member.

## ARTICLE VI

## TAXATION

6.1    **Income Tax Reporting.** The Member is aware of the income tax consequences of the allocations made by Article V and agrees to be bound by the provisions of Article V in reporting the Member's share of Company income and loss for federal and state income tax purposes.

6.2    **Disregarded as an Entity.** Notwithstanding anything contained in this Agreement to the contrary and only for purposes of federal and, if applicable, state income tax purposes, the Company shall be disregarded as an entity separate from the Member for federal and state income tax purposes unless and until the Member causes the Company to file an election under the Code to be classified as an association taxable as a corporation.

## ARTICLE VII

## RIGHTS, POWER, AND AUTHORITY OF THE MEMBER

7.1    **Management by the Member.** The Member shall have the full and exclusive right, power, and authority to manage the affairs of the Company and to bind the Company, to make all decisions with respect to the Company, and to do or cause to be done any and all acts or things deemed by the Member to be necessary, appropriate, or desirable to carry out or further the

business of the Company. The Member may from time to time be designated the Managing Member of the Company.

7.2    **Officers and Agents.** Without limiting the rights of the Member or the Company under F.S. 605.0109(8), the Member may designate one or more Persons to act as officers and/or agents of the Company to carry out and further the decisions and actions of the Member made under Section 7.1, and to execute any and all reports, forms, instruments, documents, papers, writings, agreements, and contracts, including but not limited to deeds, bills of sale, assignments, leases, promissory notes, mortgages, security agreements, and any other type or form of document by which property or property rights of the Company are transferred or encumbered, or by which debts and obligations of the Company are created, incurred, or evidenced, that are necessary, appropriate, or beneficial to carry out or further those decisions or actions.

# ARTICLE VIII

## DISSOLUTION AND WINDING UP

8.1    **Events of Dissolution.** The Company shall be dissolved upon the first to occur of (a) the written consent of the Member or (b) the entry of a decree of judicial dissolution under the Act.

# ARTICLE IX

## BOOKS AND RECORDS

9.1    **Books and Records.** The Member shall keep, or cause to be kept, at the principal place of business of the Company true and correct books of account, in which shall be entered fully and accurately each and every transaction of the Company.

# ARTICLE X

## LIMITATION OF LIABILITY; INDEMNIFICATION

10.1    **Limited Liability.** Except as otherwise provided by the Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and the Member shall not be obligated personally for any debt, obligation, or liability of the Company solely by reason of being a Member. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Member for any debts, liabilities, or obligations of the Company. Except as otherwise expressly required by law, the Member, in the Member's capacity as such, shall have no liability in excess of (a) the amount of the Member's Capital Contributions, (b) the Member's share of any assets and undistributed profits

of the Company, and (c) the amount of any distributions required to be returned under F.S. 605.0406.

10.2    **Indemnification.** The Company (including any receiver or trustee of the Company) shall, to the fullest extent provided or allowed by law, indemnify, save harmless, and pay all judgments and claims against the Member and each of the Member's agents, affiliates, heirs, legal representatives, successors, and assigns (each an "Indemnified Party") from, against, and in respect of any and all liability, loss, damage, and expense incurred or sustained by the Indemnified Party in connection with the business of the Company or by reason of any act performed or omitted to be performed in connection with the activities of the Company or in dealing with third parties on behalf of the Company, including costs and attorneys' fees before and at trial and at all appellate levels, whether or not suit is instituted (which attorneys' fees may be paid as incurred), and any amounts expended in the settlement of any claims of liability, loss, or damage, provided that the act or omission of the Indemnified Party does not constitute fraud or willful misconduct by the Indemnified Party. The Company shall not pay for any insurance covering liability of the Member or the Member's agents, affiliates, heirs, legal representatives, successors, and assigns for actions or omissions for which indemnification is not permitted under this Agreement; provided, however, that nothing contained in this Agreement shall preclude the Company from purchasing and paying for these types of insurance, including extended coverage liability and casualty and worker's compensation, as would be customary for any Person owning, managing, and/or operating comparable property and engaged in a similar business, or from naming the Member and any of the Member's agents, affiliates, heirs, legal representatives, successors, or assigns or any Indemnified Party as additional insured parties under this Agreement.

10.3    **Nonexclusive Right.** The provisions of this Article X shall be in addition to and not in limitation of any other rights of indemnification and reimbursement or limitations of liability to which an Indemnified Party may be entitled under the Act, common law, or otherwise. Notwithstanding any repeal of this Article X or other amendment hereof, its provisions shall be binding upon the Company (subject only to the exceptions set forth above) as to any claim, loss, expense, liability, action, or damage due to or arising out of matters that occur during or relate to the period prior to any repeal or amendment of this Article X.

## ARTICLE XI

## MISCELLANEOUS

11.1    **Amendment.** This Agreement may not be altered or modified except by the written consent of the Member.

11.2    **Binding Effect.** This Agreement shall be binding on and inure to the benefit of the Member and the Member's legal representatives, heirs, successors, and assigns.

11.3   **Applicable Laws.** This Agreement and the rights and duties of the Member under it shall be governed by, and interpreted and construed in accordance with, the laws of the State of Florida, without regard to principles of choice of law.

11.4   **Headings.** The article and section headings in this Agreement are inserted as a matter of convenience and are for reference only and shall not be construed to define, limit, extend, or describe the scope of this Agreement or the intent of any provision.

11.5   **Number and Gender.** Whenever required by the context hereof, the singular shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

11.6   **New Members.** No additional Person may be admitted as a Member except by the written consent of the Member.

IN WITNESS WHEREOF, this Agreement has been made and executed by the Member effective as of the date first written above.

Leo J. Govoni

# OPERATING AGREEMENT
## OF
# BIG STORM REAL ESTATE LLC
*A Florida Limited Liability Company*

## SCHEDULE A

## NAME AND INITIAL CAPITAL
## CONTRIBUTION OF THE MEMBER

| Member Name | Initial Capital Contribution |
|---|---|
| Leo J. Govoni | $10.00 |

**EXHIBIT C**

**UNANIMOUS WRITTEN CONSENT OF GOVERNING BODY**

**September 18, 2020**

The undersigned, being the sole Manager (the "***Governing Body***") of Big Storm Real Estate LLC (the "***Company***"), hereby approves, consents to and adopts the following recitals and resolutions and the actions therein authorized as the act of the Company's Governing Body:

WHEREAS, it is proposed that the Company and certain of its affiliates, as borrower, enter into that certain Loan Agreement dated as of the date hereof (the "***Loan Agreement***"), with Briar Capital Real Estate Fund, LLC, a Texas limited liability company ("***Lender***"), pursuant to which Lender will, subject to the terms and conditions therein, extend credit to the Company and the other borrowers from time to time party thereto;

WHEREAS, the Company's indebtedness under the Loan Agreement will be evidenced by one or more promissory notes described on ***Schedule 1*** attached hereto (collectively, the "***Notes***"), each executed by the Company and each other borrower and payable to the order of Lender in the amounts specified therein;

WHEREAS, as a condition precedent to entering into the Loan Agreement, Lender requires that the Company grant a security interest in favor of Lender of substantially all of the Company's assets to secure all of the indebtedness and other obligations owed to Lender under the Loan Agreement and the related loan documents;

WHEREAS, as condition precedent to entering into the Loan Agreement, Lender requires that the Company execute and deliver to Lender (a) that certain Security Agreement dated as of the date hereof, between the Company, as debtor, and Lender, as secured party, pursuant to which the Company will grant a lien in favor of Lender on substantially all of the Company's assets (the "***Security Agreement***"), and (b) that certain Mortgage, Assignment Leases of Rents, Security Agreement, and UCC Financing Statement for Fixture Filing, granting to Lender a first and prior lien on that certain property located at or about 12707 49th Street N., Clearwater, Florida 33762 (the "***Mortgage***");

WHEREAS, the terms of the proposed Loan Agreement, the Security Agreement, the Mortgage, and the other documents described in ***Schedule 1*** attached hereto, and all other related documents and instruments to be executed and delivered in connection therewith (the Loan Agreement, the Security Agreement, the Mortgage, the other documents set out on ***Schedule 1***, and all such other documents and instruments, collectively, the "***Loan Documents***"), have been reported to and reviewed by the Company's Governing Body; and

WHEREAS, in the judgment of the Company's Governing Body, the Company's entry into, the consummation of the transactions contemplated by, and the Company's performance of its obligations under, the Loan Documents to which it is or will be a party, are advisable and in the Company's best interests, will benefit the Company, directly and indirectly, and are necessary or convenient to the conduct, promotion or attainment of the Company's business.

NOW, THEREFORE, BE IT RESOLVED, that the Company's Governing Body hereby authorizes and approves the obligations of the Company under the Loan Documents and the transactions contemplated thereby;

Exhibit C – Page 1

RESOLVED FURTHER, that the form, terms and conditions of each of the Loan Documents be, and they hereby are in all respects approved;

RESOLVED FURTHER, that for purposes of these resolutions, all references to the "***Proper Officers***" of the Company shall mean, at any given time, each or any one or more of the Company's duly elected Manager and Vice President;

RESOLVED FURTHER, that any one or more of the Company's Proper Officers be, and he or she hereby is authorized, empowered and directed, for, to create, issue, execute, deliver and perform, as the case may be, each of the Loan Documents to which the Company is or will be a party in such form as may be acceptable to Lender, together with such changes or additions thereto as any one or more of the Company's Proper Officers shall approve, such approval to be conclusively evidenced by such execution and delivery, and upon such execution and delivery of all of the foregoing documents, instruments and agreements, and the execution and delivery thereof by all other parties or signatories thereto, the Company shall be bound by the terms and conditions set forth therein;

RESOLVED FURTHER, that any one or more of the Company's Proper Officers be, and he or she hereby is authorized, empowered and directed, for and on behalf of the Company, to take such steps, to perform all such acts and things, to pledge, mortgage, grant a security interest in, assign, endorse, negotiate, deliver, or otherwise hypothecate or transfer to Lender any and all assets now or hereafter held, owned or controlled by the Company; to execute and deliver to Lender any pledge agreement, security agreement, deed of trust, mortgage, financing statement, and any other security documents required by Lender from time to time, and to prepare, execute, swear to, acknowledge, deliver, file and/or record any and all agreements, documents, applications, reports, notices, waivers, consents, certificates or instruments which may by law, the Loan Documents, or to him, her or legal counsel to the Company, seem necessary, convenient or appropriate to effectuate and consummate the transactions contemplated thereby and by the foregoing resolutions in accordance therewith, to cause the Company to perform its obligations thereunder in accordance therewith, and to otherwise effectuate the purposes and intents of the foregoing resolutions, such necessity, convenience or appropriateness to be conclusively evidenced by the taking or performance of any of the foregoing steps, acts and things, executions, filings and/or recordings;

RESOLVED FURTHER, that any lawful act heretofore taken by the Company and the Company's officers, employees and agents in connection with the matters contemplated in the foregoing resolutions be, and it hereby is in all respects approved, adopted, ratified and confirmed as an act of the Company; and

RESOLVED FURTHER, that this Consent may be executed by means of an original, facsimile, portable document format (PDF), and other electronic signatures and in multiple counterparts.

***[Signatures are on the following page.]***

Exhibit C – Page 2

EXECUTED as of the date first written above.

Big Storm Real Estate LLC, a Florida limited liability company

By: Boston Holding Real Estate LLC, a Florida limited liability company, and the Sole Member and Manager

By: Boston Holding Company, a Florida liability company, and the Sole Member and Manager

By:    Leo Joseph Govoni
Title:    Manager

**SCHEDULE 1**
**TO**
**RECITALS AND RESOLUTIONS OF THE SOLE MANAGER OF**
**BIG STORM REAL ESTATE**

**Loan Documents**

1.      the Loan Agreement;
2.      the Note;
3.      the Security Agreement;
4.      the Mortgage;
5.      the Subordination Agreement;
6.      the Environmental Indemnity Agreement;
7.      the Subordination of Occupancy Rights agreement; and,
8.      the Subordination, Non-Disturbance and Attornment Agreement.

# EXHIBIT Q

THIS INSTRUMENT PREPARED BY AND
AFTER RECORDING RETURN TO:

McIntyre Thanasides Bringgold
Elliott Grimaldi & Guito, P.A.
501 E. Kennedy Blvd.
Suite 1900
Tampa, Florida 33602

Real Estate Tax Identification No. 09/30/16/70992/100/1207

## SPECIAL WARRANTY DEED

      **THIS INDENTURE,** made as of February 4, 2015, between M.R. French, Inc., a New York corporation, whose address is 72 North Village Ave., Rockville Centre, New York 11570-4600 (herein called "*Grantor*"), and Big Storm Real Estate LLC, a Florida limited liability company, whose address is 4912 Creekside Drive, Clearwater, Florida 33760 (herein called "*Grantee*").

      (Wherever used herein the terms "*Grantor*" and "*Grantee*" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations).

      **WITNESSETH:** That Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to Grantor in hand paid by Grantee, the receipt and sufficiency of which is hereby acknowledged, by these presents does grant, bargain, sell, alien, remise, release, convey, and confirm unto Grantee, its successors and assigns forever, all that certain land situated in Pinellas County, Florida, as more particularly described in Exhibit "A" attached hereto and made a part hereof by this reference.

      Together with all the tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining.

      TO HAVE AND TO HOLD the same in fee simple forever.

      AND Grantor hereby covenants with Grantee that it is lawfully seized of the land in fee simple; that it has good right and lawful authority to sell and convey such land; that it hereby specially warrants the title to such land and will defend the same against the lawful claims of all persons claiming by, through, or under Grantor, but against none other; subject, however, to those matters set forth on Exhibit "B" attached hereto and made a part hereof; provided that this reference shall not serve to reimpose the same.

**[Execution Page Follows]**

[*Signature Page of Special Warranty Deed*]

    IN WITNESS WHEREOF, Grantor has caused these presents to be executed in manner and form sufficient to bind it as of the day and year first above written.

Signed, sealed and delivered in the
presence of:

**GRANTOR:**

M.R. French, Inc., a New York corporation

Print Name: ~~Bellie Henson~~

By: _____
Name: PETER F. RING
Title: VICE PRESIDENT

Print Name: Kirk Paulsen

**STATE OF** South Carolina
**COUNTY OF** Berkeley

The foregoing instrument was acknowledged before me this 30th day of January, ~~February~~, 2015 by Peter F. Ring _____, as Vice President of M.R. French, Inc., a New York corporation. He/she [X] is personally known to me or ☐ has produced _____, as identification.

Print Name: Donna Eadie
Notary Public South Carolina

(Notarial Seal)

DONNA EADIE
MY COMMISSION EXPIRES
JUNE
5
2024
SOUTH CAROLINA
NOTARY PUBLIC

**EXHIBIT "A"**

**[LEGAL DESCRIPTION OF PROPERTY]**

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

The North 160.0 feet of the South 405.0 feet of Lot 12, in the N.E. 1/4 of Section 9, Township 30 South, Range 16 East, as shown by the plat of PINELLAS GROVES, INC., as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, LESS that portion lying within 50.0 feet of the centerline of 49th Street North as it is now constructed.

**EXHIBIT "B"**

**[Permitted Exceptions]**

1.  Taxes and assessments for the year 2015 and subsequent years, which are not yet due and payable.

2.  Deed of Conveyance of Pipelines, Appurtenances and Aquifer Rights as set forth in instrument recorded in Book 5395, Page 2081 .

3.  Agreement by and between M.R. French, Inc. and the City of Largo as set forth in instrument recorded in Book 5890, Page 433 .

THIS INSTRUMENT PREPARED BY AND
AFTER RECORDING RETURN TO:

McIntyre Thanasides Bringgold
Elliott Grimaldi & Guito, P.A.
500 E. Kennedy Blvd.
Suite 200
Tampa, Florida 33602

Real Estate Parcel No. 09/30/16/70992/100/1209

## SPECIAL WARRANTY DEED

     **THIS INDENTURE,** made as of September 14th, 2016, between **FORTY NINTH STREET REAL ESTATE LLC, a Florida limited liability company,** whose address is 12645 49th Street North, Clearwater, FL 33762 (herein called "*Grantor*"), and **BIG STORM REAL ESTATE LLC, a Florida limited liability company,** whose address is 4912 Creekside Drive, Clearwater, Florida 33760 (herein called "*Grantee*").

     (Wherever used herein the terms "*Grantor*" and "*Grantee*" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations).

     **WITNESSETH:** That Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to Grantor in hand paid by Grantee, the receipt and sufficiency of which is hereby acknowledged, by these presents does grant, bargain, sell, alien, remise, release, convey, and confirm unto Grantee, its successors and assigns forever, all that certain land situated in Pinellas County, Florida, as more particularly described in Exhibit "A" attached hereto and made a part hereof by this reference, together with any and all improvements located thereon.

     Together with all the tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining.

     TO HAVE AND TO HOLD the same in fee simple forever.

     AND Grantor hereby covenants with Grantee that it is lawfully seized of the land in fee simple; that it has good right and lawful authority to sell and convey such land; that it hereby specially warrants the title to such land and will defend the same against the lawful claims of all persons claiming by, through, or under Grantor, but against none other; subject, however, to those matters set forth on Exhibit "B" attached hereto and made a part hereof; provided that this reference shall not serve to reimpose the same.

**[Execution Page Follows]**

744263

*[Signature Page of Special Warranty Deed]*

IN WITNESS WHEREOF, Grantor has caused these presents to be executed in manner and form sufficient to bind it as of the day and year first above written.

Signed, sealed and delivered in the
presence of:

**GRANTOR:**

**FORTY NINTH STREET REAL ESTATE
LLC, a Florida limited liability company**

Print Name: _Sherzi Pal_

By: _____
Name: _Stephen L Gvuba_
Title: _President_

Print Name: _Douglas Gvaney_

STATE OF ~~FLORIDA~~ _ILLINOIS_
COUNTY OF _Cook_

The foregoing instrument was acknowledged before me this _14TH_ day of September, 2016 by _Stephen L Gvuba_ as _President_ of Forty Ninth Street Real Estate LLC, a Florida limited liability company. He ☐ is personally known to me or ☒ has produced _Drivers License_ _____, as identification.

Print Name: _Nilmar O Mendoza_
Notary Public_____

(Notarial Seal)

```
NILMAR O MENDOZA
Official Seal
Notary Public - State of Illinois
My Commission Expires Jul 2, 2020
```

744263

## EXHIBIT "A"
### [LEGAL DESCRIPTION OF PROPERTY]

The land referred to herein below is situated in the County of Pinellas, State of Florida, and is described as follows:

That part of Lots 12 and 13 in the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas Groves, as recorded in Plat Book 1, Page 55, Public Records of Pinellas County, Florida, more particularly described as follows:

The South 260.0 feet of the West 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the West 50.0 feet thereof for 49th Street North Right of Way and less the South 30.0 feet thereof for 126th Avenue North Right of Way.

Together with the West 165.00 feet of the East 1/2 of the West 1/2 of the SE 1/4 of the NE 1/4 of Section 9, Township 30 South, Range 16 East, Pinellas County, Florida, less the North 995.81 feet thereof and less the South 30.00 feet thereof for 126th Avenue North Right of Way, and reserving the East 40.00 feet of said West 165.00 feet for street purposes.

Less that portion conveyed to Pinellas County in O.R. Book 7593, Page 1527, Public Records of Pinellas County, Florida.

744263

## EXHIBIT "B"

### [Permitted Exceptions]

1. Taxes and assessments for the year 2016 and subsequent years, which are not yet due and payable.

2. Easement(s) in favor of Florida Power Corporation, as set forth in instrument recorded in Official Records Book 4055, page 1355, of the public records of Pinellas County, Florida.

3. Easement reserved in that certain Warranty Deed recorded in Official Records Book 5300, page 2083, of the public records of Pinellas County, Florida.

4. Grant Easement in favor of City of Largo, a municipal corporation, recorded in Official Records Book 5399, page 2162, of the public records of Pinellas County, Florida.

5. Indenture in favor of the City of Largo, a municipal corporation, recorded in Official Records Book 5854, page 154, of the public records of Pinellas County, Florida.

6. Utility Easement in favor of Pinellas County, a political subdivision of the State of Florida, recorded in Official Records Book 6189, page 429, of the public records of Pinellas County, Florida.

7. Annexation Agreement recorded in Official Records Book 10524, page 682, of the public records of Pinellas County, Florida.

8. Ordinance No. 2603 recorded in Official Records Book 10550, page 1461, of the public records of Pinellas County, Florida.

9. Owner Acceptance and Approval of Waiver as set forth in that certain instrument recorded in Official Records Book 14292, page 972, of the public records of Pinellas County, Florida.

10. Property Owner's Acknowledgment of Unity of Title recorded in Official Records Book 15072, page 2091, of the public records of Pinellas County, Florida.

11. Interlocal Agreement as evidenced by First Amendment recorded in Official Records Book 17036, page 1616, of the public records of Pinellas County, Florida.

744263

12. Matters shown on survey dated July 8, 2014, prepared by Frederick S. Bachmann, Professional Land Surveyor, Job No. 14-006, specifically described as: (a) 6' PVC fence on easterly portion and curbing on easterly and southerly portions of subject premises encroach into the easement areas under easements recorded in Official Records Book 4058, Page 1355, Official Records Book 5300, Page 2083, Official Records Book 5399, Page 2162, and Official Records Book 6189, Page 429, all of the Public Records of Pinellas County, Florida. (b) 6' PVC fence on east boundary line and curbing on east and south boundary lines encroach into the easement areas under easements recorded in Official Records Book 4058, Page 1355, Official records Book 6189, Page 429, and Official Records Book 5300, Page 2083, all of the Public Records of Pinellas County, Florida.

744263

# EXHIBIT R

**LOAN CLOSING STATEMENT**

**LENDER:**        BRIAR CAPITAL REAL ESTATE FUND, LLC

**BORROWER:**     BIG STORM REAL ESTATE, LLC

**CLOSING DATE:**    September 18, 2020

| | | |
|---|---|---|
| **LOAN AMOUNT:** | | **$2,500,000.00** |
| **COSTS AND DISBURSEMENTS:** | | |
| | | |
| **Clerk of Court, Pinellas County** | | |
| Rec. Notice of Termination (5 p) | $44.00 | |
| Rec. Notice of Termination (5 p) | $44.00 | |
| Rec. Mortgage (20 p) | $171.50 | |
|     Documentary Stamps | $8,750.00 | |
|     Intangible Tax | $5,000.00 | |
| Rec. LLC Affidavit (3 p) | $27.00 | |
| Rec. UCC-1  (2 p) | $18.50 | |
| Rec. Subordination of Occupancy Rights (7 p) | $61.00 | |
| Rec. SNDA (9 p) | $78.00 | |
| Rec. Collateral Assignment (4 p) | $35.50 | |
| Rec. Notice of Commencement (1 p) | $10.00 | |
|     Total: | | $14,239.50 |
| | | |
| **Old Republic National Title Insurance Company** | | |
| Loan Policy Premium | $8,825.00 | |
| Survey Endorsement | $100.00 | |
| ALTA 6 | $100.00 | |
| ALTA 8.1 | $100.00 | |
| ALTA 9 | $882.50 | |
| | | $10,007.50 |
| | | |
| **Briar Capital Real Estate Fund, LLC** | | |
| Closing Fee | $25,000.00 | |
| Tax Escrow (10 months) | $46,000.00 | |
| Insurance Escrow (3 months) | $15,024.25 | |
| Interest for September | $8,576.39 | |
| GFD Reimbursement | ($28,805.01) | |
|     Total: | | $65,795.63 |
| | | |
| **Porter Hedges** | | |
| Attorneys' fees for representation of Lender | | $32,000.00 |
| | | |
| **American Surveying, Inc.** | | |
| Survey Fee | | $125.00 |
| | | |
| **The Sinclair Group** | | |
| Construction Fees and Costs | | $288,015.00 |
| | | |
| **Three Sixty Seven Advisory Solutions, LLC** | | |
| Finders Fee | | $62,500.00 |
| | | |
| **Bush Ross, P.A.** | | |
| Attorneys' fees for representation of Borrower | $10,000.00 | |
| Misc. Costs | $200.00 | |
| Simplifile Recording Fee ($4.50 x 9) | $40.50 | |
| Reimbursement for Costs Advanced: | | |
|     Title Search Invoice | $250.00 | |
|     159 Lien Search Invoice | $150.00 | |
|     Total: | | $10,640.50 |
| | | |
| **TOTAL LOAN COSTS TO BE PAID BY BORROWER AND** | | |
| **DEDUCTED FROM LOAN AMOUNT:** | | **$483,323.13** |
| | | |
| **BALANCE OF LOAN DISBURSED TO BORROWER:** | | **$2,016,676.87** |

6CC820503.XLS

**NOTES:**

1.          Lender and Borrower hereby approve the foregoing Loan Closing Statement and the disbursements are hereby authorized.

2.          Lender and Borrower hereby agree that, in the event mathematical errors in the Loan Closing Statement are discovered by any party or that the underlying information upon which the statements are based was in error, then the parties shall appropriately adjust for such errors by post-closing remittances based on requests made by any party subsequent to closing.

3.          This Loan Closing Statement may be executed by the parties in multiple counterparts, with each counterpart in combination with the other(s) having the same force and effect as if a single instrument were executed by all parties hereto.

**[EXECUTION PAGE FOLLOWS ON NEXT SUCCEEDING PAGE]**

**BORROWER:**

BIG STORM REAL ESTATE, LLC

By: _____
Print Name: Leo Govoni
Title: Manager

**LENDER:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

By:  Briar Capital, L.P., its sole member
By: Briar Capital General, LLC, its general partner

By: _____
Print Name:
Title:

[EXECUTION PAGE TO LOAN CLOSING STATEMENT]

6CC820503.XLS

**BORROWER:**

BIG STORM REAL ESTATE, LLC

By:_____
Print Name: Leo Govoni
Title: Manager

**LENDER:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

By: Briar Capital, L.P., its sole member
By: Briar Capital General, LLC, its general partner

By:_____
Print Name:
Title:

**[EXECUTION PAGE TO LOAN CLOSING STATEMENT]**

# EXHIBIT S

**LOAN CLOSING STATEMENT**

**LENDER:**      BRIAR CAPITAL REAL ESTATE FUND, LLC

**BORROWER:**   BIG STORM REAL ESTATE, LLC

**CLOSING DATE:**   June 22, 2023

| | | |
|---|---:|---:|
| **FUTURE ADVANCE AMOUNT:** | | **$838,672.55** |
| **COSTS AND DISBURSEMENTS:** | | |
| **Clerk of Court, Pinellas County** | | |
| Rec. 1st Amendment to Mortgage (5 p) | $44.00 | |
|     Documentary Stamps | $2,935.45 | |
|     Intangible Tax | $1,677.35 | |
| Rec. LLC Affidavit (3 p) | $27.00 | |
| Rec. Release of Lien (2 p) | $18.50 | |
|     Total: | | $4,702.30 |
| **Old Republic National Title Insurance Company** | | |
| Loan Policy Endorsement Premium | $2,096.68 | |
| ALTA 9 | $209.67 | |
| | | $2,306.35 |
| **Briar Capital Real Estate Fund, LLC** | | |
| Closing Fee | $8,380.00 | |
| Appraisal Fee | $4,500.00 | |
| 7/1/2023 Installment | $41,633.84 | |
| 7/1/2023 Escrow | $4,900.00 | |
|     Total: | | $59,413.84 |
| **Porter Hedges** | | |
| Attorneys' fees for representation of Lender | | $16,500.00 |
| **Keating & Schlitt PA** | | |
| Attorneys' fees for FL representation of Lender | | $750.00 |
| **Burch Corporation (Claim of Lien)** | | $37,825.24 |
| **Bush Ross, P.A.** | | |
| Attorneys' fees for representation of Borrower | $4,500.00 | |
| Misc. Costs | $200.00 | |
| Simplifile Recording Fee ($4.75 x 3) | $14.25 | |
| Reimbursement for Costs Advanced: | | |
|     COGS | $5.00 | |
|     Title Search Invoice | $250.00 | |
|     159 Lien Search Invoice | $250.00 | |
|     Total: | | $5,219.25 |
| **TOTAL LOAN COSTS TO BE PAID BY BORROWER AND DEDUCTED FROM LOAN AMOUNT:** | | **$126,716.98** |
| **BALANCE OF LOAN DISBURSED TO BORROWER:** | | **$711,955.57** |

**NOTES:**

1.   Lender and Borrower hereby approve the foregoing Loan Closing Statement and the disbursements are hereby authorized.

2.   Lender and Borrower hereby agree that, in the event mathematical errors in the Loan Closing Statement are discovered by any party or that the underlying information upon which the statements are based was in error, then the parties shall appropriately adjust for such errors by post-closing remittances based on requests made by any party subsequent to closing.

3.   This Loan Closing Statement may be executed by the parties in multiple counterparts, with each counterpart in combination with the other(s) having the same force and effect as if a single instrument were executed by all parties hereto.

**[EXECUTION PAGE FOLLOWS ON NEXT SUCCEEDING PAGE]**

6CC820503.XLS

**BORROWER:**

BIG STORM REAL ESTATE, LLC, a Florida limited liabilty company

By:  Boston Holding Real Estate LLC, as sole member and manager

By:  Boston Holding Company LLC, as sole member and manager

By: _____

Print Name: Leo Govoni
Title: Manager

**LENDER:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

 By:  Briar Capital, L.P., its sole member
 By: Briar Capital General, LLC, its general partner

By:_____
Print Name:
Title:

[EXECUTION PAGE TO LOAN CLOSING STATEMENT]

6CC820503.XLS

**BORROWER:**

BIG STORM REAL ESTATE, LLC, a Florida limited liabilty company

By:  Boston Holding Real Estate LLC, as sole member and manager

By:  Boston Holding Company LLC, as sole member and manager


By:_____ _____
Print Name: Leo Govoni
Title: Manager

**LENDER:**

BRIAR CAPITAL REAL ESTATE FUND, LLC

By:  Briar Capital, L.P., its sole member
By:  Briar Capital General, LLC, its general partner

By:_____
Print Name:
Title:

[EXECUTION PAGE TO LOAN CLOSING STATEMENT]

6CC#20503.XLS

# EXHIBIT T

# ACH Payment

ACH-00517732 - BRIAR CAPTIAL LP (BRIARCAPTI)

**PROSPERITY BANK**

## ACH Batch Details

**Transaction Number** ACH-00517732
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** PAYMENTS2
**Total Debits** $643,773.78 (14)
**ACH Company** BRIAR CAPITAL LP (9043715331)
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4747 - DDA (Depository Wire 4747) - Prosperity Bank (113123665)
**Company Discretionary Data** 832-251-1500 ext 221
**Company Entry Description** CL MO FUND
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Oct 30, 2020 10:55 AM CDT
**Processing Date** 10/30/2020
**Payment Date** 11/02/2020

Excluded

Prenote

(Excluded)
(Excluded)

(Excluded)



ACH Payment - AUT-0051732 - BRIAR CAPITAL LP (BRIARCAP11)

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|----------|-------|-----|---------|--------|---------|---------|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Big Storm RE LLC (30) | | | $27,903.28 | | |

### Status History

| Timestamp | Status | Initiator | Description |
|-----------|--------|-----------|-------------|
| Oct 30, 2020 10:55:34 AM CDT | Created | BRIARCAPTI / KGONZALES (Karen Gonzales) | Batch Created. |

Generated on 10/30/2020 10:55:41 AM CDT

# TBK ✚ BANK

## ACH Payment

ACH-00219434 - BRIAR CAPITAL LP ( ▆▆▆▆▆ )

### ACH Batch Details

**Transaction Number** ACH-00219434
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $744,127.58 (15)
**ACH Company** BRIAR CAPITAL RE ( ▆▆▆▆ )
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank ( ▆▆▆▆ )
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Nov 30, 2020 9:44 AM CST
**Processing Date** 11/30/2020
**Payment Date** 12/01/2020
**Status** Pending Approval

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | ▆▆▆▆ Storm RE Bricks LLC (00) | ▆▆▆▆▆▆ | ▆▆▆ | | | |
| | Big Storm RE LLC (00) | ▆▆▆▆▆▆ | | $27,903.28 | | |

# TBK ✛ BANK

## ACH Payment

ACH-00232599 - BRIAR CAPITAL LP (**********)

### ACH Batch Details

**Transaction Number** ACH-00232599
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $685,766.55 (16)
**ACH Company** BRIAR CAPITAL RE (**********)
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (**********)
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Dec 31, 2020 10:56 AM CST
**Processing Date** 12/31/2020
**Payment Date** 01/04/2021

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | 40 Barry Street Realty LLC (00) | | | | | |
| | Big Storm RE LLC (00) | 021000089 | *9364 (DDA) | $28,116.31 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | (Exclu | | | | | |



# TBK ✚ BANK

## ACH Payment

ACH-00244200 - BRIAR CAPITAL LP (▮▮▮▮▮▮▮▮)

### ACH Batch Details

**Transaction Number** ACH-00244200
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $751,938.27 (17)
**ACH Company** BRIAR CAPITAL RE (▮▮▮▮▮▮)
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (▮▮▮
**Batch Type** Business (CCD) - Debit Only
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL

**Payment Creation Date** Jan 29, 2021 10:23 AM CST
**Processing Date** 01/29/2021
**Payment Date** 02/01/2021

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | ▮ | | ▮▮ | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| | O | | | | | |
| | T | | | | | |
| | E | | | | | |
| | G | | | | | |
| | H | | | | | |
| | H | | | | | |
| | K | | | | | |
| (Excluded) | L | | | | | |
| | M | | | | | |
| | M | | | | | |
| | S | | | | | |

# TBK ⊕ BANK

## Payment

ch-00255678 - BRIAR CAPITAL LP ( )

### ACH Batch Details

**Transaction Number** ACH-00255678
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $729,454.94 (15)
**ACH Company** BRIAR CAPITAL RE ( )
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (1 )
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL

**Payment Creation Date** Feb 26, 2021 11:30 AM CST
**Processing Date** 02/26/2021
**Payment Date** 03/01/2021

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |

Report generated

# TBK ✚ BANK

## ACH Payment

ACH-0269683 - BRIAR CAPITAL LP (0)

### ACH Batch Details

Transaction Number ACH-0269683
Import File Name
Import Batch ID
Recurring Frequency One-Time Payment
Template Name RE payments
Total Debits $824,943.18 (16)
ACH Company BRIAR CAPITAL RE (0)
Batch Type Business (CCD) - Debit Only
Offset Account *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank ()

Company Entry Description no pymts
Notify Initiator Options Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL

Payment Creation Date Mar 31, 2021 10:04 AM CDT
Processing Date 03/31/2021
Payment Date 04/01/2021

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |



# TBK ✚ BANK

## ACH Payment

ACH-00282614 - BRIAR CAPITAL LP (0■■■■■■■■■)

### ACH Batch Details

Transaction Number ACH-00282614
Import File Name
Import Batch ID
Recurring Frequency One-Time Payment
Template Name RE payments
Total Debits $750,820.78 (16)
ACH Company BRIAR CAPITAL RE (0■■■■■■■■)
Batch Type Business (CCD) - Debit Only
Offset Account *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (1■■■■■■■■)
Company Entry Description mo pymts
Notify Initiator Options Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
Payment Creation Date Apr 30, 2021 10:26 AM CDT
Processing Date 04/30/2021
Payment Date 05/03/2021

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | T■■■ ■■■■■ ■■■■■■ ■■■ (00) | | | | | |
| | Big Storm RE LLC (00) | ■■■■■ | ■■■■■ | $27,903.28 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |

# TBK ✚ BANK

## ACH Payment

ACH-00294841 - BRIAR CAPITAL LP ( )

### ACH Batch Details

Transaction Number ACH-00294841
Import File Name
Import Batch ID
Recurring Frequency One-Time Payment
Template Name RE payments
Total Debits $550,515.93 (14)
ACH Company BRIAR CAPITAL RE ( )
Offset Account *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (1 )
Batch Type Business (CCD) - Debit Only
Company Entry Description mo pymts
Notify Initiator Options Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL

Payment Creation Date May 28, 2021 11:36 AM CDT
Processing Date 05/28/2021
Payment Date 06/01/2021

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | 7 | | | | | |
| | Big Storm RE LLC (00) | | | $31,178.28 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |

# TBK ✚ BANK

## ACH Payment

ACH-00309135 - BRIAR CAPITAL LP (▮▮▮▮▮▮▮)

### ACH Batch Details

**Transaction Number** ACH-00309135
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $458,645.69 (11)
**ACH Company** BRIAR CAPITAL RE (▮▮▮▮)
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (▮▮▮▮)
**Batch Type** Business (CCD) - Debit Only
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL

**Payment Creation Date** Jun 30, 2021 10:43 AM CDT
**Processing Date** 06/30/2021
**Payment Date** 07/01/2021

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | ▮▮▮▮▮ | ▮▮▮▮▮▮ | $27,903.28 | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |

Report generated on 06/30/2021 10:43:27 AM CDT

# TBK ✛ BANK

## ACH Payment

ACH-00322363 - BRIAR CAPITAL LP (⬛⬛⬛⬛⬛)

### ACH Batch Details

**Transaction Number** ACH-00322363
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $458,552.93 (11)
**ACH Company** BRIAR CAPITAL RE (⬛⬛⬛⬛⬛)
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (1⬛)
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Jul 30, 2021 9:31 AM CDT
**Processing Date** 07/30/2021
**Payment Date** 08/02/2021

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | ⬛⬛⬛ | $27,903.28 | | |
| (Excluded) | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |

Report generated on 07/30/2021 09:31:57 AM CDT

# ACH Payment

ACH-00336305 - BRIAR CAPITAL LP (

# TBK ✚ BANK

## ACH Batch Details

**Transaction Number** ACH-00336305
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $457,470.76 (12)
**ACH Company** BRIAR CAPITAL RE (
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Aug 31, 2021 9:19 AM CDT
**Processing Date** 08/31/2021
**Payment Date** 09/01/2021

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |

Report generated on 08/31/2021 09:19:35 AM CDT

# TBK ⳾ BANK

## ACH Payment

ACH-00350011 - BRIAR CAPITAL LP ▮

### ACH Batch Details

| | |
|---|---|
| **Transaction Number** | ACH-00350011 |
| **Import File Name** | |
| **Import Batch ID** | |
| **Recurring Frequency** | One-Time Payment |
| **Template Name** | RE payments |
| **Total Debits** | $486,510.34 (13) |
| **ACH Company** | BRIAR CAPITAL RE (▮) |
| **Batch Type** | Business (CCD) – Debit Only |
| **Offset Account** | *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank |
| **Company Entry Description** | mo pymts |
| **Notify Initiator Options** | Pending Actions: Notify via EMAIL |
| | System Events: Notify via EMAIL |
| | Complete – Unsuccessful: Notify via EMAIL |
| | Complete – Successful: Notify via EMAIL |
| | Early Action Taken: Notify via EMAIL |
| | Early Action Removed: Notify via EMAIL |
| | Expired: Notify via EMAIL |
| **Payment Creation Date** | Sep 30, 2021 8:50 AM CDT |
| **Processing Date** | 09/30/2021 |
| **Payment Date** | 10/01/2021 |

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |

# TBK ⊹ BANK

## ACH Payment

ACH-00363884 - BRIAR CAPITAL LP

### ACH Batch Details

**Transaction Number** ACH-00363884
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $598,828.67 (15)
**ACH Company** BRIAR CAPITAL RE
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Batch Type** Business (CCD) - Debit Only
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Oct 29, 2021 9:05 AM CDT
**Processing Date** 10/29/2021
**Payment Date** 11/01/2021



| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,993.28 | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |

Report generated on 10/29/2021 09:05:16 AM CDT

# TBK ✚ BANK

## ACH Payment

### ACH-00377904 - BRIAR CAPITAL LP

### ACH Batch Details

**Transaction Number** ACH-00377904
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $549,603.14 (13)
**ACH Company** BRIAR CAPITAL RE (
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Nov 30, 2021 8:55 AM CST
**Processing Date** 11/30/2021
**Payment Date** 12/01/2021
**Status** Pending Approval



| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# TBK✚BANK

## ACH Payment

### ACH-0394633 - BRIAR CAPITAL LP

**ACH Batch Details**

**Transaction Number** ACH-0394633
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $550,564.57 (13)
**ACH Company** BRIAR CAPITAL RE
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Batch Type** Business (CCD) - Debit Only
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Dec 31, 2021 9:50 AM CST
**Processing Date** 12/31/2021
**Payment Date** 01/03/2022



| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | Big Storm RE LLC (00) | | | $27,903.28 | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |

# TBK ✚ BANK

## ACH Payment

### ACH-00409325 - BRIAR CAPITAL LP

### ACH Batch Details

**Transaction Number** ACH-00409325
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $624,948.51 (13)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Jan 31, 2022 10:36 AM CST
**Processing Date** 01/31/2022
**Payment Date** 02/01/2022

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | Big Storm RE LLC (00) | | | $27,903.28 | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |



# ACH Payment

ACH-00426141 - BRIAR CAPITAL LP

## TBK ⊕ BANK

### ACH Batch Details

**Transaction Number** ACH-00426141
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $641,948.89 (13)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Feb 28, 2022 9:57 AM CST
**Processing Date** 02/28/2022
**Payment Date** 03/01/2022



| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| (Excluded) | | | | | | |

# ACH Payment

ACH-00444903 - BRIAR CAPITAL LP ( )

## TBK ⊕ BANK

## ACH Batch Details

**Transaction Number** ACH-00444903
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $633,157.78 (13)
**ACH Company** BRIAR CAPITAL RE (     )
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (     )
**Batch Type** Business (CCD) - Debit Only
**Company Entry Description** no pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Mar 31, 2022 8:45 AM CDT
**Processing Date** 03/31/2022
**Payment Date** 04/01/2022



| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| (Excluded) | | | | | | |

# ACH Payment

ACH-00461966 - BRIAR CAPITAL LP (

## ACH Batch Details

**Transaction Number** ACH-00461966
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $638,577.79 (13)
**ACH Company** BRIAR CAPITAL RE (
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Apr 29, 2022 8:41 AM CDT
**Processing Date** 04/29/2022
**Payment Date** 05/02/2022



| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| | | | | | | |
| (Excluded) | | | | | | |

Report generated on 04/29/2022 08:41:34 AM CDT

Page 1 of 2

# TBK ✚ BANK

## ACH Payment

ACH-00479149 - BRIAR CAPITAL LP

### ACH Batch Details

**Transaction Number** ACH-00479149
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $714,772.89 (13)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Indicator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** May 31, 2022 1:02 PM CDT
**Processing Date** 05/31/2022
**Payment Date** 06/01/2022

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |

# ACH Payment

ACH-00497827 - BRIAR CAPITAL LP

**TBK ✠ BANK**

## ACH Batch Details

**Transaction Number** ACH-00497827
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $820,990.41 (12)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Jun 30, 2022 9:23 AM CDT
**Processing Date** 06/30/2022
**Payment Date** 07/01/2022

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,903.28 | | |
| (Excluded) | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |

Report generated on 06/30/2022 09:23:55 AM CDT

# TBK ╬ BANK

# ACH Payment

## ACH-00514578 - BRIAR CAPITAL LP

## ACH Batch Details

**Transaction Number** ACH-00514578
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $751,456.55 (12)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Jul 29, 2022 9:04 AM CDT
**Processing Date** 07/29/2022
**Payment Date** 08/01/2022

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|----------|-------|-----|---------|--------|---------|---------|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $27,503.28 | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |

Report generated on 07/29/2022 09:04:49 AM CDT

Page 1 of 2

# TBK ✚ BANK

## ACH Payment

ACH-00533055 - BRIAR CAPITAL LP

### ACH Batch Details

**Transaction Number** ACH-00533055
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $807,767.82 (13)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Aug 31, 2022 9:20 AM CDT
**Processing Date** 08/31/2022
**Payment Date** 09/01/2022

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $31,473.17 | | |
| (Excluded) | | | | | | |



# ACH Payment

ACH-0060642 - BRIAR CAPITAL LP

## ACH Batch Details

**Transaction Number** ACH-0060642
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $31,473.17 (1)
**ACH Company** BRIAR CAPITAL RE
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Batch Type** Business (CCD) - Debit Only
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Oct 11, 2022 10:03 AM CDT
**Processing Date** 10/11/2022
**Payment Date** 10/12/2022

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | Big Storm RE LLC (00) | | | $31,473.17 | | |

Report generated on 10/11/2022 10:03:30 AM CDT

# ACH Payment

ACH-00618403 - BRIAR CAPITAL LP

## ACH Batch Details

**Transaction Number** ACH-00618403
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $821,264.38 (12)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Oct 31, 2022 11:56 AM CDT
**Processing Date** 10/31/2022
**Payment Date** 11/01/2022

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $31,473.17 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |

# ACH Payment

ACH-00635433 - BRIAR CAPITAL LP

## ACH Batch Details

**TBK ✛ BANK**

Transaction Number  ACH-00635433
Import File Name
Import Batch ID
Recurring Frequency  One-Time Payment
Template Name  RE payments
Total Debits  $710,765.20 (11)
ACH Company  BRIAR CAPITAL RE
Offset Account  *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
Batch Type  Business (CCD) - Debit Only
Company Entry Description  no pymts
Notify Initiator Options  Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taker: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
Payment Creation Date  Nov 30, 2022 8:48 AM CST
Processing Date  11/30/2022
Payment Date  12/01/2022

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | Big Storm RE LLC (00) | | | $31,773.17 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |

# TBK ✚ BANK

# ACH Payment

ACH-00655237 - BRIAR CAPITAL LP

## ACH Batch Details

**Transaction Number** ACH-00655237
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $723,542.36 (12)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL

**Payment Creation Date** Dec 30, 2022 9:50 AM CST
**Processing Date** 12/30/2022
**Payment Date** 01/03/2023

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $34,763.72 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |

Report generated on 12/30/2022 09:50:31 AM CST

# ACH Payment

## ACH-00674891 - BRIAR CAPITAL LP

**TBK ⊕ BANK**

### ACH Batch Details

**Transaction Number** ACH-00674891
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $760,457.47 (12)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
 System Events: Notify via EMAIL
 Complete - Unsuccessful: Notify via EMAIL
 Complete - Successful: Notify via EMAIL
 Early Action Taken: Notify via EMAIL
 Early Action Removed: Notify via EMAIL
 Expired: Notify via EMAIL

**Payment Creation Date** Jan 31, 2023 10:25 AM CST
**Processing Date** 01/31/2023
**Payment Date** 02/01/2023

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $34,763.72 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |
| | | | | | | |

Report generated on 01/31/2023 10:26:47 AM CST

# TBK ✛ BANK

# ACH Payment

ACH-00693343 - BRIAR CAPITAL LP

## ACH Batch Details

**Transaction Number** ACH-00693343
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $754,270.41 (12)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Feb 28, 2023 11:01 AM CST
**Processing Date** 02/28/2023
**Payment Date** 03/01/2023

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|----------|-------|-----|---------|--------|---------|---------|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $34,763.72 | | |
| (Excluded) | | | | | | |



# ACH Payment

ACH-00715244 - BRIAR CAPITAL LP

**TBK ⧫ BANK**

## ACH Batch Details

Transaction Number  ACH-00715244
Import File Name
Import Batch ID
Recurring Frequency  One-Time Payment
Template Name  RE payments
Total Debits  $778,842.03 (11)
ACH Company  BRIAR CAPITAL RE
Batch Type  Business (CCD) - Debit Only
Offset Account  *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
Company Entry Description  mo pymts
Notify Initiator Options  Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
Payment Creation Date  Mar 31, 2023 10:17 AM CDT
Processing Date  03/31/2023
Payment Date  04/03/2023
Status  Pending Approval

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $34,763.72 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |

Report generated on 03/31/2023 11:24:02 AM CDT

Page 1 of 2

# TBK ⊹ BANK

# ACH Payment

## ACH-00740860 - BRIAR CAPITAL LP

### ACH Batch Details

**Transaction Number** ACH-00740860
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $34,763.72 (1)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** May 9, 2023 3:12 PM CDT
**Processing Date** 05/09/2023
**Payment Date** 05/10/2023

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $34,763.72 | | |

# ACH Payment

ACH-00754557 - BRIAR CAPITAL LP

## ACH Batch Details

**Transaction Number** ACH-00754557
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $725,752.24 (12)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** May 31, 2023 10:46 AM CDT
**Processing Date** 05/31/2023
**Payment Date** 06/01/2023

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $34,763.72 | | |
| | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |

Report generated on 05/31/2023 10:46:05 AM CDT

7:31 AM
06/23/23
Accrual Basis

**Briar Capital, L.P.**
**General Journal Transaction**
**June 22, 2023**

01/40/9

| Num | Name | Memo | Account | Class | Debit | Credit |
|-----|------|------|---------|-------|-------|--------|
| 27816 | | Big Storm Am... | TBK Depository/Wire | | 838,672.55 | 779,258.71 |
| | | Big Storm Am... | Real Estate Loans | | | 4,900.00 ★ |
| | | Big Storm 6/20... | Big Storm Brewery | | | 8,380.00 |
| | | Big Storm Am... | Real Estate Closing ... | | | 4,500.00 |
| | | Appraisal | Big Storm RE LLC | | | 32,208.66★ |
| | | Big Storm 6/20... | Interest | | | 9,425.18★ |
| | | Big Storm 6/20... | Real Estate Loans | | | 838,672.55 |
| TOTAL | | | | | 838,672.55 | 838,672.55 |

Page 1

# Wire Transfer

DWR-00769222 - BRIAR CAPITAL LP (043715331)



## Wire Details

Transaction Number  DWR-00769222
Recurring Frequency  One-Time Payment
Amount  USD 779,298.71
Debit Account  *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (▮▮▮▮▮)
Notify Initiator Options  Pending Actions: Notify via EMAIL,
Pending Release: Notify via EMAIL,
System Events: Notify via EMAIL,
Complete - Unsuccessful: Notify via EMAIL,
Complete - Successful: Notify via EMAIL,
Early Action Taken: Notify via EMAIL,
Early Action Removed: Notify via EMAIL,
Expired: Notify via EMAIL.
Payment Date  05/22/2023

## Originator Information

Originator Name  BRIAR CAPITAL LP
Originator Address 1  8584 KATY FREEWAY SUITE 419
Originator Address 2  HOUSTON, TX 77024 US
Originator Address 3

## Beneficiary / Payee Information

Name  Bush Ross Real Estate Trust Account
Beneficiary ID Type  Account Number
Beneficiary ID  ▮▮▮▮▮▮
Address 1
Address 2
Address 3
Beneficiary Country  US
Contact Name
Phone Number

## Beneficiary Bank Information

Name  TRUIST BANK
Beneficiary Bank ID Type  Fed ABA
Beneficiary Bank ID  ▮▮▮▮▮▮
Address 1
Address 2
Address 3
Intl Routing Number
Beneficiary Bank Country  US

## Additional Reference Information

Purpose Of Payment  Advance

Additional Information For  RE: Rio Storm RE LLC
Beneficiary

## Status History

| Timestamp | Status | Initiator | Description |
|---|---|---|---|
| Jun 23, 2023 12:35:10 PM CDT | Created | 043715331 / LCORDERO (LAURA CORDERO) | Wire Created. |

Report generated on 06/22/2023 12:05:12 PM CDT

Page 1 of 1

*Big storm Real Estate*

*Email*
*asmith@bushross.com*

**BUSH|ROSS**

*Truist Bank*
*The Bush Ross Real Estate*
*Trust Account*

### REAL ESTATE TRUST ACCOUNT
(Real Estate Closing Only)

TRUIST BANK
401 EAST JACKSON STREET
TAMPA, FL 33602
ABA# 061000104
CONTACT: CLIENT SERVICES
(866) 448-6394
SWIFT CODE: # SNTRUS3A
CREDIT TO THE ACCOUNT OF:
BUSH ROSS, P.A.-REAL ESTATE TRUST ACCOUNT

████████████

CONTACT: ALINE SMITH
(813) 204-6419 — *left vm*

*Spoke to Aline she*
*confirmed instructions*

*Advance*

*Due to the increase in wire fraud and email cyber attacks, you should not send wire transfer funds based upon the receipt of an email. Please call our office directly and ask for the accounting department to confirm all wire instructions.*

Borrower                Big Storm Amendment
Closing Date            6/22/2023

Loan Amount             838,672.55
credit good faith           -              Hold approximately 500 back for any UCC, deliveries, etc
Closing fee Briar       (8,380.00)
Appraisal Fee           (4,500.00)
July 1st Installment    (41,635.84)
July 1st Escrow         (4,900.00)
                        ███████████       Amount you put on BBC
To Borrower             (711,955.57)
Bush Ross PA            (3,219.25)
County Fees             (4,702.30)
Legal-Porter Hedges     (16,500.00)
Legal-Other             (750.00)
Documentary Stamps          -
Survey
Title Fees:             (2,306.35)
Burch Corporation       (37,823.24)
Balance check           0.00

https://briarcapitalp.sharepoint.com/Shared Documents/BRC All Users/CLIENTS/1-CLIENTS/Big Storm/Credit,

Laura Cordero

From: Susan Holliday
Sent: Thursday, June 22, 2023 12:20 PM
To: Laura Cordero; Karen Gonzales; Kristin Yowell
Cc: Lloyd, Jason T. (JLloyd@porterhedges.com)
Subject: RE: Closing instruction letter - Briar Capital / Big Storm

Yes

From: Laura Cordero <lcordero@briarcapital.com>
Sent: Thursday, June 22, 2023 12:17 PM
To: Susan Holliday <sholliday@briarcapital.com>; Karen Gonzales <kgonzales@briarcapital.com>; Kristin Yowell <kyowell@briarcapital.com>
Cc: Lloyd, Jason T. (JLloyd@porterhedges.com) <jlloyd@porterhedges.com>
Subject: RE: Closing instruction letter - Briar Capital / Big Storm

Great want to confirm amount. Is it still $779,258.71?

Thanks – Laura

From: Susan Holliday <sholliday@briarcapital.com>
Sent: Thursday, June 22, 2023 12:10 PM
To: Laura Cordero <lcordero@briarcapital.com>; Karen Gonzales <kgonzales@briarcapital.com>; Kristin Yowell <kyowell@briarcapital.com>
Cc: Lloyd, Jason T. (JLloyd@porterhedges.com) <jlloyd@porterhedges.com>
Subject: FW: Closing instruction letter - Briar Capital / Big Storm
Importance: High

Laura or Karen - proceed to funding 🙏 THANK YOU

From: Lloyd, Jason T. <JLloyd@porterhedges.com>
Sent: Thursday, June 22, 2023 11:56 AM
To: Susan Holliday <sholliday@briarcapital.com>
Subject: FW: Closing instruction letter - Briar Capital / Big Storm

I think we're good on our end.

Jason T. Lloyd | Partner
Porter Hedges LLP

1000 Main St, 36th Floor | Houston, TX 77002
t 713.226.6683    e JLloyd@porterhedges.com
Bio · Web · V-Card

From: Laura Zakarian <lzakarian@bushross.com>
Sent: Thursday, June 22, 2023 11:54 AM

1

## LOAN CLOSING STATEMENT

**LENDER:** BRIAR CAPITAL REAL ESTATE FUND, LLC

**BORROWER:** BIG STORM REAL ESTATE, LLC

**CLOSING DATE:** June 22, 2023

| | | |
|---|---:|---:|
| **FUTURE ADVANCE AMOUNT:** | | $838,672.85 |
| **COSTS AND DISBURSEMENTS:** | | |
| **Clerk of Court, Pinellas County** | | |
| Rec. 1st Amendment to Mortgage (5 p) | $44.00 | |
| Documentary Stamps | $2,935.45 | |
| Intangible Tax | $1,677.35 | |
| Ass. LLC Affidavit (3 p) | $27.00 | |
| Rec. Release of Lien (2 p) | $18.50 | |
| Total: | | $4,702.30 |
| **Old Republic National Title Insurance Company** | | |
| Loan Policy Endorsement Premium | $2,096.68 | |
| ALTA 9 | $209.67 | |
| | | $2,306.35 |
| **Briar Capital Real Estate Fund, LLC** | | |
| Closing Fee | $8,380.00 | |
| Appraisal Fee | $4,400.00 | |
| 7/1/2023 Installment | $41,833.84 | |
| 7/1/2023 Escrow | $4,900.00 | |
| Total: | | $59,413.84 |
| **Porter Hedges** | | |
| Attorneys' fees for representation of Lender | | $16,500.00 |
| **Keating & Schlitt PA** | | |
| Attorney's fees for FL Representation of Lender | | $750.00 |
| **Burch Corporation (Claim of Lien)** | | $37,825.24 |
| **Dunk Ross, P.A.** | | |
| Attorneys' fees for representation of Borrower | $4,500.00 | |
| Misc. Costs | $200.00 | |
| Simplifile Recording Fee ($4.75 x 3) | $14.25 | |
| Reimbursement for Costs Advanced: | | |
| CGOS | $5.00 | |
| Title Search Invoice | $250.00 | |
| 150 Lien Search Invoice | $250.00 | |
| Total: | | $5,219.25 |
| **TOTAL LOAN COSTS TO BE PAID BY BORROWER AND DEDUCTED FROM LOAN AMOUNT:** | | $126,716.98 |
| **BALANCE OF LOAN DISBURSED TO BORROWER:** | | $711,955.87 |

# ACH Payment

ACH-00794950 - BRIAR CAPITAL LP (███████)

## TBK ⊹ BANK

### ACH Batch Details

Transaction Number ACH-00794950
Import File Name
Import Batch ID
Recurring Frequency One-Time Payment
Template Name RE payments
Total Debits $734,059.03 (12)
ACH Company BRIAR CAPITAL RE (███████)
Batch Type Business (CCD) - Debit Only
Offset Account *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank (███████)
Company Entry Description mo pymts
Notify Initiator Options Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
Payment Creation Date Jul 31, 2023 11:46 AM CDT
Processing Date 07/31/2023
Payment Date 08/01/2023

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | ███ | $46,736.41 | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |

# TBK BANK

## ACH Payment

ACH-0816392 - BRIAR CAPITAL LP

### ACH Batch Details

**Transaction Number** ACH-0816392
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $658,233.31 (10)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank

**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL

**Payment Creation Date** Aug 31, 2023 8:51 AM CDT
**Processing Date** 08/31/2023
**Payment Date** 09/01/2023

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $46,533.84 | | |
| | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| | | | | | | |
| (Excluded) | | | | | | |

# ACH Payment

**TBK⫞BANK**

ACH-00837829 - BRIAR CAPITAL LP

## ACH Batch Details

**Transaction Number** ACH-00837829
**Import File Name**
**Import Batch ID**
**Recurring Frequency** One-Time Payment
**Template Name** RE payments
**Total Debits** $651,548.34 (10)
**ACH Company** BRIAR CAPITAL RE
**Batch Type** Business (CCD) - Debit Only
**Offset Account** *4233 - DDA (DEPOSITORY/WIRE ACCOUNT) - TBK Bank
**Company Entry Description** mo pymts
**Notify Initiator Options** Pending Actions: Notify via EMAIL
System Events: Notify via EMAIL
Complete - Unsuccessful: Notify via EMAIL
Complete - Successful: Notify via EMAIL
Early Action Taken: Notify via EMAIL
Early Action Removed: Notify via EMAIL
Expired: Notify via EMAIL
**Payment Creation Date** Sep 29, 2023 8:52 AM CDT
**Processing Date** 09/29/2023
**Payment Date** 10/02/2023

| Excluded | Payee | ABA | Account | Amount | Addenda | Prenote |
|---|---|---|---|---|---|---|
| (Excluded) | | | | | | |
| | Big Storm RE LLC (00) | | | $46,533.84 | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |
| (Excluded) | | | | | | |




# Payment Details



**Briar Capital LP - BRIARCAP**

| PAYMENT ID: 13 | | AUDIT INFORMATION | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ACH Company | BRIAR CAPITAL B | ENTERED | | Timestamp | User ID | | Company | |
| ACH Company ID | 1043715331 | | | 11/09/2023 10:59:22 AM | LCORDERO | | BRIARCAP | |
| From Account | Briar Capital Blocked Account | | | | | | | |
| From Account ID | | | | | | | | |
| Payment Type | Corporate Collections | | | | | | | |
| Same Day | No | | | | | | | |
| Value Date | 11/10/2023 | | | | | | | |
| Batch Status | Entered | | | | | | | |
| Entry Method | Created from Template | | | | | | | |
| Batch Description | CORP COLL | | | | | | | |
| Template | REPayments / REPayments | | | | | | | |
| Tnum | 2249412 | | | | | | | |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (53,972.73) | | | Checking | Entered | 473636 77 | |

| Batch Totals | | 0.00 | Credits - 0 | | Prenotes - 0 | | | |
| | | (53,972.73) | (Debits) - 1 | | | | | |

Continued

# Payment Details

 **HANCOCK WHITNEY**

Briar Capital LP - BRIARCAP

**PAYMENT ID: 29**

| | | AUDIT INFORMATION | | | |
|---|---|---|---|---|---|
| ACH Company | BRIAR CAPITAL B | | **Timestamp** | **User ID** | **Company** |
| ACH Company ID | 1043715331 | ENTERED | 11/30/2023 11:38:43 AM | LCORDERO | BRIARCAP |
| From Account | Briar Capital Blocked Account | | | | |
| From Account ID | | | | | |
| Payment Type | Corporate Collections | | | | |
| Same Day | No | | | | |
| Value Date | 12/01/2023 | | | | |
| Batch Status | Entered | | | | |
| Entry Method | Created from Template | | | | |
| Batch Description | CORP COLL | | | | |
| Template | REPayments / REPayments | | | | |
| Tnum | 2304146 | | | | |



| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (46,533.84) | | | Checking | Entered | 44 484796 43 | |

**Continued**

# Payment Details



**Briar Capital LP - BRIARCAP**

| PAYMENT ID: 50 | | AUDIT INFORMATION | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ACH Company | BRIAR CAPITAL B | ENTERED | | Timestamp | | User ID | | Company |
| ACH Company ID | 1043715331 | | | 01/05/2024 11:04:01 AM | | LCORDERO | | BRIARCAP |
| From Account | Briar Capital Blocked Account | | | | | | | |
| From Account ID | | | | | | | | |
| Payment Type | Corporate Collections | | | | | | | |
| Same Day | No | | | | | | | |
| Value Date | 01/08/2024 | | | | | | | |
| Batch Status | Entered | | | | | | | |
| Entry Method | Created from Template | | | | | | | |
| Batch Description | CORP COLL | | | | | | | |
| Template | REPayments / REPayments | | | | | | | |
| Tnum | 2404245 | | | | | | | |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (47,533.84) | | | Checking | Entered | 504021 35 | |

| Batch Totals | | 0.00 | Credits - 0 | | Prenotes - 0 | | | |
| | | (47,533.84) | (Debits) - 1 | | | | | |

Continued

# Payment Details



**Briar Capital LP - BRIARCAP**

### PAYMENT ID: 58

| | |
|---|---|
| ACH Company | BRIAR CAPITAL B |
| ACH Company ID | 1043715331 |
| From Account | Briar Capital Blocked Account |
| From Account ID | ▮▮▮▮▮ |
| Payment Type | Corporate Collections |
| Same Day | No |
| Value Date | 02/01/2024 |
| Batch Status | Released |
| Entry Method | Created from Template |
| Batch Description | CORP COLL |
| Template | REPayments / REPayments |
| Tnum | 2470880 |

### AUDIT INFORMATION

| | Timestamp | User ID | Company |
|---|---|---|---|
| APPROVED | 01/31/2024 12:09:36 PM | JVANSICKLE | BRIARCAP |
| MODIFIED | 01/31/2024 11:21:57 AM | LCORDERO | BRIARCAP |
| ENTERED | 01/31/2024 10:37:45 AM | KYOWELL | BRIARCAP |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (47,533.84) | | ▮▮▮▮ | Checking | Entered | 517150 41 | 065400150000003 |

Briar Capital LP Confidential

# Payment Details

 HANCOCK WHITNEY

**Briar Capital LP - BRIARCAP**

**PAYMENT ID: 84**

| | | | AUDIT INFORMATION | | |
|---|---|---|---|---|---|
| | | | | | |

ACH Company    BRIAR CAPITAL B
ACH Company ID    1043715331
From Account    Briar Capital Blocked Account
From Account ID
Payment Type    Corporate Collections
Same Day    No
Value Date    03/21/2024
Batch Status    Entered
Entry Method    Created from Template
Batch Description    CORP COLL
Template    REPayments / REPayments
Tnum    2609509

| | **Timestamp** | **User ID** | **Company** |
|---|---|---|---|
| ENTERED | 03/20/2024 09:31:55 AM | LCORDERO | BRIARCAP |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (49,615.53) | | | Checking | Entered | 544404 12 | |

| Batch Totals | | 0.00 | Credits - 0 | | Prenotes - 0 | |
|---|---|---|---|---|---|---|
| | | (49,615.53) | (Debits) - 1 | | | |

Continued

# Payment Details

 **HANCOCK WHITNEY**

**Briar Capital LP - BRIARCAP**

| PAYMENT ID: 133 | | AUDIT INFORMATION | | | |
|---|---|---|---|---|---|
| | | | Timestamp | User ID | Company |
| ACH Company | BRIAR CAPITAL B | ENTERED | 04/01/2024 12:24:56 PM | LCORDERO | BRIARCAP |
| ACH Company ID | 1043715331 | | | | |
| From Account | Briar Capital Blocked Account | | | | |
| From Account ID | ███████ | | | | |
| Payment Type | Corporate Collections | | | | |
| Same Day | No | | | | |
| Value Date | 04/02/2024 | | | | |
| Batch Status | Entered | | | | |
| Entry Method | Created from Template | | | | |
| Batch Description | CORP COLL | | | | |
| Template | REPayments / REPayments | | | | |
| Tnum | 2643720 | | | | |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (47,533.84) | | ████████ | Checking | Entered | 551055 48 | |

| Batch Totals | | 0.00 | Credits - 0 | | Prenotes - 0 | |
|---|---|---|---|---|---|---|
| | | (47,533.84) | (Debits) - 1 | | | |

Continued

# Payment Details

 HANCOCK WHITNEY

**Briar Capital LP - BRIARCAP**

**PAYMENT ID: 156**

| | | **AUDIT INFORMATION** | | |
|---|---|---|---|---|

| ACH Company | BRIAR CAPITAL B | | | | |
|---|---|---|---|---|---|
| ACH Company ID | 1043715331 | | **Timestamp** | **User ID** | **Company** |
| From Account | Briar Capital Blocked Account | ENTERED | 04/30/2024 11:07:00 AM | LCORDERO | BRIARCAP |
| From Account ID | ▬▬▬▬▬ | | | | |
| Payment Type | Corporate Collections | | | | |
| Same Day | No | | | | |
| Value Date | 05/01/2024 | | | | |
| Batch Status | Entered | | | | |
| Entry Method | Created from Template | | | | |
| Batch Description | CORP COLL | | | | |
| Template | REPayments / REPayments | | | | |
| Tnum | 2727792 | | | | |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (47,533.84) | | ▉▉▉▉▉ | Checking | Entered | 567907 03 | |



**Continued**

---

# Payment Details

 **HANCOCK WHITNEY**

**Briar Capital LP - BRIARCAP**

**PAYMENT ID: 179**

| | | AUDIT INFORMATION | | | |
|---|---|---|---|---|---|
| ACH Company | BRIAR CAPITAL B | | **Timestamp** | **User ID** | **Company** |
| ACH Company ID | 1043715331 | APPROVED | 06/17/2024 03:14:29 PM | JVANSICKLE | BRIARCAP |
| From Account | Briar Capital Blocked Account | ENTERED | 06/17/2024 03:08:34 PM | LCORDERO | BRIARCAP |
| From Account ID | | | | | |
| Payment Type | Corporate Collections | | | | |
| Same Day | No | | | | |
| Value Date | 06/18/2024 | | | | |
| Batch Status | Approved | | | | |
| Entry Method | Created from Template | | | | |
| Batch Description | CORP COLL | | | | |
| Template | REPayments / REPayments | | | | |
| Tnum | 2868950 | | | | |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (99,231.06) | | | Checking | Entered | 596144 39 | |

| Batch Totals | | 0.00 | Credits - 0 | | Prenotes - 0 |
|---|---|---|---|---|---|
| | | (99,231.06) | (Debits) - 1 | | |

**Continued**

# Payment Details

 HANCOCK WHITNEY

**Briar Capital LP - BRIARCAP**

## PAYMENT ID: 200

| | |
|---|---|
| ACH Company | BRIAR CAPITAL B |
| ACH Company ID | 1043715331 |
| From Account | Briar Capital Blocked Account |
| From Account ID | |
| Payment Type | Corporate Collections |
| Same Day | No |
| Value Date | 07/01/2024 |
| Batch Status | Entered |
| Entry Method | Created from Template |
| Batch Description | CORP COLL |
| Template | REPayments / REPayments |
| Tnum | 2904821 |

### AUDIT INFORMATION

| | Timestamp | User ID | Company |
|---|---|---|---|
| ENTERED | 06/28/2024 10:18:49 AM | LCORDERO | BRIARCAP |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (47,533.84) | | | Checking | Entered | 60345004 | |

**Continued**

# Payment Details

 HANCOCK WHITNEY

Briar Capital LP - BRIARCAP

**PAYMENT ID: 213**

| | | | AUDIT INFORMATION | | | |
|---|---|---|---|---|---|---|
| ACH Company | BRIAR CAPITAL B | | | **Timestamp** | **User ID** | **Company** |
| ACH Company ID | 1043715331 | | MODIFIED | 07/31/2024 12:49:01 PM | LCORDERO | BRIARCAP |
| From Account | Briar Capital Blocked Account | | | | | |
| From Account ID | | | ENTERED | 07/31/2024 12:42:47 PM | LCORDERO | BRIARCAP |
| Payment Type | Corporate Collections | | | | | |
| Same Day | No | | | | | |
| Value Date | 08/01/2024 | | | | | |
| Batch Status | Entered | | | | | |
| Entry Method | Created from Template | | | | | |
| Batch Description | CORP COLL | | | | | |
| Template | REPayments / REPayments | | | | | |
| Tnum | 2999352 | | | | | |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| Big Storm RE LLC | | (47,533.84) | | | Checking | Entered | 03 622628 94 | |

Continued

# Payment Details

 HANCOCK WHITNEY

**Briar Capital LP - BRIARCAP**

| PAYMENT ID: 236 | | AUDIT INFORMATION | | | |
|---|---|---|---|---|---|
| ACH Company | BRIAR CAPITAL B | | **Timestamp** | **User ID** | **Company** |
| ACH Company ID | 1043715331 | ENTERED | 08/30/2024 09:30:40 AM | | BRIARCAP |
| From Account | Briar Capital Blocked Account | | | LCORDERO | |
| From Account ID | ▮▮▮▮ | | | | |
| Payment Type | Corporate Collections | | | | |
| Same Day | No | | | | |
| Value Date | 09/03/2024 | | | | |
| Batch Status | Entered | | | | |
| Entry Method | Created from Template | | | | |
| Batch Description | CORP COLL | | | | |
| Template | REPayments / REPayments | | | | |
| Tnum | 3093703 | | | | |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (47,533.84) | | | Checking | Entered | 640706 73 | |

**Continued**

# Payment Details

 HANCOCK WHITNEY

**Briar Capital LP - BRIARCAP**

**PAYMENT ID: 253**

| | |
|---|---|
| ACH Company | BRIAR CAPITAL B |
| ACH Company ID | 1043715331 |
| From Account | Briar Capital Blocked Account |
| From Account ID | |
| Payment Type | Corporate Collections |
| Same Day | No |
| Value Date | 10/01/2024 |
| Batch Status | Entered |
| Entry Method | Created from Template |
| Batch Description | CORP COLL |
| Template | REPayments / REPayments |
| Tnum | 3183613 |

**AUDIT INFORMATION**

| | Timestamp | User ID | Company |
|---|---|---|---|
| ENTERED | 09/30/2024 12:19:04 PM | LCORDERO | BRIARCAP |

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| Big Storm RE LLC | | (47,533.84) | | | Checking | Entered | 658000 98 | |

Continued

# Payment Details

 HANCOCK WHITNEY

**Briar Capital LP - BRIARCAP**

---

| PAYMENT ID: 286 | | AUDIT INFORMATION | | | |
|---|---|---|---|---|---|

| | | | **Timestamp** | **User ID** | **Company** |
|---|---|---|---|---|---|
| ACH Company | BRIAR CAPITAL B | ENTERED | 10/31/2024 10:41:51 AM | | BRIARCAP |
| ACH Company ID | 1043715331 | | | LCORDERO | |
| From Account | Briar Capital Blocked Account | | | | |
| From Account ID | | | | | |
| Payment Type | Corporate Collections | | | | |
| Same Day | No | | | | |
| Value Date | 11/01/2024 | | | | |
| Batch Status | Entered | | | | |
| Entry Method | Created from Template | | | | |
| Batch Description | CORP COLL | | | | |
| Template | REPayments / REPayments | | | | |
| Tnum | 3282386 | | | | |

*came back as NSF*

---

| Beneficiary Name | Bene ID | Credit/(Debit) | ABA | Acct No. | Type | Status | Pmnt ID | Trace ID |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 93 | |
| Big Storm RE LLC | | (47,533.84) | | | Checking | Entered | 676159 | |
| | | | | | | | 82 | |

**Continued**

---